IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JORGE GOMEZ, | ) | NUMBER: |
| | ) | |
| Plaintiff, | ) | |
| | ) | SECTION: |
| v. | ) | |
| | ) | JUDGE: |
| THE CITY OF NEW ORLEANS, JOHN | ) | |
| GALMAN, and SPENCER SUTTON, | ) | MAGISTRATE: |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiff, JORGE GOMEZ, by and through his counsel, hereby sues Defendants, THE CITY OF NEW ORLEANS, JOHN GALMAN, and SPENCER SUTTON, as follows:

**INTRODUCTION**

Jorge Alberto Gomez, a United States military veteran, served his country as a Cannon Crewmember during the Iraq War. During his distinguished service, Mr. Gomez received numerous awards and commendations, including the Army Achievement Medal, National Defense Service Medal, Global War on Terrorism Service Medal, and Iraq Campaign Medal with Campaign Start, among others. After reaching the rank of Private First Class, Mr. Gomez was honorably discharged on October 29, 2014 and returned to civilian life.

Proud of his service to this country, Mr. Gomez often wore his military regalia. Because he is of Honduran descent, New Orleans Police Department ("NOPD") Officers John Galman ("Galman") and Spencer Sutton ("Sutton") decided Mr. Gomez wasn't "American" enough to be a military vet. They spewed vicious, racist, and nativist epithets at him, demeaned his service, attempted literally to strip the clothes off his back, and told him to "go back" to the place he was from. Unfortunately, their hatred did not end there as Galman and Sutton proceeded to beat Mr. Gomez into unconsciousness.

Galman and Sutton did not hesitate to attack Mr. Gomez on July 24, 2018, because they knew that as newly-minted NOPD Officers, they would face little, if any, consequences for their actions. Unfortunately, their assumption was not far from the truth. When Galman and Sutton's requested backup arrived, the responding officers saw one defendant straddling a bruised and bloody Mr. Gomez while the other restrained Mr. Gomez's unmoving and unconscious body. Despite this brutal attack, Galman and Sutton were released and allowed to go home while NOPD surprisingly commenced an investigation into Mr. Gomez. Nevertheless, every witness, including the ultimate witness – video – corroborated what was always plainly evident: Sutton and Galman violently attacked Mr. Gomez without any lawful basis whatsoever and for the most invidious reason there can be in this Nation of immigrants.

Mr. Gomez now brings this suit to vindicate the blatant violation of his constitutional rights by NOPD Officers Galman and Sutton and the officials who continue to employ, empower, and protect dangerous police officers like them who literally at the drop of a hat will beat someone senseless simply because they look or speak different.

## JURISDICTION AND VENUE

1. This action is brought pursuant to 42 U.S.C. § 1983 and §1988, alleging violations of the First, Fourth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

2. Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343, and the aforementioned statutory and constitutional provisions.

3. Plaintiff also invokes supplemental jurisdiction over claims under state constitutional and statutory law pursuant to 28 U.S.C. § 1367.

4. Venue lies in the Eastern District of Louisiana as this is where the cause of action accrued, and where the parties are located.

5. All conditions precedent to the filing of this lawsuit have been performed, satisfied

and/or waived.

## THE PARTIES

6. Plaintiff JORGE GOMEZ is a person of the full age of majority and a citizen of the State of Louisiana, and is currently domiciled in the Parish of Orleans in the State of Louisiana.

7. Defendants JOHN GALMAN and SPENCER SUTTON (collectively, "Defendant Officers") were, at all times relevant, duly authorized law enforcement officers with the New Orleans Police Department. They engaged in the conduct complained of in the course and scope of their employment, and under color of law. They are sued in their individual capacities.

8. Defendant THE CITY OF NEW ORLEANS ("Defendant City") is a municipal corporation duly authorized under the laws of the State of Louisiana and within the Parish of Orleans. At all times relevant, it was the principal and employer of Defendant Officers. The City of New Orleans, through its NOPD, is responsible for the policies, procedures, and practices implemented by the NOPD.

## THE RELEVANT FACTS

9. On the evening of July 23, 2018, Jorge Gomez went to the Mid-City Yacht Club where he was a fixture and known to play the jukebox and stay to himself.

10. At the time, Mr. Gomez was wearing fatigues and a Honduran green beret hat.

11. While Mr. Gomez was sitting at the bar, Defendant Officers entered and began accosting him.

12. When Defendant Officers began to make fun of Mr. Gomez, the bartender indicated that Mr. Gomez served in Iraq and during his service had suffered injuries.

13. Defendant Officers then ordered Mr. Gomez to approach, whereupon they began bullying him about his ethnicity, heritage, and service.

14. Defendant Officers shouted at Mr. Gomez that he was a "fake American," attempted to pull off his clothes, and repeatedly called him a liar.

15. Defendant Officers stole the beret off Mr. Gomez's head and left the bar.

16. When Mr. Gomez attempted to get his beret back, Defendant Officers again spewed racist-nativist commentaries at Mr. Gomez. They then used excessive force against him.

17. Two Good Samaritans happened to witness the attack and intervened to save Mr. Gomez.

18. Mr. Gomez then got into his vehicle and attempted to drive home.

19. However, Defendant Officers blocked his path and ordered him out of his vehicle. Understanding that he was not free to leave, Mr. Gomez did as ordered.

20. Once more, Defendant Officers used excessive and unreasonable force against him because of his ethnicity.

21. After Mr. Gomez lost consciousness, Defendant Officers identified themselves to dispatch as NOPD officers; therefore, a corresponding signal went out.

22. Upon information and belief, the signal indicated that an officer was in need of emergency assistance.

23. Aware that their misconduct had serious consequences, Defendant Officers attempted to cover up their excessive force by initiating a criminal investigation against Mr. Gomez.

24. Pursuant thereto, Defendant Officers identified themselves to the responding unit as NOPD officers and, despite Defendant Officers being caught in the act of committing a hate crime, they were allowed to leave the scene without any formal questioning.

25. Instead, Defendant Officers went home where they changed out of their clothes that contained evidence of the severity of their crime.

26. Meanwhile, investigators went almost immediately to the hospital to conduct a videotaped interrogation of Mr. Gomez.

27. Defendant Officers were treated more favorably than Mr. Gomez, as they knew they would be by NOPD because they were police officers; sadly, this is part and parcel of NOPD's history and such favorable treatment causes misconduct by its officers to flourish because they know they will not be punished for their actions no matter how obvious.

28. In fact, at the time of this occurrence, the NOPD Public Integrity Bureau already had two separate internal investigations open on Defendant Galman from which he had received no discipline nor been stripped of his police powers despite still being on his probationary period.

29. Worse, NOPD knew their applicant screening and hiring practices were constitutionally deficient.

30. In 2017, the Independent Monitor, who was appointed by the Federal Court to oversee enforcement of the Consent Decree regarding the NOPD's hiring policies and practices, found that, "NOPD's process for conducting background investigations of potential Academy recruits is not designed or implemented to ensure the Department makes offers only to highly qualified, ethical candidates with personality traits meeting the needs of a modern police department. Of the 137 active Academy recruit files we reviewed over the past month, about one third (59) of the recruit files for applicants accepted into the Academy had documented risk indicators without a corresponding explanation as to why or how those risk indicators were overcome."

31. Additionally, the Independent Monitor noted that the, "existence of these and other risk indicators in the recruit files, without evidence of meaningful follow-up, suggests to us NOPD may be accepting candidates into the Academy who should not be NOPD officers. Our discussions with and interviews of NOPD personnel give us even greater concern in this regard.

5

More than one NOPD employee noted that if a candidate does not violate an automatic 'disqualifier,' he/she generally is accepted into the Academy."

32.  NOPD Officers reported to the Independent Monitor their, "shared belief that the Department has lowered its standards in an effort to fill Academy classes, and that the background investigation process is flawed."

33.  On April 10, 2018, the Independent Monitor filed its 2017 Annual Report on the Consent Decree, which noted that, "Our in-depth review of candidate background files encompassed findings that included insufficient training of background investigators, incomplete investigations, a review process overly focused on 'automatic disqualifiers' at the expense of other facts that collectively signal relevant risks, lack of documentation of steps taken to investigate a candidate, and a myriad of other concerns and deficiencies."

34.  With the knowledge that its hiring practices were flawed, NOPD still failed to adequately train and supervise its officers. In this instance, when the Defendant Officers engaged in misconduct, the Department defaulted to its Blue Code of Silence.

35.  Indeed, NOPD investigated this incident as if Mr. Gomez was the culprit when he was clearly the victim. However, because every third-party witness corroborated Mr. Gomez's version of events and that he was never the aggressor with Defendant Officers, NOPD had no choice but to arrest and charge Defendant Officers with simple misdemeanor battery and theft.

36.  Despite the severity of Mr. Gomez's injuries, no felony charges were filed and Defendant Officers were not charged with a hate crime.

37.  That night, Mr. Gomez was rushed by ambulance to the emergency room for treatment.

38.  Subsequently, he was diagnosed with a concussion and lumbar sprain, and suffered extensive swelling and contusions to his face, head, ear and body as a result of this

vicious and unprovoked attack. But, a picture is worth a thousand words.



39. To this day, Mr. Gomez suffers from physical injuries such as continuous ringing/buzzing in his ear, hearing loss, and constant back and neck pain.

40. More severely, this racist/nativist attack has taken a severe toll on Mr. Gomez's psychological and mental well-being, making it difficult for him to work and concentrate.

41. As a direct and proximate result of the conduct of the Defendants, Mr. Gomez suffered conscious and severe physical, mental, and emotional distress, and pain and suffering in the course of this incident.

**COUNT I: 42 U.S.C. § 1983 VIOLATIONS**
**UNCONSTITUTIONAL POLICIES, CUSTOMS, USAGES,**
**PRACTICES, AND PROCEDURES**
**(Against Defendant City)**

42. Plaintiff realleges paragraphs 1 through 41 above as though fully set forth herein.

43. Defendant City violated Mr. Gomez's rights to be on a public street, to be left alone, to locomotion, to travel, to due process of law, to equal protection of the law, to freedom from unreasonable search and seizures, to freedom from excessive force, and to freedom from

cruel and unusual punishment protected under the First, Fourth, Eighth, and Fourteenth Amendments.

44. Defendant City failed to train and supervise its subordinates, namely Defendant Officers, to ensure that these subordinates did not violate members of the public's rights protected under the First, Fourth, Eighth, and Fourteenth Amendments.

45. Mr. Gomez was directly harmed by this failure to train and supervise because it contributed to the unlawful stop, detention, and arrest of Mr. Gomez, and the use of excessive force against him.

46. At all pertinent times herein, Defendant City was aware of the need to train and supervise its subordinates in order to ensure that they did not violate the rights of members of the public. These Defendants ignored that need, and acted unreasonably and with deliberate indifference and disregard for Mr. Gomez's constitutional rights as described above.

47. Defendant City's final policy makers, in their individual capacities, acting individually and together, acted to violate Mr. Gomez's rights by establishing and maintaining policies, customs, usages, practices, and procedures that they knew would deprive members of the public, including Jorge Gomez, of their constitutional rights protected under the First, Fourth, Eighth, and Fourteenth Amendments.

48. Mr. Gomez was directly harmed by these policies, customs, usages, practices and procedures because these policies contributed to the unlawful stop, detention, use of excessive force against, and arrest of Mr. Gomez.

49. At all pertinent times herein, Defendant City was aware that the policies, procedures, practices, customs, and usages that were established for NOPD would result in violations of constitutional rights. Defendant City ignored that risk and acted unreasonably and with deliberate indifference and disregard for Mr. Gomez's constitutional rights as described

above.

50. At all pertinent times, Defendant City acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety, constitutional, and civil rights of Plaintiff by failing to provide appropriate safeguards to prevent the misconduct of Defendant Officers.

51. As a result of the Defendant City's violations of 42 U.S.C. § 1983, Mr. Gomez has been damaged, in an amount to be determined at trial.

### COUNT II: 42 U.S.C. § 1983 VIOLATIONS
### UNLAWFUL STOP, DETENTION, ARREST, AND
### EXCESSIVE AND UNREASONABLE FORCE
### (Against Defendant Officers)

52. Plaintiff realleges paragraphs 1 through 41 above as though fully set forth herein.

53. Defendant Officers' unlawful stop, detention, arrest, and use of force against Mr. Gomez was without cause or justification and violated his right to be on a public street, to be left alone, to due process of law, to equal protection of the law, to freedom from unreasonable search and seizures, to freedom from excessive force, to freedom from cruel and unusual punishment, and to freedom from false arrest and detention. These rights are protected under the First, Fourth, Eighth, and Fourteenth Amendments to the United State Constitution.

54. Further, Defendant Officers acted in combination and in concert, including with the NOPD, its officers and Superintendent whose deliberate indifference in not preventing such acts, combined with the willful act of Defendant Officers and others acting in concert and conspiracy both allowed and failed to prevent the commission of these unlawful acts of illegally detaining, arresting, and exerting excessive force against Mr. Gomez in deprivation of his constitutional rights.

55. At all times Defendant Officers were acting under color of law and were aware that uses of force, stops, detention, and arrest of members of the public without any justifiable

basis were unlawful.

56. As a result of the Defendant Officers' violations of 42 U.S.C. § 1983, Mr. Gomez has been damaged, in an amount to be determined at trial.

## COUNT III
### ASSAULT, BATTERY, AND FALSE ARREST
(Against Defendant Officers)

57. Plaintiff realleges paragraphs 1 through 41 above as though fully set forth herein.

58. Defendant Officers, acting individually and together, and under color of law, engaged in a course of conduct and conspired to engage in a course of conduct that caused injury and harm to Mr. Gomez.

59. Defendant Officers willfully and maliciously assaulted, battered, and held Mr. Gomez under false arrest without just cause or provocation.

60. Defendant Officers intended to cause harmful and/or offensive contact to Mr. Gomez.

61. Mr. Gomez was harmed and offended by Defendant Officers' conduct.

62. As an actual and proximate cause of Defendant Officers' offensive conduct, Mr. Gomez has suffered and continues to suffer physical pain, humiliation, embarrassment, mental and emotional distress, and discomfort, all to his damage in an amount in excess of the minimum jurisdiction of this Court, the precise amount of which will be proven at trial.

63. Defendant Officers, in the aforementioned acts and/or ratifying such acts, engaged in willful, malicious, intentional, oppressive and despicable conduct, and acted with willful and conscious disregard of the rights, welfare, and safety of Mr. Gomez, thereby justifying the award of punitive and exemplary damages against Defendant Officers, in an amount to be determined at trial.

## COUNT IV
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
**(Against all Defendants)**

64. Plaintiff realleges paragraphs 1 through 41 above as though fully set forth herein.

65. Defendant Officers, acting individually and together, and under color of law, engaged in a course of conduct and conspired to engage in a course of conduct that caused injury and harm to Mr. Gomez.

66. As described herein, Defendants, and each of them, engaged in extreme and outrageous conduct by intentionally and recklessly subjecting Mr. Gomez to, and permitting him to be subjected to, a hate crime, assault, battery, and false arrest that caused severe bodily injuries.

67. Defendants' conduct was willful, wanton, intentional, outrageous, malicious, and acted with the intent, or in reckless disregard of the probability, of causing emotional distress to Mr. Gomez.

68. That the aforesaid actions by said Defendants were so outrageous in character and were so extreme in degree that a reasonable member of the community would regard such conduct as atrocious, going beyond all possible bounds of decency and as being utterly intolerable in a civilized community.

69. As an actual and proximate cause of the Defendants' extremely, reckless and indifferent conduct, Mr. Gomez was humiliated and suffered severe pain, emotional distress, mental anguish, and physical injuries as the result of being beaten.

70. Defendants, in the aforementioned acts and/or ratifying such acts, engaged in willful, malicious, intentional, oppressive, and despicable conduct, and acted with willful and conscious disregard of the rights, welfare and safety of Mr. Gomez, thereby justifying the award of punitive and exemplary damages, against Defendants, in an amount to be determined at trial.

## COUNT V
## NEGLIGENT HIRING
### (Against Defendant City)

71. Plaintiff realleges paragraphs 1 through 41 above as though fully set forth herein.

72. Defendant City had a duty to thoroughly investigate Defendant Officers' backgrounds before hiring them and allowing them to protect the people and property of the City of New Orleans.

73. Defendant City breached its duty by failing to conduct adequate investigations which might have revealed that Defendant Officers were unsuitable for the duties they were hired to fulfill.

74. It was unreasonable for Defendant City to hire Defendant Officers in light of information that it knew or should have known about Defendant Officers' propensity for physical aggressive behavior and/or racist, nativist, or xenophobic conduct.

75. Defendant City's breach of that duty was the actual and proximate cause of the assault and battery of Mr. Gomez by Defendant Officers, which left Mr. Gomez with physical and emotional injuries, in an amount to be determined at trial.

## COUNT VI
## NEGLIGENT RETENTION & SUPERVISION
### (Against Defendant City)

76. Plaintiff realleges paragraphs 1 through 41 above as though fully set forth herein.

77. Defendant Officers are employed by Defendant City.

78. During the course of Defendant Officers' employment, Defendant City knew or should have known that they were unfit for their job and/or or in all probability would act in a manner dangerous to the public.

79. Defendant City had a duty to terminate or, at the very least, provide reasonable supervision of Defendant Officers given their wrongful, and dangerous propensities.

12

80. Defendant City, despite its ability to control, discipline or terminate Defendant Officers, negligently retained and/or failed to exercise reasonable care to adequately supervise Defendant Officers in their positions as police officers and to prevent them from committing the wrongful acts complained of herein against Mr. Gomez.

81. Defendant City's breach of that duty was the actual and proximate cause of the assault and battery of Mr. Gomez by Defendant Officers, which left Mr. Gomez with physical and emotional injuries, in an amount to be determined at trial.

## COUNT VII
### VICARIOUS LIABILITY, *RESPONDEAT* SUPERIOR, OSTENSIBLE AGENCY AND/OR AGENCY
**(Against Defendant City)**

82. Plaintiff realleges paragraphs 1 through 41 above as though fully set forth herein.

83. At all relevant times, the Defendant Officers were employed by and/or acting on behalf of Defendant City.

84. At all relevant times, the Defendant Officers were acting within their respective capacities and course and scopes of their employment with Defendant City and/or accomplished the acts stated herein by virtue of their job-created authority.

85. The Defendant Officers negligently and/or recklessly, directly, and proximately caused physical and emotional injury to Mr. Gomez, including both acts of omission and acts of commission.

86. Therefore, Defendant City is liable under the laws of vicarious liability, including the doctrine of respondeat superior for the actions and inactions of the Defendant Officers, as described herein.

## COUNT VIII

### VIOLATION OF THE PUBLIC RECORDS LAW
### (Against Defendant City)

87. Plaintiff realleges paragraphs 1 through 41 above as though fully set forth herein.

88. Under Louisiana law, the records of public bodies like the City of New Orleans and its police department are considered "public records." Louisiana law provides that "providing access to public records is a responsibility and duty of the appointive or elective office of a custodian and his employees." La. R.S. 44:31.

89. Louisiana law mandates that "except as otherwise provided in this Chapter or as otherwise specifically provided by law, and in accordance with the provisions of this Chapter, any person of the age of majority may inspect, copy, or reproduce any public record."

90. On May 29, 2019, Plaintiff made a public records request to the City of NOPD seeking materials related to his incident. The records sought included, but were not limited to, conduct, investigative, and disciplinary reports on the Defendant Officers, behavioral evaluations of the Defendant Officers, reports and/or video footage from July 24, 2018 interview of Plaintiff, and the NOPD's training and recruiting policies in effect since 2017.

91. Under Louisiana law, within five (5) business days of May 29, 2019, the City of NOPD was required to either produce the records or provide a written estimate of the time reasonably necessary for production. La. R.S. 44:35.

92. On June 12, 2019, nearly two weeks after the request was made, the City of NOPD advised that it would need "some time" to process the request due to "high volume."

93. On June 24, 2019, the City of NOPD advised that the request would be completed by July 17, 2019.

94. On July 15, 2019, the City of NOPD changed the completion date for the request

from July 17, 2019, to July 26, 2019.  The new date is after the 1-year statute of limitations period that may apply for Mr. Gomez's claims stated herein.

95.     As of the date of this Complaint, the City of NOPD has failed to produce the requested records.

96.     The City of NOPD has denied Plaintiff's statutorily-guaranteed access to the public records related to his incident.  The City of NOPD's repeated delay in producing these records is unreasonable.

97.     Plaintiff, therefore, brings this action under La. R.S. 44:35(A) and requests an order of mandamus be issued ordering Defendant City to produce the records, a declaratory judgment that the Defendant City violated the Louisiana public records law, and for his attorneys' fees, costs, and damages.

WHEREFORE the Plaintiff, JORGE GOMEZ, prays that after due proceedings there be judgment rendered herein in Plaintiff's favor and against the Defendants, THE CITY OF NEW ORLEANS, JOHN GALMAN, and SPENCER SUTTON, individually and jointly, for compensatory and punitive damages as prayed for herein in an amount in excess of $75,000; reasonable attorneys' fees, as provided in 42 U.S.C. § 1988, 42 U.S.C. § 12205, 29 U.S.C. 794(b), and La. R.S. 44:35(A) and all costs of these proceedings and legal interest; and any such other further relief as appears equitable and just.

## **DEMAND FOR TRIAL BY JURY**

Mr. Gomez demands a jury trial of all claims so triable.

Dated: July 23, 2019 By:

Diana L. Fitzgerald, Esq. (FLSBN 15228)
Email: Diana@FILawyers.com
David C. Isaacson, Esq. (FLSBN 81691)
Email: David@FILawyers.com
FITZGERALD & ISAACSON, LLP
901 Ponce De Leon Boulevard, Suite 202
Miami, FL 33134
Telephone: (305) 372-7300
Facsimile: (305) 447-0043
(*Pro Hac Vice Application to be filed*)

And

Jarrett Adams, Esq. (NYSBN 5455712)
Email: Jadams@JarrettAdamsLaw.com
Jeanette Samuels, Esq. (ILSBN 6313890)
Email: Sam@ChiCivilRights.com
THE LAW OFFICES OF JARRETT ADAMS, PLLC.
40 Fulton Street, Floor 23
New York, NY 10038
Telephone: (646) 880-9707
Facsimile: (646) 880-9707
(*Pro Hac Vice Application to be filed*)

And

/s/Sean T. McLaughlin
Bradley J. Schlotterer, Esq. (LASBN 24211)
Email: Brad.Schlotterer@keanmiller.com
Sean T. McLaughlin, Esq. (LASBN 31870)
Email: Sean.McLaughlin@keanmiller.com
Zoe W. Vermeulen, Esq. (LASBN 34804)
Email: zoe.vermeulen@keanmiller.com
KEAN MILLER, LLP
909 Poydras Street, Suite 3600
New Orleans, LA 70112
Telephone: (504) 620-3354
Facsimile: (504) 585-3051
(*Local Counsel*)

*Attorneys for Plaintiff Jorge Gomez*

**Service Instructions:**

Please issue summons to:

1. THE CITY OF NEW ORLEANS

2. JOHN GALMAN

3. SPENCER SUTTON