## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JORGE GOMEZ, | ) | NUMBER: 19-cv-11803 |
| | ) | |
| Plaintiff, | ) | SECTION: M |
| | ) | |
| v. | ) | JUDGE: BARRY W. ASHE |
| | ) | |
| THE CITY OF NEW ORLEANS, JOHN | ) | MAGISTRATE: JANIS VAN MEERVELD |
| GALMAN, and SPENCER SUTTON, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## AMENDED COMPLAINT

Plaintiff, JORGE GOMEZ, by and through his counsel, hereby sues Defendants, THE

CITY OF NEW ORLEANS, JOHN GALMAN, and SPENCER SUTTON, as follows:

### INTRODUCTION

Jorge Alberto Gomez, a United States military veteran, served his country as a Cannon

Crewmember during the Iraq War.  During his distinguished service, Mr. Gomez received

numerous awards and commendations, including the Army Achievement Medal, National

Defense Service Medal, Global War on Terrorism Service Medal, and Iraq Campaign Medal with

Campaign Start, among others. After reaching the rank of Private First Class, Mr. Gomez was

honorably discharged on October 29, 2014 and thereafter, returned to civilian life.

As a decorated veteran, Mr. Gomez has earned and deserves our gratitude and respect.

But, in late July 2018, the New Orleans Police Department did just the opposite.  It took away his

dignity by serving him with a gruesome beating.  The incident started in a local bar, where Mr.

Gomez was sitting by himself and listening to music.  As he often did because he was proud of

his service, Mr. Gomez wore his military regalia.

Of Honduran descent, Mr. Gomez speaks with a thick accent.  Deciding Mr. Gomez was

not "American" enough to be a veteran, New Orleans Police Department ("NOPD") Officers John Galman and Spencer Sutton spewed vicious, racist, and nativist epithets at him, demeaned his service, attempted literally to strip the clothes off his back, and told him to "go back" to the place from where he came. When one of the officers hit Mr. Gomez, the other, as the NOPD trained him to do, came to his "brother" in blue's aid.

Defendant Officers made an arrest and mercilessly beat Mr. Gomez into unconsciousness, putting on full display the NOPD's deficient hiring practices, inadequate supervision, and inadequate training as to response and use of force by its new officers. The photograph of Mr. Gomez in the aftermath of his beating at the hands of the NOPD removes any doubt about the damage inflicted on a member of the public due to these deficient policies and practices, which are and have been for years the concern of the DOJ as reflected in its investigative reports commencing as early as 2011.



The NOPD's numerous deficiencies in recruiting, training, and supervising policies, and the resulting constitutional violations and patterns of misconduct that flowed therefrom were well known by Defendant City and its policymakers for years. That these policies and

practices were not corrected demonstrates a reckless disregard for the safety of the community as well as for  qualified fellow officers.

Also egregious, in an effort to skirt liability, Defendant City has engaged in a cover-up by denying Mr. Gomez access to public records concerning this matter in direct violation of the  Freedom of Information Act.  Mr. Gomez now brings this suit to vindicate the blatant violation of his constitutional rights by Defendant Officers Galman and Sutton, Defendant City, and its policymakers who continue to employ, empower, and protect unqualified police officers who are a danger to the City of New Orleans.

## JURISDICTION AND VENUE

1.      This action is brought pursuant to 42 U.S.C. § 1983 and §1988, alleging violations of the First, Fourth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

2.      Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343, and the aforementioned statutory and constitutional provisions.

3.      Plaintiff also invokes supplemental jurisdiction over claims under state constitutional and statutory law pursuant to 28 U.S.C. § 1367.

4.      Venue lies in the Eastern District of Louisiana as this is where the cause of action accrued, and where the parties are located.

5.      All conditions precedent to the filing of this lawsuit have been performed, satisfied and/or waived.

## THE PARTIES

6.      Plaintiff JORGE GOMEZ ("Plaintiff" or "Mr. Gomez") is a person of the full age of majority and a citizen of the State of Louisiana and is currently domiciled in the Parish of Orleans in the State of Louisiana.

7.      Defendants JOHN GALMAN ("Galman") and SPENCER SUTTON ("Sutton")

3

(collectively, "Defendant Officers") were, at all times relevant, duly authorized law enforcement officers with the New Orleans Police Department.  They engaged in the conduct complained of in the course and scope of their employment, and under color of law. They are sued in their individual capacities.

8.　　　Defendant THE CITY OF NEW ORLEANS ("Defendant City") is a municipal corporation duly authorized under the laws of the State of Louisiana and within the Parish of Orleans.  At all times relevant, it was the principal and employer of Defendant Officers. The City of New Orleans, through its NOPD, is responsible for the policies, procedures, and practices implemented by the NOPD.

**THE RELEVANT FACTS**

## I.　THE FIRST BEATING—SUTTON DETAINS GOMEZ, OFFICERS AID ONE ANOTHER AS THEY ARE TRAINED TO DO

9.　　　On the evening of July 23, 2018, dressed in fatigues and wearing a Honduran green beret, Mr. Gomez went to the Mid-City Yacht Club.  He was a fixture there and known to play the jukebox and stay to himself.

10.　　Later that night, Defendant Officers entered.  Noticing Mr. Gomez in fatigues and one being ex-military, they asked Mr. Gomez about his attire.  Not satisfied with his answers, and even though Mr. Gomez was sitting at the bar by himself and minding his own business, they began to accost him.

11.　　In an effort to defuse the situation, the bartender told Defendant Officers that Mr. Gomez served in Iraq and suffered injuries during his service.

12.　　Unfazed, Defendant Officers continued to bully and question him about his ethnicity, heritage, and service.

13.　　Defendant Officers shouted at Mr. Gomez, calling him a "fake American," a liar,

and even went so far as attempting to pull off his clothes.

14.   Defendant Galman stole the beret off Mr. Gomez's head, left the bar, and began to walk up the street.

15.   Mr. Gomez left the bar to ask Defendant Galman for his hat back.

16.   Defendant Sutton, who had followed behind Defendant Galman, turned around to Mr. Gomez, and acting as a police officer, gave Mr. Gomez a direct order to stop and not leave the patio area of the bar.

17.   Noticing Defendant Sutton was not behind him, Defendant Galman turned around and saw his fellow officer in possible need of assistance.  In accordance with his NOPD training and as the NOPD would expect of one of its officers, Defendant Galman went back to the patio area of the bar to assist Defendant Sutton.

18.   When he approached the scene, Defendant Galman dropped Mr. Gomez's hat, and then punched Mr. Gomez in the face.

19.   After seeing Defendant Galman strike Mr. Gomez, Defendant Sutton came to his fellow officer's aid, and joined Defendant Galman in the beating.

20.   A bloodied Mr. Gomez ended up laying across one of the patio tables until two Good Samaritans, who witnessed the attack, intervened to save Mr. Gomez.

## II.   THE SECOND BEATING—ACTING AS POLICE OFFICERS, DEFENDANT OFFICERS STOPPED MR. GOMEZ'S TRUCK, ORDERED HIM OUT, CARRIED OUT AN ARREST, AND USED EXCESSIVE FORCE

21.   After the Good Samaritans broke up the fight, Mr. Gomez gathered himself to make his way home a few blocks away.

22.   Defendant Officers spotted Mr. Gomez leaving the bar in his truck and ordered him to stop.

23.   Once the truck was stopped, Defendant Officers ordered Mr. Gomez to step out of

his vehicle.  Because they acted like police officers, Mr. Gomez believed he was not free to leave, and did as he was ordered.

24.     After Mr. Gomez followed Defendant Officers' orders to get out of the truck, Defendant Officers attacked him viciously, knocked Mr. Gomez to the ground, forced him onto his stomach, and placed his hands behind his back in a police hold as they were trained to do during an arrest, and effected an arrest of Mr. Gomez.

25.     Mr. Gomez believed he was being arrested.  During the hold down, Defendant Officers used unreasonable and unnecessary force against him.  While Defendant Sutton was on top of Mr. Gomez holding him down by restraining his hands behind his back, Defendant Galman kicked and punched Mr. Gomez into unconsciousness.

## III.   DEFENDANT OFFICERS IDENTIFY THEMSELVES TO RESPONDING OFFICERS AS POLICE OFFICERS; RESPONDING OFFICERS ALLOW DEFENDANT OFFICERS TO LEAVE AND BEGIN AN INVESTIGATION INTO VICTIM GOMEZ

26.     Instead of leaving the scene as a normal citizen would, Defendant Sutton sat on top of Mr. Gomez and called for backup in continuing to make an arrest.

27.     Defendant Officers identified themselves to NOPD dispatch as NOPD officers.

28.     Upon information and belief, NOPD dispatch sent a signal to potential responding officers that indicated that an officer was in need of emergency assistance.

29.     Pursuant to its Blue Code of Silence and aware that Defendant Officers' misconduct could have serious consequences, the NOPD investigated this incident as if Mr. Gomez was the culprit when he was clearly the victim.

30.     Defendant Officers were allowed to leave the scene without any formal questioning, and change out of their clothes that contained evidence of the severity of their crime.

31.     That night, Mr. Gomez was rushed by ambulance to the emergency room for

treatment.

32.     Meanwhile, NOPD investigators went almost immediately to the hospital to conduct a videotaped interrogation of Mr. Gomez, and conducted a second interrogation the following day.

33.     Violating its statutory obligations, Defendant City has steadfastly refused to provide copies of, among other things, both interview recordings to Mr. Gomez through four formal public records requests.

34.     Mr. Gomez was diagnosed with a concussion and lumbar sprain, and suffered extensive swelling and contusions to his face, head, ear and body as a result of this vicious and unprovoked attack.  Mr. Gomez continues to suffer from physical injuries such as continuous ringing/buzzing in his ear, hearing loss, and constant back and neck pain.

35.     Despite the severity of Mr. Gomez's injuries, no felony charges were filed, and Defendant Officers were not charged with a hate crime.

36.     Defendant Officers were treated more favorably than Mr. Gomez by the NOPD, as they knew they would be, because they were police officers.  Sadly, such favorable treatment is part and parcel of the NOPD's history, and causes misconduct by its officers to flourish because they know that generally they will not be punished for their actions no matter how obvious.

37.     However, because every third-party witness corroborated Mr. Gomez's version of events and that he was never the aggressor with Defendant Officers, NOPD had no choice but to arrest and charge Defendant Officers with something, a simple misdemeanor battery.

**IV.     DEFENDANT CITY WAS ON NOTICE THAT DEFENDANT GALMAN WAS A PROBLEM OFFICER BECAUSE HE ENGAGED IN OBJECTIONABLE CONDUCT**

38.     While Mr. Gomez was denied information concerning Defendant Officers responsive to most his requests through the Freedom of Information Action, he was able to obtain

some information.  Specifically, at the time of this occurrence, the NOPD Public Integrity Bureau already had two separate internal investigations opened on Defendant Galman from which he had received no severe discipline nor been stripped of his police powers despite still being on his probationary period.

39.     As a result of these investigations during the infancy of his career, Defendant City knew or should have known of Defendant Galman's objectionable conduct and/or propensity for violence, and that it should have terminated him and revoked any police powers given to him.

40.     For example, on May 31, 2018, Defendant Officer Galman pulled down the pants of an arrestee in his custody and proceeded to strip search him in public without providing any explanation of what he was doing or following protocol.  During the illegal strip search, Defendant Officer Galman inappropriately touched the buttocks and genitals of the subject.  In the process, Officer Galman violated numerous NOPD performance rules and demonstrated complete indifference to human dignity and a proclivity for publicly humiliating people in his charge.  That Defendant Officer Galman would resort to violence to humiliate someone is not a stretch.

41.     A week later, on June 7, 2018, Defendant Officer Galman committed criminal damage on a passing vehicle. Defendant Galman hit the passenger side front door window of a vehicle while walking across the street.  When confronted about  his actions, Defendant Galman hit the side view mirror with his head so hard that the impact knocked the mirror glass loose. Though Defendant Galman's propensity for violence was on full display, and the City determined that Defendant Officer Galman violated at least 4 of its rules, Defendant City did not terminate or discipline Defendant Officer Galman, and continued to allow him to act under the authority of police power.

42.     Despite these instances that put the NOPD on notice, the NOPD did not severely

discipline or terminate Defendant Galman for his abuse of police power, or in any other way curb his violent tendencies.  Consequently, on the night he beat Mr. Gomez, Defendant Galman believed the NOPD would again essentially give him a pass for his conduct as it had done on at least two prior occasions.

43.    Worse, and on a much larger scale, the NOPD also knew that their applicant screening and hiring practices were constitutionally deficient causing harm to the public, but did little, if anything, to address its inadequacies.

## V.    THE NOPD'S KNOWN TROUBLED HISTORY

44.    The NOPD has a historically tainted record when it comes to its recruitment, hiring, retention, supervision, and use of force policies and practices.  So deeply rooted are  these problems that the United States Department of Justice (DOJ) saw the need to investigate the NOPD for "an alleged pattern or practice of unlawful misconduct, pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141"); the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 42. U.S.C. §3789d ("Safe Streets Act"); and Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000d ("Title VI")." ("DOJ Investigation").

45.    As a result of the DOJ Investigation, the NOPD has been operating under a Consent Decree (and amended) since 2012.

46.    The findings of the DOJ's investigation of the NOPD are detailed in the DOJ's Report entitled "The Investigation of the New Orleans Police Department" (the "Report").  The Executive Summary of the Report states:

> The NOPD has long been a troubled agency. **Basic elements of effective policing— clear policies, training, accountability, and confidence of the citizenry—have been absent for years. Far too often, officers show a lack of respect for the civil rights and dignity of the people of New Orleans.** While the majority of the force is hardworking and

committed to public safety, too many officers of every rank either do not understand or choose to ignore the boundaries of constitutional policing.  (emphasis added).

\* \* \*

**We found that the deficiencies that lead to constitutional violations span the operation of the entire Department, from how officers are recruited, trained, supervised, and held accountable, . . .. In the absence of mechanisms to protect and promote civil rights, officers too frequently use excessive force and conduct illegal stops, searches and arrests with impunity.**  (emphasis added).

\* \* \*

**We find reasonable cause to believe that NOPD engages in patterns of misconduct that violate the Constitution and federal law. We find further that NOPD practices and deficiencies cause or contribute to these patterns of misconduct.**  (emphasis added).

Attached hereto as **Exhibit "A"** is a true and correct copy of the United States Department of Justice Investigation of the New Orleans Police Department dated March 16, 2011.

47.     As to Recruitment Policies, the DOJ found that: "**NOPD's longstanding failure to prioritize the recruitment of high-quality candidates contributes to the chronic, Department-wide problems we observed, including inappropriate and disrespectful conduct in the community, corruption, unnecessary uses of force, and improper stops and searches**. We found NOPD's recruitment program to be anemic, entirely passive, and lacking clear goals, plans, or accountability." (emphasis added).

48.     The DOJ indicated that "The Department has been aware of deficiencies in its recruitment efforts, yet for years failed to act meaningfully to address them."

49.     With respect to training, the DOJ investigation revealed that "**The training NOPD has for the past several years provided to its officers is severely deficient in nearly every respect, compromising officer and public safety, effective crime reduction, and the credibility and reputation of the Department as a whole.**" (emphasis added). It also "found **direct links between inadequate training and serious, systemic problems in use of force;**

10

**stops, searches, and arrests; supervision; interacting with and building partnerships with members of the community; and racial, ethnic, and gender bias in policing.**" (emphasis added).

50.     As to supervision, the Report indicates "NOPD fails to provide the supervision necessary to prevent or detect misconduct and ensure effective policing." "A number of systemic deficiencies within NOPD appear to contribute to this poor supervision. Supervisors are poorly trained and poorly guided by policy."

51.     With respect to Use of Force, the DOJ found "that NOPD engages in a pattern or practice of unconstitutional force." "The prevalence and nature of the force-related misconduct [the DOJ] observed indicates that NOPD officers' use of unreasonable force in violation of the Constitution is widespread."

52.     The 115-page Report continued listing "a number of patterns or practices of unconstitutional conduct and details DOJ's concerns about a number of NOPD policies and practices."

53.     Given the widespread serious problems with the NOPD and deep concern for the public safety of the community, the United States of America entered into a Consent Decree with Defendant City that requires:

> the City and the Department to implement new policies, training, and practices throughout the Department, including in the areas of: use of force; stops, searches, seizures, and arrests; photographic lineups; custodial interrogations; discriminatory policing; community engagement; recruitment; training; performance evaluations; promotions; officer assistance and support; supervision; secondary employment; and misconduct-complaint intake, investigation and adjudication.

Attached hereto as **Exhibit "B"** is a true and correct copy of the Amended Consent Decree Regarding The New Orleans Police Department.

54.     Defendant City agreed to an expedited change and implementation of its policies

and procedures, including that of its recruitment, training, and use of excessive force, as set out in the Consent Decree necessary "to protect the constitutional rights of all members of the community, improve the safety and security of the people of New Orleans, and increase public confidence in the New Orleans Police Department."

55.     The Superintendent of the New Orleans Police Department, along with the Mayor and City Attorney agreed to all terms of the Consent Decree.

56.     The policymakers of the NOPD are the Office of the Superintendent, which oversees every bureau of the NOPD, and The Professional Standards and Accountability Bureau, which is the Bureau tasked with among other things, facilitating the implementation of the Consent Decree, and developing and implementing all department regulations, orders, policies and rules (the "Policymakers").

57.     Despite knowing the misconduct historically resulting from its deficient hiring and recruitment policies, the NOPD continued to hire unqualified candidates.

58.     Prior to hiring Defendant Officers, in 2017, the Independent Monitor, who was appointed by the Federal Court to oversee enforcement of the Consent Decree regarding the NOPD's hiring policies and practices, conducted an in-depth review of NOPD's recruitment policies and practices, including recruit background checks and "found numerous deficiencies, including insufficient training of background investigators, incomplete investigations, and a flawed review process."

59.     On April 10, 2018, the Independent Monitor filed its 2017 Annual Report on the Consent Decree, which noted:

**Our in-depth review of candidate background files  encompassed findings that included insufficient training of background investigators,  incomplete investigations, a review  process overly focused on 'automatic disqualifiers' at the expense of other facts that collectively signal relevant risks, lack of documentation of steps taken to investigate a candidate, and a myriad of other concerns and**

**deficiencies.** (emphasis added).

60.     As part of its investigation, the Independent Monitor issued a Special Report on

NOPD Background Investigation Practices.  It noted that:

> NOPD's process for conducting background investigations of potential Academy recruits
> is not designed or implemented to ensure the Department makes offers only to highly
> qualified, ethical candidates with personality traits meeting the needs of a modern police
> department.  Of the 137 active Academy recruit files we reviewed over the past month,
> about one third (59) of the recruit files for applicants accepted into the Academy had
> documented risk indicators without a corresponding explanation as to why or how those
> risk indicators were overcome.  Perhaps even more troubling, some files were marked as
> having no negative information even though the potential recruit clearly had multiple risk
> indicators.

61.     More specifically, the Independent Monitor stated that the "existence of these and

other risk indicators in the recruit files, without evidence of meaningful follow-up, suggests to us

**NOPD may be accepting candidates into the Academy who should not be NOPD officers.**

**Our discussions with and interviews of NOPD personnel give us even greater concern in**

**this regard.**  More than one NOPD employee noted that if a candidate does not violate an

automatic 'disqualifier,' he/she generally is accepted into the Academy." (emphasis added).

62.     Even NOPD Officers themselves felt recruiting standards were lacking as they

reported to the Independent Monitor their "shared belief that the Department has lowered its

standards in an effort to fill Academy classes, and that the background investigation process is

flawed."

63.     The Independent Monitor also noted background investigation shortcomings

including, insufficient training, overly narrow reviews, incomplete background investigations,

unreasonable time pressures, ineffective and inefficient assignment processes, inadequate

attention to the voice stress analysis, lack of documentation, failure to follow-up on risk

indicators, and failure to adhere to NOPD's own announced "disqualifiers".  Attached hereto as

**Exhibit "C"** is a true and correct copy of the Special Report of the Consent Decree Monitor for

the NOPD Consent Decree on NOPD Background Investigation Practices.

64.     The Independent Monitor also issued a Special Report in July 2015 on Supervision and "found persistent non-compliance with supervisory requirements of NOPD policy and the Consent Decree.  This persistent non-compliance is primarily attributable to lack of attention, guidance, and/or accountability devoted to supervision by NOPD."

65.     Despite having knowledge that its flawed hiring practices lead to "patterns of misconduct that violate the Constitution and federal law" involving "inappropriate and disrespectful conduct in the community, corruption, unnecessary uses of force, and improper stops and searches", the NOPD still failed to implement proper hiring practices, and failed to adequately train and supervise its officers.

66.     Due to this deliberate indifference for the implementation and compliance with adequate policies and procedures, NOPD hired unqualified people such as Defendants Galman and Sutton as NOPD police officers, inadequately trained them, and gave them authority by police power.

67.     Not only should NOPD have known its deliberate indifference would lead to improper conduct on the part of its officers, but as to Defendant Galman, it should have been obvious.  Prior to Defendant Galman inflicting serious injury on Plaintiff, Defendant Galman publicly humiliated an arrestee in his charge.  Without explanation, he pulled down the subject's pants, touched his genitals and buttock, all in full public view.  A week later, Defendant Galman hit a passenger side car window of a passing car.  When confronted by the driver, Defendant Galman "headbutted" a rear-view mirror on the car with enough force to dislodge the mirror glass.

68.     Instead of facing termination, Defendant Galman was allowed to continue his tirades on the public under authority of police power that ultimately resulted in his and Defendant Sutton's attack on Mr. Gomez.

69.     The NOPD was deliberately indifferent to what should have been obvious risk indicators concerning Defendant Galman, particularly as a recruit, and he should have been terminated.  And, it is this historical deliberate indifference to such "automatic disqualifiers" that the Independent Monitor emphasized\ leads to "inappropriate and disrespectful conduct in the community, corruption, unnecessary uses of force, and improper stops and searches," such as the attack on Mr. Gomez.

## VI.   THE CITY'S COVER-UP TO AVOID LIABILITY

70.     Defendant City has deprived Mr. Gomez of not only his constitutional rights, but his right to receive information available by the Freedom of Information Act.  In doing so, Defendant City has knowingly manipulated and deterred Mr. Gomez's ability to properly adjudicate his claims against Defendant City.   In short, Defendant City has engaged in a complete cover-up, thus far without consequence.

71.     Under Louisiana law, the records of public bodies like the City of New Orleans and its police department are considered "public records."   According to Louisiana law, "providing access to public records is a responsibility and duty of the appointive or elective office of a custodian and his employees."  La. R.S. 44:31.

72.     Under Louisiana law, the right "to inspect, copy, or reproduce any public record" extends to "any person of the age of majority."

73.     On May 29, 2019, Plaintiff made a public records request to City of NOPD seeking records involving 6 subjects directly related to his incident.  The records sought included, but were not limited to, conduct, investigative, and disciplinary reports on the Defendant Officers, behavioral evaluations of the Defendant Officers, reports and/or video footage from July 24, 2018 interview of Plaintiff, and the NOPD's training and recruiting policies in effect since 2017.

74.     Pursuant to Louisiana statute La. R.S. 44:35, the City of NOPD was required to

either produce the records or provide a written estimate of the time reasonably necessary for production within five (5) business days of the request date of May 29, 2019.

75.     Well outside the 5-day window allotted for response, on June 12, 2019, the City of NOPD advised that it would need "some time" to process the request due to "high volume."

76.     After two additional extension dates, the NOPD finally indicated it would respond by July 26, 2019.  It should come as little surprise, July 26, 2019 is after the 1-year statute of limitations period that may have applied to some of Mr. Gomez's claims stated herein.

77.     Therefore, as of the date of the filing of the initial Complaint, the City of NOPD had not produced a single document pursuant to its statutory obligations, or provided any legitimate reason for its failure to do so.

78.     When the NOPD finally did respond, its response was woefully deficient.  It produced only a smattering of records, objected on improper grounds to withhold significant documentation, indicated it was providing only short form records, indicated it was withholding the full investigation file regarding the events involving Plaintiff, and as to one of the requests, it provided no response or any records.

79.     Accordingly, on August 12, 2019, Plaintiff made a second public records request on the following items that the City of NOPD ignored from Plaintiff's first request:

1.     Any and all conduct, investigative, and disciplinary reports on Officers Spencer Sutton and John Galman, including any and all suspension and termination records;

2.     Any and all reports, and/or video footage of Offices J. Vargas and A. Taylor from July 24, 2018 interview/Spanish translation of Jorge Gomez; and

3.     Any and all reports, and/or video footage of a home interview of Jorge Gomez on July 26, 2018, conducted by Lieutenant Darryl Watson, and PIB Paloma Miller

16

(certified Spanish interpreter).

80.     Despite the fact this information had already been requested in May of 2019, the City of NOPD required three (3) extensions.  Finally, on September 22, 2019, when the City of NOPD responded, it refused to produce any records as to Request Nos. 2 and 3 on the meritless objection that the records "are exempt from disclosure because they pertain to pending criminal litigation."

81.     There was no pending criminal litigation.  Defendant Sutton had already pleaded no contest to "disturbing the peace", and Defendant Galman had already pleaded guilty to a misdemeanor battery.

82.     Even where the NOPD did produce documents, they were incomplete.

83.     When the City of NOPD was contacted about the deficiency, the City of NOPD claimed that because the production may have cost too much for Plaintiff, it chose not to make those documents available. There was no indication in the NOPD's response that the production was incomplete because it decided the production may cost Mr. Gomez too much money.

84.     Still trying to obtain the information from the City of NOPD, Plaintiff made a third request for public records to seek the records that the City of NOPD deemed Mr. Gomez would find "too expensive" to produce, as well as certain items requested in his initial request that were repeated in the second request, including:

1.     Any and all reports, and/or video footage of Offices J. Vargas and A. Taylor from July 24, 2018 interview/Spanish translation of Jorge Gomez; and

2.     Any and all reports, and/or video footage of a home interview of Jorge Gomez on July 26, 2018, conducted by Lieutenant Darryl Watson, and PIB Paloma Miller (certified Spanish interpreter).

85.      Again, the City of NOPD dragged its feet.  Ultimately, in response to Plaintiff's

third request, the City of NOPD produced the purportedly "too expensive" documents but failed to provide any responsive documents or any response to Request Nos. 1 and 2.

86.     The City of NOPD must produce these records not only because they involve the events concerning Plaintiff, but they contain interviews with Plaintiff himself.

87.     A fourth time, Mr. Gomez requested the above Request Nos. 1 and 2 and made further requests such as requests for records concerning the hiring of Defendants Galman and Sutton, including references, background checks, and applications.

88.     Again, the City failed to produce the requested records.

89.     Indeed, Defendant City is using unclean hands to deny Mr. Gomez access to records and facts that will glean light on the true extent of Defendant City's culpability.

**COUNT I: 42 U.S.C. § 1983 VIOLATIONS**
**UNCONSTITUTIONAL POLICIES, CUSTOMS, USAGES,**
**PRACTICES, AND PROCEDURES**
**(Against Defendant City)**

90.     Plaintiff realleges paragraphs 1 through 89 above as though fully set forth herein.

91.     Defendant City violated Mr. Gomez's rights to be on a public street, to be left alone, to locomotion, to travel, to due process of law, to equal protection of the law, to freedom from unreasonable arrest, search and seizure, to freedom from excessive force, and to freedom from cruel and unusual punishment protected under the First, Fourth, Eighth, and Fourteenth Amendments.

92.     Defendant City failed to properly hire, train, supervise, and/or discipline its officers, including Defendant Officers, to ensure that its officers did not violate members of the public's rights protected under the First, Fourth, Eighth, and Fourteenth Amendments as described in paragraphs 38-69.

93.     Defendant City and its Policymakers had knowledge that these deficiencies lead

to constitutional violations of the public and misconduct by NOPD officers as set forth in paragraphs 46- 52, 61, 65, and 69.

94.     Defendant City's inadequate hiring practices, which have not been corrected even after the DOJ Investigation, Consent Decree, and Independent Monitor's report, allowed unqualified officers such as Defendant Officers to be hired as NOPD officers along with the police powers inherent in their positions, the abuse of which violates members of the public's rights protected under the First, Fourth, Eighth, and Fourteenth Amendments.

95.     Defendant City's failures to train, supervise, or discipline Defendant Officers, which have been a consistent problem with the NOPD, including Defendant Galman's prior bad acts as alleged in paragraphs 38-43, allow dangerous NOPD officers, armed with their police powers, to remain a threat to the community.

96.     At all pertinent times herein, Defendant City and the Policymakers were aware of the deficiencies and the need to properly hire, train, supervise, and discipline its officers by way of the DOJ's Report, the Consent Decree, and the multitude of reports issued by the Independent Monitor including those alleged in paragraphs 43-69.  Defendant City ignored that need and acted unreasonably and with deliberate indifference and disregard for Mr. Gomez's constitutional rights as described above.

97.     Mr. Gomez was directly harmed by Defendant City's failure to properly hire, train, supervise, and/or discipline its police officers because these deficiencies led to Defendant Officers' unlawful stop, detention, and arrest of Mr. Gomez, and the use of excessive force against him by Defendant Officers who expected they could act with impunity, even if unlawfully.

98.     In violating Mr. Gomez's rights, Defendant Officers abused the official powers bestowed on them by Defendant City by ordering Mr. Gomez not to leave the patio area of the bar and detaining him there, inflicting severe bodily harm on him through the use of excessive

and unreasonable force, ordering him to stop his truck as he tried to make his way home, ordering

him out of his vehicle, causing additional severe injuries once he was out of his truck through use

of excessive and unreasonable force, using police tactics to restrain him in making an arrest

including forcing him onto his stomach and pulling his hands behind his back, and engaging with

fellow officers, who provided back-up, allowed Defendant Officers to leave the scene, and

initiated an investigation and interrogation of Mr. Gomez as if he was the culprit.

99.     At all relevant times, Defendant Officers and their fellow NOPD officers were

acting under color of law as set forth in paragraphs 9-32, and 98.

100.     At all relevant times, Defendant City acted unreasonably, recklessly, and with

deliberate indifference and disregard for the safety, constitutional, and civil rights of Plaintiff

through its policies or lack thereof that led to and/or failed to prevent the misconduct of

Defendant Officers.

101.     As a result of the Defendant City's violations of 42 U.S.C. § 1983, Mr. Gomez has

been damaged, in an amount to be determined at trial.

**COUNT II: 42 U.S.C. § 1983 VIOLATIONS**
**UNLAWFUL STOP, DETENTION, ARREST, AND**
**EXCESSIVE AND UNREASONABLE FORCE**
**(Against Defendant Officers)**

102.     Plaintiff realleges paragraphs 1 through 89 above as though fully set forth herein.

103.     Defendant Officers' unlawful stop, detention, arrest, and use of force against Mr.

Gomez was without cause or justification and violated his right to be on a public street, to be left

alone, to due process of law, to equal protection of the law, to freedom from unreasonable arrest,

search and seizure, to freedom from excessive force, to freedom from cruel and unusual

punishment, and to freedom from false arrest and detention. These rights are protected under the

First, Fourth, Eighth, and Fourteenth Amendments to the United State Constitution.

104.    In violating Mr. Gomez's rights, Defendant Officers abused the official powers bestowed upon them by Defendant City by ordering Mr. Gomez not to leave the patio area of the bar and detaining him there, inflicting severe bodily harm on him through the use of excessive and unreasonable force, ordering him to stop his truck as he tried to make his way home, ordering him out of his truck, causing additional severe injuries once he was out of his truck through use of excessive and unreasonable force, and using police tactics to restrain him in making an arrest including forcing him onto his stomach and pulling his hands behind his back, and engaging with fellow officers, who provided back-up, allowed Defendant Officers to leave the scene, and initiated an investigation and interrogation of Mr. Gomez as if he was the culprit.

105.    By their actions, at all relevant times Defendant Officers and their fellow NOPD officers were acting under color of law as set forth in paragraphs 9-32, and 104, and were aware that uses of force, stops, detention, and arrest of members of the public without any justifiable basis was unlawful.

106.    Defendant City's failure to properly hire, train, supervise, and/or discipline Defendant Officers in the proper use of forces stems from its official policy of hiring and retaining unqualified officers to increase the numbers of the NOPD's ranks, and its deliberate indifference in rectifying historical problems that have plagued the NOPD as alleged in paragraphs 44-69.

107.    Defendant City's official policy of hiring and retaining unqualified officers includes looking the other way despite having notice of Defendant Galman's violent tendencies due to at least two earlier investigations into Galman's conduct, as alleged in paragraphs 38-43.

108.    Defendant City and its Policymakers had knowledge that these deficiencies lead to constitutional violations of the public and misconduct by NOPD officers as set forth in paragraphs 46-52, 61, 65, and 69.

109.    Defendant City, and the Policymakers whose deliberate indifference in not

preventing such acts, combined with the willful act of Defendant Officers and others acting in concert and conspiracy both allowed and failed to prevent the commission of these unlawful acts of illegally detaining, arresting, and exerting excessive force against Mr. Gomez in deprivation of his constitutional rights.

110. As a result of the Defendant Officers' violations of 42 U.S.C. § 1983, Mr. Gomez has been damaged, in an amount to be determined at trial.

## COUNT III
## ASSAULT, BATTERY, AND FALSE ARREST
### (Against Defendant Officers)

111. Plaintiff realleges paragraphs 1 through 89 above as though fully set forth herein.

112. Defendant Officers, acting individually and together, and under color of law, engaged in a course of conduct and conspired to engage in a course of conduct that caused injury and harm to Mr. Gomez.

113. Defendant Officers willfully and maliciously assaulted, battered, and held Mr. Gomez under false arrest without just cause or provocation.

114. Defendant Officers intended to cause harmful and/or offensive contact to Mr. Gomez.

115. Mr. Gomez was harmed and offended by Defendant Officers' conduct.

116. As an actual and proximate cause from Defendant Officers' offensive conduct, Mr. Gomez has suffered and continues to suffer physical pain, humiliation, embarrassment, mental and emotional distress, and discomfort, all to his damage in an amount in excess of the minimum jurisdiction of this Court, the precise amount of which will be proven at trial.

117. Defendant Officers, in the aforementioned acts and/or ratifying such acts, engaged in willful, malicious, intentional, oppressive and despicable conduct, and acted with willful and conscious disregard of the rights, welfare, and safety of Mr. Gomez, thereby justifying the award

of punitive and exemplary damages against Defendant Officers, in an amount to be determined at trial.

**COUNT IV**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Against all Defendants)**

118.    Plaintiff realleges paragraphs 1 through 89 above as though fully set forth herein.

119.    Defendant Officers, acting individually and together under color of law, engaged in a course of conduct and conspired to engage in a course of conduct along with Defendant City, who acted with reckless disregard as to the harm resulting through its deficient policies as set forth in paragraphs 44-69 and as further epitomized by Defendant Galman's prior bad acts as set forth in paragraphs 38-43, that caused injury and harm to Mr. Gomez.

120.    Defendant Officers abused the official powers bestowed on them by Defendant City by ordering Mr. Gomez not to leave the patio area of the bar and detaining him there, inflicting severe bodily harm on him through the use of excessive and unreasonable force, ordering him to stop his truck as he tried to make his way home, ordering him out of his truck, causing additional severe injuries once he was out of his vehicle through use of excessive and unreasonable force, using police tactics to restrain him in making an arrest including forcing him onto his stomach and pulling his hands behind his back, and engaging with fellow officers, who provided back-up, allowed Defendant Officers to leave the scene, and initiated an investigation and interrogation of Mr. Gomez as if he was the culprit.

121.    At all relevant times, Defendant Officers and their fellow NOPD officers were acting under color of law as set forth in paragraphs 9-32, and 98.

122.    As described herein, Defendants, and each of them, engaged in extreme and outrageous conduct by intentionally and recklessly subjecting Mr. Gomez to, and permitting him to be subjected to, a hate crime, assault, battery, and false arrest that caused severe bodily injuries.

23

123.    Defendants' conduct was willful, wanton, intentional, outrageous, malicious, and acted with the intent, or in reckless disregard of the probability, of causing emotional distress to Mr. Gomez.

124.    That the aforesaid actions by said Defendants were so outrageous in character and were so extreme in degree that a reasonable member of the community would regard such conduct as atrocious, going beyond all possible bounds of decency and as being utterly intolerable in a civilized community.

125.    As an actual and proximate cause of the Defendants' extremely, reckless and indifferent conduct, Mr. Gomez was humiliated and suffered severe pain, emotional distress, mental anguish, and physical injuries as the result of being beaten.

126.    Defendants, in the aforementioned acts and/or ratifying such acts, engaged in willful, malicious, intentional, oppressive, and despicable conduct, and acted with willful and conscious disregard of the rights, welfare and safety of Mr. Gomez, thereby justifying the award of punitive and exemplary damages, against Defendants, in an amount to be determined at trial.

## COUNT V
## NEGLIGENT HIRING
### (Against Defendant City)

127.    Plaintiff realleges paragraphs 1 through 89 above as though fully set forth herein.

128.    At all relevant times, Defendant Officers were acting under color of law as set forth in paragraphs 9-32, and employed by Defendant City.

129.    Defendant City had a duty to thoroughly investigate Defendant Officers' backgrounds before hiring them and allowing them to protect the people and property of the City of New Orleans.

130.    Defendant City knew its recruitment policies and practices were inadequate for decades as set forth in the DOJ's Report and Consent Decree. Even after entering into the Consent

Decree in 2012, the Independent Monitor in 2017 found numerous deficiencies in the NOPD hiring practices that resulted in the hiring of officers "who should not be NOPD officers." It also found that at least 1/3 of candidates had documented risk indicators without any corresponding explanation, and other candidate files contained "no negative information even though the potential recruit clearly had multiple risk indictors."  Because of the severity of the flawed recruitment practices, the Independent Monitor specifically issued a report that highlighted NOPD's background investigation shortcomings.

131.    Defendant Officers were hired while these deficiencies were prevalent with the NOPD.  At all relevant times, Defendant Officers were acting under color of law as set forth in paragraphs 9-32.

132.    Defendant City knew or should have known Defendants Galman and Sutton should not have been police officers and they would abuse their positions as police officers and it was foreseeable that in that abuse, Defendants Sutton and Galman would act to improperly stop, detain, arrest, and injure persons such as Mr. Gomez.

133.    It was unreasonable for Defendant City to hire Defendant Officers in light of information that it knew or should have known that Defendant Officers were not qualified to be NOPD officers and that Defendant Officers' had a propensity for objectionable conduct, and/or physical aggressive behavior and/or racist, nativist, or xenophobic conduct.

134.    Defendant City breached its duty by, among other things, failing to implement adequate hiring practices, and failing to conduct adequate investigations of Defendant Officers, which would have revealed that Defendant Officers were unsuitable for the duties they were hired to fulfill.

135.    Defendant City's breach of that duty was the actual and proximate cause of the assault and battery of Mr. Gomez by Defendant Officers, which left Mr. Gomez with physical

and emotional injuries, in an amount to be determined at trial.

## COUNT VI
## NEGLIGENT RETENTION & SUPERVISION
### (Against Defendant City)

136.    Plaintiff realleges paragraphs 1 through 89 above as though fully set forth herein.

137.    At all relevant times, Defendant Officers were acting under color of law as set forth in paragraphs 9-32, and employed by Defendant City.

138.    Defendant City had a duty to exercise reasonable care in its retaining and supervising of Defendant Officers necessary to protect the people and property of the City of New Orleans.

139.    Defendant City knew its hiring, retention and supervision policies and practices were knowingly inadequate for years as set forth in the DOJ's Report and Consent Decree.  Even after entering into the Consent Decree in 2012, the Independent Monitor in 2017 found numerous deficiencies that resulted in the hiring of officers "who should not be NOPD officers" as well as persistent non-compliance with supervisory requirements of NOPD policy.

140.    During the course of Defendant Officers' employment, Defendant City knew or should have known that they were unfit for their job and/or had a propensity for objectionable conduct, and/or physical aggressive behavior in all probability would act in a manner that would be objectionable to the public causing harm.

141.    Defendant City also had knowledge of Defendant Galman's abuse of his police powers alleged in paragraphs 38-43 that occurred during his probationary period.

142.    Defendant City had a duty to terminate or, at the very least, provide reasonable supervision of Defendant Officers given their objectionable, wrongful, and dangerous propensities.

143.    Defendant City, despite its ability to control, discipline or terminate Defendant

Officers, breached its duty of care by negligently retaining and/or failing to adequately supervise Defendant Officers in their positions as police officers.

144.     Defendant City's breach of that duty was the actual and proximate cause of the assault and battery of Mr. Gomez by Defendant Officers, which left Mr. Gomez with physical and emotional injuries, in an amount to be determined at trial.

**COUNT VII**
**VICARIOUS LIABILITY, *RESPONDEAT* SUPERIOR,**
**OSTENSIBLE AGENCY AND/OR AGENCY**
**(Against Defendant City)**

145.     Plaintiff realleges paragraphs 1 through 89 above as though fully set forth herein.

146.     At all relevant times, Defendant Officers were acting under color of law and acting on behalf of Defendant City in furtherance of a peace keeping objective and/or accomplished the acts stated herein by virtue of their job-created authority as set forth in paragraphs 9-32.

147.     Defendant Officers acted on behalf of Defendant City when they used the official powers Defendant City bestowed on them by ordering Mr. Gomez not to leave the patio area of the bar and detaining him there, inflicting severe bodily harm on him through the use of excessive and unreasonable force, ordering him to stop his truck as he tried to make his way home, ordering him out of his truck, causing additional severe injuries once he was out of his truck through use of excessive and unreasonable force, using police tactics to restrain him in making an arrest including forcing him onto his stomach and pulling his hands behind his back, and engaging with fellow officers, who provided back-up, allowed Defendant Officers to leave the scene, and initiated an investigation and interrogation of Mr. Gomez as if he was the culprit.

148.     Defendant Officers negligently, and/or tortiously, recklessly, directly, and proximately caused physical and emotional injury to Mr. Gomez, including both acts of omission and acts of commission.

149.    Therefore, Defendant City is liable under the laws of vicarious liability, including the doctrine of respondeat superior for the actions and inactions of the Defendant Officers, as described herein.

**COUNT VIII**
**VIOLATION OF THE PUBLIC RECORDS LAW**
**(Against Defendant City)**

150.    Plaintiff realleges paragraphs 1 through 89 above as though fully set forth herein.

151.    Under Louisiana law, the records of public bodies like the City of New Orleans and its police department are considered "public records."  Louisiana law provides that "providing access to public records is a responsibility and duty of the appointive or elective office of a custodian and his employees."  La. R.S. 44:31.

152.    Louisiana law mandates that "except as otherwise provided in this Chapter or as otherwise specifically provided by law, and in accordance with the provisions of this Chapter, any person of the age of majority may inspect, copy, or reproduce any public record."

153.    As set forth above in paragraph 73, commencing on May 29, 2019, Plaintiff made his first public records request to the City of NOPD seeking materials related to his incident. Although under Louisiana law, within five (5) business days of May 29, 2019, the City of NOPD was required to either produce the records or provide a written estimate of the time reasonably necessary for production (La. R.S. 44:35), it did not.

154.    The City of NOPD continued with additional extensions and advised the completion date would be July 26, 2019, a date after the 1-year statute of limitations period that may have applied to certain of Mr. Gomez's claims.

155.    As of the date of the filing of the initial Complaint, the City of NOPD failed to produce the requested records.

156.     Since that time, Plaintiff has made three additional requests seeking the information requested in the original request as well as additional information concerning Defendant Officers.

157.     As set forth in paragraphs 78-89, as part of its cover up, Plaintiff was faced with a multitude of delays, improper excuses and objections, deficient production, and a complete refusal to produce information without objection.

158.     The City of NOPD has denied Plaintiff's statutorily guaranteed access to the public records related to his incident.  The City of NOPD's actions and inaction as set forth herein is unreasonable.

159.     Plaintiff, therefore, brings this action under La. R.S. 44:35(A) and requests an order of mandamus be issued ordering Defendant City to produce the records, a declaratory judgment that the Defendant City violated the Louisiana public records law, and for his attorneys' fees, costs, and damages.

WHEREFORE the Plaintiff, JORGE GOMEZ, prays that after due proceedings there be judgment rendered herein in Plaintiff's favor and against the Defendants, THE CITY OF NEW ORLEANS, JOHN GALMAN, and SPENCER SUTTON, individually and jointly, for compensatory and punitive damages as prayed for herein in an amount in excess of the jurisdictional limits; reasonable attorneys' fees, as provided in 42 U.S.C. § 1988, 42 U.S.C. § 12205, 29 U.S.C. 794(b), and La. R.S. 44:35(A) and all costs of these proceedings and legal interest; and any such other further relief as appears equitable and just.

### DEMAND FOR TRIAL BY JURY

Mr. Gomez demands a jury trial of all claims so triable.

Dated: January 27, 2020                    By: /s/Diana L. Fitzgerald
                                                   Diana L. Fitzgerald, Esq. (FLSBN 15228)
Email: Diana@FILawyers.com
David C. Isaacson, Esq. (FLSBN 81691)
Email: David@FILawyers.com
FITZGERALD & ISAACSON, LLP
901 Ponce De Leon Boulevard, Suite 202
Miami, FL 33134
Telephone: (305) 372-7300
Facsimile: (305) 447-0043
(*Counsel admitted Pro Hac Vice*)

And

Jarrett Adams, Esq. (NYSBN 5455712)
Email: Jadams@JarrettAdamsLaw.com
THE LAW OFFICES OF JARRETT ADAMS, PLLC.
40 Fulton Street, Floor 23
New York, NY 10038
Telephone: (646) 880-9707
Facsimile: (646) 880-9707
(*Counsel admitted Pro Hac Vice*)

And

Bradley J. Schlotterer, Esq. (LASBN 24211)
Email: Brad.Schlotterer@keanmiller.com
Sean T. McLaughlin, Esq. (LASBN 31870)
Email: Sean.McLaughlin@keanmiller.com
Zoe W. Vermeulen, Esq. (LASBN 34804)
Email: Zoe.vermeulen@keanmiller.com
KEAN MILLER, LLP
909 Poydras Street, Suite 3600
New Orleans, LA 70112
Telephone: (504) 620-3354
Facsimile: (504) 585-3051
(*Local Counsel*)


*Attorneys for Plaintiff Jorge Gomez*