

# Investigation of the
# New Orleans Police Department

United States Department of Justice
Civil Rights Division

March 16, 2011

**EXHIBIT "A"**

## TABLE OF CONTENTS

I.     EXECUTIVE SUMMARY ........................................................................................ v

   A. Patterns and Practices of Unconstitutional Conduct ........................................ vi

      1.    Use of Force ...................................................................................... vi

      2.    Stops, Searches and Arrests ............................................................... vii

      3.    Discriminatory Policing ....................................................................... ix

   B. Systemic Deficiencies Causing or Contributing to Unconstitutional Conduct .................. xii

      1.    Policies .............................................................................................. xiii

      2.    Recruitment ......................................................................................... xiv

      3.    Training .............................................................................................. xiv

      4.    Supervision ......................................................................................... xiv

      5.    Paid Details ........................................................................................ xv

      6.    Performance Evaluations and Promotions .......................................... xvi

      7.    Misconduct Complaint Intake, Investigation, and Adjudication .............. xvii

      8.    Community Oriented Policing .............................................................. xviii

      9.    Officer Assistance and Support ............................................................ xx

      10.   Interrogation Practices ........................................................................ xx

      11.   Community Oversight .......................................................................... xxi

   C. Summary of Recommendations .......................................................................... xxii

ACKNOWLEDGEMENTS ............................................................................................. xxiv

GENERAL METHODOLOGY ...................................................................................... xxv

ABBREVIATIONS ....................................................................................................... xxvi

II.    Use of Force ........................................................................................................- 1 -

   A. Legal Standards ..................................................................................................- 1 -

   B. Findings ..............................................................................................................- 1 -

      1.    Overview of Force Findings ................................................................- 1 -

      2.    Unreasonable Use of Force .................................................................- 3 -

      3.    Failure to Implement Measures to Prevent Unreasonable Force ............- 9 -

III.   Stops, Searches and Arrests ................................................................................- 26 -

   A. Legal Standards ..................................................................................................- 26 -

   B. Findings ..............................................................................................................- 27 -

      1.    Inadequate Policies and Training ........................................................- 28 -

      2.    Organizational Focus on Arrests ........................................................- 29 -

      3.    Failure to Properly Justify Stops, Searches, and Arrests ....................- 30 -

i

IV.    Discriminatory Policing ........................................................................................- 31 -

  A. Legal Standards .............................................................................................- 32 -

     1.    Fourteenth Amendment ........................................................................- 32 -

     2.    Safe Streets Act ...................................................................................- 33 -

     3.    Title VI ...............................................................................................- 33 -

  B. Findings ........................................................................................................- 34 -

     1.    Discriminatory Policing on the Basis of Race, Ethnicity, and LGBT Status .........- 34 -

     2.    National Origin Discrimination:  Failure to Provide Police Services to Persons with Limited English Proficiency ............................................................................- 40 -

     3.    Gender-Biased Policing:  Failure to Investigate Sexual Assault and Domestic Violence ..................................................................................................- 43 -

V.     Recruitment ..................................................................................................- 51 -

VI.    Training ........................................................................................................- 54 -

  A. Deficiencies in Developing and Delivering Training ......................................- 54 -

     1.    Inadequate Development of Priorities and Goals ..................................- 54 -

     2.    Weaknesses in Curricula, Lesson Plans and Presentation ....................- 55 -

  B. Deficiencies in Staffing, Facilities, and Recordkeeping .................................- 56 -

     1.    Failure to Develop Criteria for Instructor Selection and Review ..........- 56 -

     2.    Inadequate Training Facilities .............................................................- 57 -

     3.    Lack of Effective Record Management .................................................- 57 -

  C. Inadequate Recruit, Field, and In-Service Training .......................................- 58 -

     1.    Problems in Recruit (Academy) Training .............................................- 58 -

     2.    Deficiencies in Field Training Program ...............................................- 58 -

     3.    Failure to Provide In-Service Training ..................................................- 59 -

VII.   Field Supervision ..........................................................................................- 60 -

  A. Deficient Field Supervision Policies ..............................................................- 61 -

  B. Deficient Field Supervision in Practice ..........................................................- 63 -

     1.    Failures in First-line Supervision ........................................................- 63 -

     2.    Reliance on Integrity Control Officers .................................................- 64 -

     3.    Ineffective Alternative Mechanisms for Supervision ...........................- 64 -

  C. Implementing Effective and Accountable Field Supervision ..........................- 65 -

     1.    Appropriate Span of Control and Staffing Allocation ..........................- 66 -

     2.    Unity of Command .............................................................................- 66 -

     3.    Systems to Support Field Supervision .................................................- 67 -

VIII.  Paid Details ..................................................................................................- 69 -

A. The Impact of the Detail System as Currently Structured ............................................- 70 -

   1.    Negative Impact on Quality of NOPD Policing .................................................- 70 -

   2.    Role of Details in Facilitating Abuse and Corruption ....................................- 72 -

   3.    Increased Risk of Dangerous Officer Fatigue ...............................................- 72 -

   4.    Role of Details in Contributing to Inequitable Policing ................................- 73 -

   5.    Cost of Details to the City ...............................................................................- 73 -

B. Fixing the Paid Detail System .....................................................................................- 73 -

IX.    Performance Evaluations and Promotions ........................................................- 75 -

A. Inadequate Processes to Assess Officer Performance ...............................................- 76 -

B. Inadequate Systems for Promoting Ethical and Effective Officers ...........................- 77 -

X.    Misconduct Complaint Intake, Investigation, and Adjudication ....................- 79 -

A. NOPD Misconduct Investigation Process and Background .......................................- 80 -

B. Deficiencies in Misconduct Complaint Intake and Investigation ..............................- 82 -

   1.    Outdated and Inconsistent Policies ................................................................- 82 -

   2.    Systemic Failure to Investigate and Track Allegations of Bias .....................- 84 -

   3.    Inadequate Training for Complaint Intake and Investigation ........................- 84 -

   4.    Insufficient PIB Staffing .................................................................................- 85 -

   5.    Faulty Complaint Intake and Classification ..................................................- 86 -

   6.    Investigations Inadequate to Support Reliable Findings ................................- 89 -

C. Inadequate Investigations of Criminal Misconduct ..................................................- 92 -

D. Deficient System for Administrative Discipline ........................................................- 94 -

E. Role of the Civil Service Commission in Disciplinary Adjudication ...........................- 96 -

   1.    Commission's High Rate of Affirming NOPD Disciplinary Decisions ...............- 97 -

   2.    Role of NOPD and the City in Reversal of Some Disciplinary Decisions ...........- 98 -

   3.    Infrequent Appeals of Unfavorable Commission Decisions ..........................- 99 -

XI.    Community Oriented Policing ...........................................................................- 100 -

A. Need for Community Oriented Policing ....................................................................- 100 -

B. Lack of Collaborative Community Partnerships .......................................................- 101 -

C. Challenges to Achieving Organizational Transformation ........................................- 103 -

D. Lack of Systematic Problem-Solving .......................................................................- 105 -

XII.    Officer Assistance and Support Services .........................................................- 106 -

XIII.    Interrogation Practices ....................................................................................- 107 -

A. Custodial Interrogations ...........................................................................................- 108 -

B. Problems with NOPD Interrogations ........................................................................- 110 -

1.    Flaws in Interrogation Policies .............................................................- 110 -

2.    Insufficient Training and Selection Requirements for Detectives.......................- 111 -

3.    Failure to Conduct Full and Complete Interrogations ...........................- 111 -

4.    Deficient Documentation of Interrogations ..........................................- 112 -

C. Allegations of Constitutional Violations ....................................................- 112 -

XIV.   Community oversight................................................................................- 113 -

XV.   Conclusion .............................................................................................- 115 -

Appendix: Recommendations to the New Orleans Police Department

## I.   __EXECUTIVE SUMMARY__

The NOPD has long been a troubled agency.  Basic elements of effective policing— clear policies, training, accountability, and confidence of the citizenry—have been absent for years. Far too often, officers show a lack of respect for the civil rights and dignity of the people of New Orleans.  While the majority of the force is hardworking and committed to public safety, too many officers of every rank either do not understand or choose to ignore the boundaries of constitutional policing.  Some argue that, given the difficulty of police work, officers must at times police harshly and bend the rules when a community is confronted with seemingly intransigent high levels of crime.  Policing is undeniably difficult; however, experience and study in the policing field have made it clear that bending the rules and ignoring the Constitution makes effective policing much more challenging.  NOPD's failure to ensure that its officers routinely respect the Constitution and the rule of law undermines trust within the very communities whose cooperation the Department most needs to enforce the law and prevent crime.  As systematic violations of civil rights erode public confidence, policing becomes more difficult, less safe, and less effective, and crime increases.

The deficiencies in the way NOPD polices the City are not simply individual, but structural as well.  For too long, the Department has been largely indifferent to widespread violations of law and policy by its officers.  NOPD does not have in place the basic systems known to improve public safety, ensure constitutional practices, and promote public confidence. We found that the deficiencies that lead to constitutional violations span the operation of the entire Department, from how officers are recruited, trained, supervised, and held accountable, to the operation of Paid Details.  In the absence of mechanisms to protect and promote civil rights, officers too frequently use excessive force and conduct illegal stops, searches and arrests with impunity.  In addition, the Department's culture tolerates and encourages under-enforcement and under-investigation of violence against women.  The Department has failed to take meaningful steps to counteract and eradicate bias based on race, ethnicity, and LGBT status in its policing practices, and has failed to provide critical policing services to language minority communities.

The problems in NOPD developed over a long period of time and will take time to address and correct.  The Department must develop and implement new policies and protocols, train its officers in effective and constitutional policing, and institutionalize systems to ensure accountability, foster police-community partnerships, improve the quality of policing to all parts of the City, and eliminate unlawful bias from all levels of NOPD policing decisions.

Recommendations on achieving these changes are attached to this Report.  We look forward to working with NOPD and the City of New Orleans to address the violations of constitutional and federal law that we identified, by developing and implementing a comprehensive blueprint for sustainable reform that will: (1) reduce crime; (2) ensure respect for the Constitution and the rule of law; and (3) restore public confidence in NOPD.

We find reasonable cause to believe that NOPD engages in patterns of misconduct that violate the Constitution and federal law.[1]  We find further that NOPD practices and deficiencies cause or contribute to these patterns of misconduct.  The following is a summary of these findings.

A.      Patterns and Practices of Unconstitutional Conduct

1.      Use of Force

Police-civilian interactions only rarely require the use of force.  In the small portion of interactions where it is necessary for officers to use force, the Constitution requires that officers use only the amount of force that is reasonable under the circumstances.  We found that officers in NOPD routinely use unnecessary and unreasonable force in violation of the Constitution and NOPD policy.

Our investigation did not include consideration of widely reported allegations of officer misconduct related to NOPD's response to Hurricane Katrina in 2005.  Many of these incidents have been, or are currently being, prosecuted by the Criminal Section of the Civil Rights Division and the United States Attorney's Office for the Eastern District of Louisiana.  We deliberately kept our civil investigation separate from the criminal investigation and prosecution of any NOPD officer, and this Report does not discuss any incident that is the subject of ongoing federal criminal proceedings.  Nonetheless, our investigation, which covered incidents that occurred within the past two years and assessed practices as they exist currently, revealed a clear pattern of unconstitutional uses of force by NOPD officers.

Our review of officer-involved shootings within just the last two years revealed many instances in which NOPD officers used deadly force contrary to NOPD policy or law.  Despite the clear policy violations we observed, NOPD has not found that an officer-involved shooting violated policy in at least six years, and NOPD officials we spoke with could recall only one out-of-policy finding even before that time.

We found a pattern of unreasonable less lethal force as well.  We found that NOPD's canines were uncontrollable to the point where they repeatedly attacked their own handlers, compelling us to recommend immediate suspension of NOPD's use of canines to apprehend suspects.  We found that officers use force against individuals, including persons in handcuffs, in circumstances that appeared not only unnecessary but deliberately retaliatory.  We reviewed instances in which NOPD officers used significant force against mentally ill persons where it appeared that no use of force was justified.

---

[1] Our investigation found reasonable cause to believe that NOPD has engaged in a pattern or practice of conduct that deprives individuals of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.  Under 42 U.S.C. § 14141, this finding authorizes the United States to obtain appropriate equitable and declaratory relief to eliminate the pattern or practice.  We did not conduct a criminal investigation, which requires the government to show guilt beyond a reasonable doubt, of any NOPD officer or any other person.  We make no assertions regarding the culpability of any individual.

NOPD, for at least the past several years, has been all too frequently indifferent to its officers' improper use of force. The Department has few meaningful controls to ensure that force is used appropriately. Officers are not properly trained on using force or alternatives to force. Policies regarding use and reporting of force are inconsistent, incomplete, and routinely disregarded. To the extent officers do report force, supervisors do not conduct investigations sufficient to determine whether the force was justified. Instances of clearly unjustified force are routinely approved by supervisors and ratified up the chain-of-command, resulting in no accountability. Officers even encourage each other to use force as retaliation. Indeed, when one NOPD officer reacted calmly after being spit on by another NOPD officer he had stopped for DWI, fellow NOPD officers told the arresting officer he was a coward for not at least punching the officer.

Even the most serious uses of force, such as officer-involved shootings and in-custody deaths, are investigated inadequately or not at all. NOPD's mishandling of officer-involved shooting investigations was so blatant and egregious that it appeared intentional in some respects. For a time, NOPD had a practice of temporarily assigning officers who had been involved in officer-involved shootings to the Homicide Division, and then automatically deeming the statements officers provided to homicide investigators to be "compelled," effectively immunizing the use of these statements in any subsequent criminal investigation or prosecution. It is difficult to interpret this practice as anything other than a deliberate attempt to make it more difficult to criminally prosecute any officer in these cases. We reviewed incidents where investigative missteps could not be explained by deficient training, such as where investigators failed to even attempt to lift fingerprints from a handgun found on the scene of shooting, where the ownership of the handgun was in dispute, and then misrepresented witness statements in their investigative report so that it appeared the presence of the weapon on-scene was not disputed. During our inquiry, we learned that many Homicide Division investigations of officer-involved shootings had never been provided to NOPD's Professional Integrity Bureau ("PIB"), which is charged with determining whether these shootings are consistent with NOPD policy. Some of these investigations were provided to PIB only following our inquiries, and the appointment of new leadership in NOPD's Homicide Division. Several still have not been located.

NOPD's use of force practices present a significant threat to the safety of the public and NOPD officers, and create a substantial obstacle to strong community-police partnerships. As we conducted our investigation, NOPD had begun to make significant and long overdue changes to its force policies regarding how officers will be trained to use force, and how force will be reported, investigated, and reviewed. NOPD will need to build on these initial steps with more comprehensive changes to policy and practice to end the pattern of unconstitutional use of force by NOPD.

2.      Stops, Searches and Arrests

We find reasonable cause to believe that NOPD officers engage in a pattern of stops, searches, and arrests that violate the Fourth Amendment. Detentions without reasonable suspicion are routine, and lead to unwarranted searches and arrests without probable cause. Our review of 145 randomly-sampled arrest and investigative reports confirmed a pattern of unlawful

conduct.  Of the arrests that NOPD initiated, we found that a significant portion reflected on their face apparent constitutional violations, in that officers failed to articulate sufficient facts to justify stops, searches, and arrests.

A previous DOJ investigation noted almost ten years ago that some NOPD officers could not articulate proper legal standards for stops, searches, or arrests.  We recommended then that NOPD provide annual in-service training to officers on this critical topic.  As discussed below, NOPD still does not provide meaningful in-service training to officers on how to properly carry out stops, searches, and arrests.  NOPD's failure to train officers or otherwise provide guidance on the limits and requirements of the Fourth Amendment contributes directly to the pattern of unconstitutional stops, searches, and arrests we observed.  Throughout the Department, and among other stakeholders in the criminal justice system, we heard broad and emphatic consensus that officers have a poor understanding of how to lawfully execute searches and seizures.

Additionally, the Department's organizational focus on arrests, particularly in combination with its poor training and policies, encourages stops without reasonable suspicion, illegal pat downs, and arrests without probable cause.  NOPD's focus on statistics, such as generating Field Interview Cards ("FIC"s) and arrests, amplifies the risk that officers will execute illegal searches and seizures.  NOPD patrol officers and many members of the command staff described a Department that has long been statistics-driven—one that measures "productivity" by quantity, rather than quality, of encounters and arrests.  As one commander told us, "[t]hese officers are under the gun to make arrest, arrest, arrest, which leads to civil rights violations and complaints."  We observed that arrests, *Terry* stops, and FIC numbers were the predominant focus of the Department's weekly COMSTAT meetings, and many officers described a strong and unyielding pressure to increase numbers.

Detached as it is from problem-oriented policing, community partnerships, or long term strategies, there is no indication that NOPD's emphasis on arrests results in better crime prevention or safer communities.  To the contrary, NOPD recently acknowledged that the Department's staggering volume of arrests for low-level offenses is counter-productive.  In November 2010, according to the New Orleans Times-Picayune, the Superintendent advised the City Council that officers would no longer make arrests based on outstanding traffic or misdemeanor warrants from neighboring parishes, noting that to do so "simply does not make sense, economical or common."

We believe that with this pledge, the Department has taken a significant and positive step.  Nonetheless, we found NOPD's emphasis on "activity," defined as numbers of encounters such as stops, FICs, and arrests—at the expense of a more deliberate focus on problem-solving—to be an ingrained part of NOPD's organizational culture.  Although the Superintendent's commitment to ensuring that officers are engaged, observant, and productive is commendable and appropriate, the Department must recognize that its tactics and chosen police strategy, together with lapses in training and policy, cultivate an atmosphere where officers cut corners and make too many errors that result in constitutional harm and compromise effective law enforcement.

### 3.   Discriminatory Policing

We find reasonable cause to believe that NOPD engages in a pattern or practice of discriminatory policing in violation of constitutional and statutory law.  Discriminatory policing occurs when police officers and departments unfairly enforce the law—or fail to enforce the law—based on characteristics such as race, ethnicity, national origin, sex, religion, or LGBT status.  Discriminatory policing may take the form of bias-based profiling, in which an officer impermissibly decides whom to stop, search, or arrest based upon one of the above-mentioned characteristics, rather than upon the appropriate consideration of reasonable suspicion or probable cause.  Failing to provide police services to some persons or communities because of bias or stereotypes, or by not taking necessary steps to enable meaningful communication, also constitutes discriminatory policing.  Discriminatory policing may also result when a police department selects particular enforcement and crime prevention tactics in certain communities or against certain individuals for reasons motivated by bias or stereotype.

NOPD has failed to take sufficient steps to detect, prevent, or address bias-based profiling and other forms of discriminatory policing on the basis of race, ethnicity, or LGBT status, despite widespread concern and troubling racial disparities in arrest rates and other data.  We further find that the Department fails to adequately investigate violence against women, including sexual assaults and domestic violence.  Additionally, we find that the Department fails to provide critical policing services to New Orleans residents with limited English proficiency.

### a)   *Discriminatory Policing on Basis of Race, Ethnicity or LGBT status*

Subjecting individuals to differential treatment—based on a belief that characteristics such as race, ethnicity, national origin, sex, or religion signal a higher risk of criminality or unlawful activity—constitutes unlawful discrimination, often called "profiling" or "biased policing."  During our investigation, many members of the community—particularly African Americans, ethnic minorities, and members of the lesbian, gay, bisexual, and transgender ("LGBT") community—reported that the Department subjects them to harassment and disrespectful treatment, and unfairly targets them for stops, searches, and arrests.  Many members of NOPD echoed these concerns.

We found a clear failure by NOPD to implement adequate policies and provide appropriate training on how to identify and articulate suspicion based on behavior and other permissible factors.  This critical lapse raises the risk that NOPD officers, without sufficient guidance and training on how to properly carry out stops and arrests, will instead rely on inappropriate factors such as racial stereotypes and bias in their decision-making.  NOPD's failure to acknowledge the potential for stereotypes and bias to taint police work, on both an individual and an organizational level, and to take steps to prevent this, further cultivates an atmosphere in which discriminatory policing can occur unchecked.

Indeed, the limited arrest data that the Department collects points to racial disparities in arrests of whites and African Americans in virtually all categories, with particularly dramatic disparity for African-American youth under the age of 17.  Arrest data provided by NOPD

indicates that in 2009, the Department arrested 500 African-American males and eight white males under the age of 17 for serious offenses, which range from homicide to larceny over fifty dollars. During this same period the Department arrested 65 African-American females and one white female in this same age group. Adjusting for population, these figures mean that the ratio of arrest rates for both African-American males to white males, and African-American females to white females, was nearly 16 to 1. Although a significant disparity in arrest rates for this age group exists nationwide, it is not nearly as extreme as the disparity found in New Orleans. Nationally in 2009, among those agencies reporting data, the arrest ratio of African-American youth to white youth, for the same offenses, was approximately 3 to 1. The level of disparity for youth in New Orleans is so severe and so divergent from nationally reported data that it cannot plausibly be attributed entirely to the underlying rates at which these youth commit crimes, and unquestionably warrants a searching review and a meaningful response from the Department.

NOPD use of force data also shows a troubling racial disparity that warrants a searching inquiry into whether racial bias influences the use of force at NOPD. Of the 27 instances between January 2009 and May 2010 in which NOPD officers intentionally discharged their firearms at people, all 27 of the subjects of this deadly force were African American. In our sample of resisting arrest reports documenting uses of force between January 2009 and May 2010, we found that in 81 of the 96 uses of force we reviewed (84%), the subject of the force was African American.

We also found reasonable cause to believe that NOPD practices lead to discriminatory treatment of LGBT individuals. In particular, transgender women complained that NOPD officers improperly target and arrest them for prostitution, sometimes fabricating evidence of solicitation for compensation. Moreover, transgender residents reported that officers are likelier, because of their gender identity, to charge them under the state's "crimes against nature" statute—a statute whose history reflects anti-LGBT sentiment. Multiple convictions under the "crimes against nature" statute, unlike Louisiana's general prostitution statute, require registration as a sex offender. Persons convicted of soliciting crimes against nature make up nearly 40 percent of the Orleans Parish sex offender registry. NOPD is charged with monitoring all registrants' compliance with sex offender registry requirements, raising questions about efficient and effective use of resources to ensure public safety. Further, for the already vulnerable transgender community, inclusion on the sex offender registry further stigmatizes and marginalizes them, complicating efforts to secure jobs, housing, and obtain services at places like publicly-run emergency shelters. Of the registrants convicted of solicitation of a crime against nature, 80 percent are African American, suggesting an element of racial bias as well. Indeed, community members told us they believe some officers equate being African American and transgendered with being a prostitute.

Both bias and the perception of bias erode citizens' inclination to trust and cooperate with law enforcement, impeding effective and safe policing. Nonetheless, NOPD has failed to take steps to counteract bias and promote impartial policing through proactive policies, clear messages from leadership, effective supervision, and quality training. The Department does not have a sufficiently comprehensive policy regarding discriminatory policing and fails to adhere to the policies that are in place. In addition, the Department has no way to track allegations and

complaints of racial profiling, and does not collect, analyze, or report race or ethnicity data for most citizen encounters with police.

> b)   *Gender-Biased Policing: Failure to Adequately Investigate Allegations of Sexual Assault and Domestic Violence*

Law enforcement may not selectively deny protective services to certain groups, including women.  This principle applies to the under-investigation of violence against women, including sexual assault and domestic violence.  Nonetheless, in many cities reports have surfaced of law enforcement agencies undercounting and failing to investigate allegations of sexual and domestic violence.  Such under-enforcement appears to stem in part from cities' reluctance to acknowledge the extent of serious crime in their communities, and in part from stereotypes and misapprehensions about sexual assaults and the victims of sex crimes.

We find that NOPD has systematically misclassified large numbers of possible sexual assaults, resulting in a sweeping failure to properly investigate many potential cases of rape, attempted rape, and other sex crimes.  Additionally, we find that in situations where the Department pursues sexual assault complaints, the investigations are seriously deficient, marked by poor victim interviewing skills, missing or inadequate documentation, and minimal efforts to contact witnesses or interrogate suspects.  The documentation we reviewed was replete with stereotypical assumptions and judgments about sex crimes and victims of sex crimes, including misguided commentary about the victims' perceived credibility, sexual history, or delay in contacting the police.  NOPD has recently acknowledged its serious deficits in responding to sex crimes, and has taken some significant remedial steps.  NOPD and the City will need to build on these efforts to bring about the extensive and sustained change necessary to effectively and appropriately respond to these serious violent crimes.

We also find systemic deficiencies in NOPD's handling of domestic violence cases.  In recent years, the New Orleans Family Justice Center ("NOFJC"), a federally funded center designed to provide comprehensive services to victims of domestic violence by integrating law enforcement, prosecution, civil legal services, and advocacy in one location, has had a salutary effect on NOPD's handling of domestic violence complaints.  Nonetheless, we find significant weaknesses in Department policies and practices in responding to these cases.

> c)   *National Origin Discrimination: Failure to Provide Effective Policing Services to Persons with Limited English Proficiency*

Failing to take reasonable steps to ensure meaningful access to services for limited English proficient ("LEP") persons is a form of national origin discrimination.  We find that NOPD is dangerously limited in its capacity to communicate effectively and accurately with LEP victims, witnesses, suspects, and community members in the Latino and Vietnamese communities.  Language barriers, and the often closely related cultural barriers, can put cases and lives at risk and create safety, evidentiary, and ethical challenges for officers and others.  Such barriers can prevent LEP individuals from understanding their rights, complying with the law, assisting law enforcement and receiving meaningful access to law enforcement services and information.

NOPD has virtually no capacity to provide meaningful access to police services to LEP community members, who in New Orleans are predominantly Latino or of Vietnamese descent. The Vietnamese community has been an established presence in New Orleans since the mid-1970s, and since Hurricane Katrina the City has seen a significant influx of Latino immigrants. Both communities represent growing shares of the City's population, and a significant segment of each has limited proficiency in English. NOPD relies primarily upon just two officers, one fluent in Spanish and one fluent in Vietnamese, to assist on calls for service and investigations throughout the Department, in addition to performing their regular duties. The Department does not compensate these officers for interpreter services performed while off-duty or provide them with enhanced pay for language fluency; nor does the Department have protocols to assess the fluency of its multilingual officers and train them in carrying out their duties.

Community members described significant consequences resulting from language barriers in their dealings with NOPD—including delays in or denial of services, incidents where victims were mistaken for suspects, and situations where encounters escalated unnecessarily due to gaps in communication. At one community meeting, a monolingual Spanish speaker reported calling police on four different nights regarding domestic violence, but receiving a response only once.

During an August 2010 ride-along, we observed firsthand a delay in response to a call for service from a victim of domestic violence, apparently because she was a monolingual Spanish-speaker. It further appeared that the officer may not have responded at all if not pressed by the DOJ investigator and if the DOJ investigator had not happened to be bilingual. After the officer continued to patrol the district for 30 minutes following receipt of the complaint, the DOJ investigator inquired about what calls had come in through dispatch. The officer initially skipped over the domestic violence call, but then asked the DOJ investigator whether he spoke Spanish. When the investigator replied that he did, the officer responded to the call. Upon arrival at the scene, the victim, who had visible injuries, said she had been waiting more than an hour for a response. Later, the officer explained that there was only one person on the shift capable of serving as an interpreter, and that the individual was often difficult to reach.

NOPD's lack of capacity to serve LEP communities undermines public safety, crime prevention, and crime-solving, and results in inferior police services to LEP community members. Although the Department has recently signaled its commitment to improving access to its services to LEP community members, NOPD has significant work ahead to ensure it can effectively serve the entire New Orleans community.

B.     Systemic Deficiencies Causing or Contributing to Unconstitutional Conduct

A number of longstanding and entrenched practices cause or contribute to the patterns or practices of unconstitutional and discriminatory conduct we observed. The Department's failure to provide sufficient guidance, training, and support to its officers, as well as its failure to implement systems to ensure officers are wielding their authority effectively and safely, have created an environment that permits and promotes constitutional harm. We found deficiencies in a wide swath of City and NOPD systems and operations, including failures to: adopt and enforce

xii

appropriate policies; properly recruit, train, and supervise officers; adequately review and investigate officer uses of force; fully investigate allegations of misconduct; identify and respond to patterns of at-risk officer behavior; implement community policing; oversee and control the system of Paid Details; provide officer assistance and support; or enact appropriate performance review and promotional systems.  NOPD has recently begun making changes in each of these areas, but more, and more fundamental, change is necessary.

Alongside police practitioners, Courts have long acknowledged that deficiencies in systems and operations can unequivocally lead or contribute to constitutional violations.  In *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), the Supreme Court held a municipality liable for failing to adequately train its law enforcement officers, recognizing that a law enforcement agency's practices and decision-making can cause constitutional harm.  *Id.* at 387.  The Fifth Circuit has extended the *City of Canton* rationale to recognize that a broad range of systemic deficiencies can result in constitutional harm, including:  inadequate disciplinary measures, *Deville v. Marcantel*, 567 F.3d 156, 171 (5th Cir. 2009) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 581 (5th Cir. 2001)); inadequate officer stress management programs, *Snyder v. Trepagnier*, 142 F.3d 791, 798-799 (5th Cir. 1998); and faulty screening of new officers, *Brown v. Bryan County*, 67 F.3d 1174 (5th Cir. 1995).

The deficiencies identified below must be corrected for legitimate, sustainable reform to occur.  Without this comprehensive reform, the patterns and practices of unconstitutional conduct within NOPD will continue.

      1.    Policies

Clear and well-drafted policies are essential to ensuring constitutional police practices.  Officers need to know what is permitted and what is prohibited.  Police managers need policies to guide their work and hold officers accountable.

In every area we reviewed, we found that NOPD policies do not provide sufficient guidance.  Policies are outdated, inconsistent, and at times, legally inaccurate.  Policies do not, for example, provide officers adequate guidance regarding stops, searches, and arrests that are lawful, safe, and effective.  Use of force policies are incomplete, out of date, and often contradictory.  NOPD does not have in place policies or protocols for how first responders (usually patrol officers) should respond to individuals experiencing a mental health crisis.  NOPD policies do not require sufficient collection of data to permit NOPD to track, assess, and respond to problems in a number of areas, from bias-based profiling, to use of force.  Policies that do require NOPD to collect and analyze data are ignored. Policies related to complaint investigation facilitate the under-investigation of whole categories of complaints.  There is a general lack of adherence to policy, exacerbated by pervasive tolerance by NOPD supervisors and commanders for officers' routine failure to comply with policy.

We do not discuss policies in a stand-alone section in this Report, but rather discuss policies pertaining to specific areas, such as use of force, supervision, or complaint intake, in each corresponding section of the Report.

2.      Recruitment

NOPD's longstanding failure to prioritize the recruitment of high-quality candidates contributes to the chronic, Department-wide problems we observed, including inappropriate and disrespectful conduct in the community, corruption, unnecessary uses of force, and improper stops and searches. We found NOPD's recruitment program to be anemic, entirely passive, and lacking clear goals, plans, or accountability. NOPD's Recruitment and Applicant Unit, which has a staff of six commissioned law enforcement officers, has no plan to seek out and recruit qualified candidates. Recruiters were unclear about the scope of their authority or obligations, and report having done little since Hurricane Katrina to find or attract highly-qualified applicants, apart from distributing literature at job fairs, colleges, and universities.

The Department has been aware of deficiencies in its recruitment efforts, yet for years failed to act meaningfully to address them. Recently, NOPD has begun to make changes to its recruiting process to ensure a stronger pool of applicants is selected to attend the academy. Although the Department has a great deal of work ahead to attract the most highly-qualified workforce possible, we commend its recent focus on these efforts.

3.      Training

The training NOPD has for the past several years provided to its officers is severely deficient in nearly every respect, compromising officer and public safety, effective crime reduction, and the credibility and reputation of the Department as a whole. Shortcomings at the recruit, field, and in-service stages of training have left NOPD officers ill-equipped to perform their duties in a safe, constitutional, and respectful manner. We found systemic problems in training of every type, including tactical, operational, legal, ethical, and professionalism training. Officers receive an insufficient amount of training—there has been almost no in-service training for the past five years—and the instruction officers do receive is often out-of date, conflicts with NOPD  policies or current legal requirements, or fails to address officers' most pressing training needs. Our investigation found direct links between inadequate training and serious, systemic problems in use of force; stops, searches, and arrests; supervision; interacting with and building partnerships with members of the community; and racial, ethnic, and gender bias in policing.

We found no disagreement that NOPD training is inadequate. NOPD officers of all ranks told us they want more and better training, and strongly expressed this sentiment in their responses to a recent NOPD employee survey. In that survey, only 24% of NOPD employees agreed that they have sufficient opportunities for training, and overwhelmingly reported that existing training needs improvement. NOPD leadership likewise has acknowledged that its training systems are in need of repair, and the Superintendent has prioritized the wholesale remaking of training in his organizational strategy to improve NOPD.

4.      Supervision

Front line supervision, especially of officers patrolling and responding to calls in the field, is a lynchpin of effective and constitutional policing. Field supervisors provide the close and consistent supervision necessary to guide officers' conduct and to help them learn from their

mistakes.  They are in best position to recognize a problem with an officer's conduct and intervene immediately to ameliorate or prevent harm.  When a supervisor is on-scene and realizes that a patrol officer has made an arrest without probable cause, the supervisor can instruct the officer to release the arrestee and immediately counsel the officer about what the officer did wrong.  When a community member is upset about how an officer responded to a call, a supervisor can immediately take a complaint—or sometimes address the concern to prevent a complaint.  How a field supervisor conducts him or herself, and whether he/she requires adherence to policy and ethics, sets a tone of accountability and integrity—or not.

Field supervisors also are in the best position to ensure that street level crime prevention efforts are as effective as possible; they know how productive their officers are, and what they need to be more effective.  Properly trained and deployed, field supervisors can identify the strengths and weaknesses of each officer under their command, adjusting their level and type of supervision accordingly.

NOPD fails to provide the supervision necessary to prevent or detect misconduct and ensure effective policing.  Supervisors frequently sign off on arrest reports that fail to articulate probable cause, and conduct use of force investigations that are grossly deficient.  They also frequently ignore obvious misconduct and poor officer performance in conducting internal investigations.

Our investigation further showed a lack of accountability throughout the chain of command sufficient to ensure that field sergeants are properly supervising their subordinates.  Much of the work supervisors do requires review or approval by the chain of command.  Commanders seem to take no notice of, much less hold accountable, supervisors who approve egregious uses of force without question, conduct obviously flawed investigations, sign off on clearly deficient arrest reports, or who simply do not supervise.

A number of systemic deficiencies within NOPD appear to contribute to this poor supervision.  Supervisors are poorly trained and poorly guided by policy.  The ratio of supervisors to officers (span of control) is too high, and unity of command (allowing for close and knowledgeable supervision by ensuring that each officer has one supervisor to hold them fully accountable) exists on paper only.  Supervisory accountability is undermined by NOPD's practice of broadly assigning supervisory responsibilities and then failing to ensure these responsibilities are carried out by anyone.

5.    Paid Details

There are few aspects of NOPD more broadly troubling than its Paid Detail system.  NOPD's Detail system, as currently structured:  1) drastically undermines the quality of NOPD policing; 2) facilitates abuse and corruption by NOPD officers; 3) contributes to compromising officer fatigue; 4) contributes to inequitable policing by NOPD; and 5) acts as a financial drain on NOPD rather than fulfilling its potential as a source of revenue for the City and Department.

The Detail system is essentially a form of overtime work for officers.  Officers may work *ad hoc* Details providing, for example, extra security for special events or individuals visiting

xv

New Orleans.  Or an officer may have a regularly-scheduled Detail, such as being hired by a business to provide security in a retail establishment or by a neighborhood association to patrol the neighborhood.  When on Detail, however, officers are paid and largely controlled by entities other than NOPD.  Many police departments allow officers to work outside law-enforcement jobs, but few if any large police departments have a system of Details as entrenched and unregulated as in NOPD.  Between August 2009 and July 2010, 69% of all officers, almost 1000 in all, submitted a request to work at least one Detail.  This number includes 85% of all Lieutenants and 78% of all Captains.  Virtually every officer works a Detail, wants to work a Detail, or at some point will have to rely on an officer who works a Detail.  The effects of Details thus permeate the entire Department.  It is widely acknowledged that NOPD's Detail system is corrupting; as stated by one close observer of the Department, the paid Detail system may be the "aorta of corruption" within NOPD.  Our interviews with NOPD officers, meetings with other New Orleans-based law enforcement agencies, criminal justice system stakeholders, and the public, revealed that NOPD's Detail system was a significant contributing factor to both the perception and reality of NOPD as a dysfunctional organization.

In the last few months, Superintendent Serpas has begun to implement measures meant to correct and prevent some of the negative impact of the Detail system.  In August 2010, the Superintendant banned cash payments.  But officers are still expected to negotiate their compensation with the Detail employer and officers who coordinate Details still wield inordinate influence including, in some instances, over their superiors.  In December 2010, the Superintendent initiated a program to try to centralize Detail information by setting up a single telephone number for all officers to call to report working a Detail, and a web-based application for officers to enter additional Detail information.  While these are undoubtedly improvements, it is too early to assess whether they are effective and, regardless, they are a small part of the wholesale remaking of the Detail system that is necessary.

### 6.     Performance Evaluations and Promotions

NOPD's evaluation and promotion practices are deficient to the point that it may be impossible to correct patterns of constitutional misconduct without also correcting the failings of these systems.  NOPD's promotional system does not adequately assess or consistently reward the officers who are best able to police effectively and constitutionally.  Promotional decisions do not adequately consider misconduct by officers or their ability to lead with integrity and diligence.  Performance evaluations do not sufficiently assess officers' conduct or value constitutional policing.  As they currently function, NOPD's performance evaluation and promotion systems erode public confidence in the Department and facilitate officers' unconstitutional conduct.

People inside NOPD and in the broader New Orleans community view NOPD's promotion and performance evaluation systems as broken.  In November 2010, a NOPD employee satisfaction survey ranked promotions and performance evaluations among the areas about which employees expressed the most dissatisfaction.  While a slight majority of respondents agreed that the Department punishes unethical behavior, a mere 17% agreed that the Department rewards ethical behavior.  Research shows that departments that reward officers who display exemplary leadership qualities with promotion foster the growth of a values-based,

ethical culture in the department. The NOPD survey also found that only 13% of respondents believed that "promotions are handled fairly."

Our review similarly showed significant problems with both NOPD's performance evaluations and its system of promotions. NOPD's performance evaluations do not assess an officer's crime prevention skills and abilities. There are no specific goals for the officers, and no assessment of an officer's progress in achieving stated goals. Likewise, there is no assessment of an officer's ability to build effective community partnerships or problem-oriented policing efforts. According to City officials, the city-wide performance evaluations have not changed in 20 years and are badly in need of updating. Consistent with recommendations from outside reviews, Civil Service Commission staff and police officials reported a need for more task-specific evaluations, but recognize that this would require the creation of different evaluations for different City departments, for which the City currently has allocated no funding. However, each department, including NOPD, already has the authority and ability to create their own performance evaluation overlay to the City-wide performance evaluation form. NOPD has not done this. In addition, training for supervisors on how to most effectively evaluate employees' performance under the current system is insufficient, and performance evaluations are infrequent and intermittent, rather than part of an ongoing process. There is no formalized system of on-going, documented, supervisory evaluation of subordinates' work, and we saw very little evidence of informal evaluation.

Similarly, NOPD's promotional system policies and practices are highly process related, too infrequently held, and include insufficient substantive assessment of candidates. NOPD's promotional policies have not been revised in nearly ten years and, until very recently NOPD's promotional exam had not been revised in years and was, by all accounts, woefully out of date. The infrequency of exams causes good officers to leave when they learn they have missed a promotion exam and it will be years before they have even an opportunity to compete for promotion. Infrequent exams mean also that officers who scored relatively low on the last exam are promoted over other officers who were not given a chance to compete.

Nor does NOPD's current promotions system provide for appropriate assessment of promotional candidates. There is little consideration of community policing or ethics (reportedly, promotional candidates in the past "did not do so well" on the ethical scenarios that were incorporated into the exam). Current NOPD policy further undermines adequate consideration of an officer's disciplinary history. By policy, only sustained violations for conduct with an *incident date* within the previous year of the promotion, and which resulted in a penalty greater than a Letter of Reprimand, are considered, and denial on even this ground appears discretionary.

We found that these problems directly impact NOPD's ability to assess and promote officers who are effective and ethical.

       7.     Misconduct Complaint Intake, Investigation, and Adjudication

NOPD's system for receiving, investigating, and resolving misconduct complaints, despite many strengths and recent improvements, does not function as an effective accountability

measure.  Policies and practices for complaint intake do not ensure that complaints are complete and accurate, systematically exclude investigation of certain types of misconduct, and fail to track allegations of discriminatory policing.  Field supervisors are not sufficiently trained or supported in conducting misconduct investigations.  Deficiencies in policies, resources, training, and oversight weaken investigations and result in findings that are unsupported by the evidence.

Discipline and corrective action are meted out inconsistently and, too often, without sufficient consideration of the seriousness of the offense and its impact on the police-community relationship.  Louisiana State law requiring that internal administrative investigations be completed within 60 days is laudable in intent, but in practice has allowed officers to commit egregious misconduct and get away with it.  Apparent criminal misconduct by officers is inadequately investigated and has in the past too rarely been prosecuted.

There is a lack of transparency in the Civil Service Commission's review of officer appeals of NOPD disciplinary decisions, making it difficult to fully assess whether troubling reversals of disciplinary decisions are due to the Commission's failure to stay within the appropriate bounds of review, as is widely perceived.  Our review of several years of Commission decisions indicates that, while there may be legitimate concerns about particular Commission decisions, significant weaknesses in NOPD's investigation of officer misconduct, and in NOPD's and the City's defense of disciplinary decisions, unquestionably contribute to many poor outcomes.

These deficiencies render NOPD's system for investigating and responding to allegations of officer misconduct ineffective at changing officer behavior or holding officers responsible for their actions.  Consequently, the system has little legitimacy in the Department or in the broader New Orleans community.

NOPD is making efforts to improve its complaint investigation process.  The Department has made innovative changes, such as appointing a civilian to lead PIB, and has implemented long-overdue corrections to basic policies, including clarifying an employee's duty to be honest and truthful and to cooperate with investigations; making dismissal the presumptive penalty for not being truthful; and requiring employees who become aware of misconduct to immediately report it to a supervisor.  These changes mark a good beginning; however neither the public nor the police have confidence in NOPD's current system for investigating and responding to allegations of police misconduct.  A fundamental transformation of the processes for investigating and responding to allegations of police misconduct must occur in order to regain the trust of the public and officers, and correct the pattern of constitutional misconduct we observed.

## 8.    Community Oriented Policing

Community policing strategies balance reactive responses to calls for service with thoughtful and proactive problem-solving.  This problem-solving is achieved in large part by forging robust relationships in the community.  The Department's policies, training, and tactics support neither a community policing orientation, nor the ultimate goal of proactively addressing problems to reduce and prevent crime, rather than merely reacting to it.  Within NOPD, the

xviii

concept of community policing is poorly understood and implemented only superficially. Outside the Department, community members, especially members of racial, ethnic, and language minorities, and the LGBT communities, expressed to us their deep distrust of and sense of alienation from the police.  This crisis of confidence and credibility serves as both a barrier to an effective community oriented policing program, and as a compelling reason to prioritize its implementation.

NOPD has publicly acknowledged the need to repair and cultivate community partnerships to more effectively fight crime and increase respect for police officers throughout the New Orleans community.  Indeed, in August 2010, the Superintendent released a 65-point plan to reform the Department, which opened with a commitment to prioritize community policing and to "listen, collaborate, and respond proactively."  The Department has implemented or announced plans to implement a number of community outreach programs, including: citizen callbacks regarding quality of service; Community Outreach Coordinator sergeants in each district; an expanded citizen academy; a partnership with clergy; and a program for bilingual outreach on public safety issues.  While these initiatives are either in the planning stages or too new to have allowed for close assessment, we commend the Department's stated interest and focus on genuinely assessing current attitudes toward the police, reaching out to diverse segments of the City, and enhancing community relations.

Nonetheless, considerable work lies ahead if community policing is to be a central feature of NOPD's culture, decision-making, and organizational structure, consistent with the Department's commitment.  The Department does not adequately encourage or promote meaningful partnership, interaction, and communication with diverse stakeholders, which is critical to learning about and collaboratively addressing problems in the community.  Indeed, community groups nearly uniformly said that the police rarely reach out to them; one member of a Vietnamese community organization reported that "[a] lot of the young Vietnamese people who get shot in this community, we know who shot them but the New Orleans police don't do anything.  They don't talk to us.  They don't build community relationships."  We found that some NOPD officers tend not to view members of the public as potential collaborative partners or sources of information and insight about their communities, but rather as potential problems, cultivating an "us vs. them" atmosphere of mutual distrust.

NOPD has also failed to implement policies, training, and accountability measures to truly integrate and embed community- and problem-oriented policing principles into each aspect of its management, structure, and use of resources.  Consequently, few in the Department believe they bear any responsibility for implementing community policing strategies, or even have a clear sense of what specific strategies would look like.  Further, officers consistently reported that pressure to conduct stops and arrests diverts attention and resources from quality arrests, community engagement, and more considered problem-solving.

Now that NOPD has identified community policing as a priority, it will need to ensure that change is sustained and more than superficial.  This will require review of the Department's leadership, policies, climate and culture, systems of accountability, training and deployment of personnel, to ensure that they reflect and integrate community-oriented and problem-oriented strategies and practices.

9.     Officer Assistance and Support

Officer assistance and support services are a significant component of a department's accountability system.  The demeanor, judgment, and physical abilities that make an officer effective in carrying out law enforcement duties can be dangerously impaired when officers work under inordinate stress levels or while grappling with symptoms of mental illness.  Police executives owe a duty to their community and officers to provide the services necessary to ensure the mental and physical wellness of their officers.  NOPD is failing to provide such critical officer assistance and support services.

Stress is not an excuse for police misconduct, but officers who are mentally and physically fit generally are more productive; use fewer sick days; and importantly, may receive fewer complaints regarding demeanor or use of force.  There is little question that NOPD is in need of officer assistance and support services.  We found that a comprehensive system of officer assistance and support services for NOPD officers has never been in place, and that efforts to create a system have been faltering, even after Hurricane Katrina underscored the need.  NOPD can better serve its officers and protect the public by implementing a centralized and comprehensive range of officer assistance and support services to address the stress and mental health needs of its employees.

10.     Interrogation Practices

NOPD's custodial interrogation practices reflect many of the same problems we found throughout NOPD:  inadequate policies, poor or non-existent training, weak supervision and accountability, and inadequate facilities and equipment.  As a result of these problems, NOPD does not adequately use custodial interrogations to build cases.  NOPD detectives conduct relatively few interrogations and the interrogations they do conduct are often perfunctory.

We found that NOPD's policies about what constitutes a constitutional interrogation are inadequate, as is NOPD's training and selection of detectives.  NOPD practice further undermines the effectiveness and integrity of NOPD interrogations.  Audio and video recordings of interrogations reflect that detectives do not conduct, or at least record, full interrogations.  Documentation of interrogations is poor due to a number of deficient practices and systems.  Most districts lack dedicated space and video recording equipment; officers only record a final summary statement by subjects and/or witnesses; officers generally destroy notes from unrecorded portions of interviews with subjects and witnesses after completing investigative reports; and taped interviews in the Districts are preserved inconsistently, if at all.  Taken together, these deficiencies not only undermine NOPD's efforts to build strong criminal cases, but could also facilitate and hide constitutional violations of criminal suspects' rights.  Indeed, we found credible allegations that such violations have occurred.

While we did not reach a conclusion on whether there is a pattern or practice of unconstitutional interrogations at NOPD, we did find that as NOPD increases its efforts to build more effective cases and improve the reliability and integrity of its criminal investigations,

current interrogation policies, training, and practices should be improved to ensure constitutional and effective interrogations.

11.    Community Oversight

The City of New Orleans and NOPD have a long history of efforts to provide effective civilian oversight of the Department.  For decades, the City's Office of Municipal Investigation served as an alternative to NOPD's PIB, accepting and investigating individual complaints of misconduct against NOPD officers (and other City employees), before it was defunded in 2008. A thoughtful and comprehensive report in 2001 by the Police-Civilian Review Task Force, which was comprised of well-regarded and prominent community advocates as well as NOPD representatives, considered whether and what type of civilian oversight might be appropriate for NOPD.  The Task Force determined that an Independent Monitor who would review policies, procedures, complaint patterns, and the quality of complaint investigations, as well as make regular reports to elected officials, NOPD and the public, would "create the impetus and the focus for correcting problems," "empower citizens with the information necessary to effect change," and would in this way "increase the ability of citizens and the NOPD to identify, address, and correct problems, thereby improving the department and building citizen confidence and support." *Report of the Police-Civilian Review Task Force* at 5.  As noted in the Task Force report, this type of "quality control monitoring" has been used in other communities and has had beneficial results. *Id.* at 6.

Almost a decade later, in August 2009, New Orleans created the Office of the Independent Police Monitor ("IPM") as an independent, civilian police oversight agency. According to the IPM, its mission is to:  improve cooperation and trust between the community and NOPD through objective review of police misconduct investigations; provide outreach to the New Orleans community; and make thoughtful policy recommendations to the NOPD and the City Council.  The IPM recently reached an agreement with NOPD to help ensure it has access to the information it needs to fulfill these responsibilities.  Last year, the IPM volunteered to use its own funds to develop a new early warning system for NOPD, and is currently working with NOPD to implement this new system.  We have met with the IPM's Police Monitor several times and have been impressed with her dedication to building genuine reform and a constructive relationship with NOPD and the community.

In addition, with assistance from DOJ's Community Relations Services, community leaders in New Orleans have contributed significant time and effort to develop a community advisory board in conjunction with NOPD and the Mayor's office.  This board would serve as a sustainable mechanism for ongoing dialogue to understand and address concerns from the community as well as opportunities for the community and police department to work together to achieve common goals.

There are myriad types of civilian oversight and each is capable of improving police-community relations, preventing unconstitutional conduct, and helping to ensure a constructive response when such misconduct does occur.  Because the type of oversight appropriate for any given community is circumstantial, deference should be given to the oversight mechanisms a community has chosen for itself.  Regardless of the type of oversight chosen, it is critical that

xxi

oversight mechanisms be sufficiently resourced and empowered.  We have some concerns regarding whether the IPM has received sufficient resources and latitude to carry out its duties effectively.  Adequate staffing, as well as the ability and authority to promptly obtain internal NOPD records on officer conduct, will be critical to the IPM's success as an oversight mechanism.  Additionally, while it is still in a nascent state, we are encouraged by the steps to develop a community advisory board and hopeful that this will be an important bridge in communications between NOPD and parts of the community most concerned about police misconduct.

When combined with practices that ensure appropriate transparency in police department decisions related to misconduct and tactics, and with tools to measure, assess, and respond to changing community attitudes towards policing over time, civilian oversight can help create a powerful form of community engagement that will ensure that reforms are sustained over time, even after court-ordered oversight has ended.

C.     Summary of Recommendations

In conjunction with our experts, we developed recommendations for correcting the deficiencies that led to the patterns and practices of constitutional violations we observed.  These recommendations are listed in the attachment to this Report.

The recommendations center on our key findings related to unconstitutional policing and its causes, and concern:

- Policies and procedures in each area we reviewed;
- Training for recruits, new officers, experienced officers, and supervisors;
- Supervision for officers in the field, including patrol and task force officers, and for detectives;
- Mechanisms of accountability, including force reporting and investigation, complaint intake and investigation, and discipline;
- Tracking and analyzing data to improve police practices, including an early warning system;
- Moving from policing to increase the number of arrests to an integration of community and problem-oriented policing strategies;
- Measures to address discriminatory policing;
- Paid Details;
- Officer assistance;
- Recruitment, performance evaluations, and promotions; and
- Community Oversight

**Conclusion**

The City of New Orleans took a critical step by asking the Civil Rights Division to conduct a thorough, independent investigation of the Police Department in an effort to bring about the "complete transformation" of NOPD. The Department of Justice's investigation, involving extensive community engagement and in-depth review of NOPD practices, has

provided a fuller understanding of the systemic problems within the Department and the extent of the resulting harm.  This understanding serves as the foundation upon which to build sustainable reform that will reduce crime and prevent crime more effectively, police all parts of the New Orleans' community fairly, respect the rights of all New Orleans' residents and visitors, and prepare and protect officers.  Past reform efforts underscore the need for long term commitment and meaningful engagement of all key stakeholders to fundamentally and permanently transform the Department in this way.  The incredible optimism and desire for change expressed by the people we met tells us that this transformation is within reach.  We look forward to working with the City, the Police Department and the broader New Orleans community to ensure that this effort is successful.

## ACKNOWLEDGEMENTS

In addition to the cooperation and assistance of Mayor Mitch Landrieu and his staff and Superintendant Ronal Serpas and his officers, we received important contributions from other public stakeholders, including the Orleans Parish District Attorney's Office, the Orleans Public Defenders, the New Orleans Civil Service Commission and the City's Office of the Independent Police Monitor.  We also appreciate the willingness of members of the State and Municipal Courts, New Orleans City Council, Louisiana State Legislature, Business Council of New Orleans & the River Region, New Orleans Police and Justice Foundation, and the New Orleans Crime Coalition to meet with us and share their perspectives.  Likewise, the insights and experiences shared by the many interested individuals and community groups with whom we met throughout our investigation were invaluable.

We worked closely with United States Attorney Jim Letten and the United States Attorney's Office for the Eastern District of Louisiana, which provided extensive assistance to Division attorneys throughout the investigation.  DOJ's Community Relations Service ("CRS") coordinated many of the community meetings, working closely with grassroots New Orleans community organizations and enabling community members to express their concerns and proposals for improving public safety in New Orleans.  Additionally, Ellen Scrivner, Deputy Director of the National Institute of Justice, and a former police deputy superintendent and chief psychologist, and Steve Parker, Assistant United States Attorney for the Western District of Tennessee, and a former police officer, each provided extensive assistance.

During our investigation, we coordinated closely with other components of DOJ, in part to enhance our understanding of NOPD and the City of New Orleans, and in part to identify areas of need in which DOJ had already provided or could immediately begin to provide assistance.  We worked with the Office of Justice Programs; the Office of Community Oriented Policing Services; the Office on Violence Against Women; the Office on Juvenile Justice and Delinquency Prevention; and the Access to Justice Initiative.  We also spoke to supervisors with the Federal Bureau of Investigation; the United States Marshal Service; and the Bureau of Alcohol, Tobacco, Firearms and Explosives, about ways to improve federal-local cooperation and coordination.  The National Virtual Translation Center expanded the reach of our work by translating the Executive Summary of this Report into Spanish and Vietnamese.

This collaboration has allowed us to provide the City of New Orleans with substantial assistance.  The City of New Orleans has availed itself of a number of other DOJ criminal justice system trainings, programs and initiatives, including but not limited to:  A Comprehensive Homicide Assessment (U.S. DOJ, Bureau of Justice Assistance ("BJA")); An Integrated Justice Information System Technology Assessment (BJA); Conflict Resolution, Sensitivity and Cultural Competency Training (CRS); Domestic Violence/Sexual Assault First Responder Training (OVW); an Orleans Parish Prison Jail-size Facilities Assessment (ATJ); and Integrated Ballistic Information System Training (ATF).  We further provided assistance that allowed NOPD to begin addressing its considerable backlog of rape kits awaiting testing (NIJ/OVC).

 It is our hope that as we continue to work together to develop and implement these initiatives, we will help New Orleans create a criminal justice system that is both more effective and respectful of civil rights.

## GENERAL METHODOLOGY

The investigative team consisted of lawyers and other staff from the Civil Rights Division's Special Litigation Section.  Throughout our investigation, our understanding was informed by the expertise of law enforcement professionals (current and former police chiefs and supervisors) and other experts working alongside Division attorneys.  These professionals provided in-depth knowledge about how to detect and respond to law enforcement challenges.

We gathered information through many interviews and meetings with NOPD officers, supervisors and command staff, as well as members of the public, City and State officials, and other community stakeholders.  Our investigation included on- and off-site review of documents, including policies and procedures, training materials, incident reports, use of force reports, crime investigation files, data collected by the Department, complaints of misconduct, and misconduct investigations.  We also participated in ride-alongs with officers and supervisors, attended COMSTAT meetings, observed police activity, and met with representatives of police fraternal organizations and several larger group officer "round tables" to elicit officer concerns and ideas about how to improve services provided by NOPD.

We participated in over 40 community meetings, including meetings held at our request as well as regularly scheduled community meetings, including New Orleans Neighborhood Police Anti-Crime Council ("NONPACC") and Rape Crisis Network meetings.  We met with judges from the State and Municipal Courts and members of the District Attorney's Office, the Public Defender's Office, the Civil Service Commission, the Office of the Independent Police Monitor, City Council, Louisiana State Legislators, the Business Council of New Orleans & the River Region, the New Orleans Police and Justice Foundation, and the New Orleans Crime Coalition.

## ABBREVIATIONS

| | |
|---|---|
| NOPD | New Orleans Police Department |
| DOJ | United States Department of Justice |
| ADA | Assistant District Attorney |
| ATF | U.S. DOJ, Bureau of Alcohol, Tobacco, Firearms and Explosives |
| ATJ | U.S. DOJ, Access to Justice Initiative |
| AVL | Automatic Vehicle Location |
| BOP | Black Organization of Police (NOPD Fraternal Organization) |
| BJA | U.S. DOJ, Bureau of Justice Assistance |
| CAD | Computer-Aided Dispatch |
| CoCo | Community Outreach Coordinating Sergeant |
| COPS | U.S. DOJ, Office of Community Oriented Policing Services |
| CVSA | Computerized Voice Stress Machine |
| DWI | Driving While Intoxicated |
| DA | District Attorney |
| ECD | Electronic Control Device |
| FBI | U.S. DOJ, Federal Bureau of Investigation |
| FIC | Field Interview Card |
| FOP | Fraternal Order of Police (NOPD Fraternal Organization) |
| ICO | Integrity Control Officer |
| LEP | Limited English Proficient/Proficiency |
| LGBT | Lesbian, Gay, Bisexual, Transgender |
| MCTU | Mobile Crisis Transportation Unit |
| NOFJC | New Orleans Family Justice Center |
| NONPACC | New Orleans Neighborhood Police Anti-Crime Council |
| NOPJF | New Orleans Police and Justice Foundation |
| OC | Oleoresin Capsicum |
| OIS | Officer Involved Shooting |
| OJJDP | U.S. DOJ, Office on Juvenile Justice and Delinquency Prevention |
| OJP | U.S. DOJ, Office of Justice Programs |
| OVW | U.S. DOJ, Office on Violence against Women |
| PANO | Police Association of New Orleans |
| PD | Public Defender |
| PIB | Public Integrity Bureau |
| PPEP | Personnel Performance Enhancement Program |
| RAR | Resisting Arrest Report |
| SOD | Special Operations Division |
| UCR | Uniform Crime Reports |
| UOF | Use of Force |

II.   **USE OF FORCE**

We find reasonable cause to believe that NOPD engages in a pattern or practice of unconstitutional force.

A.   Legal Standards

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV.  Force used by a law enforcement officer while conducting an arrest or investigatory stop is evaluated under the Fourth Amendment, and use of excessive or unnecessary force during an arrest or stop is considered an "unreasonable" seizure that violates the Fourth Amendment. *Graham v. Conner*, 490 U.S. 386, 394 (1989).

The assessment of reasonableness, and therefore constitutionality, of an officer's use of force is an objective one.  Just as an officer's bad intentions will not render an objectively reasonable use of force unconstitutional, an objectively unreasonable use of force is unconstitutional, even where the officer had good intentions.  *Id.* at 397.  Judging the reasonableness of the force used to effect a seizure requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.  *Id.* at 396.  The analysis "requires careful attention to the facts and circumstances of each particular case" to determine whether the force used was reasonable.  *Goodman v. Harris County*, 571 F.3d 388, 397 (5th Cir. 2009) (internal quotation marks omitted) (citing *Graham*, 490 U.S. at 396).

The most significant and "intrusive" use of force is the use of deadly force, which can result in the taking of human life, "frustrat[ing] the interest of . . . society in judicial determination of guilt and punishment." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).  Use of deadly force is permissible only when an officer has probable cause to believe that a suspect poses an immediate threat of serious physical harm to the officer or another person.  *Id.* at 11.  An officer may employ deadly force against someone who is attempting to evade arrest only where there is probable cause to believe:  1) a suspect has committed a crime involving the infliction of serious physical harm; 2) deadly force is necessary to prevent the suspect's escape; and 3) if feasible, the officer has warned the suspect.  *Id.* at 11-12.  In the words of the Supreme Court, "[i]t is not better that all felony suspects die than that they escape." *Id.* at 11.

B.   Findings

1.   Overview of Force Findings

While police-civilian interactions only rarely require the use of force, there are times when officers must use force to enforce the law, prevent serious injury, or protect life.  The Constitution requires that officers use force only when necessary and that, when necessary, the force used is reasonable under the circumstances.  Our review showed that officers in NOPD routinely use unnecessary and unreasonable force in violation of the Constitution and NOPD

- 1 -

policy.  We noted particular problems with NOPD's use of deadly force; force against restrained individuals, including retaliatory force; and the use of canines.

Our investigation did not include consideration of widely reported allegations of officer misconduct related to NOPD's response to Hurricane Katrina in 2005.  Many of these incidents have been, or are currently being, prosecuted by the Criminal Section of the Civil Rights Division and the United States Attorney's Office for the Eastern District of Louisiana.  We deliberately kept our civil investigation completely separate from the criminal investigation and prosecution of any NOPD officer, and this Report does not discuss any incident that is the subject of ongoing federal criminal proceedings.  Nonetheless, our investigation, which covered incidents that occurred within the past two years and assessed practices as they exist currently, revealed a clear pattern of unconstitutional uses of force by NOPD officers.

Our review of officer-involved shootings within just the last two years revealed many instances in which NOPD officers used deadly force contrary to NOPD policy or law.  We found a pattern of unreasonable less lethal force as well.  We found, for example, that NOPD's canines were uncontrollable to the point where they repeatedly attacked their own handlers, compelling us to recommend immediate suspension of NOPD's use of canines to apprehend suspects.  We found that officers used force against individuals, including persons in handcuffs, in circumstances that appeared not only unnecessary but deliberately retaliatory.  We reviewed instances in which NOPD officers used significant force against mentally ill persons where it appeared that no use of force was justified.  Our review showed further that officers likely report only a small fraction of the force they actually use.

While many of the instances of unreasonable force we reviewed cannot be explained or excused by a lack of policies or training, it is also true that police departments have the ability and responsibility to prevent and detect the use of unreasonable force by their officers.  The components of an effective and accountable use of force system are largely settled.  Police departments must ensure appropriate training in how and when to use force, and provide the supervision necessary for sufficient oversight of officers' use of force.  Departments must also provide officers clear and consistent guidance on when and how to use and report force, in the form of clear and comprehensive policies.  Departments must implement systems to ensure that force is consistently reported and investigated thoroughly and fairly.  The force investigation serves as the basis for reviewing the force incident to determine whether the officer acted both lawfully and consistent with departmental policy, as well as to determine whether the incident raises policy, training, tactical or equipment concerns that need to be addressed for officer and civilian safety.  Use of force aggregate data and trends should be monitored to enable a department to identify and address emerging problems before they result in significant or widespread harm.   We discuss below deficiencies in each of these components of an effective and accountable use of force system, including inadequate:  1) use of force policies; 2) use of force training; 3) force reporting and investigation; 4) use of force review, including reviews of officer-involved shootings; and 5) tracking, analysis, and response to use of force data and trends, including use of an early warning system.

As detailed below, we found that NOPD for years has acted with indifference to whether its officers are using force unconstitutionally and that, as a result, none of the components

necessary to prevent unreasonable force are functioning.  NOPD has allowed the systems and practices that were once in place to prevent and detect excessive force to languish.  NOPD has failed to ensure that policies are accurate, up to date, and consistent, and has not provided adequate force-related academy or in-service training.  NOPD has tolerated and condoned widespread and routine violation of policy and has allowed supervisors and commanders to ignore mechanisms previously established to investigate and review use of force and respond to problematic incidents or trends.

We observed no indication that supervisors or commanders take steps necessary to ensure that officers report force, despite evidence that force is widely underreported at NOPD.  Nor does NOPD conduct meaningful investigation and review of any type of force.  We discuss below specific incidents and types of unreasonable force that NOPD consistently has failed to investigate.  We found that the deficiencies in NOPD's investigations of officer-involved shootings were, in some instances, so blatant and severe that the mishandling appeared intentional.  We found further that NOPD's oversight of its officers' use of deadly force has been so perfunctory that until we inquired, NOPD did not know where some officer-involved shooting investigation files were located and did not initially provide officer-involved shooting investigative files for approximately one-half of the incidents that occurred during the time period we were reviewing.  Several officer-involved shooting investigations are still missing.

As a result of these deficiencies, there is little accountability for officers who use force contrary to law or NOPD policy.  We found repeated instances where officers used force, including deadly force, in a manner that plainly contradicted NOPD policy or the Constitution, and that endangered the lives of civilian bystanders and other police officers, yet no one in the chain-of-command held officers accountable.

We fully recognize the many dangers faced by law enforcement officers and that officers sometimes have to use force to enforce the law, defend themselves, or to protect others.  However, NOPD's use of force practices present a significant threat to public and officer safety, and create a substantial obstacle to building the strong community partnerships necessary to prevent crime.  As we were completing our investigation, NOPD began to make significant changes to force policies, including how officers will be trained to use force, and how force will be reported, investigated, and reviewed.  These changes are urgently needed and long overdue.  They are also only a small part of the comprehensive reform necessary to ensure that NOPD officers use force in a manner that is consistent with the Constitution.

2.     Unreasonable Use of Force

The prevalence and nature of the force-related misconduct we observed indicates that NOPD officers' use of unreasonable force in violation of the Constitution is widespread.  The incidents of unreasonable force we reviewed reflected generally poor tactics and lack of adherence to all use of force policies, rather than problems with force of a particular type or in particular circumstances.  Moreover, within NOPD, unless there is an injury requiring medical attention, there is little to prevent an officer from not reporting force, and it does in fact appear that a significant number of force incidents are unreported at NOPD.  We noted particular

problems in some areas, including the use of less lethal force,[2] particularly against restrained persons; the use of canines; and the use of deadly force.[3]

a)   *Less Lethal Force,  Force against Restrained Persons, and Retaliatory Force*

Our review of non-deadly use of force incidents included a review of almost 100 NOPD Resisting Arrest Reports ("RARs") documenting uses of force by NOPD officers between January 2009 and May 2010.[4]   We found that in a number of instances officers used force that appeared unreasonable in light of the described resistance and other relevant circumstances.  In many of the incidents we reviewed, the resulting injuries were inconsistent with the force as described and this inconsistency was not explained.  There was no indication that the reviewing supervisor probed the apparent inconsistencies or established critical facts, and the report was approved as written.

In some instances it was not necessary to look beyond the officer's own description of force to determine that the force used appeared excessive.  In one incident, an officer at central lock-up punched an apparently handcuffed arrestee in the jaw with a closed fist after the arrestee spit on the back of the officer's head.  After being punched in the face by the officer, the arrestee fell back and hit his head on the wall, sustaining what the RAR described as a "small laceration." The arrestee was then "put in the back of the [transport] wagon," where, according to the RAR, he began "rolling around," cutting himself above the right eye.  The arrestee was taken to the hospital for treatment, where a sergeant arrived and had other officers take over to "remove [the] officer [who used force] from the situation."  The supervisor approved the officer's admitted use of force, even though, if used as described by the officer, the force was clearly retaliatory and excessive.  The supervisor did not document that the arrestee was handcuffed, which under any set of police practices he would have been, and did not probe any of the subsequent injuries.  The

---

[2] NOPD uses the term "Less than lethal" to describe intermediate level force.  In our view, the term "less lethal" is more accurate and provides clearer guidance to officers.  "Less lethal" is a term of art that refers to weapons and tactics that are *designed* to temporarily disable or stop a suspect without killing, thereby providing law enforcement with an alternative to lethal force. These weapons and tactics should not be referred to as "less than lethal" because they have resulted in fatalities and in general have a greater potential for lethality than lower level uses of force such as, for example, soft hands or hard hands.

[3] Our review of NOPD force was based almost entirely upon information provided by NOPD, primarily reports written by NOPD officers and ratified by NOPD supervisors.  We did not "look behind" these materials by, for example, interviewing the individuals against whom force was used or the involved officers, or by reviewing primary source evidence such as audio or video recordings or other forensic evidence.  Because our findings are largely based on NOPD's self-reporting, it is reasonable to believe that further inquiry would reveal additional problems with NOPD's use of force.

[4] We reviewed 96 RARs involving force incidents that occurred between January 1, 2009, and May 31, 2010.  This sample included an over-representation of reports involving Electronic Control Device (ECD) discharges.  During the time period we reviewed, NOPD had a greater organizational commitment to, as well as clearer protocols about, reporting ECD use.  Recognizing this, we make no finding regarding whether ECDs are over-used within NOPD as compared to other weapons.  We did, however, for each ECD incident reviewed, assess whether the use of the ECD in that instance was justifiable.

supervisor failed even to document the injuries, interview any witnesses, or make any attempt to determine what force was used and how that force resulted in the described injuries.

The above described incident raises also the issue of retaliatory force by NOPD officers. Based on our review of this incident and others, the use of retaliatory force, which is by definition unconstitutional, appears widely accepted within the Department. Indeed, when one NOPD officer reacted calmly after being spit on by another NOPD officer he had stopped for DWI, fellow NOPD officers told the arresting officer he was a coward for not at least punching the officer, according to reports of the arresting officer's testimony in court in December 2010. It is reasonable to believe that if officers find it appropriate to hit another officer in retaliation for disrespectful behavior, and if an officer will be ridiculed for not using unnecessary force in such situations, that NOPD officers will be at least as likely to use unlawful retaliatory force against civilians who show similar disrespect.

We found that the use of significant force against restrained persons by NOPD officers is relatively frequent and approved with little inquiry by supervisors. The use of significant force against handcuffed suspects should always be subjected to great scrutiny because such force is generally unnecessary. Particularly where officers repeatedly justify force against restrained suspects on losing control of the suspect, as they do at NOPD, officer-safety and accountability demand that an agency immediately investigate and then either correct dangerously poor tactics, or hold accountable officers found to have claimed falsely to have lost control of a suspect.

The reports we reviewed indicated that instead of increased scrutiny, supervisors generally accepted without question officers' loss-of-control justification for using significant force. In the incidents we reviewed, there was no clear explanation of how officers lost control of the individual or why the force used was reasonable under the circumstances. In one instance, for example, two officers deployed an Electronic Control Device ("ECD")[5] against a handcuffed arrestee who reportedly attempted to flee after being arrested for drug offenses and possession of a firearm. When he was taken to the hospital, the arrestee was treated for injuries that included a broken nose, as well as abrasions, bruises, and swelling. Despite the level of injuries and the fact that the man was handcuffed during at least part of this use of force, there was no real investigation, or even report, of the incident. The RAR, which is supposed to be written by the sergeant and incorporate the sergeant's investigation of the incident, and the Incident Report, which is supposed to be written by the officer, are identical (a frequent occurrence in our review). Neither indicates how the suspect was able to escape; how he sustained a broken nose; or why a lesser force option was not available. In another incident, officers deployed an ECD against a handcuffed man while re-apprehending him after a foot chase. The officers were arresting him for auto burglary and he had already been apprehended once after a foot chase (any force used to effect the first apprehension was not reported). The officers deployed an ECD when the handcuffed man "struggled" during the re-apprehension. The officers did not explain what force they used to apprehend the suspect the first time; how a handcuffed subject had managed to escape from them; the nature of the resistance they encountered justifying the use of

---

[5] We use the term ECD (Electronic Control Device) because this is the term used in NOPD policy. Other common terms for the weapon more commonly known by the brand name TASER, include Conducted Energy Device ("CED") and Electronic Control Weapon ("ECW").

an ECD; or what injuries, if any, the man sustained.  The reviewing sergeant did not interview the subject, or in any way investigate these issues.

In other instances, significant force, including ECD force, was used on restrained individuals where the circumstances, as described by the involved officers themselves, did not justify the level of force they used.  In one such incident, an officer used his ECD to drive-stun[6] a handcuffed woman being arrested for public intoxication after she "attempted to strike [an] officer with [her] body" while several other officers were attempting to put her in the back of a police vehicle.  There is no indication that any lesser degree of force was attempted or that the level of resistance required use of this level of force.  Rather, the incident report states, "[d]ue to the subject not following any of the officers commands she was drive tazed by [the officer]."  As described by the officers, the force used was excessive.  There is no indication that the sergeant reviewing the force questioned why officers did not attempt a lesser degree of force, or why basic evidence, such as witness interviews, was not gathered.  In a similar incident, three officers patrolling in one vehicle used their ECD in drive-stun mode twice against a handcuffed man who was being arrested for driving with a suspended license, so that they could more easily retrieve marijuana that the handcuffed man was attempting to hide.  Using an ECD to retrieve evidence, particularly under the circumstances described in the RAR, is unreasonable.

We also reviewed instances in which NOPD officers unreasonably deployed ECDs in circumstances that increased the potential lethality of the ECD.  In one incident, for example, officers deployed an ECD against an individual riding a bicycle who had been shining a hand-held flashlight into the windows of vehicles parked on the street and fled when officers approached him.  The Incident Report (but not the RAR) states that the ECD struck the bicyclist in the back.  The individual "immediately stopped pedaling and released the bike."  There is no description of the injuries the subject incurred, only that "the subject was transported to university hospital for medical attention, then transported to central lock-up to be booked accordingly."  It is contrary to accepted police practice to deploy an ECD against an individual riding a bike, as falling off a bike with no motor control (and thus no ability to break a fall by putting hands out, etc.) creates a risk of serious, potentially lethal, injury.  In the circumstances described by the officers in their reports, this use of force was excessive.  It also violated NOPD policy, which states that "[p]roper consideration and care should be taken when deploying the ECD on subjects who are in an elevated position or in other circumstances where a fall may cause substantial injury or death."  *See* Ops. Man. Chapter 1.7.1.

### b) Canines

At the time of our investigation, NOPD's canines and their handlers were so poorly trained that handlers were not able to adequately control their canines, substantially increasing the risk that canines would bite individuals, even after those individuals were complying or trying to comply with officers' orders.  Our on-site observation of each dog and its handler undertaking drills that are routine at other police departments revealed that some dogs were almost completely uncontrollable and the rest were not consistently controllable.  One dog

---

[6] The drive-stun function of an ECD, also known as "pain compliance" mode, delivers non-incapacitating pain through direct contact of the ECD with the body.

attacked its handler twice over the period of a few hours while we were on site in October 2010. During our review of documents, we learned that there were at least three additional incidents between December 2009 and October 2010 where NOPD canines bit NOPD officers. Our review indicated that NOPD canines bite subjects approximately six out of ten times they apprehended a suspect—over twice as high as the three out of ten rate one would expect to see in a well-run canine unit.[7] NOPD's own analyses found that NOPD canines bite subjects more than 68% of the time they apprehend a suspect.[8] Especially concerning was the level of obedience demonstrated in an exercise termed "recall." In this exercise, a dog is taken off leash and ordered to attack an officer in a protective suit. After the dog has been released and is charging the subject, the officer commands the dog to stop the attack. It is essential that a canine/handler team be able to perform this exercise with precision. Many of the handlers were unable to recall their dog during the exercise and most had never previously executed this exercise.

Our observations indicated that the handlers' inability to control their dogs was a result of inadequate training and supervision rather than poor social disposition of the dogs (with the exception of one dog). We learned that none of NOPD's canines were certified to engage in criminal apprehension by any nationally recognized organization, and that there was no other assessment in place to provide adequate assurance of the Canine Unit's proper training and conduct. NOPD policy requires that canine teams attend two days of training per month, which comports with the industry standard of 8 hours every four weeks, or 16 hours every 4-6 weeks. NOPD policy also calls for canine handlers to maintain their own training records and, as a result, NOPD does not centrally maintain training records for its canines or their handlers. The Canine Unit was unable to provide any record of any dog's initial certification or of any subsequent recertification or training. Canine handlers informed us that, they had only trained with the canine trainer twice during the calendar year, contrary to industry standard and NOPD policy. Moreover, the Canine Unit's current trainer lacks sufficient training, experience, and certification to train the dogs and their handlers, and the Unit as a whole lacks supervision. The Unit's current supervisor appeared dedicated and well-meaning but was unfamiliar with conventional training practices and unaware of what training the dogs under his supervision have.

We found also that canine deployments and apprehensions are so poorly documented that appropriate oversight is not possible. When an apprehension results in a bite, an RAR is completed and approved by the sergeant supervising the Canine Unit. We reviewed 52 canine RARs covering the period from January 2009 through March 2010 and found every report deficient. These RARs were extremely short and used boilerplate language that was not tailored

---

[7] We base this 30%—or less—bite rate on the opinion of our canine expert as well as review of related research and case law. *See, e.g.*, *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1551 (11th Cir. 1989) (recounting expert testimony that "less than thirty percent of apprehensions should, on average, result in a bite" in a "properly trained and supervised canine unit").

[8] The information NOPD provided regarding bite ratio reflected an inaccurate understanding of how to calculate bite ratios. In addition to the information noted above, in response to a request for their canine unit's "bite ratio," NOPD informed us that their canines bit subjects 41 times in 109 deployments. It is widely accepted that when calculating a bite ratio, the number of apprehensions, not deployments, must be used as the denominator. Using deployments as the denominator decreases reliability, as "deployment" can be more widely defined than can "apprehension" and creates an incentive to deploy one's canine unnecessarily.

to the specific incident and did not describe with particularity the events leading up to the decision to deploy the canine. Such language included that the canine "apprehended the subject," that the subject "received minor dog bites," and that the canine "made physical contact" with the subject. Particularly since the handlers are not required to write Incident Reports or otherwise document their canines' use of force first-hand, it is not clear from where the sergeant obtained the information that is contained within the RAR. None of the reports described the nature or severity of the wounds and no photographs were taken to document injuries received. There was no indication that the sergeant who approved the use of force reviewed any of the corresponding Incident Reports.

The only reporting requirement of the Canine Unit is contained within the "New Orleans Police Department K-9 Unit Policy and Operating Procedures." It requires that, when a canine bites a suspect during an apprehension, "a departmental 'USE OF FORCE' report shall be completed and distributed by Canine Unit Supervisor within a 24 hour period." The key term "Use of Force report" is never defined, but use of this term indicates that this policy has not been substantively updated since at least before NOPD began using RARs rather than Use of Force reports. Canine patrol policy specifies that "canine officers shall complete only those reports required by the Canine Unit." Ops. Man. Ch. 41.22. Based on the documentation we reviewed, it appears that when a Canine Unit conducts a search and no bite results, the handler subsequently fills out a form entitled "N.O.P.D. Patrol K-9 Data," which is then approved by the Unit Commander. However, there is no written policy requirement that this documentation be completed, and therefore no accountability for failing to do so, raising concerns about whether this reporting is completed consistently.

Our concerns regarding NOPD's canine program were serious enough that we immediately asked the Superintendent to suspend the use of canines for suspect apprehension until NOPD was able to ensure that the canines and their handlers were properly trained and able to apprehend suspects lawfully and without unnecessary injury. We further recommended that each canine be assessed for suitability for criminal apprehension work. To the Superintendent's credit, he immediately suspended the use of canines for criminal apprehensions. We have been working, and will continue to work, with NOPD to implement both short and long term remedies to NOPD's canine program.

### c) *Officer-Involved Shootings*

Our review of NOPD officer-involved shootings revealed unconstitutional uses of deadly force, repeated violations of NOPD policy, and critical officer safety issues.[9]

Many of the officer-involved shooting incidents we reviewed involved shooting at vehicles in circumstances that did not justify the use of deadly force or were contrary to NOPD policy. Shooting at vehicles is generally a poor tactical choice because it is difficult to fire effectively; if the driver is disabled by the shot, the vehicle becomes a potentially more

---

[9] We reviewed all identified officer-involved shootings for the time period covering January 2009-May 2010. We were provided with 46 reports that involved an officer discharging a firearm during this time period. Of those, we analyzed 27. The remaining nineteen consisted of five accidental discharges, thirteen shootings at dogs, and one incident in which an officer discharged his weapon to escape a vehicle after an accident.

dangerous unguided missile; and there is a high risk of significant injury or death to bystanders. NOPD's Use of Force policy acknowledges these dangers and states that, "Police Officers shall not discharge a firearm from a moving vehicle or at a moving vehicle, unless the occupants of the vehicle are using deadly force, other than the vehicle, against the member or another person, and such action is necessary for self-defense or to protect the other person." *See* Ops. Man. Ch. 1.2.

Nonetheless, we reviewed a number of incidents in which NOPD officers fired their weapons at moving vehicles in direct violation of this policy, in some instances after the vehicle had passed by, at which point the use of lethal force was not reasonable under the circumstances. In several instances, officers shot at vehicles after the officers had placed themselves or their squad cars directly in front of fleeing vehicles, a practice contrary to sound tactics and NOPD policy. *See* Ops. Man. Ch. 41.5. In one case, where an officer placed himself in front of a vehicle and was thrown over its hood, several officers responded by shooting and killing the vehicle's driver. In another instance, an officer fired at the tires of a fleeing vehicle, a clear and dangerous violation of NOPD policy. In still another case we reviewed, an officer fired at a driver purportedly accelerating towards the officer, instead of the officer getting out of the path of the vehicle, as required by NOPD policy. The officer suspected the driver was breaking into cars.

A number of the problematic shootings we reviewed were carried out by sergeants. In one of several shootings involving sergeants, a sergeant, who has been involved in six officer-involved shootings in four years, fired several shots at individuals fleeing from him on foot in a residential area. The sergeant gave conflicting accounts as to why he fired his weapon, and the sergeant's decision to engage in a foot pursuit was tactically questionable, given that he was by himself, at night, and the only infraction he had cause to believe the subjects had committed was failure to wear seatbelts (although he stated he suspected them of selling drugs).

As discussed below, we find reasonable cause to believe that deficiencies in NOPD's investigation and review of officer-involved shootings contribute to officers' use of deadly force that is contrary to policy or excessive. Moreover, NOPD's failure to adequately investigate and review officers' use of deadly force likely endangers officers by failing to detect and correct deficiencies in NOPD policy, training, tactics, and equipment.

3.      Failure to Implement Measures to Prevent Unreasonable Force

The patterns of unreasonable force we observed are rooted in a number of longstanding systemic deficiencies within NOPD, including a failure to implement adequate: 1) use of force policies; 2) use of force training; 3) force reporting and investigation; 4) use of force review, including reviews of officer-involved shootings; and 5) tracking, analysis, and response to use of force data and trends, including use of an early warning system.

a)      *Use of Force Policies*

We found that many officers, supervisors, and commanders have a poor understanding of use of force policies. When we asked, for example, what level of force should be used against a handcuffed subject who is inside the back of a police car kicking, one sergeant (who heads a task

force) told us, contrary to generally accepted police practice and NOPD policy, that an ECD should be the first level of force used.

While this poor understanding of how to use force appropriately is due to a number of factors, including insufficient training and poor supervision, its foundation lies in the extensive deficiencies of NOPD's force-related policies. We found that NOPD has made little attempt to ensure that its use of force policies provide necessary guidance to officers. NOPD's policies regarding what constitutes force, when various levels of force may be used, and when force must be reported, are incomplete, outdated, contradictory, and often incorrect. NOPD's force policies are scattered through a number of directives[10] and have not been substantively updated in many years, in some instances over a decade. In many instances policy "revisions" appear to involve nothing more than changing the date. When NOPD has implemented new use of force policies, it has been done with little thought to how they will integrate with existing policies and practices. As a result, force policies conflict with each other and, taken as a whole, leave significant gaps. No NOPD policy, for example, provides guidance for how first responders (usually patrol officers) should respond to individuals experiencing a mental health crisis.

In many instances, key terms used throughout policies are not defined, or defined in conflicting or inaccurate ways. NOPD's primary use of force policy fails to provide definitions for key terms such as "non-lethal," "physical force," and "bodily force" and contains two different definitions for "deadly force." The definition of "excessive force" is convoluted and misleading, noting that serious injury or death is not "absolutely" necessary for force to be excessive. The policy quotes Louisiana law extensively, but does not define any of the terms included, such as "imminent danger" and "violent or forcible felony." Nor is there any explanation of how these state law requirements or terms interact or whether they are integrated into the rest of NOPD's force policy.

In some respects, NOPD's force policy implies that NOPD uses a force continuum. For example, the skills and equipment that are included are listed in ascending order of seriousness, and the baton is referred to as an "intermediate level of force." But, the policy does not include the guidance that would make a use of force continuum useful to officers, such as identifying all levels of force and the types of resistance against which such force can be expected to be effective. Related force policies are similarly deficient. The ECD policy provides officers no guidance about when an ECD, as opposed to another type of force, is appropriate, or what types of resistance justify ECD use. In general, it appears that the ECD policy (which refers to ECDs as TASERs, the brand name, throughout) has been largely cut and pasted from vendor materials, and that little if any attempt has been made to integrate it into NOPD's use of force policies.

NOPD is currently rewriting its use of force policies. To be effective, this effort must be comprehensive and ensure that force policies are integrated, consistent, and complete.

---

[10] *See* Ops. Man. Ch. 1.2, *Use of Force*; Ch. 1.13, *Policy on the Use of Force*; Ch. 1.7, *Oleoresin Capsicum Spray*; Ch. 1.7.1, *Electronic Control Device (ECD)*; Ch. 41.4, *Response to Police Calls*; Ch. 41.5, *Vehicle Pursuits*; Ch. 41.22, *Canine Patrol*.

b)      *Use of Force Training*

(1)      General Use of Force Training

The impact of NOPD's deficient force policies is substantially exacerbated by the deficient use of force training NOPD provides its officers.  Police departments have long recognized the importance of training in preventing excessive force, yet NOPD does not provide necessary training on how to use force effectively, or on tactics to avoid using force.  NOPD's use of force training is insufficient in amount and quality.  NOPD does not prepare new recruits in how to use force effectively and appropriately.  Nor does NOPD provide sufficient in-service training to ensure that officers refresh and refine their skills or understand new tactics and changes in the law.

Once recruits become officers, use of force "training" within NOPD consists primarily of annual firearms and ECD recertification.  Training Division staff reported that firearms recertification is scheduled for one to two hours per year but, because of travel time and other logistical issues, the actual training lasts about thirty minutes.  There is thus no actual training attached to firearms recertification.  Officers thus do not receive critical training in deadly force judgment or role-play or scenario-based training.  Nor has there been routine and mandated training on Oleoresin Capsicum ("O.C.") spray, the baton, or hand-to-hand encounters.  There is no training on critical use of force legal or policy issues, force options, the appropriate application of deadly force or less lethal force, or the practical application of the use of force tools and techniques.

Since there is no use of force training, there is no written testing to determine whether officers understand the limits imposed by the law and NOPD policy, or performance testing to determine whether they can properly use and apply NOPD approved physical control techniques and weapons.  NOPD officers also are not trained on what constitutes reportable uses of force, and NOPD supervisors are not trained in use of force report writing and investigation.

NOPD's failure to adequately train its officers leaves officers ill-equipped to deal with dangerous situations in the field.  Without the skill set to de-escalate or control volatile situations, officers are more likely to lose control of situations and resort to force.  They are more likely to feel unsafe and to be unsafe.  The unreasonable uses of force and tactical errors we observed in our review of use of force incidents were consistent with this lack of training.

NOPD officers at all ranks acknowledged the lack of adequate use of force training, and nearly every officer expressed a desire for more and better training in using force.  The Superintendent has been making efforts to increase and improve force training, recently announcing, for example, a plan to dedicate one and a half days per year to specifically focus on new arrest techniques, including training officers to safely avoid using force in making arrests.  This force training is a positive initial step to ensuring that all NOPD officers are trained adequately in using, reporting, and investigating force.

(2)       Training in Mental Health or Behavioral Crisis Response

Crisis intervention policies and training can change officers' preconceived notions of mental illness, decreasing officers' use of force, and improving officer safety when responding to individuals in mental health crises.  NOPD in recent years has experienced both the tragedy of an officer being killed by an individual in apparent mental health crisis, as well as the tragedy of killing an individual in apparent mental health crisis.  While it is not always possible to determine conclusively in retrospect the impact of better policies and training on such incidents, these deaths underscore the importance of policies and training to minimize the potential for harm in interactions between officers and individuals in mental health crisis.

In several of the use of force incidents we reviewed involving officers using significant force against persons in apparent mental health crisis, it appeared that if officers had been trained in responding to such persons, they might have avoided the use of force altogether.  In one incident, NOPD officers responded to a scene where a man was on his own property in a large tractor trailer, claiming to be a "member of the secret police" with "an affidavit to prove it." Under circumstances in which the use of any force was questionable, officers deployed an ECD twice against the man to little effect.  A sergeant arrived on the scene and was "able to convince [the man] to come to the front of the trailer and display his secret police affidavit to him."  The man was then apprehended without further incident.  Unlike the officers who first responded to the scene, the sergeant employed tactics that involved no force and were effective.

In addition to incidents we learned of during our review of documents, we heard many concerns about NOPD's response to mentally ill persons in our conversations with the broader New Orleans community.  Mental health professionals as well as community advocates in New Orleans characterized NOPD interactions with subjects suffering serious mental illness as resulting in avoidable or excessive uses of force and lacking in sensitivity.  One mental health community advocacy organization explained the problem "of police being called on by families for assistance in getting a loved one who is mentally ill, depressed or in emotional crisis to a hospital for care, only to have their loved one injured or killed by responding police officers."

While all police encounters involve some level of risk that force may be necessary to apprehend the subject, police encounters with subjects suffering serious mental illness and experiencing a behavioral crisis involve a greater risk that the officers will employ force.  Such incidents may involve a suspect that does not immediately respond to the directives of the officer, and who may perceive the officer as a threat.  Such incidents may also involve officers that misinterpret the behavior of the subject as deliberately threatening, or who have not been trained in de-escalating such crises without resorting to force.

While NOPD provides limited mental health crisis intervention training to officers on its hostage negotiation team and to the Mobile Crisis Transportation Unit ("MCTU"), it does not provide adequate crisis intervention training to patrol officers, who are often the first-responders. Reportedly, the only training on crisis intervention is provided during basic academy training when the officers learn about the function of the MCTU, and some ad hoc roll call training provided by the Director of the MCTU.  As a result of this lack of policies and training, it appears that NOPD is not identifying many of the individuals they encounter that suffer from

mental illness;[11] sometimes uses more force than necessary in such encounters; and is not taking full advantage of emerging community resources to divert persons in mental health crisis directly to medical treatment where appropriate.

We found some recent successes in this area at NOPD, including the innovative and expanding MCTU.  NOPD's MCTU is an innovative unit staffed with well-trained and dedicated community volunteers to assist NOPD patrol units in processing and transporting subjects with serious mental illness to a hospital emergency room or other available mental health treatment center.  The officers and volunteers of this Unit are working with NOPD leadership and the community to develop new models of crisis intervention and training.  This work in developing models of crisis intervention for first responder patrol officers is critical, as the function of the MCTU is limited to the post-apprehension transfer of the subject.  The MCTU has tremendous value but should not replace the need for crisis intervention training targeted at first-responder patrol officers.

<em>c)      Use of Force Reporting and Investigation</em>

To help ensure that unsafe tactics and misconduct are identified and can be prevented in the future, the facts of every use of reportable force must be established accurately, and reviewed fairly and thoroughly.  For the lowest levels of force, sometimes referred to as "soft" control techniques[12] where there is no complaint of injury and no discrepancy in the descriptions of the force used, a report fully describing the force used may be sufficient.  However, for even moderate levels of force, such as hand strikes and pushes, and in particular where there is a complaint of injury or a discrepancy in the description of the force used, some level of investigation and review is required, even in the absence of a formal misconduct complaint.

NOPD policy purports to provide for such force reporting, investigation, and review, but does not provide sufficient guidance for when and how to report or investigate force, or set up a realistic framework for meaningful review.  As a result of this, in combination with inadequate training and little accountability, investigations of reported force are generally of too poor quality to serve as the basis for useful force review, and many uses of force are never reported at all.

---

[11] Data provided by NOPD appears to show approximately 200 calls-for-service per month related to a mental health crisis. For a city the size of New Orleans, attempting to take into account the increase in mental illness post-Katrina, this number would be expected to be three to four times higher than this reported 200 calls for service.

[12] "Soft" control techniques usually include techniques such as wrist locks and arm twists and, performed correctly, present a minimal risk of injury. Generally, these techniques are used to control passive or defensive resistance. However, soft control techniques can be utilized for any level of resistance if tactically possible and legally permissible.  By comparison, "hard" control techniques include striking techniques using the hands or feet, and are more likely to cause injury.  The forceful direction of the suspect to the ground, sometimes called a "take-down," is generally considered a "hard" control technique. Generally, hard control techniques are used to counter defensive resistance, active aggression, or aggravated active aggression.

1)      Unreported Force

We found that NOPD tolerates widespread underreporting of force by its officers. Underreporting appears to be due in part to poor understanding of what force must be reported by policy; as discussed below, many officers reported to us that they would report force only where the subject of the force was injured or complained that the force was excessive, even though NOPD policy requires broader force reporting.  Underreporting also appears to be the result of systemic failure to hold officers accountable for not reporting force, or to even acknowledge the extent to which NOPD officers use force.  Some District Commanders reported to us that no officer in their entire District had used force in weeks or, in one instance, months.  One sergeant told us his task force, a unit that tends to have higher than average arrests and force encounters, did not have a single incident of reportable force in the previous three month period.  Given the number of arrests NOPD officers make, such claims lack credibility and indeed, officers, supervisors, and commanders at all ranks expressed to us a lack of confidence that force is consistently reported.

A snapshot of force reporting for one month further indicates that officers do in fact report only a small fraction of the force they actually use.  We reviewed all uses of force reported by NOPD officers for the month of June 2010, 34 reports in all.  During this same month, NOPD effectuated 6,787 arrests.  Nationwide, estimates of force rates vary, but generally range from approximately 2-5% (*i.e.* for every 100 arrests, officers use reportable force in approximately 2-5 arrests).[13]  Thus, in the month of June 2010, if NOPD officers were using force at the national average rate, one would expect to have seen between approximately 135 and 340 uses of force, rather than the 34 NOPD reported.  This underreporting appeared to be prevalent throughout the Department.  In every district there were a substantially lower number of uses of force reported than one would expect based on the numbers of arrests.  In one district, officers made 647 arrests in June 2010 and did not report a single use of force.  Our conversations with NOPD staff reported similarly incredible use of force rates.

Our dataset of a random sample of RARs had fewer reports related to hands, fists, or other bodily force than would be expected in a department that by policy requires reporting this type of force.  In our view, this is at least partially explained by the fact that NOPD has more structured protocols for how to report ECD deployment, and to some extent the use of O.C. spray, resulting in more accurate reporting of these types of force.

---

[13] *See, e.g.,* Edward R. Hickey & Joel H. Garner, *Rate of Force Used by the Police in Montgomery County, Maryland,* U.S. Dep't Just. Nat'l. Inst. Just. 199877 (2002) (reporting a force rate of 6.4 percent);  William Terrill, Ph.D, *City of San Antonio, Texas Police Department Use of Force Analysis  July 1, 2001-December 31, 2002,* (2003), *available at* www.sanantonio.gov/SAPD/pdf/UOFcomplete.pdf. (reporting a force rate of 2 percent); Dr. Steven Brandl, *An Overview of Milwaukee Police Department Use of Force Incidents:  January 1, 2010 to June 30, 2010,* Rept. Fire and Police Commission (2010),  *available at* www.ci.mil.wi.us/ImageLibrary/.../ 2010_ MidYear _Use_of_Force_Report.pdf  (reporting a force rate of 1.12 percent).  We found no evidence that NOPD officers use force at less than the average rate.  It is likely that the variance in force/arrest ratios is due in part to different requirements among law enforcement agencies of what force must be reported.  NOPD policy requires generally broad force reporting.

Widespread underreporting of force by officers means that NOPD has no opportunity to learn from use of force incidents. It also means that NOPD does not learn of some uses of force that were unjustified and should have resulted in officers or supervisors being held accountable. It appears that part of the reason that force is reported at very low rates within NOPD is that its force reporting policies do not require, or at least are not understood to require, reporting some of the force that officers use. However, the larger problem appears to be that within NOPD many officers simply do not report the force they use, despite knowing that policy requires that they do so, and that NOPD does not hold officers accountable for failing to report uses of force.

(2)     Force Reporting Policies

NOPD's policy on use of force reporting, Ops. Man. Ch. 1.3, *Resisting Arrest Report,* states that force reporting: "shall benefit the Department by identifying training improvements; problem assignments, activities or locations; potential liability issues and situations; the cause of confrontation and conflict resolution; and statistical data to assist in the planning and the development of policies and procedures." This is a good policy but it is not being followed. We saw no evidence that force was being reported, reviewed, or analyzed in a way that would realize any of these stated benefits.

NOPD's Use of Force and RAR policies each address when and how force must be reported, but conflict with each other and, even read together, contain signification gaps.[14] One critical deficiency is that neither chapter defines "reportable use of force" or otherwise provides clarity on what types of force must be reported. The RAR policy states that a RAR "shall be prepared when an employee of the Department is involved in any situation where lethal and/or less than lethal force is used by or toward an employee." However, "less than lethal force" is not defined in the NOPD Operations Manual and it is unclear whether reportable "less than lethal force" is meant to encompass only the devices explicitly specified as less than lethal in NOPD's Use of Force policy (batons and chemical agents), or is meant to cover *all* types of force besides lethal force, including, for example, bodily force such as hits, kicks, and leg sweeps.

Another provision of NOPD's force policy is likely responsible for the erroneous opinion we heard voiced more than once by NOPD officers; that force need only be reported if it results in injury. The policy states that "in all instances where physical force is used to control an individual and the individual is injured or complains of injury, the supervisor shall complete an offense report covering the circumstances surrounding the incident." The terms "offense report" and "physical force" are not defined in either the Use of Force or RAR policy, further confusing how and when to report force.

Not surprisingly, officers and commanders at all levels expressed confusion or contradicted each other when describing what NOPD considers reportable force, and NOPD's definition of less than lethal force. One Captain who currently commands a District told us that an officer need only report force when the officer used more force that the officer thought

---

[14] NOPD policy on use of force reporting is captured primarily in its *Use of Force* policy, Ch. 1.2, and its *Resisting Arrest Report* policy, Ch. 1.3, and to a lesser degree in Ch. 1.6, *Police Firearms Discharge,* and Ch. 1.24, *In Custody Deaths.*

necessary.  During a visit to another District station, we observed an arrestee who was bleeding from his forehead.  An officer stated that the man had injured his head after officers dragged him out from under a house; the arrestee stated that an officer had pulled him off a fence by his ankle, causing him to fall and hit his head.  While the officers and subject disagreed on what type of force led to the injury, all parties agreed that the officers had used force and that the man was injured.  Yet we received conflicting answers from the officer, his sergeant, and the lieutenant, about whether a use of force report would be completed, and whether the man would be taken to the hospital, even though NOPD policy clearly required both.

Officers also displayed inconsistent and erroneous understandings of when officers must notify NOPD's Public Integrity Bureau ("PIB") of a use of force.  Some told us PIB would be notified only where there is a discrepancy between an officer's and subject's description of a force event.  Others told us PIB would be informed if a supervisor thought excessive force had been used.  NOPD's RAR policy in fact requires that the completed RAR "shall be forwarded" to PIB within 24 hours from the time of the force incident, and does not appear to limit this to RARs involving only more serious or questionable uses of force.

Neither the Use of Force nor RAR policy makes clear that an employee observing a use of force has a responsibility to report that force. In fact, NOPD's RAR policy appears to release employees from that responsibility, stating that "[r]esponsibility for the notification of an appropriate supervisor within his chain of command to handle the report shall rest with the employee involved in the incident."  It is appropriate to place the primary responsibility for reporting force on the officer that used the force, but any reporting policy should make clear that all employees have a responsibility to ensure that force is reported, especially where the employee believes the force used was unreasonable.

(3)     RAR Investigations

Our review of RARs and related policies, as well as conversations with NOPD officers, supervisors and commanders of all ranks, make clear that NOPD does not routinely investigate the uses of force that officers do report.  Further, we saw no accountability for supervisors who conduct inadequate force investigations.  By tolerating supervisors' failures to investigate uses of force NOPD gives up the opportunity to correct dangerous behavior, and instead sends the message that there is little institutional oversight or concern about officers' use of force.

Pursuant to NOPD policy, a supervisor is required to respond to the scene to "conduct the necessary follow-up investigation" of each "resisting arrest incident."  As discussed above, NOPD policies do not make clear what constitutes a "resisting arrest incident" requiring supervisory follow-up.  However, even in circumstances where a RAR is completed, we generally did not find evidence of the "follow-up investigation" required by policy.  We found that in many instances it does not appear that the supervisor even responds to the scene as required by policy and, even when a supervisor did respond, the supervisor appears to have done little more than complete the RAR, taking few if any investigative steps to establish the facts related to the officer's use of force.  We found that, despite the clear policy requirement that supervisors interview officer and civilian witnesses, conducting such interviews is the exception rather than the rule.  We reviewed incidents in which one supervisor responded to the scene of a

- 16 -

use of force and a different one conducted the interviews. Often, interviews were conducted days after a use of force had already been approved by a different supervisor. While many departments recognize the value of ECD cameras but cannot afford the expense, NOPD has purchased this much more expensive version of ECD, but supervisors do not routinely review— or at least document their review of—the video capture of an ECD deployment. Similarly, we rarely saw reference to whether a sergeant had reviewed in-car camera recordings of an incident, or what the recording showed.

In many instances, it appeared that the officer who used the force simply wrote the RAR and gave it to the supervisor to sign. Often, the language in the RAR, which is by policy meant to document the supervisor's investigation of the use of force, was identical to the incident report, which is meant to document the arresting officer's version of events. Both types of reports often included general language that the subject was "violently resisting," or that the officer "took the suspect down," which does not describe the level of resistance or the type of force used with the specificity necessary to permit meaningful assessment of the incident. Yet, supervisors consistently approved, and in some cases wrote, force reports replete with such language.

Similarly, we observed many instances in which a single officer wrote an Incident Report to document the actions of all involved employees, rather than having each employee document their observations in supplemental reports. The Incident Reports documenting force were nearly always written in the third person, making it impossible to discern whose version of events was being reported, or to hold any one officer accountable for his or her actions; and, consequently building into any investigation based on the Incident Report the assumption that all officers saw and heard the same things. As only one officer is required to sign the report, there is no indication that the other named officers agreed with or even saw the version of events described in the Incident Report. It was often unclear when supervisors reviewed and approved officers' reports. In many instances, the signature blocks on reports were not clear, making it difficult or impossible to discern who investigated the use of force and who approved the report. We also reviewed reports in which the signature blocks were not signed or dated.

Upon completion of the force "investigation," supervisors generally do not document whether the force used indicated a failure of training or tactics and whether it was consistent with NOPD policy. This was true even where the use of force clearly demonstrated inappropriate conduct, such as an ECD discharged at a range too close to be effective, necessitating multiple ECD cycles. Even in cases of such clear policy violations, we found that supervisors marked "Yes," to the question "Was departmental policy followed?"

NOPD policies and protocols further fail to provide the structure for reliable and credible force investigations. NOPD policy does not require that the RAR be completed, and the use of force investigated, by a supervisor who was uninvolved with the use of force, or who is of a higher rank than the officer who used force. Indeed, we saw many uses of force reported and investigated by supervisors who were present when the force occurred, and thus had already tacitly approved the action of the officer, raising the potential of a self-serving RAR. We reviewed some cases in which supervisors reviewed their own uses of force. We also saw

several cases in which officers investigated the use of force of officers of the same or higher rank.

NOPD does not provide sufficient guidance to supervisors on conducting use of force investigations. No directive, training curricula, or other document provides direction on the purpose of the questioning and the appropriate line of questioning. No policy, protocol or training sets out how to conduct use of force investigation interviews, how to decide who to interview, or what issues need to be resolved. No policy requires that the supervisor gather evidence as necessary to resolve material discrepancies, or consider and document whether the description of the force used is consistent with the injuries sustained. NOPD policies do not require collecting forensic evidence, taking photographs, or gathering and reviewing any audio or video evidence.

(4)     Officer-Involved Shooting Investigations

The systemic deficiencies in NOPD's investigation and review of officer-involved shootings are so egregious that they appear in some respects to be deliberate. NOPD officer-involved shooting investigations consistently fail to gather evidence, establish critical facts, or fairly analyze the evidence that is readily available. As a result, despite clear and systemic problems with how NOPD officers use deadly force, NOPD has not found that an officer-involved shooting violated policy in at least six years, and NOPD officials we spoke with could recall only one out-of-policy finding even before that time.

To prevent the unconstitutional use of deadly force, build credibility with communities, protect officer safety, and manage risk, every use of deadly force, including all officer-involved shootings, should be promptly and comprehensively investigated and reviewed. To be complete, this investigation must be conducted from the criminal and administrative perspectives. Neither investigation depends upon whether anyone has complained about the use of force. These investigations may be conducted at the same time or sequentially, depending upon departmental policy and the circumstances of the incident.

The criminal investigation assesses whether the use of deadly force was lawful, and is often conducted by a specialized force investigation team, or by an outside entity such as the state police, a neighboring jurisdiction, or the DA's Office. In many departments the homicide division conducts the assessment of whether the officer's use of deadly force was justified; doing so necessitates specific policies, training and supervision to ensure investigations are credible, complete, and reliable. If the criminal investigation indicates that the shooting may have been unlawful, the incident should be referred to local prosecutors to determine whether to seek prosecution.

The administrative investigation of the use of deadly force assesses whether the involved officers or others violated departmental policies, and whether the incident raises tactical, policy, training, or equipment concerns. This administrative investigation is often conducted by a department's internal affairs division, by a specialized force investigation team, or, particularly in controversial cases, by an independent, skilled, and credible outside investigative team. As discussed in the next section, once the administrative investigation of the use of deadly force is

completed, the department must make use of the information, reviewing the incident to determine the appropriate response to any identified policy violations or tactical, policy, training, or equipment concerns.

NOPD does not have a legitimate system in place for investigating uses of deadly force by its officers. Where a firearms weapons discharge results in death or injury, the Homicide Cold Case Unit has the primary responsibility to investigate. In such circumstances, PIB's administrative investigation is, pursuant to written policy, to "ask the assigned Homicide Investigator if there are apparent violations of law or departmental regulations on the part of the involved officer." This and other NOPD directives divest PIB of any real authority or ability to conduct an administrative investigation and place that authority instead with the Homicide Division, whose detectives have no training in conducting administrative investigations, nor independence from the criminal investigation. Our conversations with NOPD officials confirmed that, counter to good policing practice, NOPD conducts an administrative investigation only of officer-involved shootings where no one is injured or killed.

Adding to the harm caused by NOPD's failure to conduct focused administrative investigations of officer-involved shootings in which someone is injured or killed, is the consistent extremely poor quality of the investigations of these incidents conducted by NOPD's Homicide Division. As noted above, we reviewed all identified officer-involved shooting investigations for the time period covering January 2009-April 2010. We found each of the investigations of these shootings to be deeply flawed. The investigations generally did not include the investigative steps or analysis necessary to make a credible determination of whether the use of force was lawful. In addition, the Homicide Division investigations made no attempt to determine whether the use of force was consistent with policy, or even to conduct an investigation that would allow anyone else to make this determination. For a time, NOPD even had a practice of temporarily assigning the officers who had been involved in officer-involved shootings to the Homicide Division, and then automatically deeming the statements officers provided to Homicide investigators to be "compelled." As discussed more fully below, this practice effectively immunized the use of these statements in any subsequent criminal investigation or prosecution. It is difficult to view this practice as anything other than a deliberate attempt to make it more difficult to criminally prosecute any officer in these cases, regardless of the circumstances.

We found that, in addition to broad practices and policies that undermine the efficacy of NOPD's officer-involved shooting investigations, individual investigations are severely deficient as well. In one officer-involved shooting incident we reviewed, a sergeant endangered bystanders and other officers when shooting at a fleeing vehicle after unnecessarily placing his vehicle in front of it. Officers were attempting to stop the vehicle for traffic violations, although they suspected the car was stolen. After a lengthy vehicle pursuit in which the subject rammed several police cars trying to escape, the sergeant pulled his squad car directly in front of the vehicle, violating NOPD policy and exposing himself and his partner to danger. The sergeant fired four shots at the car, hitting the driver once. The shooting would have clearly violated policy except that the sergeant reported that he saw the driver of the car raise a handgun. Clearly the statement that the driver was holding a gun was a crucial fact in determining whether the shooting was consistent with NOPD policy, and perhaps whether it was excessive.

The credibility of the investigation was undermined by the investigator's failure to take basic but critical investigative steps and by a report that appeared designed to confirm the involved sergeant's version of events and gloss over admissions of clear violations. Though a gun was found in the car, no officer besides the sergeant who fired said that he saw a gun during the incident. The driver and three passengers each stated that the driver did not have a gun. The investigating sergeant did not make any attempt to determine why none of the officers saw the weapon, despite lighting that the investigator called "excellent." While investigators successfully lifted prints from the car, they did not attempt to take prints from the gun. NOPD's efforts to talk with the gun's registered owner, whose home address the detectives had, are also unclear and described only as meeting with "negative results." In addition to these troubling facts, the homicide investigator's report implied that the driver admitted that there was a gun in the car but that it was not his. However, the transcript of the driver's statement makes clear that the homicide investigator's characterization of the driver's statement is misleading. The driver told investigators clearly that he did not have a gun, that he never saw a gun in the car that night, and that he had no knowledge that anyone in the car had a gun with them. The driver told detectives that the female passenger had spoken of a gun that she owned in the past, but that he had never seen her with one. A fair and thorough investigation would have resolved these discrepancies rather than obscured them.

We found that even in instances where officers' use of deadly force resulted in the death of an individual, basic investigative steps were not taken and key facts remain unresolved. One such incident involved officers who shot and killed the fleeing suspect of a car-jacking. The man was unarmed and was ramming vehicles in an attempt to evade officers. When an officer placed himself in front of the man's truck, the officer was struck and thrown over the hood of the car. Officers shot and killed the man while still in his truck. Officers gave different rationales as to why they fired and witnesses stated that the driver was attempting to surrender when the officers shot him. The Homicide Division investigation did not attempt to establish whether the facts mitigated officers' decision to shoot at the driver, in violation of NOPD policy, rather than get out of the path of the truck. The criminal investigator did not resolve the conflict between witness statements, or even interview a number of "reluctant" witnesses. The investigator did not account for all shots fired; determine which officer fired the fatal shot; or interview the officer who was struck by the truck. The officers apparently were not separated before they were interviewed, and investigators compelled officers' statements (immunizing the use of such statements in any criminal prosecution) without first attempting to obtain voluntary statements.

Officer-involved shooting investigations conducted by PIB (because no one was struck or injured) appeared largely pro forma. Often in response to the question on the Administrative Shooting Notification Form, "Follow up Administrative Investigation to be Conducted," the investigator did not even check either "Yes" or "No." In many of the investigations where an administrative investigation was purportedly conducted, the administrative investigator did not indicate whether the force was within policy or presented training concerns, leaving the answer to that question blank as well.

In one officer-involved shooting investigated by PIB, an officer shot at a moving vehicle, reporting that he had done so because the driver was about to hit him with the car and that he was

unable to get out of the way. The recording from the officer's in-car video system showed this to be false. The officer's supervisor claimed to have watched the in-car video, but did not question the officer's account. According to the PIB lieutenant that investigated the incident, the video showed that the car was not heading towards the officer when he shot at it; there were no visible obstructions that prevented the officer from retreating; and the officer was not in danger when he fired the shot. The PIB investigator also discovered that several officers in the District turned off their in-car video cameras during the vehicle pursuit that preceded the shooting. Inexplicably, the formal investigation found the violations associated with the shooting to be "not sustained," a finding that is supposed to indicate that the policy violation could be neither proven nor disproven. Neither the supervisor who failed to identify the apparent policy violation, nor the officers who turned off their in-car video cameras were held accountable.

NOPD has acknowledged the problems with its investigations of officer-involved shootings, and reports that it is fundamentally remaking its systems for investigating them. Already, NOPD has made some changes, including reportedly revising its previous practice of not allowing PIB investigators behind the tape in an officer-involved shooting—although this change has not yet been memorialized in policy. This change is significant. We reviewed officer-involved shooting scene sign-in sheets that documented over seventy officers and City officials allowed on-scene following shootings, making it appear as though everyone within NOPD except PIB was allowed on-scene. Access to the scene of any major crime, especially the scene of an officer-involved shooting, should be kept to as few personnel as possible, and PIB investigators conducting the administrative investigation of the shooting should always be included among those few.

More broadly, NOPD has reported that it is developing a system under which both the administrative and criminal investigations of officer-involved shootings, as well as of other critical incidents, will be conducted by a force investigation "team." This team will report to PIB, which in turn will report directly to NOPD's Superintendent.

(5)     In-Custody Death Investigation

To minimize and appropriately respond to unreasonable force, police departments must thoroughly investigate the deaths of detainees or arrestees that occur while in police custody, regardless of whether these deaths appear to have occurred proximate to the use of deadly force. Neither Ops. Man. Ch. 1.24, *In Custody Death,* nor any other NOPD directive, provides for sufficient investigation and review of in-custody deaths. Indeed, that policy is little more than a list of who must be notified. Our conversations with NOPD officials confirmed that there is no specific guidance or training for NOPD criminal or administrative investigators regarding how to investigate an in-custody death.

One of the two in-custody death investigations in the data set we were provided was sufficiently complete to review.[15] This investigation by NOPD's Homicide Division raised significant concerns about the adequacy of NOPD's in-custody death investigations. NOPD investigated the death of a man arrested for a family-related disturbance of the peace. According

---

[15]   We did not review an in-custody case file that was provided to us that included a handwritten note stating that the file "was recreated as much as possible," and noting that "perhaps the FBI has the case file."

to police reports, the man was belligerent during the arrest and had to be forcefully subdued. The man was taken to the hospital twice during the evening of his arrest, first because the jail refused to accept him because he had sustained a laceration above his eye when officers arrested him (the investigation report notes the laceration was "very minor," although it required "several stitches" to close); the second time because of high blood pressure.  Approximately three days later, while still in jail custody, the man died.  According to the investigation, the coroner determined that the man died of a laceration to the spleen that occurred approximately 48 hours prior to the man's death.  The investigator concluded that NOPD officers did not cause the man's death.

This investigation leaves critical questions unanswered.  The case file includes no documentation of the coroner's conclusion that the man died due to injuries sustained approximately 48-hours prior to death, or indication that the investigator talked with the coroner to determine how wide a time-span might be included in this "approximate" time frame.  Rather, the only document in the investigative file from the coroner notes a final diagnosis of, among other things, "multiple recent injuries of blunt impact," does not mention an injury to the spleen, and classifies the death as "undetermined."  In addition, the investigator did not record, or even take a formal statement from, the deceased man's mother, who witnessed the event.  The mother, according to interview notes, believed that her son was unconscious after officers arrested him, while officers state that the man, who moments earlier had been belligerently threatening to shoot officers, was conscious but "passively resisting" by not moving when they took him to the squad car.  The report notes that the mother was extremely upset and that a formal statement would be "forthcoming," but, as we observed in other investigations by NOPD's Homicide Division, the follow-up interview of a witness whose statement appeared to conflict with officers' versions of events was not conducted or recorded.  Without taking any investigative steps to verify facts, the report concluded that the man likely died after thrashing on the floor of the jail or a "physical encounter with another inmate." But the investigator did not interview any jail inmates or staff.  We found it impossible to draw any firm conclusions from this investigation regarding the circumstances of the subject's death.  We did conclude however, that NOPD's investigation and review of the incident were clearly inadequate and are particularly concerned that there is no indication that NOPD command staff intervened to require a more thorough and reliable investigation of this death.

### d)      Use of Force Review

A use of force investigation serves as the basis for a department's review of the incident to determine whether there were any policy violations or tactical, policy, training, or equipment concerns.  This review is critical in enabling the department to learn from past incidents, prevent future misconduct, and improve officer safety.  Reviewing aggregate force data allows a department to identify concerns and trends (including positive trends) with particular types of force, geographic areas, officers, supervisors, or units, and to enable an evidence-based response that may include policy changes, training, corrective measures, a shift in tactics, or new equipment.  While NOPD nominally has in place systems to review use of force incidents and aggregate force data, we found that these systems are not functioning and these reviews do not take place.

(1)   Review of Officer-Involved Shootings and other Critical
Incidents

NOPD policy does not set out a clear process for reviewing officer-involved shootings or
other critical incidents.  Our conversations with NOPD officials indicate that PIB has in the past
conducted administrative "hearings" that consisted primarily of the PIB commander meeting
with the officer to discuss the shooting.   Even this "review" has in many instances been
impossible because, in a number of instances, the Homicide Division failed for months or even
years to provide its investigative report of the shooting to PIB, as required by policy.  Based on
our conversation with NOPD officials, this failure by the Homicide Division to provide these
files to PIB appears to have effectively prevented any review of these officer-involved shootings.

As of September 2010, there were fourteen firearms discharge reviews that could not be
completed because PIB had requested but not received the Homicide investigations or RARs for
these cases.  After we inquired about these outstanding investigations, some of which dated back
to 2005, PIB asked Homicide to provide them.  In November, Homicide's new commander
provided PIB with every OIS criminal investigation she could find.  Still missing are NOPD's
investigations of four officer-involved shootings that occurred between 2005 and 2007, and an
additional two RARs regarding officer-involved shootings, one from 2006 and another from
2010.  NOPD's oversight of its officers' use of deadly force has been so perfunctory that until we
inquired, PIB had not requested the Homicide Division to provide these long-overdue
investigations.  Moreover, when we asked for all of NOPD's officer-involved shooting
investigations during a given time period, NOPD initially provided investigations for only
approximately one-half of the incidents.  It was only after repeated additional inquires that
NOPD was able to locate and provide a list of all officer-involved shootings as well as the
related investigative case files.

Even in the cases where it has a complete investigative file, PIB has not conducted
"hearings" in a timely manner.  As of September 2010, in addition to the fourteen cases that
could not be completed because Homicide had not provided the files to PIB, an additional eleven
cases were completed but awaiting hearing.  One of these cases dated from 2008 and several
were from 2009.  NOPD's failure to complete reviews of some officer-involved shootings in a
timely manner unnecessarily compromises officer and civilian safety, and subjects the City and
Department to substantial liability risks.

Alongside its efforts to improve investigations of critical incidents like officer-involved
shootings, NOPD reports it is remaking its process for reviewing such incidents, moving towards
an interdisciplinary force review "board."  Whether this board is effective at preventing
misconduct and increasing officer safety will depend upon how NOPD structures and supports
this board.

(2)   Review of Non-Deadly Force Incidents

In addition to failing to ensure that non-deadly force is reported and investigated, NOPD
also fails to adequately review the non-deadly force used by its officers.  By policy, PIB is
responsible for reviewing all NOPD uses of force, but we found this review has been

deliberately, albeit implicitly, narrowed over the years and is currently largely ministerial. A number of PIB protocols, read together, provide for expansive use of force review. PIB Operations Directive #17 states that PIB's Professional Standards Section is responsible for complying with the requirements of Ops. Man. Ch. 1.3, *Resisting Arrest Report*,[16] by conducting a "continual analysis" of use of force reports received during the calendar year and submitting periodic reports. Chapter 1.3 provides that PIB is responsible for the "collection, review, analysis, and dissemination of information gained from the 'Resisting Arrest Reports.'" The policy further specifies that this review should determine: 1) whether Department policy and procedures were adhered to; 2) whether policy and procedures are clearly understandable to the employee and effective to cover the situation; 3) whether Department training is adequate; and 4) whether Department equipment is adequate. The PIB Directive further provides that reports analyzing use of force are to be submitted quarterly, or more frequently as needed, to the Deputy Superintendent of PIB. An annual report summarizing the quarterly reports is required to be submitted to PIB's Deputy Superintendent annually. Chapter 1.3 requires that a written, yearly analysis summarizing use of force incidents be submitted to the Superintendent.

The use of force review contemplated by NOPD policy is appropriate; unfortunately, none of this mandated use of force review or analysis is or has been occurring, at least for the past several years. Our interview of PIB staff and review of documents indicated that PIB's review of use of force, at least in recent years, has been limited to the narrow report review mandated by PIB Directive #27, which does not acknowledge the existence of the more expansive PIB Directive #17. PIB Directive #27 requires review of NOPD's use of force reports to ensure that they are "completed as required" and to correct "any deficiencies in the form completion." It appears that Directive #27 was added without consideration of Directive #17 and that no attempt has been made to update the former directive or to otherwise make consistent PIB's responsibilities pursuant to each directive. Our conversations with NOPD officials made clear that the sergeant PIB assigned to review use of force reports was given a narrow mandate for reviewing force. He did not appear aware of any responsibilities beyond the minimal facial review required by Directive #27, nor had he been trained in the more substantial force review contemplated by Directive #17 and Chapter 1.3. Accordingly, this sergeant reported providing some ad hoc feedback to supervisors regarding their officers' use of force, but stated that generally feedback is related to ensuring that use of force reports are filled out completely.

NOPD's use of force review is further undermined by NOPD policies and practices that diffuse responsibility for reviewing force while not demanding accountability to ensure that review by anyone actually occurs. Thus, while some policies nominally place responsibility for use of force review, tracking, and reporting on PIB, other NOPD policies and practices act to divest PIB of some of its authority to review and determine the propriety of force. Integrity Control Officers ("ICOs"), who report to District Commanders, not PIB, are required to review two in-car camera videos per day and "note any deficiencies and [counsel] officers as needed." Our interviews with staff throughout NOPD confirmed that there is no consultation with PIB by the Training Division or ICOs when making these determinations. The RAR form itself contains a distribution list for the completed report, which includes PIB, the Unit Commander, the

---

[16] PIB Operations Directive #17 refers to this Chapter as "Use of Force Report," but this reference appears outdated, as this Chapter is currently called "Resisting Arrest Report."

Division Commander, the Bureau Assistant Superintendent, and the Superintendent, but there is no indication of what, if any responsibility for review any of these offices besides PIB has.

*e)     Force Data Review and Response*

NOPD has implemented a number of systems that require the review of aggregate force data to identify concerns and positive and negative trends, including NOPD's early warning system, called Personnel Performance Enhancement Program ("PPEP"), and the collection and review of force data by PIB.  Neither of these systems is functioning as necessary to be effective, or as required by policy.

(1)     Early Warning System

The development and implementation of NOPD's new early warning system will better enable NOPD to track and analyze force data.  NOPD's current system, set out in Ops. Man. Ch. 13.27, *Professional Performance Enhancement Program (PPEP)*, is outdated and essentially exists in name only.  Officers of every rank and throughout the Department told us that information is only haphazardly submitted for inclusion in the database, and being subjected to the program's single intervention—a one-size-fits all course commonly referred to as "bad boy school"—reportedly is seen by some as a badge of honor.  There has been only one of these classes in the past eight months while NOPD implements a new program that will provide more individualized interventions and will make a professionalism and courtesy course part of in-service training for every employee.

To be effective, NOPD's early warning system should be re-tooled so that it is a single-source of real time information that can assist line supervisors and upper level commanders alike in identifying officers who may need closer supervision or particular interventions.  Interventions developed based on early warning system data should be tailored to the specific problem presented, and the intervention should be monitored and refined as necessary until the problem is resolved.  Part of this function should be identifying use of force outliers, determining whether the aberration is meaningful and needs correction, and monitoring interventions to determine that any use of force problems have been resolved.

NOPD, in conjunction with the Independent Police Monitor, is currently working to implement new software and hardware to create a more comprehensive and current early warning system.  Alongside this effort, NOPD must ensure that the appropriate policies and training related to the early warning system are developed and implemented, and that provisions are made to ensure the ongoing maintenance of the hardware and database.  More generally, NOPD should work closely with the Independent Police Monitor to analyze and respond to force trends.

(2)     PIB Data Collection

PIB collects a broad variety of complaint, investigation, and use of force data and reports this information in lengthy annual and statistical reports.  These reports, required by NOPD policy, are quite detailed, including, for example, types of complaints by assignment, district and

rank; identifying the officers with the most complaints, including the type and resolution of each complaint; and listing a breakdown of complaints by race and gender of the officer. This information, however, is unaccompanied by any analysis or discussion of how this raw data might be used to help decrease misconduct complaints through, for example, prioritizing training areas or changing oversight mechanisms. It is significant and laudable that NOPD is gathering and tracking this data. However, without analysis of the data for such purposes as developing policy and identifying training needs, collecting and aggregating this data amounts to a substantial amount of work with little tangible benefit.

(3)   COMSTAT

COMSTAT provides another opportunity for NOPD to prevent force misconduct by discussing use of force trends and directly comparing the use of force rates of various units, Districts, and other strata with their similarly situated peers; their respective arrest rates; the rate of misconduct complaints; and the quality of arrests, i.e. whether and what type of prosecutions result from the arrests. ICOs are required to report to COMSTAT each week a variety of integrity related data. In the several COMSTAT meetings that we attended we never saw this data presented. Use of force data can be included in the data ICOs compile for COMSTAT and substantively discussed at COMSTAT meetings.

## III.   <u>STOPS, SEARCHES AND ARRESTS</u>

Our investigation also provided reasonable cause to believe that NOPD officers violate the Fourth Amendment by engaging in a pattern or practice of stopping, searching, and arresting individuals without the requisite reasonable suspicion or probable cause.

A.   Legal Standards

The Fourth Amendment guarantees in part, "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Generally, a search or seizure is unreasonable "in the absence of individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). Under the Fourth Amendment, "[a] person is seized if 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *United States v. De Jesus-Batres*, 410 F.3d 154, 160 (5th Cir. 2005) (quoting *Kaupp v. Texas*, 538 U.S. 626, 629 (2003)).

Probable cause supporting an arrest exists only where the facts and circumstances within the arresting officer's knowledge "are sufficient to warrant a prudent person . . . in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Club Retro L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009). The facts "must be particularized to the arrestee," *Id.* (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)), and "must be known to the officer at the time of the arrest; post-hoc justifications based on facts later learned cannot support an earlier arrest." *Id.*

- 26 -

Absent probable cause, the Fourth Amendment permits law enforcement officers to briefly detain individuals for investigative purposes if the officers possess reasonable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Reasonable suspicion must be supported by articulable facts particular to the detained individual, which, combined with "rational inferences from those facts, reasonably warrant an intrusion." *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994). To justify a *Terry* stop, officers must possess "more than a hunch" that an individual may engage in wrongdoing. *Id.* at 840. Notably, the suspected behavior must constitute an actual violation of the law. If a police officer incorrectly interprets the law in seizing a person, a Fourth Amendment violation has occurred even if the officer's factual observations were correct or the officer's interpretation of the law was made in good faith. *See United States v. Lopez-Valdez*, 178 F.3d 282, 288 (5th Cir. 1999) (finding that stop reliant upon officer's mistaken interpretation of state traffic law violated the Fourth Amendment because "the legal justification [for a stop] must be objectively grounded," internal quotation marks omitted).

Under limited circumstances, an officer may briefly search a detained individual for weapons incident to a valid *Terry* stop. A *Terry* weapons search must be premised on "individualized suspicion" derived from "specific and articulable facts" that a suspect "is armed and dangerous" or "may gain immediate control of weapons." *Maryland v. Buie*, 494 U.S. 325, 332-334 (1990). *See also Arizona v. Johnson*, 129 S. Ct. 781, 784-786 (2009); *United States v. Rideau*, 969 F.2d 1572, 1575 (5th Cir. 1992). During a lawful *Terry* weapons search, a law enforcement officer may also seize objects whose incriminating nature is immediately apparent. *Minnesota v. Dickerson*, 508 U.S. 366, 375-376 (1993). Nonetheless, courts are "sensitive to the danger . . . that officers will enlarge a specific authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will." *Id.* at 378. Thus, to seize evidence under the "plain feel" exception, an officer must first have probable cause to believe that the item is contraband. *Id.* at 376-377.

B.    Findings

NOPD's policies and training on warrantless searches and seizures are highly inadequate, leaving officers with little guidance regarding the Fourth Amendment's limitations on their authority to detain, search, and arrest. A previous DOJ investigation noted almost ten years ago that some NOPD officers could not articulate proper legal standards for stops, searches, or arrests. We recommended then that NOPD provide annual in-service training to officers on this critical topic. As discussed below, NOPD still does not provide meaningful in-service training to officers on how to properly carry out stops, searches, and arrests. Throughout the Department, and among other stakeholders in the criminal justice system, we heard broad and emphatic consensus that officers have a poor understanding of how to lawfully execute searches and seizures. NOPD's failure to train officers or otherwise provide guidance on the limits and requirements of the Fourth Amendment contributes directly to the pattern of unconstitutional stops, searches, and arrests we observed. Additionally, the Department's organizational focus on arrests encourages stops without reasonable suspicion, illegal pat downs, and arrests without probable cause.

1.      Inadequate Policies and Training

NOPD's written policies governing warrantless search and seizure provide insufficient detail and explanation to adequately guide officers' conduct.  A clear example is Ops. Man. Ch. 41.3, regarding field interviews and stops and frisks.  The policy, which was placed in effect August 29, 1999 and last updated on October 5, 2003, is just four pages long, and only two paragraphs provide officers with direction on the appropriate legal standards for initiating an investigatory stop and/or frisk under *Terry*.  While the policy provides a canned list of recognized facts used to justify a *Terry* stop, it does not instruct officers that most of these facts standing alone are insufficient—effectively glossing over the requirement that to establish reasonable suspicion under *Terry*, officers must have articulable facts that, when considered together, provide evidence that a crime is about to be, is being, or has been committed.  Overall, the policy fails to provide clear and comprehensive guidance on stops and frisks, while its tone serves to minimize the *Terry* standard in a manner that may promote improper stops.

We also found officer training on search and seizure to be deficient in both content and frequency.  Officers, including uniform patrol, detectives, and members of narcotics and task force units, consistently reported to us that they received search and seizure training in their original recruit class, but no yearly in-service training to update and reinforce their understanding of the law and of NOPD policy.  NOPD's recruit training schedule reflects that a current patrol officer with a law degree teaches several legal blocks related to search and seizure.  Typically, however, training divisions secure outside instructors who have a current and thorough knowledge of Fourth Amendment issues, such as law school professors or attorneys regularly encountering search and seizure issues in court.  As discussed in the Training section of this Report, NOPD's Fourth Amendment training curriculum does not reflect either current or thorough knowledge of this critical area.  The USAO has in the past offered free search and seizure instruction to the Department, but only a small fraction of the force took advantage of the training.  Indeed, only recently has NOPD leadership appeared receptive and welcoming of outside training opportunities.

We saw no evidence of efforts to reinforce or build upon what officers learn in the Academy related to search and seizure, or to provide officers with legal updates on this constantly-evolving area of law.  Officers at all levels, criminal court judges, and prosecutors uniformly pointed to a need to augment and enhance NOPD's search and seizure training.  Indeed, one district commander told us:  "This gets us in so much trouble," pointing to the need for training in "justification for detaining someone, when you have PC [probable cause], when you put your hands on someone."  The same commander observed that what cadets "learn at the Academy is sucked right out of their heads as soon as they leave," reflecting the reality that once in the field, officers forget what they learned due to non-use and/or other officers exchanging common misconceptions of law.  Without regular refresher courses to correct misconceptions and mistakes, NOPD risks institutionalizing common legal errors and converting them into de facto operating methods.

The consequences of the Department's lapses with respect to training were evident in our interviews with officers who displayed a profound lack of understanding of the limits of *Terry*.  For example, one officer, when asked about the appropriate length of time for a *Terry* stop,

responded that he had the right to detain a person for a period of one hour. He did not identify any particularized circumstances that might justify a detention of that length, but rather appeared to believe it was presumptively appropriate. In another exchange, several officers were queried about the circumstances under which they could conduct a pat down for weapons. The officers responded that they had the right to check anyone detained to ensure the officer's safety. In fact, the law is clear that an officer can only conduct a pat down when he has reasonable articulable facts to support that the subject is armed and dangerous. Deficiencies in NOPD's policies and training have left officers with an unacceptably poor understanding of how to constitutionally execute warrantless searches and seizures.

          2.     Organizational Focus on Arrests

Additionally, we found that NOPD's focus on statistics, such as generating Field Interview Cards ("FIC"s) and arrests, amplifies the risk that officers will execute illegal searches and seizures. As one commander told us, "[t]hese officers are under the gun to make arrest, arrest, arrest, which leads to civil rights violations and complaints." NOPD patrol officers and many members of the command staff described a Department that has long been statistics-driven—one that measures "productivity" by quantity, rather than quality, of encounters and arrests. We observed that arrests, *Terry* stops, and FIC numbers were the predominant focus of the Department's weekly COMSTAT meetings, and many officers described a strong and unyielding pressure to increase numbers.

Officers throughout NOPD told us that pressure to make arrests and engage in sufficient "activity" to satisfy command staff and NOPD brass encourages aggressive enforcement of low-level infractions, and diverts attention and resources from quality arrests leading to significant convictions. Indeed, in 2009, NOPD made nearly 60,000 arrests, of which about 20,000 were of people with outstanding traffic or misdemeanor warrants from neighboring parishes for such infractions as unpaid tickets. By mid-2010, the Department had made nearly 10,000 arrests on outstanding warrants, about two-thirds of which were for minor out-of-parish warrants, according to reports from the Metropolitan Crime Commission, a New Orleans-based non-profit organization.

Additionally, NOPD's database of documented field interviews appears to reflect a dramatic recent uptick. For four months, from June 1, 2010 through October 1, 2010, NOPD recorded in its FIC database nearly 24,000 field interviews, compared with about 29,800 for three and a half years, from 2007 through May 31, 2010. Of course, this increase may partially reflect both better reporting and increased use of the electronic database (although some officers continue to use physical field interview cards and store them in individual districts). Nonetheless, it is consistent with reports from both officers and the community of more intense field-interview activity in recent months. At the same time, it was apparent during our interviews that officers lack a uniform understanding regarding the completion, use, and preservation of FICs. Some officers stated they prepared FICs only in "special cases," while others said they prepared FICs on people they encountered during traffic stops and calls for service.

The pressure to achieve a high volume of field interviews comes with little correlative emphasis on gathering and using quality intelligence.  Officers reported that they rarely, if ever, find FIC data useful.  Moreover, NOPD retains FIC data longer than such information could be considered relevant or timely; the Department appears not to have ever expunged sensitive information from the database, though it is available to all sworn officers and contains personal data such as social security numbers.  FIC cards and the FIC database are also of little use as documentation of *Terry* stops.  Although a *Terry* stop requires a factual basis to establish that a crime is about to be or has been committed, neither the physical FIC card nor database has any place to list the suspected crime.  Moreover, FICs lack a narrative portion for the officer to specifically articulate the basis for the stop.  Overall, we found that the Department's exclusive focus on the number of FICs prepared may institutionalize and encourage officers to make illegal stops.

Recently, NOPD acknowledged that the Department's staggering volume of arrests for low-level offenses is counter-productive.  In November 2010, according to the *Times-Picayune*, the Superintendent advised the City Council that officers would no longer make arrests based on outstanding traffic or misdemeanor warrants from neighboring parishes, noting that to do so "simply does not make sense, economical or common."  We believe that with this pledge the Department has taken a significant and positive step.  Nonetheless, we found the emphasis on "activity," defined as numbers of encounters such as stops, field interview cards, and arrests—at the expense of a more deliberate focus on problem-solving—to be an ingrained part of NOPD's organizational culture.  Although the Superintendent's commitment to ensuring that officers are engaged, observant, and productive is commendable and appropriate, the Department must recognize that its tactics and chosen police strategy, together with lapses in training and policy, cultivate an atmosphere where officers cut corners and make too many errors that result in constitutional harm and compromise effective law enforcement.  This was fully apparent in our review of NOPD arrest reports.

### 3.    Failure to Properly Justify Stops, Searches, and Arrests

We find reasonable cause to believe that NOPD's lack of adequate policy and training regarding search and seizure, along with the Department's emphasis on arrest numbers, contribute to the frequency of constitutional violations we found reflected in arrest reports.  We reviewed 145 randomly-sampled arrest reports to determine whether the officers articulated sufficient facts to justify arrests, searches, or pat downs.  Many of the reports that NOPD provided involved circumstances in which NOPD did not initiate the stop or arrest, for example where a store owner detained a suspect, and NOPD merely effectuated the arrest, or where the NOPD responded to a scene after learning of an outstanding warrant.  Of those arrests that NOPD initiated—involving either warrantless search or seizure or execution of a search warrant—we found that a significant portion reflected constitutional deficiencies.  Our review confirmed serious gaps in knowledge, and included examples of illegal detentions, searches, and pat downs, as well as arrests without probable cause to establish the elements of the crimes.  Moreover, because our review encompassed only arrest reports, it would not capture stops and/or searches where the officer did not find contraband or effectuate an arrest, encounters which have a potentially higher rate of impropriety.

Each of these deficient reports reflected not only an NOPD officer's illegal search or seizure, but also a supervisor's failure to adequately review the arrest report, as required. For instance, in one case, while the officer had reasonable suspicion to make a *Terry* stop, the report referenced no information or facts to demonstrate reasonable suspicion that the subject was armed and dangerous. Nonetheless, the officer performed a *Terry* frisk and found a packet containing synthetic marijuana. The report failed to state any reason for the frisk, or what facts, upon feeling the packet, justified a search into the pockets to retrieve the drugs, using the "plain feel rule." In another case involving an apparently illegal search, officers opened the closed backpack of a suspect without consent, removed an iPod believed to be stolen, and arrested the juvenile suspect.

In another instance, an officer received a "suspicious person" call from the dispatcher, but the arrest records reflected no specific articulable facts to justify a *Terry* stop. Although the officer made a traffic stop based on the suspicious person call and found stolen property in the car, the report is totally devoid of facts demonstrating a reasonable suspicion to make the stop or probable cause to search the vehicle. A citizen complaint of a "suspicious person" alone is insufficient to authorize a *Terry* stop; the officer must still have the specific facts to articulate the justification for the detention. *See United States v. Gomez,* 623 F.3d 265 (5th Cir. 2010) (holding that in a *Terry* stop resulting from a citizen telephone caller the officer must have specific detailed information from the caller that would satisfy the articulable suspicion standard).

We also found examples of arrests for which the reports failed to state probable cause to support a criminal violation. In one case involving a juvenile arrest for curfew violation, the arrest report provides no narrative whatsoever describing why officers believed a curfew violation occurred, and therefore no facts to justify a stop, detention or arrest of the juvenile. In several situations, reports reflected that officers executed search warrants for narcotics at residences, and then transported individuals who were merely present at the scene to districts stations for interrogation, without stating any facts to justify their detention or arrest.

Overall, our review of arrest reports reflected what many within and outside of the Department told us during our review: that inadequate policies and training have left officers without the basic foundation to perform their duties within constitutional boundaries. Further, as discussed in the next section of this Report, these factors increase the likelihood that officers, unable to properly perceive and articulate reasonable suspicion and probable cause, may either stop individuals arbitrarily or rely on impermissible factors such as an individual's race, ethnicity, or national origin.

## IV.   <u>DISCRIMINATORY POLICING</u>

We find reasonable cause to believe that NOPD engages in a pattern or practice of discriminatory policing in violation of constitutional and statutory law. Discriminatory policing occurs when police officers and departments unfairly enforce the law—or fail to enforce the law—based on characteristics such as race, ethnicity, national origin, sex, religion, or LGBT status. Discriminatory policing may take the form of bias-based profiling, in which an officer decides whom to stop, search, or arrest based upon one of the above-mentioned characteristics,

rather than on the subject's behavior or on credible information identifying the subject as having engaged in criminal activity. Denying police services to some persons or communities because of bias or stereotypes, or failing to take meaningful steps to enable communication, also constitute discriminatory policing. Discriminatory policing may also result when a police department selects particular enforcement and crime prevention tactics in certain communities or against certain individuals for reasons motivated by bias or stereotype.

NOPD has failed to take sufficient steps to detect, prevent, or address bias-based profiling and other forms of discriminatory policing on the basis of race, ethnicity, or LGBT status, despite widespread concern and troubling racial disparities in arrest rates and other data. We further find that the Department fails to adequately investigate violence against women, including sexual assaults and domestic violence. Additionally, we find that the Department fails to provide critical policing services to New Orleans residents with limited English proficiency.

A.    Legal Standards

1.    Fourteenth Amendment

The Equal Protection Clause of the Fourteenth Amendment prohibits selective or discriminatory enforcement of the law. *Whren v. United States*, 517 U.S. 806, 813 (1996). Discriminatory policing may arise from an explicit classification or a facially neutral law or policy. *Id.* In the latter case, an Equal Protection violation occurs when the government's administration of the facially neutral law is motivated by a discriminatory purpose and results in a discriminatory effect. *See Washington v. Davis*, 426 U.S. 229, 239-40 (1976); *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001). Evidence of discriminatory effect may include evidence of similarly situated individuals who were not subjected to the enforcement action, statistical evidence, or both. *United States v. Armstrong*, 517 U.S. 456, 467 (1996). To assess discriminatory intent, courts consider direct and circumstantial evidence, including contemporaneous statements by decision makers, the impact of the challenged policy or action on different groups, patterns of conduct, historical background, substantive departures from normal procedure, and the sequence of events leading up to the adoption of the policy or action. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). Further, a plaintiff may illuminate discriminatory motives by showing a "clear pattern, unexplainable on grounds other than race." *Id.* (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) and *Gomillion v. Lightfoot*, 364 U.S. 339 (1960)). The Fourteenth Amendment does not require proof that the government actor was motivated solely by a discriminatory purpose, but only that such purpose was a contributing factor. *Arlington Heights*, 429 U.S. at 265-66.

This admonition applies equally to discriminatory inaction – such as law enforcement practices that systematically under-serve certain communities. As the Supreme Court has explained, "the Fourteenth Amendment not only prohibits the making or enforcing of laws which shall abridge the privileges of the citizen, but prohibits the states from denying to all persons within its jurisdiction the equal protection of the laws. Denying includes inaction as well as action, and denying the equal protection of the laws includes the omission to protect." *Bell v. Maryland*, 378 U.S. 226, 311 (1964) (Goldberg, J. concurring). *See also DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197, n.3 (states may not "selectively deny

its protective services" to certain protected groups without violating the Equal Protection Clause.).  Many courts, including the Fifth Circuit, have extended this principle to under-enforcement of sexual and domestic violence where such under-enforcement adversely impacts women.  *See, e.g., Shipp v. McMahon*, 234 F.3d 907, 916 (5th Cir. 2000); *Beltran v. City of El Paso*, 367 F.3d 299, 305 (5th Cir. 2004).[17]

Finally, we note that a number of factors weigh in favor of applying heightened scrutiny in the context of discrimination by law enforcement on the basis of sexual orientation and gender identity, including a long history of animus and deeply-rooted stereotypes about lesbian, gay, bisexual, and transgender ("LGBT") individuals.  As the Attorney General recently noted, "there is, regrettably, a significant history of purposeful discrimination against gay and lesbian people, by governmental as well as private entities, based on prejudice and stereotypes that continue to have ramifications today.  Indeed, until very recently, states have 'demean[ed] the[] existence' of gays and lesbians "by making their private sexual conduct a crime.'"  Letter from Attorney General Eric Holder to the Hon. John A. Boehner (Feb. 23, 2011) (quoting *Lawrence v. Texas*, 539 U.S. 558, 578 (2003)).  We found this dynamic clearly at work in New Orleans.

  2. Safe Streets Act

Discriminatory law enforcement activities are likewise prohibited by the Safe Streets Act, which provides that "[n]o person in any State shall on the ground of race, color, religion, national origin, or sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under or denied employment in connection with any programs or activity funded in whole or in part with funds made available under this title."  42 U.S.C. § 3789d(c)(1).  NOPD is a program recipient under the Safe Streets Act.  The statutory text and implementing regulations make clear that the Act applies not only to intentional discrimination, but also to any law-enforcement practices that disparately impact an identified group based on the enumerated factors.  The non-discrimination regulation implementing Section 3789d(c) prohibits program recipients from "utiliz[ing] criteria or methods of administration which have the effect of subjecting individuals to discrimination under [§ 3789d(c)], or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, sex, national origin, or religion."  28 C.F.R. § 42.203.

  3. Title VI

Similarly, Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  NOPD is a program recipient under Title VI.

Title VI prohibits intentional discrimination, *see Alexander v. Sandoval*, 532 U.S. 275, 281 (2001), and the Title VI regulations proscribe law-enforcement activities that exert a discriminatory effect on the basis of race, color, or national origin.  *See Sandoval*, 532 U.S. at

---

[17] While the cases following *Shipp* address domestic violence specifically, federal courts have adopted a substantially similar standard for § 1983 claims addressing failure to report and investigate allegations of sexual abuse.  *See, e.g.*, *Michels v. Greenwood Lake Police Department*, 387 F. Supp. 2d 361, 366 (S.D.N.Y. 2005).

281-282; *see also* 28 C.F.R. § 42.104(b)(2) (Title VI funding recipients may not "utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin.").

The Supreme Court has held that failing to take reasonable steps to ensure meaningful access for limited English proficient ("LEP") persons is a form of national-origin discrimination prohibited by Title VI regulations. *See Lau v. Nichols*, 414 U.S. 563 (1974). Executive Order 13166, issued in 2000, reinforced that mandate by directing federal agencies to publish LEP guidance for their financial assistance recipients, consistent with initial general guidance from DOJ. *See* 65 Fed. Reg. 50121 (Aug. 16, 2000). In 2002, DOJ issued final *Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition against National Origin Discrimination Affecting Limited English Proficient Persons*. 67 Fed. Reg. 41455 (June 18, 2002) (DOJ Guidance).

B.    Findings

1.    Discriminatory Policing on the Basis of Race, Ethnicity, and LGBT Status

When law enforcement subjects individuals to differential treatment, based on a belief that characteristics such as race, ethnicity, national origin, gender, or religion signal a higher risk of criminality or unlawful activity, it constitutes unlawful discrimination, often called "profiling" or "biased policing." Law enforcement's consideration of the above listed characteristics in its decision-making is only permissible in very limited circumstances, such as when an officer has specific information, based on credible sources, to "be on the lookout" for specific individuals identified in part by race, ethnicity, or other personal identifying characteristics.

We find reasonable cause to believe that there is a pattern or practice of unconstitutional conduct and/or violations of federal law with respect to discriminatory policing. NOPD personnel at all levels of the Department not only acknowledged that the community perceives racial and ethnic profiling as a significant problem, but some also expressed their own belief that such discriminatory conduct occurs. Both bias and the perception of bias erode citizens' inclination to trust and cooperate with law enforcement, impeding effective and safe policing. Although both community members and officers told us that this dynamic is clearly at work in New Orleans, the Department has failed to respond with systems to prevent, detect, and respond to discriminatory policing, and to ensure that police officers are conducting themselves in accordance with constitutional guarantees of equal protection.

The Department's inadequate policies and training in conducting proper stops, searches, and arrests increase the likelihood that officers, without sufficient understanding of how to identify and articulate suspicion based on behavior and other permissible factors, will instead rely on inappropriate stereotypes and bias in their decision-making. At the same time, NOPD fails to acknowledge the potential for stereotypes and bias to taint police work, on both an individual and an organizational level, and to take steps to prevent this through proactive policies, messaging from leadership, supervision, and training. The Department does not have a sufficiently comprehensive policy regarding discriminatory policing, fails to adhere to those policies that are in place, has no way to track allegations and complaints of racial profiling, and

does not collect, analyze, or report race or ethnicity data for most citizen encounters with police. This failure to counteract bias and promote impartial policing further cultivates an atmosphere in which discriminatory policing can occur unchecked.

The data that we have been able to review, though haphazard and incomplete, points to troubling disparities in treatment of the City's African-American community, and an urgent need to implement systems to ensure that the Department is providing services and enforcing the law in a fair, equitable, and nondiscriminatory manner.

<em>a)      Community Concerns</em>

NOPD's statistics-driven approach to policing appears to contribute to the strong community perception of bias in stops, arrests, and other encounters.  Individuals we spoke with, particularly youth, African Americans, ethnic minorities, and members of the LGBT community, told of frequent stops and of being targeted, booked, and arrested for minor infractions.  They consistently described how these tactics serve to drive a wedge between the police and the public, antagonizing and alienating members of the community.

Many individuals with whom we spoke directly linked biased policing to what they describe as a focus on maximizing arrests, as opposed to reducing serious crime.  In a complaint to PIB, one man alleged that he had been pulled over for "being a black man driving a nice car." The officers told PIB that they had stopped the man for following another car too closely, ran the driver's name, and arrested him for having an outstanding warrant for an unpaid seatbelt ticket in another city.  The driver, who was handcuffed and then booked into Orleans Parish Prison, wrote in his complaint:  "Forgive me if I seem to be prehistoric, but I thought racial profiling was illegal.  One good thing happened, [the officer] got his arrest credit."

Regardless of whether this specific driver was in fact following a car more closely than allowed by law, the complaint clearly conveys the individual's frustration and belief that officers would never have stopped him for this type of infraction, much less handcuffed and jailed him, but for his race and the Department's emphasis on arrests for minor violations.  Whatever the reason for stops and arrests like this one, there is little question that the frequency and tenor of police encounters has deeply alienated many segments of the New Orleans community.  One Orleans Parish criminal court judge told us that "[i]f you are a black teenager and grew up in New Orleans, I guarantee you have had a bad incident with the police."  African-American residents consistently cited negative encounters with police as a source of deep distrust of law enforcement, reporting experiences with discourtesy, harassment, and unwarranted stops, arrests, and uses of force.  Community members often raised specific concerns over task forces, whose members wear distinctive military-style uniforms and are referred to throughout the City (and colloquially within the police department) as "jump out boys."  One sergeant, assigned to a community relations position, acknowledged that the task forces "are perceived by the community as jump out boys, dirty cops, the ones who are going to be brutal."

While task forces can play an important role in combating chronic and complex crime problems, we did not observe NOPD to be providing the kind of direction, hands-on supervision, monitoring, and training in problem-solving that task forces require.  The Department relies

- 35 -

heavily on task forces as the sole "enforcers" and agents of crime control for the City, while also measuring productivity by numbers of stops and arrests, and failing to provide officers with adequate training and supervision.  This combination invites problematic encounters with citizens, and raises the risk that officers will rely on inappropriate considerations such as race in the course of discharging their duties.  Although task forces and specialized units tasked with crime suppression typically generate more citizen complaints than other components of a police department, simply because there is a greater potential for negative encounters with members of the public, NOPD will not begin to repair the reputation of its task forces, particularly among the African-American residents in many of New Orleans' neighborhoods, without a shift in emphasis towards community policing and adequate training and supervision.

Latinos in New Orleans, especially young Latino males, reported that NOPD officers stop them for unknown reasons or for minor offenses that would not ordinarily merit police attention, and then question them regarding immigration status.  Members of the Latino community also told us they believe they are pulled over at a higher rate than other drivers for minor traffic violations, because officers assume from their appearance that they are undocumented immigrants, and therefore driving without a valid license.  NOPD's position on inquiring about immigration status has been in flux; recently, however, the Superintendent clarified that officers may not question victims of crime about whether they are lawfully present in the country.  Nonetheless, members of the Latino immigrant worker community, who are frequently victimized because they tend to carry cash on their person, reported a deep reluctance to report crime—either as victims or witnesses.  We heard reports of specific incidents in which immigrant workers called to request police assistance after being victimized by crime, but instead of providing assistance, NOPD officers questioned them about their immigration status.  Consequently, we found a strong belief among some segments of the Latino community that reporting crime to NOPD may subject the reporter to unwanted attention or harassment.  As one participant in a community meeting told us:  "Out of fear, we stay quiet."

Members of the LGBT community complained that NOPD officers subject them to unjustified arrests for prostitution, targeting bars frequented by the community and sometimes fabricating evidence of solicitation for compensation.  Moreover, transgender residents reported that officers elect to charge them under Louisiana's statute criminalizing solicitation of "crimes against nature," rather than the state's generic solicitation law.  The crimes against nature statute, a statute whose history reflects anti-LGBT sentiment, in part criminalizes the solicitation of an individual "with the intent to engage in any unnatural carnal copulation for compensation."  Louisiana Revised Statute § 14:89.  Until August 2010, a first offense under this statute constituted a felony and required registration in the sex offender registry, unlike the general prostitution statute.  Although the state legislature equalized penalties for a first conviction, a second conviction under the crimes against nature statute still requires registration as a sex offender.  Persons convicted only of soliciting crimes against nature make up nearly 40 percent of the Orleans Parish sex offender registry.  NOPD is charged with monitoring all registrants' compliance with sex offender registry requirements, raising questions about efficient and effective use of resources to ensure public safety.  Further, for the already vulnerable transgender community, inclusion on the sex offender registry further stigmatizes and marginalizes them, complicating efforts to secure jobs, housing, and obtain services at places like publicly-run emergency shelters.  Of the registrants convicted of solicitation of a crime against nature, 80

- 36 -

percent are African American, suggesting an element of racial bias as well.  Indeed, community members told us they believe some officers equate being African American and transgender with being a prostitute.

Further, members of the City's LGBT community gave accounts of harassment and even sexual and physical abuse by law enforcement.  The community cited a culture within NOPD of insensitivity and animosity, and our own interviews and observations of inappropriate joking underscored a need for sensitivity training and education regarding LGBT issues.  A number of community members also complained of a long-standing failure by NOPD to take complaints by LGBT individuals seriously, with several reporting that PIB had failed to act on their complaints of officer misconduct.  While NOPD has a policy prohibiting discrimination based on sexual orientation, PIB has no system or mechanism for tracking or analyzing complaints alleging bias or misconduct based on sexual orientation or gender expression.

### b)   Policies, Training, and Accountability

Although the Department acknowledges the perception of biased policing, and officers at the highest levels of the Department acknowledge that it sometimes occurs, NOPD has failed to put in place systems and measures to detect, prevent, and respond to allegations of profiling and other forms of biased policing.  The Department's policies on biased policing contain many essential elements, but are not sufficiently detailed to guide officers' conduct, and do not contain a sufficiently clear or emphatic statement of purpose.  A police agency's profiling policy should serve to embed principles of bias-free policing and set clear expectations for officers regarding their conduct.  We also found that the Department fails to adhere to existing policy in many respects.

The Department's policy on "bias-based profiling," Ops. Man. Ch. 41.6, contains many appropriate elements, including a broad statement prohibiting "bias-based profiling," a restatement of the reasonable suspicion standard for investigatory detentions, and a directive that outside of a credible report, "an individual's race, gender, sexual orientation, or ethnicity or any combination thereof, shall not be a factor in determining probable cause for an arrest, the reasonable suspicion for a stop, or asset seizure and forfeiture efforts."  Although this directive is appropriate, the policy is internally inconsistent in that it also defines profiling as reliance "solely" on one of the delineated characteristics—an inappropriately narrow construction.

Chapter 41.6 also requires the Education and Training Division to formulate a lesson plan on bias-based profiling, and to teach this course to each recruit class and to each commissioned employee during his or her yearly in-service training.  Although recruits do receive a one-hour block at the Academy, many NOPD personnel until recently had received no in-service training since Hurricane Katrina.  In the fall of 2010, DOJ's Community Relations Service trained more than 300 officers in mediation for law enforcement and responding to allegations of racial profiling.  Attendees included sergeants, lieutenants, and command staff, as well as Community Coordinating sergeants and the NOPD Hispanic Liaison officer.  The two-day training featured a joint class between officers and community members.  The training is a significant step forward, but still leaves the Department far short of the training requirement appropriately required by policy, and from the overarching goal of inculcating attitudes of bias-free policing.

NOPD policies also include some accountability measures and requirements, to which the Department has not adhered.  Chapter 41-6 requires PIB to submit an annual statistical summary of all profiling complaints received to the Assistant Superintendent of NOPD's Operations Bureau, and the Superintendent.  The Assistant Superintendent is required to use the summary of citizen concerns, and the information received from the summary of profiling complaints received, to recommend changes to NOPD procedures, practices, in-service instruction, and disciplinary procedures.  The policy requires the Assistant Superintendent to forward these recommendations to the Superintendent, with the goal of eliminating racial and ethnic profiling.  NOPD has not completed this summary, conducted analysis, or formulated any recommendations pursuant to this policy.

PIB personnel told us they receive very few allegations of racial profiling.  This conclusion is unreliable, given the poor systems in place to track racial profiling allegations, and is undercut by our review of PIB cases and policies.  That review indicated that NOPD is likely systematically undercounting such complaints, as discussed in this Report's section on NOPD's complaint investigation process.  Moreover, the perceived lack of integrity and effectiveness of the misconduct complaint process was a theme that we heard from many community members, who frequently expressed reluctance to make complaints against specific officers out of a fear of retaliation and reprisal.  One citizen, at a Vietnamese community group meeting, said that "[y]our house gets burglarized and it may take 10, 12 hours from the police to show up.  You get a cop in trouble and you'll see the whole force here."  Another participant told us that "NOPD needs a code of silence to protect citizens, not each other."  These comments point to underlying issues of trust and credibility that are pervasive among some communities, and that may prevent them from making complaints related to bias or other forms of misconduct.

NOPD's bias-based profiling policy also contains a requirement that when an officer makes a stop, he or she is to radio the dispatcher and provide a description of the subject.  While the policy is not clear, the inclusion of this requirement in the policy on "profiling" suggests an intent to record data regarding such factors as race and ethnicity.  Yet the Computer-Aided Dispatch ("CAD") data that we reviewed contained no information regarding subjects, apart from occasional observations regarding apparent race or ethnicity in a section for officer comments.  Although the FIC database does contain race and ethnicity data, as discussed in section III of this Report, its use is inconsistent.  The FIC card and database also fail to capture such important information as whether a frisk or other search took place, whether contraband was found, and the disposition of the stop.  In any case, it is clear that the Department is not collecting data in a sufficiently useful or complete way, and is conducting little or no analyses of the data it does have.

c)      *Arrest and Force Data*

Among other reasons to question NOPD's crime data, the Department has not reported certain arrest data to the FBI's Uniform Crime Reports ("UCR") system for at least several years.  This data typically includes the race and ethnicity of persons arrested.  The internal arrest data that the Department provided to us upon request was limited and haphazard, but pointed to racial disparity in virtually all categories, with particularly dramatic disparity for African-American

youth under the age of 17.  For example, the Department provided recent arrest data for the eight UCR "Index" or "Part 1" offenses, which are the offenses that the FBI uses to produce its Crime Index:  homicide, forcible rape, robbery, burglary, aggravated assault, larceny over $50, motor vehicle theft, and arson.  It recorded arrests, by age, in five different race/ethnicity categories:  "Black," "White," "Spanish," "Orientals," and "Unknown."  For all age groups, the Department recorded no arrests for "Spanish" or "Orientals," itself a problematic omission.

NOPD's data indicates that in 2009, the Department arrested 500 African-American males and 65 African-American females under the age of 17 for these offenses.  For the same time period, the Department arrested eight white males and one white female in the same age group.  Adjusting for population, these figures translate to a ratio of arrest rates for both African-American males to white males and African-American females of nearly 16 to 1, a deeply concerning disparity.  In 2010, there were 419 arrests of African-American males and 61 of African-American females in this age group for Part 1 offenses, compared with eight of white males and three of white females, resulting in an overall arrest rate ratio of nearly 11 to 1 when adjusted for population.  Although a troubling disparity in arrest rates also exists nationwide, it is not nearly as extreme.  Nationally in 2009, among those agencies reporting data, the ratio of arrest rates for African American youth to arrest rates for white youth, for the same offenses, was approximately 3:1.

For non-UCR Part I crimes, which include such offenses as simple assault, curfew and loitering offenses, disorderly conduct, drug and drinking offenses, weapon offenses, and driving under the influence, there was a similarly striking level disparity for youth under the age of 17.  For example, the black to white arrest rate ratio for males was approximately 11:1 in 2009, and approximately 5:1 in 2010.  For both UCR Part I and Part II crimes, racial disparities exist for adult men and women as well, but are closer to or comparable to the level of disparity reported nationwide.

Although we are continuing to review the Department's data and practices regarding bias-based profiling, what we have found so far is strongly suggestive of differential enforcement for whites and African Americans, most clearly for New Orleans' youngest residents.  Certainly, a disparity in arrest rates between African-American males and white males is not unique to New Orleans, and many people with whom we spoke, both black and white, attributed the starkly different rates primarily to socio-economic factors.  However, the level of disparity for youth is so severe and so divergent from nationally reported data that it cannot plausibly be attributed entirely to the underlying rates at which these youth commit crimes, and unquestionably warrants a searching review and a meaningful response from the Department.

NOPD use of force data also shows a troubling racial disparity that warrants a searching inquiry into whether racial bias influences the use of force at NOPD.  Of the 27 instances between January 2009 and May 2010 in which NOPD officers intentionally discharged their firearms at people, all 27 of the subjects of this deadly force were African American.  In our sample of resisting arrest reports documenting uses of force between January 2009 and May 2010, we found that in 81 of the 96 uses of force that we reviewed (84%), the subject of the force was African American.

More generally, it is critical that Department and City leadership acknowledge community concerns regarding discriminatory policing, consider the ways its policies, training, and supervision may encourage bias, and implement adequate systems to detect, prevent, and remedy bias in its police practices.  These measures are essential if the Department is to rebuild itself as one that serves—and is perceived as serving—all segments of the community fairly, equally, and effectively.

2.   National Origin Discrimination:  Failure to Provide Police Services to Persons with Limited English Proficiency

NOPD is dangerously limited in its ability to communicate effectively and accurately with limited English proficient ("LEP") victims, witnesses, suspects, and community members, a deficiency that directly undermines public safety, crime prevention, and crime-solving, and results in inferior police services to LEP community members.  Language and cultural barriers can put cases and lives at risk by creating safety, evidentiary, and ethical challenges for officers and others.  Language and cultural barriers can prevent LEP individuals from understanding their rights, complying with the law, reporting crimes, and receiving meaningful access to law enforcement services and information.

While NOPD recently has taken steps to connect with LEP communities, including the "El Protector" program, which will involve bilingual outreach to Latinos on public safety issues, and a similar program directed to the Vietnamese community, the Department will need to undertake more concerted and comprehensive efforts to ensure that LEP individuals receive meaningful access to vital police services.

a)   *Failure to Develop a Language Assistance Plan*

NOPD has virtually no capacity to provide meaningful access to police services to LEP community members, who in New Orleans are predominantly Latino or of Vietnamese descent. Although demographic data post-Katrina remains imperfect, the Vietnamese community has been an established presence in New Orleans since the mid-1970s, and since the storm the City has seen a significant influx of Latino immigrants.  A significant segment of each of these communities speaks little or no English and the presence of both communities in the City has been growing.  NOPD relies primarily upon just two officers, one fluent in Spanish and one fluent in Vietnamese, to assist on calls for service and investigations throughout the Department, in addition to performing their regular duties.  The Department does not compensate these officers for interpreter services performed while off-duty or provide them with enhanced pay for language fluency; nor does the Department have processes to assess the accuracy of its multilingual officers and train them in carrying out their duties.

Although the Department employs several Vietnamese-speaking officers and between fifteen and twenty Spanish-speaking officers, one member of NOPD leadership acknowledged that "there is no real incentive" for officers with language capacity to provide interpretation, making many "reluctant" to do so.  Indeed, the lack of a structured language assistance program has actually created disincentives for officers to utilize their language skills.  Those officers who do volunteer to assist with interpretation needs appear to be subject to receiving calls from units

throughout the Department at all times of the day or night, while off duty or on vacation, and on their personal cell phones.

The Department's Bureau of Policy and Review has engaged in limited efforts to formalize Spanish-language interpretation for NOPD, and in December 2008 issued a General Order setting out official personnel policies with respect to scheduling an interpreter, appropriate compensation for interpreters, and interpreter responsibilities under a new program.  This General Order also provided for overtime pay for Spanish-language interpretation, though the process for receiving overtime compensation was complex and cumbersome.  But in April 2010, NOPD ceased paying any overtime.  The General Order did not specify the interpretation policy for any non-Spanish language, the process for translating any vital documents, the training necessary for becoming an interpreter, or any required training for officers on how to work with interpreters.

For the period between December 2008 and April 2010, the Department's primary Spanish interpreter, who now also serves as the Hispanic Liaison officer, kept a log documenting that he assisted on more than 350 calls for service, illustrating the considerable demand for these services.  There has been no comparable tracking of calls for service by monolingual Vietnamese speakers, nor any efforts to formalize Vietnamese-language interpretation and translation.  The Department's few Vietnamese speakers have always provided interpreter assistance on an informal basis.

Apart from the December 2008 General Order, which contained very little substantive guidance, the Department has no formal language assistance plan, nor any policies or procedures for:  determining the number of LEP individuals within its jurisdiction; determining the languages spoken by LEP individuals within its jurisdiction; collecting and recording primary language data for LEP individuals encountered; collecting and recording the number of LEP victims and witnesses who seek NOPD services; informing victims and witnesses of the availability of language assistance; interrogating and interviewing LEP individuals; or responding to and tracking citizen complaints filed by LEP individuals.  The Department similarly lacks protocols to identify and train multilingual staff; assess the accuracy of multilingual staff's translation and interpretation skills; train NOPD officers on how to work with interpreters in the field; and train all NOPD personnel on providing language assistance services to LEP individuals.  Finally we found no evidence of any systems to identify and translate vital documents such as: consent to search forms; witness and victim statement forms; citation forms; victim rights notification forms, and citizen complaint forms.

### b)       Impact on LEP Communities

NOPD's lack of a formal and comprehensive plan to serve individuals who have limited English proficiency results in the provision of inferior and, in some instances, no police assistance to a growing segment of the City's population.  We spoke to many officers, both with and without foreign language capacity, who described communication barriers as a significant problem.  Community members and individual officers also told us that a Department-wide lack of cultural competency further impedes communication and effective policing of the City's Latino and Vietnamese communities.  No one in the Department was able to articulate how

NOPD serves LEP residents when one of the "unofficial" interpreters is off-duty, in court, or otherwise unavailable. Some officers said that when an officer who could interpret was not available they used gestures or drew pictures in an attempt to communicate. We heard from officers with language fluency that they receive frequent phone calls directly from language-minority members of the public who seek a more direct and efficient police response.

During an August 2010 ride-along, we observed firsthand a delay in response to a call for service from a victim of domestic violence, apparently because she was a monolingual Spanish-speaker. It further appeared that the officer may not have responded at all if not pressed by the DOJ investigator and if the DOJ investigator had not happened to be bilingual. After the officer continued to patrol the district for 30 minutes following receipt of the complaint, the DOJ investigator inquired about what calls had come in through dispatch. The officer initially skipped over the domestic violence call, but then asked the DOJ investigator whether he spoke Spanish. When the investigator replied that he did, the officer responded to the call. Upon arrival at the scene, the victim, who had visible injuries, said she had been waiting more than an hour for a response. Later, the officer explained that there was only one person on the shift capable of serving as an interpreter, and that the individual was often difficult to reach.

In addition to delaying or preventing response to complaints of serious violence, the Department's inability to provide language assistance, in situations where officers do respond, can lead to family members or children serving as interpreters. This can be especially dangerous in domestic violence cases where using a family member to interpret may discourage the victim from speaking or, in cases where the abuser is the interpreter, may further isolate an LEP victim whose words are purposefully misinterpreted.

The direct observation described above is consistent with reports we received not only from officers but also from members of the community. Community members described significant consequences resulting from language barriers in their dealings with NOPD—including delays in or denial of services, incidents where victims were mistaken for suspects, and situations where encounters escalated unnecessarily due to gaps in communication. At one community meeting, a monolingual Spanish speaker reported calling police on four different nights regarding domestic violence, but receiving a response only once. She attributed the lack of response to the Department's failure to understand her. At another meeting, a participant said that she was arrested in front of her small child after failing to comprehend and follow an officer's orders. This encounter began when she attempted to intervene on behalf of another person being arrested. Officers themselves recognized the dangers inherent in NOPD's lack of language capacity; one gave the scenario of a victim of a robbery, waving his hands in agitation, and unable to communicate with the responding officer: "So the victim gets cuffed or restrained."

We also heard accounts of Spanish-speaking individuals being cited or arrested themselves after calling police to report wage theft or other conflicts with employers, because an officer was unable to understand or sort out precisely what was taking place. Workers also perceived that officers were more likely to understand and consequently side with employers, who generally speak English. One worker, who filed a complaint with PIB in November 2009, alleged that he called police to report a physical assault by an employer, but that instead of fully

investigating, the responding officers interrogated him about his immigration status and cited him for disturbing the peace. PIB sent the complainant a response letter in March 2010, stating that the allegations could not be substantiated. The investigation noted, however, that because the responding officers were "[u]nable to resolve the dispute at the time of the incident, the officers issued a summons to both men for disturbing the peace so the matter could be resolved in court," seeming to support the complainant's allegation that he was inappropriately cited. The investigation also pointed to some confusion over the officers' questions on the scene, which the PIB investigator attributed to the interpretation skills of a community organizer who was assisting the worker. Irrespective of whether the investigator's conclusion was valid, the incident reinforces the need for NOPD to develop its own capacity to provide LEP individuals with meaningful access to law enforcement services.

This complainant submitted his complaint to PIB with the assistance of a local community group that works with and represents Spanish-speaking day laborers. But in general, Spanish or Vietnamese speakers who wish to make a complaint regarding police conduct have very limited options. A monolingual Spanish or Vietnamese speaker attempting to make a complaint at a district could only do so if he or she were fortunate enough to find someone present to interpret. PIB officials said they would probably have to call in an officer from outside the bureau to interpret a complaint of misconduct from a non-English speaker. This raises serious concerns about the confidentiality of complaints and integrity of the investigation process when persons with limited English proficiency are involved.

3.    Gender-Biased Policing:  Failure to Investigate Sexual Assault and Domestic Violence

Inadequate policies and procedures, deficiencies in training, and extraordinary lapses in supervision have contributed to a systemic breakdown in NOPD handling of sexual assault investigations. NOPD has misclassified large numbers of possible sexual assaults, resulting in a sweeping failure to properly investigate many potential cases of rape, attempted rape, and other sex crimes. Additionally, in situations where the Department pursued sexual assault complaints, the investigations were seriously deficient, marked by poor victim interviewing skills, missing or inadequate documentation, and minimal efforts to contact witnesses or interrogate suspects. The documentation we reviewed was replete with stereotypical assumptions and judgments about sex crimes and victims of sex crimes, including misguided commentary about the victims' perceived credibility, sexual history, or delay in contacting the police. NOPD recently acknowledged its serious deficits in responding to sex crimes, and has taken some significant remedial steps. NOPD and the City will need to build on these efforts to bring about the extensive and sustained change necessary to effectively and appropriately respond to these serious crimes.

We also found systemic deficiencies in NOPD's handling of domestic violence cases, although not to the degree evident in sex crimes. The City benefits from the presence of the New Orleans Family Justice Center ("NOFJC"), a federally-funded center designed to provide comprehensive services to victims of domestic violence by integrating law enforcement, prosecution, civil legal services, and advocacy in one location. The NOFJC, which is managed by the non-profit Catholic Charities, opened two years after Hurricane Katrina and now houses NOPD's Domestic Violence Unit. Although the existence of the NOFJC appears to have had a

salutary effect on NOPD's handling of domestic violence complaints, we found significant weaknesses in the Department's policies and practices with respect to responding to and investigating these cases.

### a)   Sexual Assault Policies, Training, and Supervision

The Department's policies covering sex crimes investigations are set forth primarily in Ops. Man. Ch. 42, *Criminal Investigations*.  Department leadership acknowledged that these policies are outdated and in need of revision.  The current policies are short on substantive content, failing to provide guidance with respect to such basic, essential functions as:  initial and follow-up victim interview protocol; collaboration with victim advocates; protocols for forensic examinations of victims; suspect interviews and forensic examinations; evidence preservation and crime scene management in the sexual assault context; and services/assistance to be offered to victims.

Rape crisis advocates, representatives from the DA's Office, and officers themselves told us that additional training is urgently needed for sex crimes detectives and supervisors, as well as patrol officers, who are generally the first responders to a complaint of sexual assault.  Sex Crimes Unit detectives described their training as having been largely "on-the-job" for the last several years.  Although some reported attending courses on interviewing and interrogation on an ad hoc basis, the Department has not required in-service training for detectives for at least three years.  Specialized training in such critical areas as victim interviewing skills, investigating non-stranger and drug and alcohol facilitated sexual assault, and documenting sexual assaults are essential.

We further found that supervision of the Sex Crimes Unit has been grossly inadequate.  In the context of sex crimes, it is essential that supervisors clarify expectations of investigators; ensure that complaints are being classified, investigated, and cleared appropriately; enhance cooperation between rape-crisis centers and forensic examination programs; and communicate early and effectively with prosecutors.  Community stakeholders, prosecutors, and officers alike reported that this type of supervision and leadership has been virtually absent from the Sex Crimes Unit, for at least several years.  In June 2010, the Department took the long-overdue step of installing a new commander of the Sex Crimes Unit.  The Unit's new commander has prioritized collaborative, victim-centered problem-solving with the DA's Office and rape-crisis advocates, who uniformly report improved working relationships with the Unit and its leadership.

### b)   Classification of Sexual Assault Complaints

Under the FBI's UCR program, police departments provide statistics regarding reports of certain crimes, including forcible rape and attempted forcible rape.  The UCR program defines forcible rape as the "carnal knowledge of a female forcibly and against her will," and specifies that "'[a]gainst her will' includes instances in which the victim is incapable of giving consent because of her temporary or permanent mental or physical incapacity (or because of her youth)."  Many types of sexual assault that fall outside of the UCR's definition of forcible rape still

constitute felonies under Louisiana law, and the Sex Crimes Unit is charged with fully investigating these offenses.

Departments must include reports of forcible rape or attempted forcible rape in their UCR data irrespective of whether the victim cooperates or an arrest is made.  In situations where investigators determine that a report is false or baseless—meaning that the evidence shows no crime occurred or was attempted—the department may designate a report as "unfounded." Departments must still include these reports in their UCR statistics for Index Crimes, under the category of unfounded crimes.

In 2009, NOPD reported 98 forcible rapes and 179 homicides, when in virtually every other city the number of rapes far outpace the number of homicides.[18]  By mid-August 2010, the Sex Crimes Unit had investigated just 54 UCR rapes for the year, along with 49 non-UCR investigations, which include "carnal knowledge" or statutory rape, sexual battery, oral rape, rapes of males, and sexual assault complaints deemed "unfounded."  These figures, particularly in a city with high tourism and multiple colleges and universities, are strikingly low.  Based on our review of the documents and interviews with NOPD and other stakeholders, we concluded that the Department likely had diverted many complaints of possible sexual assault from being fully investigated by classifying them as non-criminal "Signal 21s," the Department's code for miscellaneous complaints.  The *Times-Picayune* reported NOPD's extensive use of Signal 21 designation in June 2009, putting the Department on notice about the potential misclassification of sexual assault complaints.

Use of codes and signals for classification of complaints varies widely across police departments.  There are often situations where it is appropriate to categorize a complaint with a "miscellaneous" or "non-criminal" type designation—namely, when the elements of a crime are clearly not present, or when a third party reports a crime but the reported victim denies that one occurred.  Our review determined that NOPD has used the Signal 21 code far more expansively, effectively shutting down investigation for a significant proportion of possible sex crimes.  In 2008, the Sex Crimes Unit of NOPD responded to 230 complaints of alleged sexual assault; of those 230 complaints, the Department classified 144 – or almost 63 percent – as "Signal 21" miscellaneous complaints.  In 2009, NOPD used the miscellaneous complaint code for 112 of 261 total sexual assault complaints, or 43 percent.  By mid-August 2010, the Unit had classified 81 out of 184 complaints of possible sexual assault received in 2010, or about 44 percent, as Signal 21s.  In the vast majority of these cases, sex crimes detectives filled out a Major Offense Report Form ("MORF"), coded the disposition as "NAT," or "Necessary Action Taken," and undertook no further review, victim follow-up, or investigation.

The Department's practice, according to the Sex Crimes Unit's caseload reports, has been to give complaints the Signal 21 designation not only in situations where the elements of a crime do not appear to exist, but also where the detective concludes, after only an initial investigation, that there is:  "an uncooperative victim;" "the victim is unsure of what occurred or unsure if she

---

[18] According to 2009 UCR data:  In New York City there were 471 homicides and 832 rapes; Los Angeles 312 homicides and 903 rapes; Pittsburgh, Pennsylvania 39 homicides and 116 rapes; Austin, Texas 22 homicides and 265 rapes; Las Vegas, Nevada 111 homicides and 698 rapes; Louisville, Kentucky 62 homicides and 230 rapes; and Nashville, Tennessee 77 homicides and 262 rapes.

wants to report the incident;" "if the evidence refutes the allegation;" or if there are "conflicting statements."  The caseload reports also note that "If we can prove that the allegation is false during the initial investigation that's a MORF."

Indeed, the Signal 21 reports that we reviewed clearly reflected a focus on and effort to, from the outset, "prove an allegation is false"—a conclusion that is virtually impossible to draw based on a cursory investigation or preliminary victim interview.  Many of the reports emphasized the victim's inconsistent statements, gaps in knowledge or memory, or inability to give a good description of the perpetrator, none of which demonstrate that an allegation is false.  Such reactions, common for sexual assault victims in crisis or suffering from posttraumatic stress, should not be used to label a report of assault as false.  The determination that a report of sexual assault is false should only be made if the evidence, obtained in a thorough investigation, establishes that no crime was committed or attempted.

Additionally, the Signal 21 reports often expressed skepticism about victims' credibility, opined on victims' possible motivations for lying, and expressed judgments about delayed reporting, an extremely common dynamic in sexual assault cases.  In many instances, the investigation seemed to focus on the trustworthiness of the victim herself, rather than on the alleged crime; indeed, in a number of reports the investigator noted checking the victim's criminal history.  Among the justifications given for classifying a complaint as a Signal 21 were: history of prostitution; mental illness; having previously made a "similar" report in another city; having "lied" about being arrested in the past; and "a possibility that the victim lied to the police" in an unrelated matter.  One investigator classified the signal as a 21 due to "the victim staying out at night knowing she has a live in boyfriend of 14 years, and the victim not really concern with the rape only the morning after pill."

In arriving at these conclusions, investigators appeared to rely on initial victim interviews in which detectives asked leading or blaming questions, or on stereotypes about how victims of sexual assault should behave.  In many of the Signal 21 reports, detectives asked victims why they did not resist, why they put themselves in certain situations, and why they did not immediately disclose the assault to police, family, or friends.  In one report, the detective asked the victim "if she screamed or resisted the perpetrator," and when the victim replied that she did not, he "then asked why she did not resist.  The victim stated the perpetrator was aggressive and she was afraid, the victim then stated she did not think anyone would help her."  In another report, the detective commented that the victim "seemed very calm and unrattled seeing as though the aforementioned account had just taken place."  He also asked her why she did not leave the French Quarter earlier with some family members, "rather than walk alone in the cold on a dark street at that time in the morning."  Later in the same interview, he asked her whether she had a cell phone on her, and when she replied that she did, he "asked her why she didn't try to call 911" during the assault.

In short, our review of Signal 21 reports found that NOPD routinely asks questions that are likely to heighten many victims' feelings of shame and self-blame, fear of not being believed, and lack of confidence in the criminal justice system.  Such interview tactics, particularly at the critical initial stage of a sexual assault investigation, may well intensify a victim's reluctance to cooperate with an investigation or prosecution.  This effect was clearly evident in a number of

anonymous survey responses that victims completed after receiving treatment at area hospitals. One victim said she felt that detectives were "there to catch me in a lie, not to help. They were unconcerned and analyzing my story to find fault and not the truth." Another said the detective "seemed bored" while questioning her, and that she "got one thing out of sequence and he seemed annoyed." A third victim said she "felt pressured into not pressing charges/not cooperating," and another said the detective told her "there was nothing to report, that NOPD didn't have the manpower to handle my case, and I could go to the hospital or urgent care if I wanted."

In addition, the Signal 21 reports reflect an NOPD practice likely to discourage victims from pursuing prosecution. Files indicated that NOPD routinely has victims fill out and sign a document called a "Voluntary Victim/Witness" form, stating that they do not want to file charges or proceed with an investigation or prosecution. The form also includes information on the content and penalty of Louisiana's "Criminal Mischief" and "Injuring Public Records" statutes. Use of this form at such an early stage is a poor practice that may deter many from participating in an investigation and potential prosecution.

NOPD has acknowledged serious problems in the way it classifies sexual assault complaints, and recently provided 93 Signal 21 reports from 2009 to the Louisiana Commission on Law Enforcement ("LA Commission"). The state agency conducted an audit of the reports and concluded that 9 were reportable as UCR rapes or attempted rapes, and another two dozen could have been scored as a different UCR reportable offense (such as Assault or Aggravated Assault). The LA Commission's focus was on UCR-reportable offenses, excluding from review many other possible sex crimes that under Louisiana law may have been coded inappropriately and should be thoroughly investigated. The LA Commission's audit also listed several dozen complaints as "unfounded"—irrespective of the fact that they were never thoroughly investigated—without explaining why the unfounded designation was appropriate.

The Department, to its credit, recently reopened the nine rape/attempted rape complaints identified by the LA Commission, along with an additional 21 identified through internal review. The request for the audit and the performance of an internal review were significant and positive initial steps. Nonetheless, as described above, our review suggested that many more complaints may have been coded inappropriately and diverted from full and thorough investigation. More significantly, the underlying deficiencies—particularly in the areas of victim interviewing, sensitivity, documentation, and an understanding of the dynamics of sexual assault—are pervasive and have yet to be addressed.

### c) Inadequate Sexual Assault Investigations

We also found that even where assaults were properly classified, those investigations were inadequate in several important respects. As in Signal 21 documentation, the investigative reports suggested problematic interviewing techniques such as blaming or leading questions, and stereotypes regarding how a victim behaves in a "real" case of rape. In one interview, of a teenager who reported being assaulted by her mother's boyfriend, the detective wrote that the "victim was asked if she resisted and asked to explain. The victim stated that she told him to stop and he didn't. She stated she didn't yell or scream, nor did she try to use her cell phone to

call her mom or the police. The victim states that the accused never threatened or implied to have a weapon or cause her physical harm. In fact, the victim states that accused is smaller than her in weight and around the same height." The detective also noted that the "victim's demeanor and her mother's were very nonchalant and unwavered by the police inquisition."

In some cases it was difficult to separate poor interviewing from poor report-writing. Many reports omitted critical details, such as descriptions of victim injuries, or results of forensic exams or requested laboratory analysis. Additionally, detectives wrote their reports in the third person, an unusual practice that results in confusing and hard-to-follow narratives. In virtually every investigation we reviewed, victim and witness statements contained no first-person quotes, and were essentially a synopsis of what the detective believed he heard the victim or witness say. Detectives appeared to routinely sanitize victims' accounts or used clinical language that civilians, and especially victims of sexual assault, do not typically use. It is critically important that investigators learn to preserve a victim's own detailed statement.

Investigative reports also did not compile or contain any reports prepared by patrol officers or first responders. We learned that patrol officers do not prepare any reports themselves when responding to a sexual assault complaint, although they do write reports for all other crimes, including major and violent offenses. Instead, we were told that sex crimes detectives are called out to every complaint, and they interview patrol officers about what they observed, just as they would any other witness. We found no evidence of such interviews in the investigative reports, however, which lacked the important information typically captured by first responders, such as "outcry" statements by the victim, appearance of the scene, or whether the victim required medical assistance. Although patrol officers will need intensive training in dealing with sexual assault victims, conducting and recording preliminary interviews, and preparing reports, it is crucial to successful investigation and prosecution that first responding officers accurately document what they see, do, and hear. Additionally, having a record of uniformed officers' actions in these cases will assist the Department in identifying training needs and ensuring that first responders and investigators treat victims appropriately. Although detectives told us that patrol officers call them almost immediately to respond to a complaint of sexual assault, uniformed officers are still a victim's first interaction with law enforcement, an interaction that is likely to influence a victim's decision to participate in an investigation.

Detectives routinely failed to seek out and interview witnesses and interrogate suspects. In fact, both officers and prosecutors told us that until recently the Sex Crimes Unit had an "unofficial" but clear policy of not conducting interviews of suspects, and instead built cases based on victim testimony. Our review confirmed that detectives rarely questioned suspects, even in situations where a suspect was positively identified in a line-up and arrested. In one report, although a suspect was identified, arrested, and waived his rights, the one and only statement that the detective documented was the suspect's denial of having been involved in any rape. There was no evidence of any effort to question the suspect about the details of the incident or elicit any additional information. Fortunately, the new commander of the Sex Crimes Unit has significant background and expertise in interrogations, and has prioritized changing policy and practice in this area. We learned that he recently secured private funding to purchase video equipment for an interrogation room.

We also found that investigators failed to follow standard guidelines governing collection of physical and forensic evidence.  In one case, the detective failed to bring the victim to University Hospital for a forensic examination due to the amount of time that had elapsed since the date of the assault – approximately 54 hours, which is well within the national standards for obtaining forensic examinations.  In 2004, the National Protocol for Sexual Assault Medical Forensic Examinations (Adult /Adolescents) increased the time frame for forensic exams from 72 hours to 96 hours following an assault and many agencies collect biological evidence in a forensic exam up to 120 hours (5 days) after the assault.  In another case, the detective informed the victim that "because she had reported the incident over 72 hours after it happened, there would be no chance of getting physical evidence."  In addition to blaming the victim for her delay in reporting, the detective's statement overlooks the possibility of obtaining physical evidence from clothing or from the victim's car, where the assault allegedly occurred.

Another significant issue confronting NOPD's investigations of sexual assaults is its crime lab's lack of DNA analysis capacity.  The Department has sent evidence to the state police crime laboratory for analysis, but at the time of our review, there were 800 untested forensic examination kits in NOPD's property room.  NOPD recently announced an NIJ-sponsored partnership to transfer backlogged kits to Marshall University, at a rate of 60 per month.  Additionally, the Department has sought funding to hire two DNA Criminalists to work at the state laboratory (pending funding and construction for their own DNA lab).

d)    *Inadequate Domestic Violence Policies, Procedures, and Training*

Ops. Man. Ch. 42.4 sets out basic procedures for making domestic violence arrests and carrying out investigations, and specifically requires that officers prepare a report documenting every domestic violence call for service.  Additionally, the commander of the Domestic Violence Unit, who, like the Sex Crimes Unit commander, recently assumed his position, provided us with a second operations manual specific to his Unit.  He indicated that he is revising the Unit's operations manual, which contains minimal guidance for detectives or other officers responding to domestic violence calls; it merely lays out the mission, goals, and broad responsibilities of detectives, listing such duties as "conduct[ing] follow-up investigation," "ensur[ing] that appropriate resources are provided," and "provid[ing] helpful information to victims."

Neither NOPD's Operations Manual nor the Domestic Violence Unit's manual contains specific guidance regarding such important functions as:  protocols for 911 operators taking domestic violence calls; initial entry and preliminary investigation of domestic violence scenes; identifying and documenting victim injuries; or procedures for follow-up investigations.  The absence of specific guidance for officers and detectives not only impedes effective response and investigation, but also creates potentially dangerous conditions for victims.  As an example, the Department has no specific protocols regarding how to safely communicate with victims, either during initial encounters or future contacts, a serious deficiency in the domestic violence context.  In a survey administered by the NOFJC, a victim noted that she "[i]nformed the dispatcher to inform the officers that were coming out not to let the batterer know I was the one calling or that I was inside the house.  They did it anyway.  He wasn't arrested but was asked to leave my property.  I had plenty of reasons why I asked them to do it this way.  They did the way they

wanted to do it.  What they did, I could have done myself.  To me, they are the reason this has escalated."

e)      *Inadequate Domestic Violence Investigations*

At the time of our review, the Domestic Violence Unit was staffed by only three detectives, which was wholly inadequate to address the volume of the Department's domestic violence calls and provide appropriate follow-up and services to victims.  In one NOFJC survey, a victim noted that the center "[r]eferred me to a detective who never called."  As of July 2010, there had been 6,200 calls for service regarding domestic violence since the beginning of the year.  Of those cases, about 1200 had been assigned to Domestic Violence Unit detectives for follow-up, while another 2700 were fully handled by officers in the individual districts, though subject to a superficial "review" by domestic violence detectives.  We were told that at least 1500 reports were "missing" due to the recent transition to a new reporting system.

Due to the high volume of domestic violence cases, the three detectives assigned to the Domestic Violence Unit are not permitted to do field work, severely restricting their ability to conduct any meaningful follow-up investigation.  And consistent with this, the reviewed reports did not reflect any follow-up interviews of witnesses.  Although officers generally photographed and documented injuries at the scene, we did not find any evidence that they were returning to take photographs at a later point, when injuries might become more visible.  Nor did we find that officers were seeking communication tapes of dispatch calls for inclusion in reports, though such follow-up appeared appropriate in many cases.  In general, it appears that substantive follow-up investigation is largely handled by the Domestic Violence Prosecution Unit of the DA's office.  As with sex crimes, the Department's involvement in investigating a case appears to end at the point of arrest, although both the DA's office and the Department reported that they are beginning to cultivate a more collaborative relationship on both sex crimes and domestic violence.

Patrol officers and district investigative officers handle the vast majority of on-scene investigations in domestic violence cases.  Officers, prosecutors, and advocates reported that training for these officers has long been grossly inadequate, compromising the quality, completeness, and consistency of on-scene investigations and written reports.  In some cases officers did a thorough job of documenting the appearance of the crime scene, describing injuries, and capturing spontaneous statements in direct quotes.  In many others, however, officers failed to solicit or document key facts regarding past history of domestic violence or assault, or include sufficient information to identify the primary aggressor in a situation.  Officers are also failed to note symptoms of strangulation or ask appropriate follow-up questions related to strangulation.

In most instances, efforts to find and interview witnesses were minimal.  In one case, for example, the report reflected that a neighbor had heard screams and called 911, yet there is no indication that the officer interviewed or attempted to interview the neighbor.  In another, the report suggests that a male friend of the victim's was present, and involved in the events that led

to the disturbance, yet the report reflects no attempt to interview him or obtain his contact information.

Additionally, the reports reflect that officers virtually never interview child witnesses, even in cases where children are present at the scene and listed on the domestic violence reporting form. It may be that officers believe that children must be interviewed by a forensic interviewing specialist, but we found no evidence that such follow-up interviews were taking place, or that officers were obtaining even minimal statements from children. While very sensitive, properly-trained officers can interview child witnesses. Interviews of suspects are also the rare exception, and officers do not appear to interview suspects when they arrest on a warrant, despite routinely providing *Miranda* warnings. The reports do reflect that officers reliably pursue arrest warrants when suspects have left the scene.

NOPD has taken some recent significant steps to remediate deficiencies in its overall response to domestic violence. Over several months between April and December 2010, the Department sent nearly 300 officers to training on domestic violence, provided in a collaborative effort by the USAO, the State Attorney General's Office, and the Louisiana Supreme Court Protection Order Registry. Additionally, as in sex crimes, the Department named a new commander of the Domestic Violence Unit, who appears committed to partnering with advocates in the community to improve the Unit's performance.

Nonetheless, the Department has yet to fully leverage the considerable tools and resources available to enhance its response to domestic violence. For example, none of the reports we reviewed contained a victim referral to the NOFJC. Further, the NOFJC has urged implementation of an Integrated Protocol for Law Enforcement, which NOPD has reviewed but has yet to endorse or adopt as policy. The Integrated Protocol reflects best practices and contains the specific and detailed guidance that NOPD currently lacks. Additionally, the NOFJC's technical assistance provider, the National Family Justice Center Alliance, recently conducted a "Snapshot audit," a review of each aspect of the NOFJC's service provision designed to improve programs and identify training issues. The Snapshot, which involved record and data review, interviews with service providers, and focus groups with victims, made many findings consistent with ours and included a comprehensive set of recommendations that we urge NOPD to carefully review.

## V. __RECRUITMENT__

NOPD's longstanding failure to prioritize the recruitment of high-quality candidates contributes to the chronic, Department-wide problems we observed, including inappropriate and disrespectful conduct in the community, corruption, unnecessary uses of force, and improper stops and searches. Good police officers possess problem-solving skills, emotional maturity, sound judgment, interpersonal and communication skills, and the ability to collaborate with a diverse cross-section of the community. If the Department is to attract a workforce capable of policing ethically and effectively, it will need to develop a strategic recruiting plan focused on attracting recruits with these qualities.

We found NOPD's recruitment program to be anemic, entirely passive, and lacking clear goals, plans, or accountability.  NOPD's Recruitment and Applicant Unit, which has a staff of six commissioned law enforcement officers, has no plan to seek out and recruit qualified candidates.  Recruiters were unclear about the scope of their authority or obligations, and report having done little since Hurricane Katrina to find or attract highly-qualified applicants, apart from distributing literature at job fairs, colleges, and universities.

City policy decentralizes recruitment efforts among various departments and functions, primarily NOPD's Recruitment Unit and the Civil Service Commission, and also delegates some informal authority to a non-profit entity, the New Orleans Police and Justice Foundation (NOPJF).  Consequently, recruiting efforts are unfocused and reactive, and there is little accountability for outcomes.  While NOPD recruiters told us they rely in part on the Civil Service Commission for recruiting, Civil Service employees told us recruitment was the NOPD's job; they described their primary responsibility as administering the Civil Service Exam and providing administrative oversight to the hiring process.  No one we spoke to identified, as their primary goal or responsibility, recruitment of high-quality applicants who share the Department's values and can help it achieve its mission.

The Department has long been aware of deficiencies in its recruitment efforts, yet for years failed to act meaningfully to address them.  In many ways, in fact, leadership decisions appear to have compounded these problems.  In the past, extremely noncompetitive entry pay reportedly impeded the Department's ability to attract strong candidates.  With entry pay increases several years ago, that obstacle has diminished (although it appears that noncompetitive pay increases for officers may still be hindering retention of good candidates).  In more recent years, the failure to attract strong candidates appears linked to NOPD's lack of any strategic recruiting plan, along with the pressure the Department was under to hire new police officers after Hurricane Katrina.  NOPD hired hundreds of officers during a relatively short time period; one estimate is that 400 officers were hired during the three year period following Katrina.  In its press to hire these officers, NOPD reportedly lowered its recruiting standards, essentially removing the physical agility requirement and asking the Civil Service Commission to score the written portion of the application less vigorously.

In 2006, NOPD asked the RAND Gulf States Policy Institute (RAND GSPI) to review its recruitment process.  RAND GSPI's 2007 report observed that Recruitment Unit officers spent most of their time on the internet performing background checks; that NOPD had no specific selection criteria to identify successful recruiters; and that the Department provided no training to members of its Recruitment Unit.  The study also found that NOPD made no attempt to collaborate with institutions that could be a source of well-qualified recruits.  After its review, the RAND GSPI made simple and common sense recommendations to NOPD to help establish a more successful recruitment process—recommendations that the Department has ignored until relatively recently.

Predictably, these deficiencies have hampered NOPD's ability to hire quality recruits.  At the time of our review, the attrition rate for the latest recruit class was nearly sixty percent.  Of the sixty-six recruits that successfully completed the recruitment and background investigation, thirty-nine were eliminated from the training class.  NOPD expended thousands of dollars to test,

train, and conduct background checks on what were clearly marginal applicants, a waste of funds that NOPD could have better used in a more targeted recruiting process. Nonetheless, NOPD's decision to eject unqualified candidates before they became officers was the appropriate one. In interviews with NOPD officers at all ranks, we heard the consistent complaint that the Training Academy routinely graduated police recruits who were sub-par and not fit for duty.

Recently, NOPD has begun to make changes to its recruiting process to ensure a stronger pool of applicants is selected to attend the academy. Working with the Civil Service Commission, NOPD has made the physical agility portion of the exam more stringent, and has instituted a requirement that applicants for police officer have at least 60 hours of college credits from an accredited college or university, or two years of full-time military service. The Department is also launching a partnership with a local community college, through which cadets will work twenty hours per week at NOPD while attending school. Once the cadets have earned sufficient college hours and completed certain requirements, including taking courses in a foreign language, they will be eligible to apply to NOPD's recruit academy. While research shows that most participants in junior cadet programs do not become police officers, these efforts appear to be cost-effective and can serve to improve police-community relations. Although the Department has a great deal of work ahead to attract the most highly-qualified workforce possible, we commend its recent focus on these efforts.

The Department will also need to focus on meeting its particular need for officers who can communicate and form partnerships with all segments of the New Orleans community—which includes efforts to attract a diverse applicant pool. NOPD's policies specifically require the involvement of minority employees in formal recruiting presentations and pre-employment counseling programs, as well as outreach to community organizations for recruitment assistance. *See Ops. Man. Ch. 32, Recruitment.* Although these guidelines make clear that NOPD acknowledges the value and importance of a diverse workforce, the Department's practices with respect to recruitment depart significantly from its policies. Members of the diverse community groups with whom we spoke consistently reported that the Department has not reached out to them for any assistance in recruitment efforts. Nor has the Department sought the assistance or leveraged the community contacts of employees such as the Hispanic Liaison Officer. Such outreach to community organizations and stakeholders, and efforts to elicit their active support, is critical to both strengthening and maintaining community ties, and ensuring that the Department is in the best possible position to serve all of its citizens.

As we discuss in section III.B.2 of this Report, NOPD is particularly ill-equipped to serve the City's significant Vietnamese and Latino populations. The Vietnamese community has long comprised a sizable minority within the City, and the Latino population has grown substantially in the last five years, with Latino laborers participating heavily in the City's post-Katrina rebuilding efforts. We heard from both community organizations and those within NOPD that recruiting officers with language skills and cultural awareness is critical to serving these communities. Although these qualities do not necessarily or exclusively flow from race and/or ethnicity, diversifying the applicant pool is one important way that the Department can seek to increase its language capacity and cultural fluency—along with providing pay incentives for any officers with language skills, and enhancing diversity training for all officers. Doing so through

diverse stakeholder organizations serves the additional purpose of strengthening community ties and signaling the Department's commitment to being inclusive and representative.

## VI.   <u>TRAINING</u>

The training NOPD has provided to its officers during the last several years is severely deficient in nearly every respect.  NOPD's failure to train compromises officer and public safety, effective crime reduction, and the credibility and reputation of the Department as a whole. Shortcomings at the recruit, field, and in-service stages of training have left NOPD officers ill-equipped to perform their duties in a safe, constitutional, and effective manner.  We found systemic problems in training of every type, including tactical, operational, legal, and ethical. Officers receive an insufficient amount of training—there has been almost no in-service training for the past five years—and the instruction officers do receive is often out-of-date, conflicts with NOPD  policies or current legal requirements, or fails to address officers' most pressing training needs.

We found no disagreement that NOPD training is inadequate.  NOPD officers of all ranks told us they want more and better training, and strongly expressed this sentiment in their responses to NOPD's employee survey.  In that survey, only 24% of NOPD employees agreed that they have sufficient opportunities for training, and overwhelmingly reported that existing training needs improvement.  NOPD leadership likewise has acknowledged that its training systems are in need of extensive repair.  NOPD's Superintendent has prioritized the wholesale remaking of training in his organizational strategy to improve NOPD.

Other sections of this Report address the impact of poor training in the areas of use of force; stops, searches, and arrests; investigating misconduct; supervision; community policing; and racial, ethnic, and gender bias in policing.  Our investigation found direct links between inadequate training and serious, systemic problems in each of these areas.  This section addresses our findings regarding NOPD's overall systems for developing and delivering training, including priorities and goals; curricula and lesson plan development; selection of training staff; facilities; and records management.

A.      Deficiencies in Developing and Delivering Training

1.      Inadequate Development of Priorities and Goals

NOPD lacks a strategic training plan that sets out the Department's training goals, establishes its training priorities, and reflects the Department's values.  Such training plans are essential to ensuring that a police department directs its resources to meeting its officers' greatest training needs, and provides officers and recruits with consistent messages regarding its mission and values.  The Department has not only failed to develop and implement a plan, but its leadership provided only minimal, sporadic executive input into the Training Division's activities.  This lack of focus and planning has had clear consequences; indeed, only 23% of respondents to NOPD's employee survey reported that NOPD provides the "right kind" of training to District officers.  Even fewer, 14%, believed that NOPD provides the "right kind" of training to detectives/investigators.

While NOPD has a centralized, staffed Training Division, the Division does not serve as an effective central management or coordination point for NOPD's training efforts. The Department's limited in-service training occurs on an ad-hoc basis. Specialized units in particular often formulate and carry out their own training. Much of the training offered at the District level is not communicated back to NOPD's Training Division. Further, the Department does not properly develop or review training curricula, evaluate instructor qualifications and abilities, or keep centralized training statistics. This near-total absence of coordination and planning results in poor quality control, inefficient training practices, and grossly inadequate documentation and record-keeping.

As the Department seeks to address the lack of coordinated strategy and planning in training, it should establish an executive training task force to advise the Superintendent and identify global training priorities and broad training goals. The Department should also take full advantage of the resources available outside of the Department, including the many colleges and universities in and around New Orleans. A public safety training consortium, comprised of the presidents/chancellors of local universities/colleges, as well as representatives from the public and private secondary school system, and the Louisiana POST, could provide NOPD with expertise in creating training strategy, course topics, curriculum development, classroom/facility use, instructor development, and training delivery.

## 2.    Weaknesses in Curricula, Lesson Plans and Presentation

Once a department establishes training goals and priorities, it must develop appropriate curricula and lesson plans, to ensure that officers receive instruction that is consistent with departmental policy and values, constitutional policing practices, and current law. NOPD has no formal curriculum development process. As a consequence, we found that NOPD training materials are not integrated with each other or NOPD policy; use or reference outdated materials; contain contradictory definitions; are poorly and inconsistently formatted; and do not reflect community involvement in their development.

As noted in section I of this Report, NOPD's use of force materials are particularly poorly integrated. They do not convey a complete or consistent message regarding how NOPD officers should use force. The use of force curriculum, for example, refers to a federal use of force curriculum that is no longer in use, and contains contradictory definitions. Similarly, NOPD's exclusionary rule training materials date back more than two years and reference material from more than a decade ago. The curriculum does not address the Supreme Court's ruling in *Arizona v. Gant*, 554 U.S. 941; 129 S. Ct. 24 (2009), and its important implications for how officers should conduct warrantless searches and seizures.

We further found that NOPD devotes an insufficient amount of time for instruction of some of the most critical and complex subjects in policing. The materials we reviewed reflect only eight hours of Academy training on the topic of use of force, which is wholly insufficient. Similarly, the Department provides recruits with two hours of training on the exclusionary rule, a critical piece of a police officer's training regimen. The amount of time devoted to weapons recertification is also grossly inadequate; NOPD reports that officers spend only 30 minutes on

firearms requalification for the entire calendar year.  The Department should be providing two eight-hour mandatory training sessions (16 hours per year), and incorporating a firearms/use of force requalification curriculum.

We also found that NOPD's over reliance on classroom lectures in delivering its training undermines the effectiveness of the instruction the Department does provide.  The Department should be incorporating a variety of teaching strategies into its lesson plans, including scenario-based role play, video, case-study, local-example methods, and field trips.  We noted that the *Police and the Community* curriculum did incorporate video, and the *Diversity in the Community* curriculum included viewing the movie *Crash*, but saw few other examples of teaching modes other than lecture.  As with the development of training curricula, the Department should incorporate community involvement in the delivery of training to give officers a better understanding of community perspectives, and help build police-community partnerships.

One area in which a variety of teaching methods can be particularly helpful is in report writing.  NOPD should use actual reports (redacted if necessary) as examples of both high quality and also low quality reports.  Training should include a discussion of the impact that police reports have on the criminal justice system, including the repercussions of poor reports and the benefits of high-quality reports.  Experts and guest speakers such as judges, prosecutors, and even crime victims can serve to complement a basic report writing lecture.  Finally, as it relates to all reports, NOPD should offer various levels of writing, spelling, and grammar classes, with an emphasis on legal writing.

B.     Deficiencies in Staffing, Facilities, and Recordkeeping

1.     Failure to Develop Criteria for Instructor Selection and Review

A highly qualified training staff is critical to ensure that training is developed and delivered effectively.  NOPD's training staff is comprised of twenty-one members—thirteen based at the Training Academy and eight at the firing range.  In addition, adjunct instructors (temporary instructors from units within the Department, but not assigned to the Training Division) also provide training.  Adjunct instructors are normally on loan to the Training Division for a short period to teach designated topics.

The Training Division staff appeared motivated and dedicated, and has attempted to fill gaps and compensate for the lack of upper-level command leadership and training strategy.  However, the lack of established criteria for instructor selection, alongside a failure to provide regular reviews of Training Division personnel or adjunct instructors, means that the Department is not formally considering the quality of instructors' basic qualifications, past performance, their adherence to Department values, or their complaint or disciplinary history in deciding who will train NOPD officers.  The Department should have set criteria for selecting qualified staff, including certain select-in criteria (i.e. college or special certifications), as well as disqualification criteria such as sustained excessive force, misconduct, or behavior violations.  NOPD will also need to require annual reviews of all staff assigned to the Training Division to ensure they meet delineated criteria, as well as tailored annual training, including training on effective teaching and adult-learning techniques, as well as curriculum development.

2.      Inadequate Training Facilities

Although the Training Division recently moved into a new building that offers a clean, comfortable, and professional environment, the facility currently does not have the capacity to allow large groups to conduct physical skills training in defensive tactics and ground fighting techniques.  We observed some undeveloped space at the Training Academy that the Department could potentially convert into a space for such training, as well as some usable space in the lower level of the Third Police District building.

The Department has also suffered from the lack of a well-functioning firing range, since its own facility was damaged in Hurricane Katrina.  The Department has yet to repair the facility, and instead requires officers to use ranges operated by two other law enforcement agencies in order to recertify annually.  The arrangement creates serious logistical challenges for officers, and leaves them without adequate space, time, and facilities to qualify with weapons and learn other less-lethal tactics.  NOPD should provide officers access to a safe and modern firing range to ensure that their sworn members receive appropriate firearms training.

The current NOPD firing range facility is in disrepair and we were told the facility is located in a flood plain.  We were told also that there is a U.S. Coast Guard Facility, a NASA facility, and a refurbished New Orleans Fire Department facility adjacent to the police firearms range site and that the site has an excellent secure driving training area.  NOPD and the broader New Orleans community should consider whether to renovate this firing range facility for short-term use until a longer-term solution is realized.

3.      Lack of Effective Record Management

The Department lacks an effective record management system to monitor and track all training activity; a critical function to ensure that officers receive training and complete mandatory training requirements.  During our investigation, we learned that previously maintained records were destroyed during Hurricane Katrina, and the Department has since failed to re-establish a training record management system.  Training staff, NOPD leadership, and rank-and-file officers all expressed concern and dissatisfaction with the current system, which has left the Department unable to accurately determine what training classes have been offered to NOPD officers and which officers completed mandatory or voluntary training classes.

Recently, NOPD's Training Division has made efforts to track training manually, creating a centralized hard-copy training file with folders for all sworn members of the Department.  These records are stored in an upstairs file room and are maintained by a lone sergeant.  Our review of these training files revealed that they contained very little documentation and the information was not recorded in a consistent format.  More typically, with the exception of TASER certification records, records are maintained throughout the Department with little coordination to ensure that records are forwarded to the Training Division or any other centralized location.  Consequently, we found instances where officers had not yet completed

mandatory training, the Department was apparently unaware of the lapse, and the officers were neither scheduled for training nor reprimanded for failing to complete the mandatory training.

C.     Inadequate Recruit, Field, and In-Service Training

1.     Problems in Recruit (Academy) Training

During our investigation, we did not have the opportunity to closely review recruit training.  The recruit class had recently graduated and it was the last one scheduled for the year.  However, the concerns we have expressed regarding NOPD's training apply fully to new recruits.  In addition, we found that the unfocused recruit selection process discussed in section IV of this Report has an impact on academy training.  The Department hired candidates as they became available and immediately placed them into the existing academy class, creating varied training levels within the class, and leading to considerable confusion and inefficiency.  NOPD found itself with a class size of nearly 75 recruits, which was too large to be manageable, given the resources available and the structure of the training.  Recruit class sizes should be kept to approximately 25-30 candidates.

Recruit selection problems also result in a high attrition rate at NOPD's academy.  During just one week of NOPD's most recent Academy, five recruits were released after "behavioral red flags" were raised.  It is appropriate to release recruits from the Academy when it becomes apparent that they are not suitable to be police officers. It is of course preferable not to admit unsuitable recruits in the first place.

We also found that, as in other areas of training, there did not appear to be a curriculum developed for each of the delineated topics.  Also as in other areas of training, an overwhelming majority of officers, nearly 80%, according to NOPD's employee survey, said that they believe training for recruits needs to be improved.

2.     Deficiencies in Field Training Program

Field training is an integral component of an effective training program, transitioning recruits from classroom theory to field practice.  NOPD's process for selecting Field Training Officers ("FTOs") raises significant concerns.  District Commanders have chosen the Department's more than 70 FTOs without any established criteria, reportedly leading to selection of some FTOs who are unqualified and unsuitable to supervise and train recruits.  Most troubling, we learned of situations where District commanders were aware that FTOs were unqualified to supervise or train, yet failed to remove those FTOs from their positions.  This lapse constitutes an egregious disservice to new recruits and risks liability to the Department, injury to officers and civilians, and damage to relationships in the community.  We were told that unqualified FTOs typically were not removed because recruit assignments for Districts are predicated on the number of FTOs in each district.  Thus, District Commanders have an incentive to keep as many FTOs as possible to ensure that new recruits are assigned to their districts.  This dynamic underscores the need for established, centralized criteria for the FTO selection process.

We are also concerned that there does not appear to be any process for the Training Division or Field Training Coordinator to actively elicit feedback from recruits regarding their perspective on the quality of their field training, including the extent to which their field training was consistent with what they learned in the Academy. This can be a valuable way to learn what is working and what is not, as well as which FTOs may need additional instruction.

The failure to develop an adequate process for selecting, retaining, and removing FTOs, in combination with the generally poor state of training at NOPD, likely explains why officers throughout NOPD hold a poor opinion of the FTO program. NOPD's Employee Survey identified FTO training as a major weakness in NOPD, with over 80% of surveyed employees agreeing that training for FTOs needs to be improved. Officers described the FTO program as "defunct," telling us that officers without sufficient experience or competence are selected, and suggesting that FTOs receive more instruction before they are asked to train recruits.

Rehabilitating the program, and its reputation within NOPD, will require that the Department establish clear eligibility criteria for FTOs; develop and implement a FTO training curriculum that incorporates training on learning styles, generational differences, and adult instruction; and implement a mechanism to review FTOs, and remove them where appropriate.

NOPD has a good foundation upon which to build a credible and effective FTO program. The Department's program is based on the San Jose Field Training Model and involves seventeen weeks of intensive on-the-job training, including daily observations of recruits and bi-weekly reporting of recruit progress. This constant evaluation helps determine recruits' readiness for patrol duty. Training officers and sergeants are responsible for mentoring and advising recruits, as well as formally monitoring their progress. The structure of NOPD's FTO program is also good. FTOs receive tailored instruction, and are regularly updated on new items by the Training Division. There is a central FTO manager based at the Training Division, and each district designates a field training sergeant coordinator. The Training Division field training manager meets monthly with district-based field training sergeants to discuss the progress and training of each individual new officer in the program. This allows for early identification of problems and allows for timely adjustments so the new officer can be successful.

### 3.    Failure to Provide In-Service Training

NOPD's failure to provide a formal and mandatory in-service training program is a critical lapse. For many years, the Department has required only firearms re-qualification and driving training. Officers throughout the Department reported that they have not received in-service training since Hurricane Katrina, and overwhelmingly told us they needed and desired more training. While some in-service training does take place, attendee selection appears random, attendance is not documented, and training curricula are not preserved. There is no strategic planning to determine in-service training priorities, attendee selection, or delivery of training. Most importantly, there appears to be no accountability for failing to attend required training.

In-service training is the most effective way to prevent poor police tactics, incorporate best police practices, provide necessary training updates and refresh perishable skills. NOPD

leadership has committed to improving in-service training and the Superintendent has asked the Training Division to develop a 40-hour annual in-service training program. Critical in-service topics include: use of force, firearms, defensive tactics, integrity and ethics, community policing, communication skills (de-escalation training), cultural competency, search and seizure, policies and procedures, and current legal developments.

Recently, NOPD has offered valuable courses, including leadership and community relations, and has also stepped up its efforts to provide less-lethal force training to officers. There is still, however: no plan that sets in-service training goals or prioritizes training needs; no system for developing good in-service training curricula and lesson plans; and no system for tracking what has been offered and whether officers attended as required. These steps are critical as the Department moves forward with its plan to implement a mandatory in-service training program.

In concert with annual in-service training, NOPD will need to develop and implement a supervisory training program that specifically focuses on supervisory and managerial roles, with a specific emphasis on risk management. NOPD has not provided such training, at least in recent years. All newly-promoted officers should complete mandatory supervisory training prior to assuming a supervisory position. NOPD should also provide tailored training for all specialized units. The Department should consider that, as it develops and implements new policies, many of these policies will require structured, formal, in-service training.

In addition to structured in-service training, NOPD should provide meaningful daily roll call training, and consider incorporating distance-learning into its training delivery methods. Daily roll call training allows for continuing, effective daily instruction on less complex departmental policies and procedures, review of laws, and officer safety. These sessions are short in duration and intended to supplement other departmental training and allow for officer discussion. Daily roll call sessions typically occur at the beginning of each shift and are an essential part of a strategic training program. Daily roll call training at NOPD is not being used to its potential and may be another source of inconsistent communication of NOPD policies, procedures, and practices. While NOPD has what it calls "roll call" training, we found that the Training Division is not involved with developing topics, evaluating instructors, or even reviewing lesson plans. While we did observe one roll call training during a line up, an officer approached us immediately afterwards to tell us that what we observed was staged for our benefit and did not fairly represent NOPD's normal roll calls, in which officers regularly arrive late and little of substance is covered.

## VII.   FIELD SUPERVISION

Field supervisors, who at NOPD are sergeants, supervise NOPD field officers who work in the streets and neighborhoods of New Orleans. These field officers may be in a "platoon," assigned to patrol and respond to calls, or they may work in District-level task forces or narcotics units, usually assigned to non-patrol duties, but occasionally patrolling and responding to calls to supplement patrol operations. While their assignments vary, field officers have daily interactions with the public. These interactions provide the opportunity to solve problems and build

community relationships, or to create or exacerbate divisions, making it more difficult for NOPD to police effectively.

Field sergeants, with critical support from their Lieutenants, provide the close and consistent supervision necessary to guide officers' conduct and to help them learn from their mistakes. Field sergeants should be in the best position to recognize a problem with an officer's conduct and intervene immediately to ameliorate or prevent harm. When a supervisor is on-scene and realizes that a patrol officer has made an arrest without probable cause, the supervisor can instruct the officer to release the arrestee and immediately counsel the officer about what the officer did wrong. When a community member is upset about how an officer responded to a call, a supervisor can immediately take a complaint—or intervene to prevent a complaint. How a field sergeant conducts him or herself, and whether he/she requires adherence to policy and ethics, sets a tone of accountability and integrity—or not. Field sergeants also are in the best position to ensure that street level crime prevention efforts are as effective as possible. Field supervisors know how productive their officers are, what they need to be more effective, and should be able to identify the strengths and weaknesses of each officer under their command, adjusting their level and type of supervision accordingly.

During our investigation, we encountered many excellent field sergeants and lieutenants. However, we found a number of systemic obstacles to effective field supervision and found that these obstacles are in fact preventing NOPD from providing officers the supervision necessary for accountability and effectiveness.

As in other areas of NOPD practice, with respect to field supervision there is a disconnect between policy and actual practice. In some instances, the policies are poor. But more often, supervisors simply do not follow policy and NOPD does not take steps to hold supervisors accountable for failing to adhere to policies or provide necessary supervision and guidance.

A.      Deficient Field Supervision Policies

By policy, NOPD allows for too few assigned supervisors. The number of officers a sergeant supervises—the sergeant's "span of control"—is a critical factor affecting the adequacy of supervision. At NOPD, a patrol supervisor may be responsible for directly supervising up to twenty officers. *See* Ops. Man. Ch. 11.0.1, *Authority & Responsibility-Unity of Command.* NOPD's Bureau Commander for Operations told us that each platoon "should" have one lieutenant, three sergeants, twenty officers and six detectives. However, as per policy, there is only a requirement that two "supervisors" work at a time on the weekend. *See* Ops. Bureau Policy #2. We have been told also that there are currently an insufficient number of platoon sergeants to staff each platoon with three sergeants, even on paper. The sergeant/officer ratio for District Task Forces is, by policy, 1:12. *See* Ops. Bureau Policy #2. The span of control for District narcotics units is 1:6 by policy, and, we were told by the Bureau Commander, the actual span of control for these units can be 1:10.

The 1:20 span of control allowed by NOPD policy for patrol units is too large to permit adequate supervision. We observed assigned spans of control at this ratio, generally where an assigned sergeant was off duty and another sergeant was handling two squads/platoons, although

we also routinely saw far smaller spans of control, including 2:8 or 2:11.  It is generally accepted practice that spans of control for patrol units should be no more than 1:10, and 1:5 is recommended.  Any span of control should take into account the level of activity and type of assignment of the unit being supervised.  As discussed below, given the considerable supervision challenges NOPD faces, a span of control at the lower end of this spectrum for all field units is necessary to ensure adequate supervision.

In some other respects, field supervision policies are sufficient as written.  Supervisors are clearly required by NOPD policy to review, correct, and approve each arrest report, affirming that the report "is sufficient in form and content."  *See* Ops. Man. Ch. 82.1, *Incident Report/Field Report Writing Manual* at p. 20.  Similarly, another directive requires that the supervisor of the arresting officer, "review, correct, and approve" the arrest report, before forwarding.  *See* Ops. Man. Ch. 42.15, *District Attorney Screening and Arrest Case Management*.  Another policy requires that all District officers, including platoon (patrol), task force, narcotics officers, K-9, Mounted, Traffic, SOD personnel, and any other NOPD personnel working patrol, complete a Daily Activity Report.  *See* Ops. Bureau Policy #19.  Platoon and Task force supervisors are required to review and approve each Daily Activity Report completed by their subordinates, and to complete their own "Supervisors Daily Activity Report."  According to this policy, supervisors "shall be responsible and accountable for counseling officers/supervisors whose Daily Activity Reports are disapproved."  Where a Daily Activity Report is disapproved more than three times in a quarter the supervisor is required to discipline the officer, and document that discipline in a DI-2.  If there are subsequent violations, the supervisor is required by policy to initiate a formal investigation of the officer.

NOPD policy requires sergeants to be in the field directly supervising patrol officers. Operations Bureau Policy #18 provides that, except at the beginning or end of a shift, only one platoon sergeant may stay in the station.  All other platoon sergeants "shall remain on the street directing resources, supervising personnel, managing backlogs, responding to scenes, signing affidavits, etc."  This policy further requires that at least one platoon sergeant respond to the scene of every UCR Part I crime in their district to "ensure the appropriate police action/response."  Sergeants are also required by this policy to ensure that certain types of calls are responded to immediately, by a sergeant if no one else is available; that sergeants monitor calls for service backlogs and response times; and that sergeants "ensure that there are sufficient personnel on the street at all times."  Platoon sergeants are further required by this policy to ensure that officers are logged into the Department's AVL system (which tracks squad car location) and in-car camera system, and ensure that their systems are functioning properly.

These policies comport with the standard practice of field supervisors reviewing, correcting, and approving the arrest reports of their subordinate officers, and confirming through documentation and observation that officers are actually active and productive in the field. However, other NOPD policies appear to place these responsibilities on only one sergeant in each District per shift, regardless of the number of officers working the shift, or whether the incident involves an officer under the direct command of that sergeant.  Operations Bureau Policy #5, for example, requires platoon commanders (usually lieutenants) to delegate to each platoon sergeant specific job assignments and responsibilities.  The policy requires that only a

single sergeant review, track, and approve all reports and activity sheets for the entire platoon.[19] Depending upon the number of officers working and the activity in the District, it may not be possible for a sergeant to adequately review all arrest reports and activity sheets for accuracy and completeness, much less to do so in conjunction with the other activities patrol sergeants must undertake, such as responding to the scenes of certain arrests or uses of force, and handling misconduct complaints.  Moreover, if a sergeant is reviewing, correcting, and approving arrest reports written by officers who officially report to another sergeant, this can undermine unity of command and make it more difficult to effectively supervise, counsel, and assist officers.

      B.       Deficient Field Supervision in Practice

           1.       Failures in First-line Supervision

Through our interviews, document review, ride-alongs, and other first-hand observations, we found that NOPD fails to provide the supervision that is necessary for accountability and effectiveness, and required by the Department's policy.  We saw a pattern of arrest and use of force reports that had been approved by a supervisor even though they contained obvious flaws—a problem we discuss in more detail in other sections of this Report.  We found that arrest reports sometimes appear to have not been reviewed at all, and use of force reports sometimes appeared to have been written by the involved officers, rather than by the supervisor as required by policy.  Some reports were signed days after the incident, or not signed at all.  As discussed in the Use of Force section of this Report, it is clear that supervisors do not always respond to the scene of a use of force incident, or conduct investigations of uses of force as required by policy.  We saw little indication that Daily Activity Reports are being accurately and consistently filled out, or that counseling and corrective action occur when they are not.  There is evidence that some supervisors do not even ensure that officers stay on-duty:  local officials told us that officers have argued in litigation that it is consistent with Department "customs and practices," to leave early on a slow day while remaining on the clock, even though this clearly violates Department rules.

On ride-alongs, it was often our experience that only a single platoon sergeant was providing field supervision for an entire District.  During one ride-along in the Eighth District, for example, the sergeant with whom we rode was the only supervisor in the field and was responsible for supervising the entire uniform patrol, as well as specialized units and a special task force assigned to Canal Street.  Sometimes this situation was the result of having two sergeants on duty, with one sergeant remaining at the District station; in other instances, there appeared to be more sergeants staying at the station than supervising in the field.  Exacerbating this lack of field supervision, sergeants in the field often responded to calls as if the sergeant were simply another officer in the platoon, rather than first determining whether an officer was available to take the call so that the sergeant could remain free to perform supervisory duties.

---

[19] Sergeants are assigned other platoon-wide tasks as well. One platoon sergeant is assigned the task of handling platoon scheduling and lineups, including reviewing and tracking attendance, sick leave and furloughs.  One platoon sergeant is assigned the task of handling filing, correspondence and paperwork, and one, roll-call training.  Ops. Bureau Policy #5.  Many of these tasks are completed by civilian employees or non-supervisory officers in other Departments.

### 2.      Reliance on Integrity Control Officers

In many respects, NOPD relies on ICOs to conduct direct supervision duties.  ICOs, for instance, are charged with conducting periodic on-scene observations to "monitor the quality of NOPD services;" checking summons issued by District personnel daily for errors; and talking with citizens about their experiences with NOPD officers.  Officers' direct supervisors should be conducting such tasks in the first instance, and NOPD should not have to rely on ICOs for such duties.  A similar example is NOPD's initiation of an "audit procedure" in which "field supervisors will randomly visit the scenes of calls to NOPD where the original officer recorded the disposition as Necessary Action Taken, Unfounded, or Gone on Arrival."  Such supervisory response to calls, especially calls that are more complicated or prone to problems, should be a routine part of field supervision rather than part of a special "audit."

While ICOs and similar oversight mechanisms serve important functions, we found that NOPD's overreliance on these entities to perform functions that should be part of direct supervision leads to a number of problems.  First, the surrogate supervision provided by these other mechanisms is too often ad hoc or random, and insufficient in scope or amount.  We found that ICOs are the widely acknowledged but unofficial Assistant Commander for each District, as well as the Administrative Lieutenant for the District Commander, creating duties that are sufficient for at least one full time job.  Consequently, ICOs spend relatively little time on direct, integrity-related activities that are, by policy, the core function of their assignment.  We found that some ICOs rarely leave the station and do not, as required by policy, check off-duty detail locations or attend community meetings.  Nor do ICOs conduct the document-based integrity checks as required by policy.  Ops. Bureau Policy #8 requires that ICOs review at least two in-car camera videos each day and make two random citizen call-backs each day, completing a Daily Citizen Call Form for each.  Our review of ICO COMSTAT weekly and year-to-date statistics made clear that ICOs, while reporting hundreds of call-backs and in-car camera video reviews over the year, are not keeping up with this requirement.  ICO weekly reports routinely indicated between 2-5 citizen call-backs or in-camera videos reviewed per week, and sometimes these duties did not occur at all during the week.  Although required by policy, we found that some Districts did not report their ICO's integrity related duties for COMSTAT, and we saw no evidence that ICOs' integrity related work is ever discussed or even referenced during Department-wide COMSTAT meetings.

It is clear that ICOs are not able to complete even the integrity related duties as required by policy.  Not surprisingly, we found they are not effectively performing the additional direct supervision duties they have been assigned.

### 3.      Ineffective Alternative Mechanisms for Supervision

Other units assigned direct supervision-type duties are similarly unable to provide sufficient or consistent oversight.  For instance, "A-case officers" are assigned to each District and are meant to act as a liaison between the District and the DA's office to ensure that arrest reports articulate probable cause and thus form a strong basis for prosecution.  We found that this assignment had become largely moribund, although the DA's office reports recent attempts to revive the role of A-case officers.  This is a good step but, even if performing as contemplated,

A-case officers cannot substitute for close and consistent supervision of field officers by their direct supervisors.  Similarly, the Incident Report Review Section is tasked with monitoring the quality of reports "throughout the Bureaus" to ensure they are accurate; complete; include the correct signal and classification; comply with NOPD policy on Incident Reports; and comply with Louisiana criminal law, criminal procedure, and evidentiary law.  This Section is required by policy to return reports that do not meet these standards to the originating officer's commander and Bureau Superintendent to meet the standards set forth [by policy]."  *See* Ops. Man. Ch. 82.5.  Such a unit is commendable if used as a backstop behind first-line supervisors who have already carefully reviewed every arrest report completed by officers under their command.  However, our interviews with supervisors and officers, as well as the number of extremely poor arrests reports we reviewed, indicates that supervisors are routinely missing errors and problems with arrest reports.  The Incident Report Review Section, while ripe with potential, is in practice of little use, particularly, since it is only staffed by a single officer, a lieutenant.  Moreover, any unit set apart from the field, with no realistic opportunity to be on-scene and which does not review incidents until days or weeks later cannot provide the benefits of contemporaneous on-site review that field supervisors are meant to provide.

The second problem with NOPD's de facto reliance on specialized positions or units is that it confuses lines of authority and accountability.  In doing so, it may encourage supervisors and officers to view oversight and direction that should be ongoing and routine (such as responding to the scenes of uses of force or particular arrests, and reviewing reports), as something intermittent and random—and someone else's responsibility.  As discussed in other sections of this Report, we found this lack of responsibility and ownership throughout NOPD, and particularly evident in responsibilities related to direct supervision, such as use of force reporting and investigation, complaint intake, and report approval.

Finally, where direct oversight is shifted from officers' direct supervisors to others, the supervisor does not have the same opportunity to learn about officers' strengths and weaknesses, and may not always learn immediately of specific errors, depriving the supervisor of the ability to intervene, counsel, and work with their officers to improve their skills and conduct.  Primary review and counseling by those more removed from the officer may be less informed, less efficient, and less effective.

We understand that NOPD's establishment of these various systems to act as accountability mechanisms is almost certainly motivated by a perceived need to provide closer oversight to officers and to identify problems that supervisors were missing.  However, these systems currently are used as an alternative to effective direct supervision rather than to supplement it, and are a poor substitute for close, consistent supervision of officers by well-qualified supervisors.

By adopting the changes outlined below, NOPD can facilitate more effective and efficient direct field supervision, and allow these other oversight mechanisms to narrow and focus their efforts to better support NOPD's integrity, quality control, and accountability efforts.

C.      Implementing Effective and Accountable Field Supervision

Many of the recommendations made elsewhere in this letter apply equally to the area of field supervision. Inadequate training, poor recruitment, and the problems in NOPD's Field Training Officer program result in too many officers in need of inordinate levels of supervision. Problematic performance evaluations and constraints on promotions result in officers being promoted to supervisory positions when they are not ready or are unqualified to supervise. The lack of in-service training, particularly for new supervisors in areas such as use of force reporting and review, complaint intake and investigation, report writing, and stops, searches and seizures, further compromises field supervisors' ability to effectively supervise. Improvements in these areas will positively impact field supervision of patrol officers. Below, we discuss a number of additional changes to NOPD practice that are necessary to bring about adequate field supervision.

1.     Appropriate Span of Control and Staffing Allocation

In the context of current staffing allocations, field sergeants' span of control which, as noted above, can by policy be as high as one sergeant supervising twenty officers, is too wide to allow for effective supervision. Field supervisors should be able to respond to the scene to review uses of force and to approve certain arrests. They also should be available to handle the initial response to complaints about their subordinates. Supervisors should know their officers and assigned areas well enough to maximize the efficiency and effectiveness of their unit. They should be working closely enough with their officers to be able to comprehensively and credibly evaluate their performance.

In addition to specifically allowing for a wide span of control, NOPD policy and practice further encourages an overly broad span of control by requiring one sergeant to review, track, and approve all reports and activity sheets for the entire platoon. *See* Ops. Bureau Policy #5. While it is not unusual to assign one sergeant the duty of ensuring that all reports are collected at the end of a shift, it is unrealistic to expect one sergeant to conduct meaningful review of all reports and activity sheets for a platoon that may number over twenty officers, even if the sergeant is not assigned any other platoon-wide responsibilities. Even where only eleven officers are covering an entire District during a watch, which, as noted above, did not appear to be uncommon, what would be a manageable span of control of 2:11 is rendered a far more challenging ratio of 1:11, due to NOPD's approach of keeping one sergeant in the station house.

A smaller span of control on paper is thus meaningless if field supervisors are not actually responsible for fewer officers and given the opportunity to directly supervise them by responding to the scene, reviewing their reports, and providing counseling, redirection, and support where necessary. NOPD should review the current staffing allocation of platoon supervisors and restructure current allocations to permit sergeants to spend more time directly supervising officers. At the same time it deploys more sergeants to the field, NOPD should ensure that sergeants in the field do not become de facto patrol officers. NOPD should require that, where feasible, sergeants determine the status of each officer and attempt to identify an available officer before responding to a call to perform the duties of an officer.

2.     Unity of Command

NOPD policy requires that "all employees of the New Orleans Police Department shall be answerable to only one supervisor at a time." *See* Ops. Man. Ch. 41.01.05. This idea of "unity of command," is meant to ensure that officers have consistent supervision and that supervisors know their subordinates' strengths and weaknesses, allowing them to better direct and redirect their work. It appears, however, that large spans of control in patrol and the current allocation of sergeants undermine unity of command. Under NOPD's current approach to supervision, the supervisor to whom a patrol or task force officer reports can change on a daily basis. Officers may be assigned on paper to a particular supervisor to whom they submit leave requests and the like, but supervisors and their subordinates do not consistently work the same days, and supervisors do not necessarily respond to the calls of their own subordinates. There is no true unity of command that facilitates the development of a genuine supervisory relationship between sergeants and their subordinates. With the reported current shortage of platoon sergeants, this dynamic is exacerbated.

In even the best run departments, the absence or unavailability of an officer's supervisor will at times require that another supervisor respond to the scene, review reports, or take a complaint. However, this should be the exception, not the norm. NOPD should implement a true system of unity of command, in which officers and their supervisors have the same days off and the same schedules, and officers report consistently to one sergeant. Sergeants should respond to the scene of arrests and uses of force by the officers they supervise, and should closely review and approve their reports. This level of consistent interaction will allow field sergeants to develop a genuine supervisory relationship with their officers, allowing them to better learn and respond to each officer's strengths and weaknesses, and provide the appropriate level of direction and correction.

### 3. Systems to Support Field Supervision

As discussed above, NOPD has in place a number of units and individuals that, properly used, can serve as a significant source of support to field supervisors. There are a number of additional systems that NOPD can implement that will facilitate supervision that is more efficient, effective, and accountable.

#### a) *Chain-of-Command Accountability*

Our investigation showed a lack of accountability throughout the chain of command for ensuring that field supervisors properly supervise officers. As discussed throughout this Report, supervisors too frequently approve arrest reports that do not articulate probable cause and use of force reports that are grossly deficient; ignore obvious misconduct in conducting internal investigations; and approve timesheets that are inaccurate. Many, if not most, of these documents require review or approval up the chain of command. There seemed to be no notice taken, much less discipline imposed, for NOPD supervisors who approve egregious force without question; conduct obviously flawed investigations; approve clearly deficient arrest reports; or who simply do not adequately supervise officers. Even where officers are disciplined for misconduct, there is no consistent effort to determine whether supervisors played a role in condoning or turning a blind eye to the officer's conduct, or to hold supervisors accountable where they knew or should have known of the officer's misconduct.

- 67 -

NOPD should provide field supervisors the tools and training to effectively supervise and should consistently hold them accountable where they fail to provide appropriate supervision. This is true also for NOPD commanders.  NOPD must hold accountable lieutenants, captains, and above for reviewing and correcting incomplete or inaccurate work by sergeants, and for ensuring that supervisors supervise.

*b)*     *Early Warning System*

As discussed in the Use of Force section of this Report, NOPD's early warning system, called PPEP, currently exists in name only, providing no real support or assistance to NOPD managers and supervisors.  NOPD is currently working with New Orleans' Independent Police Monitor to develop and implement a new early warning system.  If properly developed, implemented, and maintained, an early warning system can be an effective way of tracking uses of force and misconduct complaints, among other data.  This tracking can assist departments in identifying those officers, supervisors, and units with uses of force or complaints that are unexpectedly high, even after taking into account the nature of the particular assignment.  In addition, an early warning system can identify other warning signs, such as excessive sick leave or a sudden decline in performance.  Early warning systems can also allow an agency to track trends based not only on individual officers, but also on individual supervisors and commanders.

Once an apparent problem is identified, the department can more closely analyze available data to determine whether there is in fact a problem, and implement appropriate interventions to address it.  Interventions might include, for example:  requiring additional or remedial training in de-escalation techniques; referral to an officer assistance and support program; transferring an officer to a more suitable assignment; breaking up a problematic unit; or providing training to a sergeant on how to better respond to complaints about her subordinates. By implementing non-disciplinary interventions—and monitoring or revising the intervention to ensure the problem is resolved—departments can prevent more serious misconduct, improve officer safety, avoid substantial liability, improve or repair police-community relationships, and sometimes save an officer's career.

Supervisors can be an invaluable part of providing an early warning about problematic officers, and early warning systems can be an invaluable part of effective supervision.  In order for this to be so, early warning systems should be developed and implemented to provide supervisors access to information about their subordinates, as well as the ability to enter into the system their own supervisory observations.  With a well-run and accessible early warning system, supervisors do not have to search for documents or rely on second-hand information and hallway conversations to gain complete and real-time information about the officers under their supervision.  In order to ensure that early warning systems are accepted and effective, a department must ensure that they are user-friendly and useful to supervisors.  This requires consideration of supervisory use at the development and policy stages, as well as training for supervisors on the system once it is implemented.

As it develops NOPD's new early warning system, NOPD should ensure that it can be used as a supervisory tool.  NOPD also should provide the policy, training, and administrative

support to ensure that the early warning system is maintained and the information included in it is accurate and timely, and that supervisors know how to use it.

### c)   *COMSTAT*

COMSTAT, if modified as recommended in other sections of this Report to include regular consideration and analysis of integrity-related data and the quality of arrests by NOPD officers, will become a more useful tool for supervisors.  NOPD should modify COMSTAT in this way and train supervisors how to use this information to provide more effective supervision and direction to their officers.

### d)   *Recording Devices*

NOPD should also ensure that the technology it has implemented is maintained and actually used so that supervisors can better monitor and respond to their officers' actions.  NOPD currently has ECD cameras, AVL, and in-car camera capabilities, but these technologies are reportedly underused and, particularly with in-car cameras, often in disrepair.  By NOPD policy and generally accepted practice, it is a supervisor's responsibility to report equipment problems, seek to have the equipment repaired, and ensure that officers are properly caring for and using the equipment they are assigned.  It is also a supervisor's responsibility to use the valuable information captured by these types of technology to determine the accuracy of reports and assist supervisory inspections of the unit.

Recordings of officer-civilian interactions nearly always exonerate an officer, and in any event they allow a department and a community a better opportunity to learn what really happened during controversial incidents.  In the use of force and misconduct investigations we reviewed, there was rarely any indication that supervisors or investigators sought or reviewed audio or video recordings of incidents.  NOPD should ensure that review of such information is a routine part of supervision.

NOPD also should consider providing officers with lapel cameras to document interactions, and providing supervisors with handheld audio recorders to permit supervisors to contemporaneously record interactions with community members and complainant statements.

## VIII.   **PAID DETAILS**

There are few aspects of NOPD more broadly troubling than its Paid Detail system. Between August 2009 and July 2010, 69% of all officers, almost 1000 in all, submitted a request to work at least one Detail.  This number includes 85% of all Lieutenants and 78% of all Captains.  Virtually every NOPD officer either works a Detail, wants to work a Detail, or at some point will have to rely on an officer who works a Detail.  The effects of Details thus permeate the entire Department.  It is widely acknowledged that NOPD's Detail system has a corrupting effect on the Department.  Our interviews with NOPD officers, meetings with other New Orleans-based law enforcement agencies, criminal justice system stakeholders, and the public, revealed that NOPD's Detail system was a significant contributing factor to both the perception and reality of NOPD as a dysfunctional organization.

The Detail system is essentially a form of overtime work for officers.  When on Detail, however, officers are paid and largely controlled by entities other than NOPD.  Many police departments allow officers to work outside law-enforcement jobs, but few if any large police departments have a system of Details as entrenched and unregulated as in NOPD.  Most well functioning departments have far more checks in place to ensure that outside employment does not undermine the police mission or officer accountability.  NOPD's Detail system is a vestige of the days when starting pay for NOPD officers was among the lowest in the nation.  Details were created as a way to give officers maximum flexibility to find work to supplement their incomes.  But as NOPD starting salaries became commensurate with similar jurisdictions in the region (though salaries linked to promotions and years-on continue to lag), the Detail system remained largely unchanged.

In the last few months, the Superintendent has begun to implement measures meant to correct and prevent some of the negative impact of the Detail system.  In August 2010, the Superintendant banned cash payments.  *See* Gen. Order #828.  But, pursuant to this same policy, officers are still expected to negotiate their compensation with the Detail employer.  In December 2010, the Superintendent initiated a program to try to centralize Detail information by setting up a single telephone number for all officers to call to report working a Detail, and a web-based application for officers to enter additional Detail information.  *See* Gen. Order #848.  While these are undoubtedly improvements, it is too early to assess their effectiveness and, regardless, they are a small part of the wholesale remaking of the Detail system that is necessary.

A.    The Impact of the Detail System as Currently Structured

NOPD's Detail policy is set out in the NOPD Ops. Man. Ch. 22.8, *Paid Details* and defines a Detail as "off-duty employment, for compensation (anything of value, however slight, (tangible or intangible)) . . . by another individual, business, establishment, or organization where the employee is performing the duties of a police officer or a function of the police department."  The policy provides further that   "[e]mployees working paid Details do so as representatives of the New Orleans Police Department."   Officers working Details are "governed by all Department rules, orders and procedures."  Despite these mandates, NOPD's Detail system, as currently structured:  1) drastically undermines the quality of NOPD policing; 2) facilitates abuse and corruption by NOPD officers; 3) contributes to compromising officer fatigue; 4) contributes to inequitable policing by NOPD; and 5) acts as a financial drain on NOPD rather than a source of revenue.

1.    Negative Impact on Quality of NOPD Policing

The Detail system contributes to the poor policing that we observed.  There is evidence that some officers are more committed to their Details than their work for NOPD.  We heard accounts of "ghosting," where an officer shows up for roll call and then reports to his or her Detail, rather than his assignment for NOPD.  Law enforcement officers from outside agencies told us about NOPD officers leaving in the middle of investigations so as not to be late for their Details.  In the records of an October 2009 appeal of a disciplinary decision, it was shown that, for over two years, an officer worked his Detail thirty-eight times on the same days that he took

sick leave before it came to the attention of NOPD officials via an anonymous tip.  In some cases, officers are paid by the City and are on a Detail for the same hours.  PIB, for example, found that two detectives worked Details that overlapped with their assigned shifts.  One of the detectives worked overlapping shifts for an eight month period, including eight times in two months.  The other worked four overlapping shifts.

Details can also decrease the quality of policing by leading to divided loyalties and attendant under-policing.  Even where officers working Details show up for their regular shifts, we found evidence that some officers are predominately concerned about their Details, with little regard for making good arrests or their other policing responsibilities.  For example, an officer may ignore potential criminal incidents that could have an adverse effect on the officer's Detail if addressing the apparent criminal violation would jeopardize the Detail (and income), or if there is a personal relationship with the business because of a friendship or a longstanding working relationship.  It is widely acknowledged in the policing field that some businesses hire officers on Detail with the expectation that officers will "look the other way" when faced with a conflict between enforcing the law and protecting the business's interest.  We reviewed one case, for example, in which an officer learned that a warrant had been issued for his Detail employer's arrest, and the officer called to notify the employer about the warrant and did not arrest him or send others to arrest him.  While the employer subsequently turned himself in, this can be seen as either preferential treatment for the Detail employer or a dereliction of duty by the officer but, regardless, is not the manner in which warrants should be handled.

The amount of money that officers can earn working Details increases the incentive for officers to emphasize their Details over their regular police duties.  We have, for example, heard of officers receiving as much as $300 to $500 a night to serve as private security guards for professional athletes.  We also heard of two motorcycle officers who insisted on $100 cash each for a one way escort from a New Orleans church to a New Orleans French Quarter hotel.  When officers can earn more money on their Details than they do as officers, they may feel a greater allegiance to their Detail employer than they do to the public they are sworn to protect, and they may look the other way rather than report criminal wrongdoing by their Detail employer.

NOPD's Detail system further undermines good policing by undermining the chain of command.  Although Chapter 22.8 bars lower ranked officers from supervising higher ranked officers, there is nothing to bar lower ranked officers from coordinating Details for higher ranked officers.  The Detail coordinators possess an inordinate amount of power.  The coordinator decides who works when, where, and for how much.  Some Detail coordinators officially receive extra pay from the businesses, while others are said to just "take a little off the top."  We were told that some coordinating officers get paid an extra five hours a week or receive as much as $200 per week just to coordinate Details.  Having lower ranked officers acting as coordinators puts supervisory officers who want to make extra income in a situation where they answer to a lower ranked officer.  This naturally affects the ability or willingness of the supervisor to question the performance of, or to discipline, an officer who is responsible for the supervisor's additional income.  This also leads to the appearance of, if not the reality of, favoritism.

It is also likely that the coordinating officer is coordinating the Details during regular work hours.  In order for a Detail coordinator to determine who will work, when officers will

work, and how last minute absences will be staffed, that coordinator needs to be in regular contact with the officers and the business entity. It is highly unlikely that all of this work is done on non-NOPD time.

### 2.   Role of Details in Facilitating Abuse and Corruption

With poor documentation, no restrictions on officers soliciting work, and officers being allowed to negotiate their own compensation, it is easy for officers to extort businesses or individuals. We heard, for example, of many instances in which officers insisted on exorbitant sums of money, often in cash, for motor escorts. We learned of one instance in which officers told a business owner that if the business owner did not hire certain officers at a particular rate, the business would not receive *any* police protection from NOPD. The business owner reportedly was told, "You f*** with me and you will never see a police car again." When the business owner tried to speak to a supervisory officer about the issue, the supervisory officer told the business owner that there was nothing the supervisory officer would or could do about the threat. Because of the perceived need for the additional security, the business owner relented and hired the officers he was told to hire at the rates demanded.

We heard of officers receiving free or subsidized housing for doing nothing other than living, and possibly parking their police car, in a particular neighborhood. While subsidizing officer housing can be a progressive measure to enable and encourage officers to live in the cities and neighborhoods they police, such a program constitutes compensation and requires oversight to ensure it is administered fairly and effectively. We were told that some officers who were provided free or subsidized housing would not leave their residences when notified of an incident occurring right outside their doors.

Complaints about officers working Details might also be compromised. In some larger Details, such as the security for events at the Superdome, misconduct complaints are given to the Detail coordinator, and neither the Superdome nor the officer's regular supervisor has any way of knowing how or if the coordinator deals with these complaints.

### 3.   Increased Risk of Dangerous Officer Fatigue

Because NOPD Detail policy allows officers to work as many as 28 additional hours per week and has little oversight to ensure officers adhere to even this generous cap, it facilitates a system in which officers are so fatigued that it compromises their own safety, impacts their long term well being, and impacts the quality of their work. Until recently, NOPD had virtually no way to know if officers were keeping to the maximum allowable number of hours. NOPD's new web-based application allows NOPD to better track officers' Detail hours, but the Department has not put in place a system of accountability to ensure that officers do not work more than 28 hours, or that their Detail work does not compromise their work for NOPD. In speaking with Judges and other members of the criminal justice system, we heard complaints that officers were often too tired to perform their duties on the street and in the courtroom. There is nothing in the rules to prevent an officer from working an overnight Detail and then going directly to his/her NOPD job in the morning. Being sleep-deprived, especially chronically so, can contribute to an officer making dangerous tactical errors; missing potential evidence; taking investigatory short

cuts; writing incomplete reports; providing inaccurate testimony; and acting unprofessionally toward residents.

### 4.     Role of Details in Contributing to Inequitable Policing

NOPD's Detail system contributes to the inequitable policing we observed in New Orleans. NOPD leadership should know how to best deploy its officer resources, but the Detail system as it is currently operating undermines that judgment. The breadth and prevalence of the Detail system has essentially privatized officer overtime at NOPD, resulting in officers working Details in the areas of town with the least crime, while an insufficient number of officers are working in the areas of New Orleans with the greatest crime prevention needs. Those with means in New Orleans are essentially able to buy additional protection, while those without such means are unable to pay for the services and extra protection needed to make up for insufficient or ineffective policing. When NOPD is able to do its job effectively, no community should feel that it has to pay extra to be secure. NOPD officers who work neighborhood Details do the same work—stand watch, patrol, investigate criminal activity—that the City pays them to do, but when they work these Details, they are not supervised by NOPD. While any community that wants extra security certainly has a right to pay for it, it raises troubling legal and ethical questions when that extra security might otherwise have been focused on parts of the City most in need of police assistance. We were told by NOPD officers that, pursuant to policy, when they work a Detail they have no obligation to respond to a crime reported near to, but outside, of their Detail area. *See* Ops. Manual Ch. 22.8.36 ("Commissioned members working paid details will investigate all incidents which occur within the boundaries of the detail area.").

### 5.     Cost of Details to the City

The Detail system costs the City money it can little afford to spend, while the City could easily be making money for providing the same service. Officers are permitted and even expected to use their NOPD equipment while working Details. In most instances, neither the business nor the officer is charged for the private use of this equipment. NOPD's vehicle fleet is in significant disrepair, and yet the City pays for the additional maintenance on and gas for vehicles used during Details. If an officer gets injured while performing police duties on a Detail, or is successfully sued for misconduct while working a Detail, the City is potentially liable. Over the past three years, for example, three motorcycle officers who have been in accidents while working Details have had their workers' compensation claims paid by the City. In December 2009, a canine officer took his dog to his Detail assignment and took the opportunity to conduct a training exercise. The canine died when it fell down an open elevator shaft. The City bore the loss of the approximately fifteen thousand dollars it would cost to replace this trained canine.

### B.     Fixing the Paid Detail System

It is uncertain whether NOPD's Detail system can or should be salvaged. What is certain is that the mechanisms currently in place to prevent the type of problems discussed above are insufficient, and far-reaching changes to the Detail system are necessary. As the examples noted above indicate, the mechanisms NOPD currently has in place to ensure officer accountability,

including Detail checks by the Office of Compliance and ICOs, may not be significantly more effective than reliance on ad hoc anonymous tips. NOPD's ambivalence towards effective accountability in its Detail system is further evidenced by its lax enforcement of Detail related policies, such as Ops. Man. Ch. 22.8, which provides that officers are not permitted to work Details at ABOs. The definition of ABOs —"a place where the sale of alcoholic beverages is the primary source of revenue"— can be, and is, flexibly interpreted, and there is no guidance for supervisors approving the Detail in what "primary" means or how they are to make this factual determination.

Despite recent changes, NOPD's Detail documentation still does little to encourage accountability. Even with the recently added web-based data entry system, the Paid Detail Authorization Form is still used to initially approve Details. This means that Detail information is still kept on nearly three thousand pieces of loose paper divided among the different districts. This paper-based system undermines effective oversight, a dynamic that is further exacerbated by the fact that the individuals tasked with this assignment, ICOs, have almost no time to do it. An ICO told us that he had very little time for checking on Details when it was just one of dozens of areas of compliance for which he was responsible. While the supervisor said that he does random checks on Details, he stated that he has never thought to ask a business owner how the Detail came to exist or about officer performance on the Detail. With close to 1000 officers working Details, as they are currently structured, it would take a sizeable number of officers to ensure appropriate oversight, including making sure that officers are not working Details when or where they are not supposed to be, and are properly representing the Department when they are working Details.

NOPD needs to immediately stop the decentralized-system of self-negotiated and poorly monitored Details. In its place, the City should create a single office that arranges all outside employment requests. If done right, this office will pay for itself and more. In Miami, for example, such an office makes over one million dollars annually for the City. NOPD should establish a system with appropriately stringent criteria that will fairly assign officers to work paid Details, sending the message that Details are not an entitlement based on favoritism or friendship. NOPD should set Detail pay uniformly according to rank and include a reasonable fee that goes to the City to cover the expenses of the outside employment office, workers compensation, fuel, use of equipment, and any other actual or potential costs to the City. Officers who work outside employment should be required to log into CAD system and the District Commander will have the authority to pull officers to another assignment in the event of an emergency in the area. This new office will pay the officers and take out any applicable taxes in the same manner that taxes are taken out of officer salaries. The 28 hours per week maximum should be examined and likely lowered. In addition, officers with any sustained disciplinary actions should be ineligible to work these outside jobs.

There is no question that working a Detail is a privilege and not a right; a refusal to approve a Detail, or to withdraw approval, is not subject to appeal to the Civil Service Commission. While a significant number of officers expressed to us their desire that the Detail system remain unchanged, many others acknowledged the problems related to Details. We believe that the changes we recommend have the potential to provide officers better protection from the problems we found. The changes we recommend will help ensure that supervisors do

not play favorites based on Detail positions, or unfairly punish the non-favorites, and that everyone who wants to work extra-time can do so (except those whose behavior has made them ineligible). These changes should provide officers, some of whom told us they pay for their own supplemental insurance, greater assurance that they are covered by City insurance if they are injured while working a Detail. While some officers noted their concern that non-NOPD officers would not have to abide by any new rules and could price themselves below the NOPD officers, the experiences of officers in other cities indicate that this need not be the case.

NOPD already has models, albeit not perfect ones, for a better-regulated centralized Detail system. At the Superdome, the City's largest Detail, NOPD officers are paid according to rank: Officers make $29.00 per hour; Sergeants $33.00; Lieutenants $35.00; and Captains $39.00. Officers who want to work at the Superdome must fill out a separate employment application and fill out tax forms (I-9, W-4, L-4). The officers are then paid by check. While this Detail is currently coordinated by one NOPD Captain, a City office could and should take over this task.

Similarly, the New Orleans Police and Justice Foundation ("NOPJF") administers a media Detail for movie and television productions under which all of the officers are paid a predetermined amount (normally $25 an hour and up to $75 an hour during a City-wide special event such as Mardi Gras). An officer-administrator is paid 10% of that amount, and the NOPJF receives 4%. The business requesting the Detail pays the NOPJF which distributes the money and provides a 1099 tax form. That 14% in administrative fees could and should go to the City.

Fundamentally restructuring the current Detail system will also protect businesses. Currently, businesses sometimes feel they must pay for Details to obtain the police services that should be provided by NOPD as a matter of routine policing. In addition, businesses have no way to hold officers accountable when they do not show up for their contracted Detail or perform poorly while on Detail. A business owner described this problem in stark detail when he explained that there was nothing that he could do when officers showed up late, failed to show up at all, or failed to provide agreed upon services, all of which the business owner had experienced. Another employer described his frustration that he had no idea whether or not he would actually receive security because everything was handled casually over the phone and he was rebuffed when he requested written confirmation. A new, centrally-run system will help NOPD provide better policing for the City overall and ensure that its individual officers provide better policing as well.

## IX.   PERFORMANCE EVALUATIONS AND PROMOTIONS

NOPD's evaluation and promotion practices are deficient to the point that it may be impossible to correct patterns of constitutional misconduct without also correcting the failings of these systems. NOPD's promotional system does not adequately assess or consistently reward the officers who are best able to police effectively and constitutionally. Promotional decisions do not adequately consider misconduct by officers or their ability to lead with integrity and diligence. Performance evaluations do not sufficiently assess officers' conduct or value constitutional policing. As they currently function, NOPD's performance evaluation and promotion systems erode public confidence in the Department, facilitate officers'

unconstitutional conduct, and fail to identify and develop officers with the capacity to lead with integrity.

People inside NOPD and in the broader New Orleans community view NOPD's promotion and performance evaluation systems as broken. City leadership, community members and NOPD officers share a deep concern about these systems. In November 2010, a NOPD employee satisfaction survey ranked promotions and performance evaluations among the areas about which employees expressed the most dissatisfaction. While a slight majority of respondents agreed that the Department punishes unethical behavior, a mere 17% agreed that the Department rewards ethical behavior. Research shows that departments that reward officers who display exemplary leadership qualities with promotion foster the growth of a values-based, ethical culture in the department. The NOPD survey also found that only 13% of respondents believed that "promotions are handled fairly." A report by the Business Council of New Orleans assessing the New Orleans Civil Service System noted similar problems in a report released in May 2010. Our review similarly showed significant problems with both NOPD's performance evaluations and its system of promotions. These problems directly impact NOPD's ability to assess and promote officers who are effective and ethical.

A.       Inadequate Processes to Assess Officer Performance

Performance evaluations are an important tool for a department to help employees improve their skills and effectiveness, and assess employees' ability for particular assignments. As with promotional assessments, performance evaluations must be carefully aligned to a department's values, mission, and needs, both as a signal to employees of what the department values and will reward, and to assess employees' ability to live up to those standards.

NOPD's performance evaluation system is insufficient in form, frequency and scope to achieve the goals of encouraging, assessing, and rewarding effective and constitutional policing. Our review of NOPD policy, as well as interviews with NOPD officers, supervisors and commanders, City officials, and Civil Service Commission employees, confirmed that the current performance evaluation process is not directly tailored to police work or to individual officer goals. We found that NOPD's performance evaluation system is out of date and focuses too much on process and too little on substance. NOPD's policy on Performance Evaluations, Ops. Man. Ch. 35.1, *Performance Evaluations,* was last updated in 2005. According to the Civil Service Commission, and the Business Council of New Orleans' report, performance evaluations are used primarily to prioritize which employees should be terminated, in the event that budgetary restraints necessitate a reduction in force. This is a gross-underutilization of a valuable tool.

NOPD's performance evaluations do not assess an officer's crime prevention skills and abilities. There are no specific goals for the officers, and no assessment of an officer's progress in achieving stated goals. Likewise, there is no assessment of an officer's ability to build effective community partnerships or problem-oriented policing efforts. According to City officials, the city-wide performance evaluations have not changed in 20 years and are badly in need of updating. Consistent with recommendations from outside reviews, Civil Service Commission staff and police officials reported a need for more task-specific evaluations, but

recognize that this would require the creation of different evaluations for different City departments, for which the City currently has allocated no funding.  However, each City department, including NOPD, already has the authority and ability to create their own performance evaluation to overlay the City-wide performance evaluation form.  NOPD has not done this.

In addition, training for supervisors on how to most effectively evaluate employees' performance under the current system is insufficient.  Supervisors are offered three hours of non-mandatory training that consists of little more than how to complete the city-wide performance evaluation form.  Formal performance evaluation appears to be an annual (at most) event, rather than an ongoing process.  The Civil Service Commission encourages quarterly evaluations, but we found no evidence of NOPD consistently meeting this goal.  There is no formalized system of on-going, documented, supervisory evaluation of subordinates' work, and we saw very little evidence of informal evaluation.

Performance evaluations should be both formal and informal, with formal evaluations occurring several times a year.  Evaluations should be documented to track employees' progress and growth.  Poor performance should also be documented.  Documentation is critical so that a new supervisor can understand an employee's strengths and weaknesses and can build on previous efforts.  Each supervisor of an employee during the time period being evaluated should provide input on the employee's performance.

More generally, NOPD should work with the City and the Civil Service Commission to modify the current City-wide system, or develop a more useful new system.  Regardless of whether the current system continues, NOPD should develop its own specific and comprehensive system of evaluating officer performance.  This system should recognize that ethical and effective policing are intertwined and assess both.  Performance evaluations should build in consideration of the officer's productivity in all areas of law enforcement, including the officer's success at preventing crime, helping to build strong prosecutable cases, and engendering community trust.  The performance evaluation system should be better integrated into ongoing supervision and should be documented.

B.      Inadequate Systems for Promoting Ethical and Effective Officers

A police department's mechanism for selecting officers for promotion is a critical component of effective and constitutional policing.  As officers are promoted they gain wider impact and influence.  Promotion decisions convey to other officers and to the community the department's values and the type of conduct that will be rewarded.  To be effective and to ensure that officers and the community recognize the department's values, the department has a strong interest in ensuring that its promotional system identifies and selects for promotion the most capable and ethical officers, with the greatest capacity to grow and to lead others.

The challenge in developing and implementing a system of promotions that furthers a police department's effectiveness and integrity is two-fold.  First, the promotions system must be thoughtfully tailored to measure the particular skills, values, and traits the department needs in its leaders.  To do this, promotional tests and interviews must accurately assess officers' law

enforcement knowledge and skills, including an officer's sense of ethics and ability to remain clear-headed under pressure, implement problem-oriented policing strategies, communicate professionally, and motivate others.  Second, an effective promotional system must strike the difficult balance between structure and flexibility.  A system of promotions must be sufficiently structured to ensure that the process identifies and rewards the values and abilities that the department needs to be effective, and does so in a manner that is fair for all employees.  At the same time, a promotions system must be sufficiently flexible to ensure that the best officers are promoted despite the unavoidable imperfections of the assessment process, or unnecessary procedural obstacles.  This is particularly true in organizations like NOPD, where a failure to promote the most highly capable and ethical officers both reflects broader systemic deficiencies and contributes to patterns of misconduct.

NOPD's promotions system does not include any of the components of an effective system.  NOPD promotion policies, Ops. Man. Ch. 34.1, *Police Officer Classes and Promotional Criteria,* Ch. 34.2, *Promotion Committee,* and Ch. 34.3, *Promotional Examinations,* have not been revised since 2001-2002.  In policy and practice, NOPD's promotions system is overly focused on process, with limited substantive assessment.  Moreover, until very recently, the promotional exam had not been revised in years and was, by all accounts, woefully out of date.

The infrequency of NOPD's promotions exams narrows the pool of the most capable promotional candidates.  Due to the Civil Service Commission's limited resources, there are too few opportunities for officers to sit for promotional exams.  Officers may wait for several years after they are eligible before taking an exam.  Recently, for example, the City decided not to fund a sergeant's promotion exam.  Infrequent exams can have a dramatic impact not only the promotion but also the retention of good officers.  As noted in a 2007 report by the RAND Corporation, because NOPD exams are infrequent, some officers who seek promotion will resign because, as quoted in the RAND report, "their timing was wrong," and they do not want to wait for years until the next examination is given.  At the same time, when promotion exams are infrequent, old promotion lists remain in effect and higher-scoring officers may leave the Department, resulting in officers who score relatively low being promoted over newer officers who were not given a chance to compete.

NOPD's promotions system as currently structured does not provide for sufficient assessment to determine which officers should be promoted.  There is little consideration of community policing or ethics (persons close to the process report that, promotional candidates in the past "did not do so well" on the ethical scenarios that were incorporated into the exam).  The promotional examinations result in a relatively rigid system of employee "bands" that, particularly combined with problems caused by the infrequency of exams, may not enable the Superintendent to select the most appropriate candidates.  NOPD's promotions policy ostensibly takes into account an officer's disciplinary history.  However, NOPD's complaint investigation system renders this consideration ineffective.  Many complaints are not formally investigated when they should be; investigations are not sustained when they should be; and sustained cases do not result in the discipline they should.  Current NOPD policy further undermines adequate consideration of an officer's disciplinary history.  By policy, only sustained violations for conduct with an *incident date* within the previous year of the promotion, and which resulted in a

penalty greater than a Letter of Reprimand, are considered, and denial on even this ground appears discretionary.

NOPD should work with the City and Civil Service Commission to improve the promotions process in NOPD so that it is both equitable and flexible, allowing for promotions of NOPD's most effective and ethical officers. NOPD, the City, and the Civil Service Commission should also work to ensure that promotional exams are given more frequently. NOPD and the City should develop promotional criteria and assessment tools that ensure that NOPD promotional selection criteria both communicate NOPD's values and mission, and result in the promotion of officers who most closely adhere to these values and are capable of carrying out its mission. NOPD should require assessment of officers' community policing and problem solving efforts and abilities, as well as officers' professionalism, ethics, and integrity, as part of the promotions selection process. Officers with a disciplinary history that does not comport with the behavior that NOPD wants to model for other officers should be disqualified from promotion.

## X.   MISCONDUCT COMPLAINT INTAKE, INVESTIGATION, AND ADJUDICATION

An effective system for investigating complaints of officer misconduct can prevent constitutional violations and transform a community's perception of its police department. NOPD's system for receiving, investigating, and resolving misconduct complaints, despite some strengths and recent improvements, does not yet function as an effective accountability measure. Our review found significant weaknesses in policies governing complaint classification, documentation and investigation, as well frequent departures from existing policies. We found that NOPD's policies and practices exclude from investigation many categories of serious officer misconduct and fail to adequately investigate and track allegations of discriminatory policing.

In addition to the lack of clear policy guidance, we found deficiencies in resources, training, supervision, and accountability, which serve to weaken investigations and result in poorly-supported investigative outcomes. We found significant problems with how NOPD collects, documents, and analyzes evidence in misconduct investigations, including physical evidence and witness interviews.

Our review also found that the Department metes out discipline and corrective action inconsistently and, too often, without sufficient consideration of the seriousness of the offense and its impact on police-community relationships. As a consequence of these deficiencies and an accompanying lack of transparency, NOPD's system for investigating and responding to allegations of officer misconduct does not effectively change officer behavior or hold officers responsible for their actions, giving it little legitimacy within the Department or in the broader New Orleans community.

NOPD is making considerable efforts to improve complaint intake, investigation and adjudication. The Department has made both innovative changes, such as placing a civilian at the helm of PIB, and implemented long-overdue corrections to basic policies — such as clarifying an employee's duty to be honest and truthful at all times; making dismissal the presumptive penalty for not being truthful; and requiring employees to cooperate with investigations and

- 79 -

report misconduct to a supervisor.  In making these efforts, NOPD has acknowledged that the objectivity, independence, and integrity of misconduct investigations are critical to police accountability.  However, NOPD will need to implement more fundamental and comprehensive change to achieve a truly effective system for investigating and responding to allegations of misconduct, and to restore community and officer trust in this critical accountability system.

A.     NOPD Misconduct Investigation Process and Background

PIB is commanded by a civilian Deputy Superintendent who is responsible for overseeing the timeliness and quality of NOPD's internal investigation process, from complaint intake through the imposition of discipline.  PIB's Administrative Division is responsible for complaint intake, administrative investigations (including assigning most administrative investigations for District-level investigation), and processing sustained investigations for hearings.[20]  The Bureau's Criminal Division conducts investigations of most criminal allegations against officers, and its Special Operations Section is responsible for conducting integrity checks, although PIB's last Annual Report noted that no such checks were conducted in 2009.  Allegations of rape, child abuse, and homicide by officers are investigated by the corresponding specialized NOPD Division.

PIB Directives provide that an accused officer's individual district or specialized component conducts investigations of administrative (non-criminal) allegations, except for those involving positive drug screening results; firearms discharge incidents resulting in formal investigations; criminal complaints occurring outside Orleans Parish, and unauthorized force complaints.  PIB Dir. #25.  The directives require PIB commanders to consider additional factors when deciding whether PIB should investigate a complaint that would normally be delegated to a District, such as:  whether there may be a perception of bias on the part of the subject employee's immediate supervisor; whether the complaint involves "sensitive issues" or "media attention;" whether the officer is also under criminal investigation in another matter; or at the request of field commanders.  A large proportion of NOPD's internal investigations are thus conducted not by PIB, but by the supervisor (usually a sergeant) of the officer alleged to have committed misconduct.  Each District has an ICO who is tasked with ensuring that misconduct complaints are properly and timely investigated.  However, as discussed in more detail in the Supervision section of this Report, ICOs and PIB report that ICOs have broad and diffuse responsibilities, and that those responsibilities are often expanded further by District commanders, leaving insufficient time for oversight of misconduct investigations.

Under Louisiana State Law, non-criminal, administrative investigations must be completed, and officers notified of the disposition, within 60 days, unless granted an extension by the Civil Service Commission.  *See* La. Rev. Stat. 40:2531.  Even with an extension, which is subject to challenge by the subject officer, the case must be completed within 120 days.  Under state law, without "complete compliance" with this timeline there can be "no discipline,

---

[20] In addition to its responsibilities directly related to investigating allegations of officer misconduct, PIB is responsible for administering a number of other accountability related systems including:  conducting administrative reviews of officer-involved shootings; reviewing and analyzing use of force reports; and administering NOPD's early warning system, known as the Personnel Performance Enhancement Program ("PPEP").  These additional accountability systems are discussed elsewhere in this Report.

demotion, dismissal or adverse action of any sort," regardless of whether the officer committed the misconduct.  *Id.*

NOPD reports that most investigations are completed within two months, with more complex cases taking four months to complete.  However, the term "complete" does not mean that the case is resolved, since if the complaint is sustained and discipline is proposed, the subject officer may appeal, thereby prolonging the process.  Further, as discussed below, the Department designates many investigations as "complete" without appropriately resolving the allegations of misconduct.  Thus, despite some success in this area, the intent of a due date—ensuring that investigation of each allegation is initiated and resolved in a timely manner—is not being met.

According to PIB's most recent Annual Report, it conducted 1,465 "case investigations" in 2009.[21]  Of these, approximately 321 were formal investigations (called "DI-1s"), including 129 based on complaints from outside NOPD, and 192 based upon complaints initiated by NOPD.  Another 342 of these "case investigations" were actually, by policy, documentation of "minor administrative violations" correctable by "simple counseling or minimal intervention by a supervisor" (called "DI-2s").  The vast majority of these DI-2s (291) were based upon internally-generated complaints.  "INFO" cases, or documentation of information that does "not contain sufficient information to initiate an investigation," accounted for 168 "complaints."  The remaining 634 complaints received and "investigated" by PIB, were resolved with one of the following designations:  "NVO" (no violation observed); "NIM" (no investigation merited); or "NFIM" (no formal investigation merited).  These classifications fall into NOPD's "DI-3" category, which, by Department policy, includes complaints that do not warrant formal investigation because, among other reasons:  "the actions complained of have no basis in fact;" the complainant "challenges the legality of an arrest or a citation;" the allegation is being investigated by an outside agency; or for "other appropriate reason."

Significantly, when a complaint is classified as NVO, NIM, NFIM, or INFO, the allegation of misconduct remains unresolved, with no formal determination of whether the allegation should be "sustained," "not sustained," "unfounded," or "exonerated."  Nor is an "informal" complaint finding included on an officer's "short form," the documentation used for decisions related to discipline, assignments, transfers, and promotions.  In addition, some informally resolved complaints appear not to be tracked in NOPD's early warning system, called PPEP.[22]   In addition, a complaint made to PIB may be "cancelled," but there is no clear instruction in policy regarding what the criteria are for cancelling a complaint.  These many exceptions to the requirement that NOPD investigate misconduct complaints thus have the

---

[21] *See* PIB 2009 Annual Report, Appendix I.  The count of complaints and the various sub-categories is not consistent throughout PIB's 2009 Annual Report.  The actual number in any category often varied by a small amount—usually less than five.

[22] Ops Manual Chapter 13-27, states that PPEP tracks "personnel complaints (sustained, not-sustained, withdrawn, and pending cases)."  It thus appears not to track, at least formally, even exonerated or unfounded complaints, as well as informally resolved complaints.  PIB staff provided inconsistent answers regarding whether informal complaints are tracked by PPEP.  Over a number of conversations, it became apparent that current use of PPEP is haphazard and inconsistent, and Departmental understanding of how it actually operates is similarly inconsistent and incomplete.

potential to affect not only the outcome of individual complaints of misconduct, but also the overall picture of officers' conduct over time.

NOPD reports that of 2325 charges[23] in 2009, it sustained 354, or 15.22%. Of these 354 sustained charges, approximately 128 came from sources outside the department. Thus, it appears that NOPD's rate of sustained allegations of misconduct by non-police civilians is approximately 5.5%. Our review of recent internal investigations similarly indicated that sustained allegations result more often from internally generated "complaints" such as a failure to appear in court, although other sustained charges included being intoxicated on duty, shoplifting, and charges related to an off-duty car accident. PIB's annual reports note that in many instances the final disposition in sustained cases was changed or was still pending, meaning that the allegation has not in fact been sustained and indicating that the actual sustained rate is almost certainly lower than the rate reported in PIB's annual reports.

    B.      Deficiencies in Misconduct Complaint Intake and Investigation

        1.      Outdated and Inconsistent Policies

NOPD policies and directives related to the receipt, investigation, and adjudication of misconduct complaints are in critical need of revision, updating and clarification. Current policies, most notably Ops. Man. Ch. 26.2, *Disciplinary Hearings/Penalties*; Ch. 52.1, *Internal Disciplinary Investigations*, and PIB Operation Directives, nominally updated in May 2010, include policies that fundamentally undermine NOPD's ability to fully and fairly investigate misconduct. In other instances, there is a disconnect between the policy as drafted and NOPD's operational structure or capacity, resulting in a policy with which NOPD officers literally cannot comply, and undermining the credibility of NOPD's written mandates overall.

Some PIB policy deficiencies appear to have a significant impact on the scope, quality, and effectiveness of NOPD's efforts to investigate and review officer conduct. Under PIB Operation Directive #3, for example, one of the most frequently complained of and serious types of misconduct in policing is outside the jurisdiction of PIB investigation: where the "complaint challenges the legality of an arrest or citation," the challenge "must be resolved in the appropriate court of law," and the complaint should be classified by PIB as "NVO," or No Violation Observed.

It is appropriate for an agency to decline to investigate complaints that truly challenge only the guilt or innocence of the complainant without alleging officer misconduct, and another PIB Directive does provide that "investigators shall obtain and review all pertinent documentation and information to ensure that no other violations exist." Furthermore, our review of PIB case files indicated that investigations of allegations of illegal arrest do occur. However, PIB's policy in this area likely discourages the investigation of allegations of serious misconduct. Indeed, our review of PIB case files confirmed that many allegations of illegal arrests and related misconduct, such as improper stops, detentions, searches, and seizures, are not fully investigated and are instead improperly closed with a "NVO" or similar "informal"

---

[23] Each case may include more than one charge, although the PIB reports we reviewed were not always consistent in presenting this information.

designation.[24]  In one investigation we reviewed, NOPD closed a case as an informal DI-3 where the complainant alleged that officers planted drugs on his stepson, subjected the stepson to a body cavity search (officers first obtained a warrant), and used unnecessary force in the arrest. When it closed the case informally, NOPD sent a letter to the complainant saying, "The matter of your son being arrested must be adjudicated in State Court."  This policy is particularly problematic given widespread concerns we heard from community members about allegedly illegal stops, searches, and seizures.

We also found a lack of clear guidance about when an investigation can be changed from a DI-1 formal investigation to a DI-3 informal investigation, or why this change was made in particular cases.  The ease with which complaints can be downgraded or resolved as NVO, NFIM or NIM undermines the integrity of NOPD's misconduct investigation process.  Our review showed a number of instances, beyond allegations related to searches and arrests, where a formal finding should have been reached but was not.  In one case closed without resolution as an informal DI-3, the complainant called 911 after her former boyfriend, an NOPD officer, allegedly tried to kick in her door after she refused to answer his knock.  In another case, resolved as INFO, the complainant alleged that an officer "bumped" him with his squad car and left the scene.  Other cases closed without resolution that should have been formally resolved include a complaint that an officer was alleged to be assisting criminals and a number of complaints that officers were rude and unprofessional when interacting with community members during pedestrian or traffic stops.

Because it prevents investigation of allegations of even serious misconduct, and results in a systemic failure to track complaints over time, this classification system needs to be fundamentally altered.  Complaint classification should be allegation-driven, not outcome-driven, so that all allegations of misconduct are investigated and given a formal disposition of sustained, not sustained, exonerated, or unfounded.  The level of investigation should be tailored to the requirements of the case including, for example, the seriousness of the allegations and the complexity of the case.

PIB policies and directives related to the assignment and investigation of misconduct complaints by field supervisors are also deficient in that they assign relatively serious and complex allegations for field investigation and do not provide sufficient guidance to field supervisors on how to fairly and completely investigate misconduct complaints.  It is common and acceptable in policing to have field supervisors investigate less serious allegations, such as those concerning demeanor, verbal abuse, neglect of duty and poor response to calls for service. Requiring field supervisors to investigate such complaints can be an important and beneficial component of a department's accountability system, since the field supervisor is in the best position to provide positive and constructive feedback to his/her subordinates, and in the best position to prevent recurrence of negative encounters between officers and community members.

---

[24] Consistent with the view that pursuant to this policy complaints of illegal arrests and related misconduct are often not investigated is the fact that none of the 2076 allegations listed in the 2009 PIB Annual Report were in a category that would appear to directly encompass false arrest, illegal stop, search or seizure, or other Fourth Amendment violations. There were only 152 allegations for the entire year in the four categories that, while broader, could conceivably capture such allegations:  Adherence to Law (121); Abuse of Position (6); False/Inaccurate Reports (21); and Acting Impartially (4).

However, without strong training, clear policy guidance, and close oversight — including by supervisors' own chain of command — field investigations of misconduct will be sub-par. At NOPD, none of these elements are in place, resulting in demonstrably poorer-quality misconduct investigations completed by field supervisors.

2.      Systemic Failure to Investigate and Track Allegations of Bias

Another policy failure that impedes NOPD's overall ability to investigate and track a significant area of misconduct is the lack of any policy or protocol that provides guidance or structure to the requirement that the Department track allegations of racial, ethnic, LGBT status, or other bias-based profiling. *See* Ops. Man. Ch. 41.6. Currently, PIB is not tracking allegations of racial profiling or other forms of bias-based policing because it does not have the ability to do so. To the extent that they are tracked at all, PIB complaints are tracked exclusively by rule number violation. Because there is no specific rule violation covering discrimination or bias, PIB personnel told us they would probably classify a racial profiling complaint under "Professionalism." Of the three types of classifications that PIB uses, DI-1, DI-2, and DI-3, only the DI-3 has a place to note that the complaint concerned discriminatory policing. This is particularly problematic since, as noted above, DI-3s are usually resolved with findings of NVO, NFIM, or NIM, which are not tracked in NOPD's early warning system and do not result in any formal determination of whether the alleged misconduct occurred.

PIB's inability to capture or track racial profiling/bias complaints prevents any meaningful study or analysis of those complaints. Indeed, although PIB's 2009 Annual Report states that there were zero racial profiling complaints that year, there is little question that NOPD does receive complaints of racial profiling and other forms of biased policing. In addition to the many complaints about bias we heard from community members, we found such allegations in the sample of investigative files we reviewed. In one case, a bus driver observed an officer doing a traffic enforcement detail and alleged that the officer cited only black drivers and gave white drivers warnings. PIB conducted an investigation of the case but closed the case with a NVO finding, even though the facts as alleged clearly would have violated NOPD policy. In a separate case that was formally investigated but not sustained, the complainant asserted that the officer used a racial epithet towards him, slapped him, and stole his computer when having his car towed. Consistent with PIB's statement that it does not track such allegations, these case files did not indicate that these allegations were recognized, or tracked, as allegations of racial profiling or biased policing.

3.      Inadequate Training for Complaint Intake and Investigation

Police personnel investigating allegations of misconduct should be among a department's best investigators and should receive training specific to conducting internal investigations. At NOPD, misconduct investigations are conducted by investigators within PIB and at the District level by supervisors, usually sergeants. Neither PIB nor District-level investigators receive sufficient training. District-level supervisors, despite being asked to investigate serious allegations of misconduct receive little to no training in conducting investigations at all, much less internal investigations. To ensure that all investigations meet a threshold of acceptability, a department must provide substantial and ongoing investigative training to field supervisors, as

well as additional guidance, including investigative templates and written investigation protocols, for "field" misconduct investigations, and thorough quality control checks.  NOPD lacks each of these components necessary to ensure adequate District-level investigations.

Many of the investigators within PIB and the ICOs, tasked with oversight of misconduct investigations at the field level, have not been specifically trained in conducting administrative investigations.  This training is essential because the rules and methods for internal investigations are often different than traditional criminal investigations.  Consistent with our findings about training throughout NOPD, most investigators learn how to carry out their responsibilities through on-the-job experience, based primarily on information passed on from more experienced, but usually equally poorly trained, investigators.

In addition to investigative training, NOPD should train all personnel at every level on their role in taking misconduct complaints.  NOPD should explain the mechanics of complaint intake and teach officers and supervisors how complaints can actually be turned into positive police-civilian interactions.  NOPD should also make clear to all personnel the consequences of failing to take a misconduct complaint.

        4.       Insufficient PIB Staffing

Throughout the course of our review, there were 32 total staff in PIB, including investigators, support staff, and managers.  This staffing includes a total of fourteen investigators, not including commander/reviewers, or the five investigators in the Special Operations Section, responsible for conducting integrity checks.  Four of these investigators are responsible for complaint intake; four are administrative investigators, and six are criminal investigators.  As noted above, PIB reported that in 2009 it received 1465 complaints of misconduct and, by state law, has only 60 days (or 120 days if the Civil Service Commission grants an extension) to complete investigations.  It is well-settled that NOPD may not discipline an officer if it exceeds this deadline.  In one case, for example, NOPD found that an officer discharged his personal weapon during a domestic disturbance, suspended him for fifteen days, and demoted him from the rank of sergeant to officer.  The Civil Service Commission denied the officer's appeal but the State appellate court reversed that denial on the grounds that the investigation exceeded both the mandated initial 60-day period and the maximum allowable 120-day period.  *Davis v. New Orleans Police Dep't*, 899 So.2d 37 (2005).  In another instance, NOPD terminated a sergeant because he and his wife took two police department vehicles on a personal vacation to Florida, contrary to NOPD rules and City policy.  The State appellate court confirmed the Commission's decision to overturn the termination because the PIB investigation exceeded 60 days.  *Dunn v. New Orleans Police Dep't*, 938 So.2d 217 (2006).

While we did not undertake a formal staffing study as part of our investigation, it appears that, particularly in light of state mandated deadlines, PIB needs additional investigators.  Moreover, based upon our interviews and review of case files, it appears that this lack of investigators may be undermining the quality of investigations by encouraging the referral of serious or complex misconduct investigations to field supervisors; the downgrading of cases from formal to informal investigation; and giving short-shrift to investigations to ensure they are completed within the mandated timeframe.

It is critical that a law enforcement agency have sufficient numbers of specially trained and dedicated internal misconduct investigators to investigate more serious administrative complaints of officer misconduct.  Likewise, criminal allegations of misconduct, when not investigated outside the agency, should be investigated by specially trained investigators who are kept separate from administrative investigators to avoid contamination of either process.  These dedicated investigators, in addition to being well-trained, must also be sufficient in number to ensure that investigations are initiated and completed quickly.  Long running or delayed investigations result in lost or stale evidence and are unfair both to the complainant awaiting vindication of his or her rights, and the officer who must endure the stress of an ongoing investigation.  Because state law prohibits the disciplining of officers for misconduct if an investigation is not completed within strict state timelines, justice delayed is truly justice denied in instances where the complaint of misconduct was meritorious.

ICOs, if used to their potential, could be a critical adjunct to PIB investigators, allowing PIB to refer some cases for District-level investigation, and requiring less time and focus from PIB to ensure that District level-investigations are well-done and timely.  Each District within NOPD is assigned an ICO, who reports to the District Commander. The ICO's duties are myriad but, at least by policy, all directly relate to ensuring that officers within the District abide by Departmental policy.  Among many other responsibilities, the ICO is supposed to meet with community members, review randomly selected arrest reports, "ensure" that PIB cases are "properly investigated," manage the Field Training Officer Program, and personally inspect Detail sites.  The ICO system is innovative and has enormous potential to assist NOPD with a number of its accountability systems.  However, as discussed in the Supervision section of this Report, at present ICOs are spread thin, undertaking responsibilities that could be a routine part of supervisors' and even officers' daily activities, as well as acting as the administrative assistant to the District Commander.  As part of ensuring adequate staffing to conduct misconduct investigations, NOPD should rethink how ICOs are deployed and determine how best to restructure so that they can play a more effective role in overseeing misconduct investigations and reduce the staffing pressures on PIB.

5.      Faulty Complaint Intake and Classification

Complaint intake is the critical first step of misconduct investigation.  If an individual is afraid to make a complaint, or finds it exceedingly difficult to do so, the police department may never learn of the misconduct.  As importantly, if the agency official taking the complaint does not properly and completely document the complaint, a fair and complete investigation will be compromised from the outset.

NOPD has many policies in place designed to ensure that there are no artificial obstacles to complaint investigation:  third party and anonymous complaints are accepted, and supervisors are required to receive and document all complaints, even where the complaint does not appear to the supervisor to state a violation of Departmental rule.  By policy, complaints can be provided via telephone or letter, and do not need to be written on any particular form.  Complaints may be made to the Independent Police Monitor, or via the internet, and NOPD has a complaint brochure and form.  PIB commanders told us that "when made aware of it" PIB will

investigate allegations of police misconduct that are alleged in lawsuits against the Department or City (although we found no evidence to confirm this is occurring).  NOPD has in place written requirements for documenting the circumstances under which an individual has decided to withdraw a complaint.  Moreover, by policy, where an investigator determines that the "violations complained of are so egregious that the department would have an interest in pursuing the investigation without the complainant. . . . the investigation must continue to its logical conclusion."  This policy of broad complaint acceptance is laudable.

We found that in practice, complaint acceptance does not match the promise of NOPD policy.  NOPD's written complaint brochure and form are outdated and misleading.  The brochure, which still includes on the cover the name of the former Superintendent, suggests that complaints can be made only to PIB, the DA's Office, the FBI, or the U.S. DOJ.  There is no mention anywhere on the form that complaints can be made to any officer, or any supervisor, anywhere in the City.  Nor is there mention that individuals may file complaints with the Independent Police Monitor.  The form suggests further that complaints must be made in a particular format.[25]  After visiting every District station, we noted that posters or other visual information about how to file a complaint were usually absent.  Forms were often unavailable.  Many District stations were locked and inaccessible even during daylight hours, making it difficult if not impossible for a civilian to file a complaint in person, or even determine how to file a complaint.

A bigger obstacle to ensuring that complaints are received and investigated is the lack of clear direction and variety of opinion among field supervisors over what constitutes a "complaint," and what "taking a complaint" requires.  Pursuant to NOPD policy, misconduct complaints can be made to any officer or directly to PIB.  PIB policy provides that PIB is open until 10 p.m. to take complaints, although PIB staff stated that PIB in fact was taking *calls* until 10 p.m., and now even that is not happening because the sergeant who took those calls was terminated and has not been replaced.  It appears that complaints made at PIB will be received and documented.  However, it is far less clear what happens to complaints made to individuals outside PIB.  It appears that officers are to direct complainants to their supervisors or to PIB to take the complaint, although policy on this point is unclear.  Nearly every supervisor we talked with understood that if an individual went to a District station and said they wanted to make a complaint, the supervisor should meet with them.  Beyond that, there was little consistency.  We received varying opinions from supervisors about whether supervisors must always formally initiate the complaint process or whether they are permitted in some circumstances to refer the person to PIB, or even informally resolve the complaint and not document it.  For complaints made outside PIB, there is no documentation or tracking of when a complaint was made and to whom, and the complainant is not given any sort of reference or control number.  According to PIB, if the supervisor does not take the complaint, "we probably won't know."  PIB is aware of this problem and reportedly making efforts to correct it, telling us that it recently became aware of a supervisor's failure to take a complaint and initiated a formal misconduct investigation against the supervisor.

---

[25] The form notes that "If a complaint is not made *to the Public Integrity Bureau,* the NOPD will have no means by which to judge the effectiveness of the services it provides or the professionalism of its employees.  Therefore, we strongly encourage citizens *to use the attached form* to file a complaint of police misconduct." (Emphasis added.)

The confusion about what "taking a complaint" requires appears due in part to a lack of clear policy. NOPD policy on complaint intake is in some respects very specific, including, for example, the exact information the supervisor is to leave on PIB's voicemail when reporting a complaint. However, overall, the policy is deficient.

Adequate complaint intake often requires ensuring that medical attention is provided, if warranted; taking photographs if the complaint involves use of force whether there is observable injury or not; preserving evidence such as video surveillance records; taking statements of on-scene witnesses who may be difficult to locate later; taking officer statements; and completing and attaching related reports. At NOPD there is no apparent organizational dedication to requiring that supervisors take the steps necessary to establish the facts related to an allegation of misconduct. Supervisors are given no clear direction or guidance in this area. Policy is unclear regarding when a supervisor must or should take a complainant's statement, whether witnesses should be canvassed before they disburse, and whether photographs should be taken or any physical evidence (*e.g.,* camera tapes or clothing) collected. Some supervisors told us they would always take the complainant's statement; others told us they never would. Most told us they would not take pictures or interview witnesses, although a few said that they would. We found that complaint statements are too often not recorded and the complainant's statement is often written by the supervisor, with no sign-off by the complainant to ensure that the supervisor accurately captured the entirety of the complaint.

The failure to have complainants write out, or at least review and sign, complaints is of particular concern given the large number of complaints that are resolved with NFIM or NVO findings, which are in many instances based upon the complainant's putative failure to state allegations which, if true, would constitute a violation of NOPD rules or directives. Similarly, many of the DI-2 files we reviewed did not include documentation sufficient to determine the nature of the initial complaint. There is thus no way for PIB (or anyone else) to ensure that the supervisor of the subject officer identified and investigated each potential rule violation alleged by the complainant.

Another area of particular concern is the delay between the field supervisor's receipt of the complaint and submitting documentation of the complaint to PIB. For DI-1s, the supervisor must leave a message on PIB's recorder and submit the documentation related to the complaint within three calendar days. It compromises investigation quality and sends the wrong message to officers to wait three days to initiate a complaint investigation. Complaints of serious misconduct, especially misconduct that has just occurred, require an immediate response. Leaving a message on a recorder minimizes the seriousness of a complaint and is an insufficient substitute for talking with a PIB investigator to ensure that an investigation is being handled appropriately from the outset. For DI-2s, supervisors have four calendar days to submit documentation to PIB, and for DI-3s fourteen calendar days. It is only after receiving this documentation that PIB can fully evaluate whether the field supervisor has properly initiated and classified the complaint. Particularly in light of the 60 day deadline, as well as the insufficient training and lax oversight of field investigations, waiting fourteen days to determine whether a complaint has been properly initiated could significantly undermine any investigation, and is substantially out of line with accepted police practice.

6.        Investigations Inadequate to Support Reliable Findings

The quality of an internal investigation, including gathering evidence, analyzing that evidence, and making findings consistent with what a preponderance of the evidence shows, is the heart of misconduct investigations and, in many police departments, also the Achilles' heel. In addition to training, workload, and resource challenges, police departments often must contend with investigators who may have difficulty making findings against their colleagues, and with complainants who often do not engender investigators' sympathies.  A strong culture of accountability and integrity, often combined with an infusion of outside perspective, can temper these tendencies and allow a police department to reach findings that are credible, reliable, and consistently supported by the evidence.

At NOPD, the mechanics supporting robust misconduct investigations are in some respects in place, and we reviewed many good investigations.  The Superintendent's decision to put in place a civilian to head PIB demonstrates recognition of the importance of injecting a non-law enforcement perspective to strengthen the objectivity and credibility of investigations.

But, our review of investigative case files and on-going conversations with PIB command staff and investigators, NOPD officers, and community members, make clear that PIB is not yet working as it should.  Policies are not followed; review of the completeness and quality of investigations is lax; findings at odds with the evidence are routinely accepted and affirmed through the chain of command; allegations of misconduct are often not investigated, or are improperly resolved without any determination of whether the conduct was within policy; evidence of misconduct, including physical evidence and witness statements, is frequently not gathered; and evidence is often not fairly analyzed, resulting in findings that are inconsistent with the evidence.  In general, we found that investigations done at the District level were of poorer quality than those completed by PIB investigators.

While the deficiencies in the quality of misconduct investigations at NOPD have a myriad of causes, it does appear that, in a few instances, through no fault of its own, NOPD simply does not have sufficient time to complete a fair, thorough, and complete investigation. The purpose behind the state mandate that internal investigations be completed within 60 days is laudable, but in practice it has allowed officers to commit egregious misconduct and get away with it.  In order to "complete" an investigation within 60 days, PIB investigators do not always gather and sufficiently analyze the evidence necessary for the investigation to withstand scrutiny. NOPD and the City should work with the State to modify the state law to allow for certain exceptions, as do similar laws in other states, such as where the alleged misconduct involves numerous officers or is particularly complex, or where evidence is newly discovered well into the investigation.

a)        *Failure to Identify and Investigate all Allegations of Misconduct*

With some significant exceptions addressed above regarding the investigation of allegations of illegal arrests and biased policing, NOPD policies encourage the identification and investigation of all apparent misconduct, even if the allegation goes beyond the four corners of the complaint.  This approach to investigation allows NOPD an opportunity to review the

- 89 -

officer's interaction with the public and evaluate not only whether policy was followed, but also whether the interaction indicates training and safety concerns that need to be addressed. Unfortunately, in the cases we reviewed, we found that this opportunity was often squandered, with very little consideration of training and safety concerns, and often, as discussed above, a failure to formally investigate and resolve even obvious policy violations. This was true even where the allegations of misconduct were quite serious, including use of unnecessary force, planting evidence, and untruthfulness.  In one case involving all of these allegations, the investigator made little attempt to contact the alleged victim of the misconduct, and closed the case without ever interviewing him.

In addition to a pattern of allegations of misconduct not being investigated, we found also that in some instances allegations were extensively investigated, only to be closed without any determination of whether the conduct was within policy.  We found that this was often done by reclassifying complaints from DI-1 formal investigations to DI-3 informal investigations well into the investigation with no documentation supporting the decision.  We observed this practice even where the complainant requested a formal investigation and a formal investigation appeared warranted.  Complaint classification should be allegation based, not outcome based, and any change in classification should be documented.

We saw little evidence in the files we reviewed of supervisory oversight of the quality and content of investigations.  There was often a failure of the chain of command to sign off on an investigation, indicating that there was no meaningful review.  The failure to identify and investigate all allegations of misconduct thus appears to be one of more than just policy, and reflects a failure by NOPD to review misconduct investigations and require that they be completed fairly and fully.

*b)*      *Inadequate Collection and Analysis of Evidence*

To be effective, administrative investigations must collect and analyze evidence. Available evidence is generally in the form of physical evidence, documentation, and information gained through interviews.  We found problems with how NOPD collects and documents evidence in misconduct investigations.

 Official documentation (*e.g.,* police reports, video documentation, dispatch records, shift assignment sheets and officer activity materials) pertinent to the investigation is not consistently gathered; nor do investigators consistently or thoroughly gather evidence through witness interviews.  Although the complaint and related documentation will generally make clear what witnesses must be interviewed, a reasonable inquiry to determine whether there are other persons who may have information is a basic component of any investigation.  This inquiry, depending on the nature of the complaint, may involve a canvass of the area of the incident, whether the area is a neighborhood or a police lockup, or review of surveillance videos.  Whether a police agency conducts a complete search for witnesses is indicative of the police agency's dedication to determining the truth of misconduct allegations.  We found not only a failure to canvass for witnesses but a failure to interview even known, highly relevant witnesses.

Where interviews were conducted, they appeared to be incomplete or even biased. Unbiased, professional, and thorough interviews of the involved persons and uninvolved witnesses are central to credible and effective evidence gathering. The investigator must be willing and able to appropriately question the version of facts offered by the interviewee, especially where that version conflicts with the physical evidence or information from other witnesses, whether the interviewee is a police officer or civilian. To help ensure all persons interviewed are treated in the same manner, police agencies often establish a consistent protocol for interviews during administrative investigations to ensure and reinforce proper execution of these protocols through training. In NOPD, interviews are not guided by a policy or practice to be consistent and thorough. Most interviews conducted by NOPD are documented in a narrative summary format, which is both very time consuming and difficult to do without letting some modicum of personal bias alter the interpretation of the information offered by the person being interviewed. Nor does it appear that interviews are consistently recorded or reviewed by the chain of command. To monitor and minimize these problems, the Department should develop interview protocols and should ensure that all interviews be audio recorded and reviewed as appropriate for investigative and audit/supervision purposes.

In the cases we reviewed, the analysis of evidence was often poor. We found instances where investigators used witnesses' statements to the extent they supported officers, but overlooked statements where they supported the complainant. We found that investigators often researched complainant backgrounds to determine credibility but did not document or appear to similarly consider officers' backgrounds. Factual assertions by officers were often not probed, even where the facts asserted in interviews were not included in contemporaneous official documentation.

> c)    *Findings Unsupported by a Preponderance of Evidence*

The ultimate test of the quality of analysis and overall fairness of a misconduct investigation is whether the findings are supported by the evidence. In administrative investigations, the finding must be supported by a preponderance (often described as 51%) of the evidence. We found too many cases where the findings were not supported by a preponderance of the evidence. We found a failure to sustain allegations even where the officer admitted to the violation, and a failure to even list as allegations obvious violations that should have been sustained. In other cases, we found that PIB exonerated officers when the evidence dictated otherwise. This distinction is more than administrative—as noted above, exonerated allegations are not tracked in NOPD's early warning system or considered as broadly for personnel considerations as are "not sustained" findings. In general, the standard for sustaining a case appeared too high. One expert noted that the only sustained allegations in the cases he reviewed involved incidents where the officer was arrested.

It is widely believed that having a higher level commander, rather than the internal affairs or chain of command investigator, make the actual dispositive finding for each allegation (i.e. sustained; not sustained; exonerated; or unfounded) may result in findings more in line with the evidence. NOPD should explore this approach.

C.       Inadequate Investigations of Criminal Misconduct

Reducing and preventing criminal activity by NOPD officers will require transforming a number of NOPD systems, including recruiting, training, supervision, Details, and use of force investigation and review.  Along with these efforts, NOPD and the City must improve the system for investigating alleged criminal misconduct and assisting in the prosecutions of officers who commit crimes.  Current practices place significant obstacles to effective prosecutions of officers and their removal from the Department, and must be changed if NOPD hopes to effectively prevent criminal misconduct by its officers.

In 2009, according to PIB, eighteen officers were arrested and seven issued summonses for alleged criminal conduct including aggravated burglary, theft, false imprisonment, kidnapping, perjury, driving while intoxicated (DWI), domestic violence, aggravated rape and aggravated incest.  Some of these cases have resulted in convictions; others are awaiting trial.  These numbers count only once each of two NOPD officers who were arrested twice in 2009.  By comparison, NOPD's officer arrest rate of 1.3% to 1.8% (depending upon whether summons are included) compares to a New York Police Department officer arrest rate  that ranged between .25% and .36%  from 2001 to 2006.[26]  Moreover, the number of NOPD officers involved in criminal misconduct is likely greater than reflected in the data provided by PIB.  PIB's 2009 Annual Report noted that there was at least one instance where an officer was arrested by another jurisdiction, but did not report the arrest to NOPD as required.  Additionally, we reviewed instances where PIB investigated officer misconduct that appeared clearly criminal, but there was no indication of any arrest or summons, or referral to the DA's Office.

PIB criminal investigators investigate allegations of officer misconduct that are potentially criminal and are required to submit cases with apparent criminal violations to the DA's Office.  Pursuant to PIB Directive, the investigator must check the status of referrals to the DA's Office every thirty days and, after ninety days, inform the complainant that the matter is being reviewed by the DA.  If the investigator finds that there are no criminal violations but "suspects administrative violations may have been committed," the investigation is reclassified from criminal to administrative.  Upon reclassification from criminal to administrative, the 60-day clock for the completion of administrative officer misconduct investigations begins.  PIB does not have policies directly guiding administrative investigators on how to proceed if they discover apparent criminal misconduct in the course of conducting an administrative investigation.

Our review found three overarching problems with NOPD's internal investigations of criminal misconduct.  First, according to PIB and DA officials, as well as NOPD policy, in most instances NOPD does not initiate an administrative investigation until a criminal investigation is complete and the prosecutor has declined prosecution, or if the matter is prosecuted, unless and until a conviction is obtained.  Where a case is criminally prosecuted but the officer is acquitted, NOPD reportedly will not investigate whether the officer violated NOPD policies, despite the lower standard of proof and the fact that it is often the case that misconduct that is not criminal

---

[26] This calculation uses 1400 as the number of NOPD officers and 34,500 as the number of NYPD officers. According to NYPD IA reports, the number of NYPD officer arrests was: 2001: 124; 2002: 114; 2003: 103; 2004: 86; 2005: 91; 2006: 114.

nonetheless may violate agency policies.  This practice results in a delay in the initiation of the administrative investigation in some cases for months or even years after the incident occurred.  By this time, any additional evidence that might be needed is often impossible to obtain.  In addition, the delay of appropriate administrative discipline undermines NOPD's accountability systems.  In DWI cases, for example, where there is breathalyzer evidence (and often an admission) indicating the officer's guilt, there usually is generally no reason for NOPD to wait, often for months, until there is a conviction before completing the administrative investigation and administering discipline.  Similarly, where an officer is accused of excessive force but the use of force is not found to be criminal, this same conduct nonetheless may violate numerous NOPD policies and warrant the officer's termination from the Department or imposition of other significant discipline.  Acknowledging these concerns, PIB reports that it has begun to conduct the administrative investigation in some cases while the criminal investigation is ongoing, creating a firewall to keep cases separate.  However, this practice, along with important accompanying protections, have not been memorialized in policy or guided by training.

Each internal investigation should be considered individually and where it becomes apparent that the case may in fact involve criminal conduct, it may be prudent to delay compelling interviews of subject officers, and sometimes other interviews as well.  Conducting a full investigation short of compelling an interview generally does not compromise either investigation and is often critical to ensuring the later success of the administrative investigation.  Regardless of whether or for how long a compelled statement is delayed, a meaningful and timely administrative investigation is particularly important in cases alleging criminal misconduct, given the usually egregious nature of the allegations, the often slow wheels of the criminal justice system, and the very low rate at which these cases are prosecuted (regardless of jurisdiction).  Where officers are not guilty of committing the misconduct, they deserve to have the case adjudicated internally and be brought back to work; where an officer is guilty, the community and department have an interest in seeing the officer disciplined or removed from the force without having to wait months or years with the officer on paid or unpaid suspension.  The DA's Office is supportive of this parallel approach to criminal and administrative investigations and the First Assistant reports he has requested that NOPD start taking this approach.

Our second concern regarding NOPD's criminal investigations of officer misconduct is the apparent lack of adequate bifurcation between the administrative and criminal investigations.  Officers cannot be forced to choose between losing their jobs because they disobeyed an order to answer questions, and exercising their Fifth Amendment right to avoid self-incrimination.  *Garrity v. New Jersey,* 385 U.S. 493 (1967).  While an officer may be ordered (or "compelled") to provide a statement to police department investigators, that statement, and any other evidence that derives from that statement, may not be used against the officer in any subsequent criminal prosecution of the officer.  Accordingly, whether administrative and criminal investigations are conducted sequentially or simultaneously, the processes, at least after compelled statements have been taken, should be kept bifurcated so that the criminal investigation is not compromised.

In cases where PIB is essentially conducting parallel administrative and criminal investigations—as noted above, without guidance in policy or training—PIB attempts to bifurcate the criminal and administrative investigations and asserts that it does not allow investigators handling the criminal charge to co-mingle their investigations with investigators

conducting the administrative portion.  However, ensuring true separation is difficult in a PIB the size of NOPD's.  Indeed, in our review of DA's Office prosecutions of NOPD officers, we observed instances, including some quite serious, that were reportedly quashed because the criminal investigation had been infected by information gained directly or indirectly from compelled statements.  To avoid this result, and to ensure the fact and appearance of independence and impartiality, at least some criminal investigations of officer misconduct should be conducted by an outside agency.  In addition, PIB should immediately develop and implement policies and training to ensure that there is clear guidance and that investigators know how to follow that guidance to keep criminal and administrative investigations separate.

One positive change we observed in this area is that NOPD has ended the egregious practice of transferring officers who had been involved in officer-involved shootings to the Homicide Division and then having a Homicide investigator interview the officer and, at the end of the interview, state on the record that the officer was being compelled to provide a statement, regardless of whether the officer was willing to voluntarily talk about the shooting.  This practice not only undermined the normal dynamic in good departments of officers voluntarily talking about shootings they know are justified, it also sabotaged any criminal case in the usually rare instance where the officer's conduct may not have been justified.

Our third overarching concern about NOPD's investigations of criminal misconduct relates to how criminal referrals are made to the DA's Office and what has happened in the past once those referrals are made.  NOPD offers no written guidance to administrative investigators on when or how to contact a prosecutor for advice or declination when potentially criminal conduct becomes apparent in an investigation.  Currently the practice in PIB is to consult with the prosecutor when the investigator is "concerned" that there may be a criminal issue and the investigator believes the case will be sustained.  NOPD should provide written guidance and training to ensure that investigators identify, seek advice, and refer where appropriate, allegations of criminal conduct.

The flip side of this responsibility lies with the DA to prosecute cases where officers have committed serious crimes.  Our review of some DA's Office case files of NOPD officer prosecutions revealed a number of previous decisions which caused us to question whether the DA's Office investigated and prosecuted potential criminal acts by officers.  In one case, the DA's Office refused to prosecute a referral by NOPD of an officer for indecent behavior with a juvenile and two years later refused to prosecute a charge of simple rape against the same officer. The current DA is now prosecuting a case of forcible rape and molestation of a juvenile against this officer—who remained on the force until this most recent prosecution.  It is critical that the DA's Office expand its efforts to work with NOPD in this area to ensure that criminal investigations are fair and thorough, and that officers who commit crimes do not escape accountability.

D.    Deficient System for Administrative Discipline

In any police department, it is vital that the leadership administer a disciplinary system that has the confidence of its police officers and the public.  Unfortunately, neither the force nor the public are confident that NOPD's disciplinary system is fair, and our investigation indicates

that this lack of confidence is well-founded.  Internally, officers view NOPD's disciplinary system as arbitrary, or as unfairly targeting certain individuals, diminishing its ability to improve behavior.  Externally, NOPD's disciplinary system is seen as ineffectual and, in some instances, protective of bad actors within the Department.  This perception undermines the community's confidence in the Department overall.  There are measures NOPD can and should take so that its disciplinary system routinely metes out reasonable discipline and treats all similarly situated officers equally.  Once such a system is in place NOPD will, in time, regain the confidence of the public and its own officers.

In NOPD's administrative investigation, the investigator makes a finding and recommends a disposition for each identified allegation.  Once completed, the investigation is, according to policy, reviewed by a number of supervisors and commanders for "error checks," and "content checks," and then provided to the PIB Deputy Superintendent for final approval. Where there are no sustained violations, the case is closed.  At the close of the investigation, PIB is required to send a letter to the complainant and any other involved party, notifying them of the disposition.

Where there is a sustained violation approved by NOPD's Superintendent, the case should be scheduled for a disciplinary hearing, according to NOPD policy.  Disciplinary hearings, pursuant to NOPD policy, are meant to determine the validity of the investigation; recommend a disposition; allow the subject officer to present mitigating circumstances; and recommend a penalty "if the investigation is validated."  *See* Ops. Man. Ch. 26.2.  The Hearing Officer (who may be any of a number of commanders) documents the disposition and penalty recommendation and this information is provided to the Superintendent, who may approve, disapprove, or change any recommended disposition or penalty.  The Superintendent's disciplinary action is documented in a disciplinary letter to the officer.  The officer may appeal the disciplinary decision to the Civil Service Commission.

In making disciplinary determinations, NOPD nominally uses a penalty schedule.  This penalty schedule was recently updated to increase the penalties for dishonesty and interfering with investigations in need of some further updating and revision, has the potential to be a strong accountability tool.  It provides a disciplinary range for rule violations that increases with each recurrence and allows the decision maker to take into account various aggravating and mitigating circumstances to go outside the range.  However, officers at all levels acknowledged that the penalty schedule has not been adhered to or been particularly relevant for a number of years.

Currently NOPD has in place no policy regarding the production of PIB files that document disciplinary decisions that are potentially exculpatory to a defendant in a criminal case, such as findings that an officer lied during an investigation; provided false or misleading statements; or submitted a false police report.  We reviewed one case where an employee was disciplined for lying during the investigation.  Under current policy, this employee would likely be dismissed but, in any event, NOPD should be aware of every employee who may have credibility issues, and should establish a protocol for identifying and producing such materials where appropriate.

NOPD should update its penalty schedule and put in place policies to ensure its proper use (*e.g.* requiring that all deviations outside the prescribed range are documented in writing and that exceptions to the stated range do not become the rule).  More broadly, NOPD should revise its disciplinary hearing structure to provide a greater degree of consistency and integrity to the process by, for example, having a small, defined, and well-trained number of persons (or even one person) conduct disciplinary hearings and document the reasons for disciplinary recommendations.  In addition, the Superintendant should document the reasons for every decision to reverse an investigative finding as well as the reasons for accepting or changing any disciplinary recommendation.  Finally, the City Attorney's Office, which should play a larger advisory role at every stage of the investigative process, should provide close guidance at the disciplinary stage to ensure that NOPD's disciplinary decisions are as fair and legally defensible as possible.

E.       Role of the Civil Service Commission in Disciplinary Adjudication

Sworn and non-sworn permanent NOPD employees have a right to appeal the disciplinary decisions of the Superintendent to the city's Civil Service Commission, and, in adjudicating these appeals, the Commission has an independent duty to ensure that the discipline is in accordance with the rights granted under Louisiana's constitutionally-based civil service system.[27]

During our review, people from across the criminal justice system – from individuals in the Public Defender's office to longtime advisors to the NOPJF to former and current NOPD officials – stated their belief that the Civil Service Commission operates as an impediment to NOPD's ability to appropriately discipline its officers.  There is a shared belief that there are times when officers are rightfully terminated and the Superintendent gets "rolled over" by the Commission.  This sentiment was summarized in a 2010 study of the Commission conducted jointly by the Business Council of New Orleans and the Bush School of Government and Public Service:  "[i]n addition to stories that expose wrongdoing [by public servants], the media also reports information detailing how disciplined civil servants often escape punishment, thanks to the city's appeals process… Rightly or wrongly, the public perception is that the city suffers from widespread corruption and a civil service system that is not functioning."

We reviewed many of the Commission's recent decisions in which it overturned or modified the discipline NOPD imposed.  While we disagreed with some decisions and believe that greater transparency is necessary to improve the Commission's credibility, we found:  1) that the Commission upholds the majority of NOPD's disciplinary decisions; 2) many examples in which NOPD itself appeared at fault for a decision being overturned; and 3) that NOPD has only rarely chosen to exercise its power to appeal an adverse decision of the Commission.

---

[27]  The Louisiana Constitution states:  "No person who has gained permanent status in the classified state or city service shall be subjected to disciplinary action except for cause expressed in writing.  A classified employee subjected to such disciplinary action shall have the right of appeal to the appropriate commission pursuant to Section 12 of this Part.  The burden of proof on appeal, as to the facts, shall be on the appointing authority."  La. Const, Art. X, Sec. 8(A).  The relevant "appointing authority" here is NOPD.

Although there were Commission decisions that we found questionable, the problems we observed in NOPD's investigation and adjudication of officer misconduct, alongside a lack of transparency in the Commission's appeal process, made it difficult to fully assess the extent to which troubling disciplinary decisions are due to the Commission's failure to stay within the appropriate bounds of review, as is widely perceived, or are instead due to weakness in NOPD's investigations of officer misconduct and NOPD's and the City's defense of disciplinary decisions.

We heard concerns that recommendations to the Commission by past hearing officers were in some instances influenced by bias or favoritism. We found no evidence that such bias was widespread, indeed as discussed below, the Commission overwhelmingly affirms NOPD's disciplinary decisions. Nonetheless, it is clear that even a small number of notorious decisions by the Commission can delegitimize the process in the eyes of the officers and the public. Further, the almost complete lack of transparency in the way the Commission operates – none of its decisions are posted online, for example – has fostered an atmosphere where rumors can fester. Addressing this lack of transparency by posting Commission decisions in full and online, will give the public and NOPD officers the tools to better understand the Commission's decisions.

Ultimately, we found that while there may be instances where the Commission made the wrong decision, NOPD and the City should not lose focus on the very real problems in their complaint investigation and adjudication processes. Correcting these deficiencies will improve the Department's ability to prevail before the Commission to a greater extent than is commonly acknowledged.

        1.      Commission's High Rate of Affirming NOPD Disciplinary Decisions

For at least the past four years, the Commission has upheld many more of NOPD's disciplinary decisions than it overturned or modified, and its rate of affirming NOPD is increasing. For the four years between 2006 and 2009, there was an average of 105 appeals per year of NOPD disciplinary decisions. There are, of course, many cases where discipline is not appealed. In recent years, it appears that roughly half of NOPD's disciplinary letters were appealed.[28] Of the 112 cases appealed in 2009, the NOPD employee won outright in thirteen cases. In addition to those thirteen, there were ten cases in which the Commission modified the Superintendent's judgment downward in some way.[29] In 2008, there were only 80 appeals, but there were twenty-four in which the employee either won outright or won a modification. Thus, in 2008, 30% of the decisions altered NOPD's judgment, but, in 2009, only 20% did.

---

[28] In 2007, there were 208 letters issued and 115 appeals decided. In 2008, there were 206 letters issued and 80 appeals decided. In 2009 there were 192 letters and 112 decisions. As of October 15, 2010, there were 158 letters issued in 2010. The number of disciplinary letters issued by NOPD does not correspond directly to the number of appeals heard each year because the appeal may be decided in a different calendar year.

[29] The Commission cannot increase the penalties assessed by the Department.

2.      Role of NOPD and the City in Reversal of Some Disciplinary Decisions

We found a number of examples where NOPD failed to support its disciplinary decisions with evidence, which left the Commission little choice but to find for the testifying employee. Indeed, a former high-ranking NOPD official told us that, in the past, some charges that clearly could not be adequately proven (but were believed to be true) were nonetheless brought against officers in order to put them through the difficult civil service appeal process. This type of action is exactly the harm the civil service system was designed to prevent.

Additionally, City Attorneys often do not join the investigation until too late in the process to ensure that the cases will withstand scrutiny and meet the City's burden of proof. For instance, in 2010, in a traffic accident case involving two police cars, NOPD failed to call any fact witnesses to contradict the appealing officer's version of events, even thought the witnesses were police officers and thus should have been easy for the City to locate. In addition, the officer who wrote the police report about the accident only interviewed the other driver-officer, and "provided no explanation for his failure to interview the Appellant even though he determined she caused an accident." Facing only hearsay to rebut direct evidence, the Commission overturned the discipline.[30]

In some cases it appears that NOPD's disciplinary decisions were overturned because they were, in fact, arbitrary. Four of the overturned cases we reviewed from the last two years involved NOPD questionably disciplining officers for failing to attend court. It is essential that officers attend court when asked to do so, and we are aware that NOPD has had a problem in the past because good cases have had to be dropped when officers failed to appear in court. However, in three of cases overturned by the Commission, officers were punished for not appearing in court even though they were excused in advance by the Assistant District Attorney ("ADA") prosecuting the case or were told by the ADA they were not needed. Under these circumstances, it is difficult to find that cause for the imposed discipline was sufficient.

In several cases we reviewed, commanders reviewing investigations appeared to change the disposition of the case or the level of discipline even where the evidence indicated that the original determination was correct. It is sometimes incumbent upon a reviewing official to modify the disposition or level of discipline in a case. However, this should only be done to correct an erroneous determination that is at odds with a preponderance of the evidence, and the rationale supporting the change should always be documented. Our review indicated that in cases where there was an increase in penalty for a documented reason, the increase was more likely to be upheld. In a case ultimately appealed to the state's Fourth Circuit, an officer was originally issued a letter of reprimand for making a traffic stop while off-duty, in civilian clothes, and in his own car. Then-Deputy Superintendent Serpas increased the penalty to a three-day suspension because it was the officer's second violation in three years—an increase that fit within the penalty schedule. This was upheld at both the Commission level and on appeal.

---

[30] *See* Docket No. 7624 (2010) and Docket No. 7447, 7448 (2009) for similar cases in which the Commission determined that the City did not meet its evidentiary burden.

However, in most of the cases we reviewed, these criteria were not met. For example, in a traffic accident case from 2009, there was no dispute over the facts, and the appealing sergeant's testimony was uncontested.  There was no explanation in the record for why the investigating officer and the supervisor's report, both of which found the sergeant to be not at fault, were overruled by a captain on the Accident Review Board.  In another traffic case, again both the investigating officer and the supervisor on the scene found no violation.  Here, their findings were "overturned by the Superintendent, apparently based solely on the amount of damage."  The then-Superintendent did not testify to provide another reason.

In another case, a letter of reprimand had been recommended, but a former NOPD Superintendent increased the penalty to a five-day suspension.  There was no explanation for the increased discipline in the record, and the Deputy Superintendent who testified at the hearing stated that he had not been aware of the fact that the appealing sergeant had been acting on the advice of her supervisors.  He testified that, had he known this, he would not have recommended even the letter of reprimand.  Finding that the appealing Sergeant had been acting in good faith, as well as on the advice of her superiors, when she made her mistake, the Commission reduced the discipline back to the letter of reprimand.

We acknowledge that there may be cases where the Commission simply made the wrong decision and nothing that NOPD might have done would have altered that outcome; we certainly reviewed cases where we did not agree with the Commission's decision.  However, it is the responsibility of NOPD and the City Attorney's Office to ensure that the record, both at the internal investigative level and then at the Commission level, includes all the evidence supporting their determinations.  As stated in the 2010 study of the New Orleans Civil Service system, "[u]sually, when a department has its disciplinary action overturned, it is because the managers in the department were either unaware of proper procedure or failed to follow it."

It is the responsibility of the City Attorney's Office to advise NOPD so that inappropriate decisions at the investigation and internal review stages are less likely.  Where NOPD's decisions are appropriate, it is the responsibility of the City Attorney's Office to vigorously defend those decisions before the Commission.  Where NOPD and the City do not meet these responsibilities it is not surprising that the Commission finds for the appellant.  Where the City and Police Department do meet these responsibilities they will better be able to defend their decisions—to the public and on appeal—in instances where the Commission's determination was incorrect.

3.      Infrequent Appeals of Unfavorable Commission Decisions

The decision whether to appeal an unfavorable decision involves consideration of a number of factors, and we do not make any findings as to whether the City should have appealed any particular unfavorable Commission decision we reviewed.  However, we do note that the City and NOPD have asserted that Commission decisions are contrary to law and an abuse of their discretion, yet they have relatively rarely chosen to appeal those decisions.  Between the years of 2004 and 2009, the City appealed between zero and nine Commission decisions, averaging fewer than 5 appeals per year.  During this same time period, NOPD has received an average of 14.7 outright reversals by the Commission per year, and about seven modifications

per year.  The City thus has appealed fewer than a quarter of the unfavorable decisions handed down by the Commission.  As NOPD and the City improve their systems for investigating misconduct, including imposing discipline and defending disciplinary decisions, it is likely that alongside an increase in favorable Commission decisions the City's ability to successfully appeal erroneous Commission decisions to the Fourth Circuit will also improve.

## XI.    COMMUNITY ORIENTED POLICING

Community policing strategies balance reactive responses to calls for service with thoughtful and proactive problem-solving.  This problem-solving is achieved in large part by forging robust relationships in the community.  The Department's policies, training, and tactics support neither a community policing orientation, nor the ultimate goal of proactively addressing problems to reduce and prevent crime, rather than merely reacting to it.  Within NOPD, the concept of community policing is poorly understood and implemented only superficially.  Outside the Department, community members, especially members of racial, ethnic, and language minorities, and the LGBT communities, expressed to us their deep distrust of and sense of alienation from the police.  This crisis of confidence and credibility serves as both a barrier to an effective community oriented policing program, and as a compelling reason to prioritize its implementation.

A.    Need for Community Oriented Policing

NOPD has publicly acknowledged the need to repair and cultivate community partnerships to more effectively fight crime and increase respect for its officers.  Indeed, in August 2010, the Superintendent released a 65-point plan to reform the Department, which opened with a commitment to prioritize community policing and to "listen, collaborate, and respond proactively."  The Department has implemented or announced plans to implement community outreach programs, including:  citizen callbacks regarding quality of service; an expanded citizen academy; a partnership with clergy; and an "El Protector" program, which will involve bilingual outreach to Latinos on public safety issues.  Additionally, the Department has sought funding and is preparing a Request for Proposal to commission an independent and detailed survey of community attitudes and perceptions of NOPD.  While these initiatives are either in the planning stages or too new to allow for close assessment, we commend the Department's stated interest in genuinely assessing current attitudes toward the police, reaching out to diverse segments of the City, and enhancing community relations.

Nonetheless, considerable work lies ahead if community policing is to be a central feature of NOPD's culture, decision-making, and organizational structure.  As the U.S. Department of Justice's Office of Community Oriented Policing ("COPS") instructs, a true community oriented policing strategy rests on the key components of:  1) collaborative partnerships between police and the public to identify and solve public safety problems and increase community trust; 2) organizational transformation, that is, the alignment of a law enforcement agency's management, structure, personnel, and technology systems to support these partnerships and problem solving efforts; and 3) proactive and systematic examination of

identified problems to develop and rigorously evaluate effective responses.[31]  An effective community policing approach to crime-fighting should integrate these key tenets, and should hold accountable all members and components of the organization for their implementation.  We identified barriers that NOPD must address before it can institutionalize the core components of community policing:  collaborative community partnerships, organizational transformation, and systematic problem-solving.

B.    Lack of Collaborative Community Partnerships

NOPD does not adequately encourage or promote meaningful partnership, interaction, and communication with diverse stakeholders, which is critical to learning about and collaboratively addressing problems in the community.  The Department's Operations Manual addresses "Community Relations" in a 3-page policy, outlining the duties and responsibilities of the Department's Crime Prevention Unit, and of the designated "Crime Prevention Officers" assigned to each of NOPD's eight districts.  The policy states that Crime Prevention Officers will act as liaisons to community groups; assist in formulating community relations policies for the Department; identify training needs; and "relay information and concerns, through the chain of command, from community groups to the proper authority within the department."  The policy further requires each district's Crime Prevention Officer to hold a monthly New Orleans Neighborhood Police Anti-Crime Council ("NONPACC") meeting of neighborhood watch groups and other interested citizens.

Until recently, the functions of the "Crime Prevention" position had been the responsibility of Quality of Life officers in each district, but we were told that these officers were frequently pulled from those duties when the platoons were short on manpower.  In July 2010, the Department created the position of Community Outreach Coordinator Sergeant, also known as "CoCos," who have assumed some of the responsibilities described in the Operational Manual, and who appear to have more authority and autonomy than the Quality of Life officers.  Although the CoCo sergeants appeared engaged and committed to enhancing community relations, at the time of our review, they described themselves as essentially "self-taught" and in need of specialized training in community- and problem-oriented policing principles.

In November 2010, the CoCo sergeants, along with other supervisors and a number of advocacy organizations, attended CRS' training in basic law enforcement mediation and racial profiling.  Another participant in the training was the Department's Hispanic Liaison officer, a position the Department created in mid-2009 and that has improved dialogue between the Department and some groups in the community.  The officer conducts a weekly radio show in Spanish, makes public presentations, reaches out to Spanish-language media, and also serves as the Department's primary interpreter while on-duty.  Although creation of this position was a positive step, the Latino organizations we spoke with said broader and more extensive engagement and communication is sorely needed.

While CoCo sergeants have begun attending their districts' NONPACC meetings and neighborhood homeowners' association meetings, outreach to other sectors of the community,

---

[31]      See http://www.cops.usdoj.gov/Default.asp?Item=36, U.S. Department of Justice Office of Community Oriented Policing Services.

which have traditionally had less sustained and positive interaction with police, has been far more limited.  One CoCo sergeant, for example, described language barriers in engaging heavily immigrant communities.  He also noted that the CoCos tend to avoid more volatile neighborhoods out of fear of citizens labeling those contacted as "snitches."  He further observed, more generally, that in "high crime neighborhoods, officers may stay five minutes explaining a crime whereas in the rich part of town they might stay ten minutes.  Officers aren't inclined to listen to someone they believe is a suspect.  The culture here forgot that we are required to protect and serve."

Minority community groups nearly uniformly said that the police rarely reach out to them, for any purpose.  One member of a Vietnamese community organization reported that "[a] lot of the young Vietnamese people who get shot in this community, we know who shot them but the New Orleans police don't do anything.  They don't talk to us.  They don't build community relationships."  We found that some NOPD officers tend not to view members of the public as potential collaborative partners or sources of information and insight about their communities, but rather as potential problems, cultivating an "us vs. them" atmosphere of mutual distrust.  Some community members said that such assumptions and perceptions by the police are especially evident in their interactions with young people.  One young community organizer told us that, "Officers are on a power trip.  NOPD needs to learn how to talk to young people.  They get harassed like no other in New Orleans. Whether you're white, black or Asian, or Latino [young people] get treated like crap. They see us as a walking problem."

Many within and outside of the Department observed an NOPD "culture" of discourtesy, disrespect, and an unwillingness to listen.  This constitutes a significant barrier to successful outreach to the community and to the creation of constructive partnerships.  One community leader said that when officers engage with members of the community, they too often do so with an "arrogance, a hostility, a rudeness and vulgarity.  It's not everybody, some people know how to talk to people, but it's the culture."  The prevalence of discourtesy and disrespect was acknowledged at the highest levels of NOPD, with one member of the Department's leadership observing:  "I don't know where this thing, this thing that we have to demoralize people in getting our point across … I don't know where this disrespect thing came from … I'm trying to get officers to understand that the public just wants to know why they are being detained, the purpose of the citation, what are my recourses and just show me some professionalism, and some courtesy, and some respect.  The public is hungry for this type of interaction."

He went on to recount being at the scene of a homicide and seeing a woman in her kitchen window, looking out.  "I went over to talk to her through the screen, talking about her living conditions and why she's still living back here, when they're going to tear this building down.  She said, 'You know, I tried to talk to the officers on the scene about what happened.'  I said, 'You know what happened?' She said, 'Yeah, I did.'  I said, 'What did the officer tell you?'  She said, 'he said get the F off this scene.  Get behind the yellow tape.  So I got behind the yellow tape and went into my apartment.'  So we almost lost that witness who was wanting to help and the officer was being belligerent.  That's what I'm trying to get the officers to understand, that every contact is important, no matter how old, young, rich or poor, that person can be your biggest advocate."

Our review found that NOPD has a particularly long way to go to repair its reputation, build trust, and create community partnerships with the City's minority citizens. Indeed, a recent survey by the Kaiser Family Foundation found that trust in the police, though lacking across the board, differed considerably by race. For white respondents, 59 percent said they trusted the police to do what is right "almost always" (18 percent) or "most of the time" (41 percent). At the same time, only 34 percent of African-American respondents said they could trust the police "almost always" (9 percent) or "most of the time" (25 percent).

Citizens, particularly youth, African Americans, ethnic minorities, and members of the LGBT community, spoke of discourtesy, harassment, unwarranted stops, and arrests for minor infractions. They consistently reported that these tactics serve to drive a wedge between the police and the public, antagonizing and alienating members of the community. In the Latino and Vietnamese communities, language barriers and a lack of cultural fluency further impede effective engagement with the police. Encouragingly, however, participants in our community meetings consistently told us that they are ready to work with, and toward, a police department that is inclusive, respectful, and fair in its service delivery and enforcement of the law. Improved relationships with the community will benefit the Department by enhancing people's willingness to report crime, work with the police in problem-solving efforts, and be the "eyes and ears" for the police.

C.      Challenges to Achieving Organizational Transformation

Organizational transformation requires that a police department integrate and embed community- and problem-oriented policing principles into each aspect of its management, structure, and use of resources. To ensure that change is sustained and more than superficial, an agency must review its leadership, policies, climate and culture, systems of accountability, and training and deployment of personnel.

As an initial matter, we observed that outside of the CoCo sergeants, few others within NOPD could articulate the basics of community policing, especially its "problem solving" component. Indeed, officers tended to describe community policing as the domain of the CoCo sergeants, rather than as a shared, Department-wide, responsibility. Apart from the Operations Manual chapter on Community Relations, which lacks substance and primarily describes the responsibilities of "Crime Prevention Officers," there are no policies to require or guide patrol officers in integrating community policing strategies into their assignments.

We also found that training in community policing principles and techniques—for CoCo sergeants and even more critically for patrol officers—is both qualitatively and quantitatively deficient. Currently, the Department offers just four hours of training on community policing to recruits at the Academy, and no mandatory in-service training to reinforce those skills and concepts. NOPD does not incorporate community policing concepts and strategies into the field training program or the "traditional" academy courses on patrol procedures, investigations, traffic enforcement, and use of force; nor does it offer training in problem solving techniques, such as the "SARA" (Scanning, Analysis, Response, Assessment) approach to identifying, assessing, resolving, and evaluating its collaborative efforts to reduce crime. In-service training on verbal de-escalation of conflict, language barrier policing, and cultural sensitivity are

similarly lacking, though the Department did recently introduce a unit entitled "Latino Cultural Awareness," and plans to roll out an expanded version. Other than that course, which a Latino community organization helped to develop and present, the Department has not solicited community input in assessing training needs or developing curricula.

The Department also lacks systems and measures to ensure accountability for and to determine the impact of community policing efforts. Neither recruits' "Daily Observation Reports" nor patrol officers' performance reviews evaluate engagement with the community, and success in utilizing community policing strategies is not a criteria for promotion. Apart from NONPACC meetings, the Department does not report on community partnerships; or evaluate or measure how these meetings and partnerships help identify and effectively respond to public safety problems. COMSTAT, the weekly crime meeting that the Superintendent opened to the public in May 2010, has the potential to serve as a useful tool to hold commanders and supervisors accountable for implementing community policing. Although some of the CoCo sergeants reported that they now attend and present at COMSTAT, our observations of COMSTAT meetings and review of COMSTAT materials confirmed that its predominant focus remains the recitation of crime statistics. The Department does not presently utilize COMSTAT as an effective means to gauge what specific efforts are being made to improve community relations, or how these efforts are aiding in addressing crime.

As discussed above, officers consistently reported that pressure to conduct stops and arrests diverts attention and resources from quality arrests, community engagement, and more considered problem-solving. One commander observed that community policing had become a "buzzword" in the Department but "we have to go to COMSTAT and produce. I can't say I went out and shook 2000 hands. If I said that, someone else would be sitting in this chair." We heard this sentiment repeated often in our conversations with both patrol officers and supervisors. One Lieutenant could recite crime statistics for his district for the previous week, but could not provide basic information about the demographics or businesses in the district.

The Department's deployment of personnel reflects this emphasis on arrests and statistics; staffing is heavily concentrated into specialized units and task forces, which engage in the crime suppression tactics that the Department calls "proactive policing," as opposed to uniformed patrol platoons, which handle calls for service. The Special Operations Division ("SOD") also functions as essentially a city-wide task force unit, in addition to handling more typical SWAT duties such as hostage situations, barricades, and high-risk warrant service. SOD patrols the City in full SWAT uniform and gear on a daily basis, an unusual practice with strong potential to project hostility and intimidation. Some within NOPD, including supervisors, acknowledged this potential, recommending that SWAT be used only for special deployments because of this dynamic.

The emphasis on statistics-driven policing leaves officers with less time or opportunity to constructively engage with the community. Arresting people in situations where a warning or a citation would serve a tantamount purpose takes time away from more important law enforcement needs. Indeed, the Metropolitan Crime Commission estimated that each of the 20,000 NOPD arrests last year on misdemeanor or traffic warrants took an hour to 90 minutes of an officer's time, or between 35,000 to 40,000 hours. For their part, platoon officers told us that

- 104 -

they spend their shifts traveling between calls for service throughout their districts, and are rarely able to cultivate relationships or meaningfully communicate with members of the public. Such dialogue is critical to identifying community problems and unique needs, gaining the trust of the public, determining strategic deployment of resources, and problem- and crime-solving. The Department plans to conduct a staffing allocation analysis, which should help identify whether such issues exist and how to re-deploy personnel to address them. It is critical that in conducting that review, the Department align its assessment with a community policing philosophy.

D.     Lack of Systematic Problem-Solving

The third major component of community policing involves proactive problem-solving, executed in a systematic and routine manner. COPS defines problem-solving, in the context of community policing, as follows: "Rather than responding to crime only after it occurs, community policing encourages agencies to proactively develop solutions to the immediate underlying conditions contributing to public safety problems. Problem-solving must be infused into all police operations and guide decision-making efforts. Agencies are encouraged to think innovatively about their responses and view making arrests as only one of a wide array of potential responses. A major conceptual vehicle for helping officers to think about problem solving in a structured and disciplined way is the SARA problem-solving model."

With the exception of just a few officers in command positions, those within NOPD were uniformly unfamiliar with proactive problem-solving methodologies and concepts. The district task forces are charged with carrying out "proactive" duties for the Department, yet their singular focus is on making arrests and cooling crime "hotspots" in a fundamentally reactive manner. Several officers observed that to date, NOPD's proactive efforts have not yielded sustainable change in volatile neighborhoods, yet the Department continues to repeat the same enforcement cycle. Daily deployments of resources appear to depend largely on the previous day's reports or tips received, rather than on any effort or plan to address identified trends and patterns. Although the Department has technologies like density mapping and visual mapping at its disposal, we did not see task forces using them to forecast crime patterns. Moreover, there is virtually no coordination among specialized units or process to avoid conflicts in operations, and uniformed patrol officers are largely unaware of what tactical units are doing in their districts, creating potential officer safety issues.

We also found that NOPD does not provide adequate direction, incentive, training and opportunity for uniformed patrol officers to engage constructively with the community. Officers have generally not been assigned to fixed geographic areas within their districts, although one commander, who was well-versed in the fundamentals of community and problem oriented policing, did say he had recently begun keeping patrol officers in specific zones. Some districts have also implemented walking beats, although their use appeared to be sporadic and subject to factors like manpower and weather. Patrol officers are viewed, and view themselves, as responsible strictly for responding to calls for service, and not for watching and listening to identify and assess problems within neighborhoods.

Although COMSTAT has the potential to advance problem-solving efforts, the Department does not currently use it for that purpose. COMSTAT does not encourage a

collective mission of reducing crimes in neighborhoods while minimizing friction and confrontation with citizens.  We observed no exploration at COMSTAT of issues underlying crime, potential collective solutions, or how to strategically align resources Department-wide to address a common crime problem.  We saw very limited use of crime mapping or similar technologies to visualize trends and patterns, other than to display number and location of arrests.  Additionally, we saw no evidence that the Department utilizes COMSTAT to hold supervisors accountable for their officers' performance – either to promote the use of community and problem-oriented policing strategies, or to identify performance and integrity issues.

## XII.    OFFICER ASSISTANCE AND SUPPORT SERVICES

Officer assistance and support services are a significant component of a department's accountability system.  The demeanor, judgment, and physical abilities that make an officer effective in carrying out law enforcement duties can be dangerously impaired when officers work under inordinate stress levels or while grappling with symptoms of mental illness.  Police executives owe a duty to their community and officers to provide the services necessary to ensure the mental and physical wellness of their officers.  NOPD is failing to provide such critical officer assistance and support services.

Stress is not an excuse for police misconduct, but officers who are mentally and physically fit generally are more productive; use fewer sick days; and importantly, may receive fewer complaints regarding demeanor or use of force.  There is little question that NOPD is in need of officer assistance and support services.  We repeatedly received reports of NOPD officers' unsuccessful efforts to seek out stress and mental health counseling.  Supervisors and command staff reported that officers have approached them with questions about the availability of services.  Representatives of the local chapter of the FOP and other law enforcement associations and training organizations relayed stories of NOPD officers seeking services.  Officers expressed to us directly their frustration about the lack of stress and mental health counseling available to officers and their families.

Some of the need relates to the daily stressors of police work.  There is also a continuing need to address the effects of NOPD officers' experiences during Hurricane Katrina.  An April 2006 report by the Centers for Disease Control found that one in five NOPD officers self-reported symptoms of Post-Traumatic Stress Disorder ("PTSD").  More than one in four NOPD officers self-reported symptoms of major depression.  And reminders of Katrina still remain throughout the City.  Many officers patrol areas devastated since 2005.  A NOPD mental health professional speaking of PTSD noted:  "Where's the 'post' to this?  The effects of Katrina haven't ended, they go on and on."

There are few officer assistance and support services provided by NOPD, and those that exist are uncoordinated and difficult to access.  Mental health counseling to help officers and their families combat stress and cope with traumatic incidents, are available on an ad hoc basis at the District level, placing referral and approval control with the District commanders.  This lack of Department-wide direct access leads to less confidentiality and less accessibility, resulting in fewer officers seeking and obtaining services.

This lack of services forces officers, and associations like the FOP, to search outside of NOPD for stress and mental health treatment.  The FOP, for example, is working with the Southern Law Enforcement Foundation to develop a peer counseling program.  These services are potentially helpful and welcome, and NOPD's present leadership has appropriately embraced these efforts.  However, these nascent programs are not a substitute for a comprehensive range of officer assistance services.

NOPD currently contracts with two mental health professionals, a psychiatrist and a psychologist, both of whom focus primarily on conducting fitness for duty ("FFD") evaluations on behalf of the Department.  These FFD evaluators are often called upon to provide counseling and other support services.  FFD evaluations identify officers with potential psychological difficulties that may manifest themselves in inappropriate police behaviors, and are thus critical to helping a law enforcement agency ensure that its officers are able to serve safely and effectively.  Professionals conducting these evaluations owe a duty to the department and confidentiality to the officer generally is not guaranteed.  When the FFD evaluators provide other services to officers, they may have a conflict of interest between what is best for the officer and what is best for the department.  For this reason, both the American Psychological Association's Guidelines for Consulting Psychologists and the practice guidelines from the Police and Public Safety Section of the International Association of Chiefs of Police caution their membership to avoid assuming multiple roles with the same individual when at all possible.  Nonetheless, the mental health professionals performing NOPD's FFD evaluations recognize the unmet need in NOPD, and attempt to meet that need as best they can.

At NOPD, the potential risk caused by the dual role its FFD evaluators play is exacerbated by a lack of clarity about what services they are being asked to provide.  The FFD policy appears to be primarily focused on the use and or abuse of sick leave, not assessing the psychological fitness of employees.  Yet, the mental health professionals' contracts state that they should conduct FFD evaluations.  Without clear policies and protocols that clearly delineate professionals' roles and the services they are being asked to provide, the risk of conflicting duties and responsibilities is increased.

It appears that a comprehensive system of officer assistance and support services for NOPD officers has never been in place, and that efforts to create a system have been faltering, even after Hurricane Katrina underscored the need.  NOPD can better serve its officers and protect the public by implementing a centralized and comprehensive range of officer assistance and support services to address the stress and mental health needs of its employees.

## XIII.  INTERROGATION PRACTICES

Custodial interrogations can be an integral part of police investigations. They may lead to a reliable confession, often the most important piece of evidence in a case.  Even where they do not, they may result in leads that can be used to build present or future cases.  However in their eagerness to obtain the evidence needed to make a case, or sometimes due to a simple lack of knowledge about what the law permits or how to protect their cases, detectives may use methods that run afoul of the Constitution — running the risk that the wrong person will be prosecuted, or that the prosecution of the right person will fail because of unlawful tactics used during the

interrogation.  Ensuring that custodial interrogations are robust but not abusive, leading to strong evidence and legitimate convictions, not false confessions and thrown-out cases, requires that the detectives that conduct them have skill, strong training, and integrity — and can document the propriety of their conduct**.**

Custodial interrogation involves the questioning of suspects by law enforcement officers under conditions that the suspect would not feel at liberty to cease the questioning and leave.  *See Thompson v. Keohane*, 516 U.S. 99 (1995).  The Constitution provides certain protections to suspects during custodial interrogations, including the right to counsel and the right to remain silent.  *Miranda v. Arizona*, 384 U.S. 436 (1966).  Not only do suspects retain such rights during custodial interrogations, but law enforcement officers are required to warn suspects of their rights, and provide an opportunity for the suspect to exercise or waive their rights.  *Id.*  The warnings that law enforcement officers are required to provide — known commonly as *Miranda* warnings—require that the suspect "be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  *Id.* at 478-79.  The Constitution also provides suspects due process protections against coercive interrogation methods such as physical violence or the threat of physical harm; lengthy interrogations involving sleep and food deprivation; or lengthy incommunicado interrogations.  *Colorado v. Connelly*, 479 U.S. 157 (1986) (due process protections); *Stein v. People of State of New York*, 346 U.S. 156 (1953) (physical violence);  *Arizona v. Fulminante*, 499 U.S. 279 (1991) (threat of physical harm); *Ashcraft v. Tennessee*, 322 U.S. 143 (1944) (sleep and food deprivation); *Spano v. New York*, 360 U.S. 315 (1959) (lengthy incommunicado interrogations).

NOPD's custodial interrogation practices reflect many of the same problems we found throughout NOPD:  inadequate policies, poor or non-existent training, weak supervision and accountability, and inadequate facilities and equipment.  As a result of these problems, NOPD does not adequately use custodial interrogations to build cases.  NOPD detectives conduct relatively few interrogations and the interrogations they do conduct are desultory.  We did find practices that could facilitate and hide constitutional violations of criminal suspects' rights, as well as allegations that such violations in fact occur.  Our overarching concern is that as NOPD begins to focus more on building strong cases, and thus presumably will be conducting a greater number of interrogations, it runs the risk that many of these interrogations may be neither effective nor legal.  To ensure that this does not happen, NOPD should revise its interrogation policies and practices.

A.     Custodial Interrogations

Within NOPD, custodial interrogations are conducted by detectives assigned to specialized investigative units, such as Homicide and Sex Crimes, and by detectives assigned to the various Districts investigating property crimes and crimes of violence that do not involve homicides or sexual assaults.  Reportedly, patrol officers do not typically conduct custodial interrogations.  Instead, patrol officers will often conduct questioning before placing a suspect under arrest, thus removing the custodial aspect of the questioning and the necessity of *Miranda* warnings.  Such on-the-scene questioning by patrol officers is often brief.  In more serious cases,

as when a patrol officer responds to the scene of a major crime, officers are trained to defer questioning of a suspect to the responding detectives.

Interrogations are conducted in various NOPD locations, depending on the unit or detective conducting the interrogation. The Homicide Unit, for example, has two interview rooms, each equipped with video recording technology. Both rooms are adjacent to a monitoring room, in which the recording equipment is stored and observers can view the interior of the interview rooms. Similarly, the Sex Crimes Unit now has a dedicated interview room with video recording technology and a monitoring room. The various Districts, however, struggle with dedicated space for interview rooms. Most District interview rooms double as storage rooms. All of the Districts have audio recording capability, but few are equipped with video recording technology. District 8, for example, has video recording technology, but this is largely due to the efforts of the detectives in the District who have set up the system themselves. District 8 uses VHS tapes to video record interrogations, as opposed to digital recording, and the detectives usually bear the costs of purchasing the necessary tapes.

In New Orleans, NOPD detectives refer to the fact-gathering interview phase of a custodial interrogation as the "pre-interview" phase, and the interrogation phase as "the interview" or "the confession."[32] NOPD detectives do not employ the phrase "interrogation." In reality, there appears to be very little actual interrogation conducted during the "interview" or "confession" phase. Any interrogation, in the traditional sense of the word, is actually taking place during the unrecorded "pre-interview" phase, and "the interview" or the "the confession" usually consists of only the suspect's recorded statement. As one of the NOPD detectives explained the process, "the pre-interview is everything we do before we turn on the tape."

It appears that the interrogation process routinely employed by NOPD is not unduly lengthy. In fact, most interrogations are reportedly concluded in under an hour. Rarely do interrogations continue for several hours, and in no case could we find interrogations lasting a day or longer.

Homicide detectives said that they attempt to obtain statements from every suspect arrested. The Homicide Division does not, however, track the number of cases that involve confessions. Until recently, the Sex Crimes Unit did not conduct interrogations at all. The practice within that unit was not to conduct interviews of suspects. Sexual assault cases were thus built largely on the testimony of the victims, particularly in light of problems with NOPD's crime lab, as noted earlier. This practice has since changed and interrogations are now viewed as an important part of sex crimes investigations.

NOPD will at times utilize a Computerized Voice Stress Analysis machine ("CVSA machine") and a polygraph. While we did not find any NOPD statistics indicating how successful NOPD has been using these devices, we were told that, in one District, officers

---

[32] Ironically, the only unit not employing this terminology was the NOPD Training Division. The training personnel we interviewed had never heard the phrase "pre-interview," and the training materials we reviewed referred to "interviews" and "interrogations." This is further evidence of a larger NOPD trend, in which officers are taught during official NOPD training is contradicted by what they learn in the field.

primarily used the CVSA machine on "victims" where the officers suspected false reporting. We also noted that NOPD has very few trained examiners for either device.

Juveniles are rarely brought to NOPD District stations for questioning. Instead, juveniles are transported to the Juvenile Intake Unit, which is equipped with audio and video recording capability. Juvenile suspects are required to be accompanied by a parent or guardian during questioning. *Miranda* warnings are to be given to both the juvenile and the parent or guardian, and the juvenile is required to have adequate time to consult with the parent or guardian before choosing to invoke or waive his or her rights. Juvenile witnesses and victims are to be interviewed by trained forensic interview experts at a specialized facility in Children's Hospital.

B.      Problems with NOPD Interrogations

Our review found a number of problems with NOPD's interrogation practices. We found that NOPD's policies about what constitutes a constitutional interrogation are inadequate, as is NOPD's training and selection of detectives. NOPD practice further undermines the effectiveness and integrity of NOPD interrogations. Audio and video recordings of interrogations reflect that detectives do not conduct, or at least record, a full interrogation. Documentation of interrogations is poor due to a number of deficient practices and systems, including that: most of the Districts lack dedicated space and video recording equipment; officers only record a final summary statement by subjects and/or witnesses; officers generally destroy notes from unrecorded portions of interviews with subjects and witnesses after completing investigative reports; and taped interviews in the Districts are preserved inconsistently, if at all. Taken together, these deficiencies not only undermine NOPD's efforts to build strong criminal cases, they could also facilitate and hide constitutional violations of criminal suspects' rights. Indeed, we found credible allegations that such violations have occurred.

The current NOPD administration and the broader New Orleans' criminal justice system appear well aware of the problems with NOPD's interrogation practices. The DA's Office recently began working more closely with NOPD detectives in order to improve interrogation practices and documentation.

1.      Flaws in Interrogation Policies

NOPD policies provide very little guidance on appropriate methods of conducting interrogations. There are several particular omissions in NOPD policies on interrogations worth noting. First, the policies fail to discuss the basic purpose and importance of conducting interrogations, or the risks of employing certain interrogation methods, including the danger of eliciting a false confession. Second, the policies do not provide any legal references or constitutional standards to place the rules and procedures of interrogation into context for the detectives. Third, the rules and procedures regarding adherence to legal safeguards are inadequate, failing to, *inter alia*, address the rules and procedures to be followed when a suspect invokes constitutional or other legal rights, or how prosecutors' discovery obligations impact how detectives document and retain records of their interrogations. Fourth, the policies do not include any express prohibitions on interrogation methods, such as physical violence or threats of

harm.  Finally, the policies do not address the importance of documentation of the interrogations, and do not set forth procedures for documentation.

### 2.     Insufficient Training and Selection Requirements for Detectives

NOPD does not adequately train or select detectives, impacting the quality of custodial interrogations.  NOPD provides very little formal training to its detectives regarding custodial interrogations.  We were told that during recruit training at the NOPD Training Academy, police recruits are taught basic differences between a police interview that seeks information about a crime, and a police interrogation that seeks to obtain a confession from a suspect.  Legal issues involving *Miranda* warnings and waivers are reportedly also covered during basic recruit training.  There is, however, no NOPD training specifically tailored for detectives conducting interrogations.  Any training detectives receive is usually conducted through private outside courses.  Using outside training courses can bring in needed outside expertise, but supervisors should carefully examine all outside training because some courses and instructors overstate their effectiveness, and encourage techniques that may violate constitutional safeguards, or that create a risk of obtaining false confessions and unreliable information.

NOPD also has too few personnel trained to properly use CVSA machines and polygraphs.  NOPD does not provide adequate training to detectives on how to use these machines most effectively during an investigation, or on the dangers of overreliance on these machines.

The selection of detectives for Districts and specialized units appears inconsistent with policy and poorly understood throughout NOPD.  It appears that to be a District detective, an officer must have at least two years of experience on the job, but this rule does not appear to be strictly enforced.  One detective interviewed knew of several officers selected for detective immediately following their post-academy field training.  Applicants for District detective positions do not undergo any special selection process or application procedure.  For specialized units, such as the Homicide Division, the minimum experience is five years, but this rule too seems to be subject to exceptions.  Specialized units require supervisor recommendations and samples of the officer's investigative reports.

### 3.     Failure to Conduct Full and Complete Interrogations

NOPD does not conduct interviews and interrogations in a manner sufficient to build strong cases.  Prosecutors attribute NOPD's failure to conduct full interrogations to a lack of ownership for the prosecution of a case after a suspect is arrested.  Defense attorneys agreed with the notion that NOPD is driven by arrest statistics, but suggested a different reason for NOPD's lack of post-arrest interrogations:  a desire to avoid discovering exculpatory information during the interrogation that would interfere with the arrest or prosecution of the suspect.  Our finding that NOPD only conducts interrogations post-arrest and does not expend much legitimate effort to obtain confessions or investigative leads from interrogations, is consistent with both explanations.

### 4.    Deficient Documentation of Interrogations

NOPD does not adequately document its interrogations.  *Miranda* warnings are reportedly provided at the start of the "pre-interview" and waivers are obtained prior to questioning.  The "pre-interview," which appears to include the bulk of what would, under normal practice, be considered the interrogation, is not recorded with audio or video recording by NOPD detectives.  In fact, the "pre-interview" is rarely documented in any significant manner at all.  This means that any interrogation techniques and methods employed by the detectives during the "pre-interview" are not recorded or documented, making it difficult both to confirm that detectives are conducting proper pre-interviews, and to defend proper conduct when it is questioned.

The only video or audio recording appears to be that of "the interview" or "the confession."  The recorded "interview" or "confession" in cases where the suspect is willing to make a statement is usually just a summary statement by the suspect of what was discussed during the "pre-interview."  *Miranda* warnings are provided again at the start of the recorded confession.  Documentation of the entire process is limited to a report prepared by the detective taken largely from the detective's notes from the interrogation process.  In a practice our experts found particularly concerning, it is routine for NOPD detectives to then destroy their notes after preparing the report.

In addition to the audio or video recording, NOPD policy requires that recordings be transcribed.  In the Homicide Division, an administrative staff completes the transcriptions, but in the Districts, this responsibility falls upon the detectives.  The policy requiring the transcription of all recordings provides a strong incentive for detectives to limit the length of the taped portion of interrogations, or to not tape interrogations at all.  Retention of the audio and video recordings depends on the unit and the storage space available.  In the Homicide Division, the original recording is processed into evidence, a copy is provided to the DA's Office, and another copy is retained in the Division.  In District 8, however, a lack of storage space prevents regular and systematic retention of the recorded video tapes in the District.  Some Districts, and some rooms in the Homicide Division (due to equipment in disrepair), lack the capability to video record interrogations, further undermining good documentation and potentially impacting the decision whether to conduct an interrogation.

### C.    Allegations of Constitutional Violations

NOPD employs practices that could facilitate and hide constitutional violations of criminal suspects' rights.  We heard allegations that such violations do in fact occur, although we did not confirm them.  According to well-regarded criminal defense attorneys, apparent constitutional violations frequently encountered in NOPD interrogations include:  investigators waiting until incriminating statements are made before advising suspects of their *Miranda* Rights, rather than providing the rights at the start of the interrogation process; threats made during interrogations—most commonly against family members, such as threatening to "go to grandma's house, knock down the door, and search for drugs," or threats to women that they may lose their children to social services if they do not cooperate, or to spread a rumor in the suspect's neighborhood that the suspect is a snitch; and questioning that continues even after the

suspect tells the interrogator that s/he does not want to talk anymore.  Other allegations of improper interrogation tactics include promises of leniency, and, in juvenile cases, telling children, incorrectly, that their guardians have waived the suspect's *Miranda* Rights, and that is all that is required.

## XIV.  COMMUNITY OVERSIGHT

The City of New Orleans and NOPD have a long history of community engagement, including efforts to provide effective civilian oversight of the Department.  For decades, the City's Office of Municipal Investigation served as an alternative to NOPD's PIB, accepting and investigating individual complaints of misconduct against NOPD officers (and other City employees), before it was defunded in 2008 after years of concern about its viability and effectiveness.  A thoughtful and comprehensive report in 2001 by the Police-Civilian Review Task Force, which was comprised of well-regarded and prominent community advocates as well as NOPD representatives, considered whether and what type of civilian oversight might be appropriate for NOPD.  The Task Force determined that an Independent Monitor, who would review policies, procedures, complaint patterns, and the quality of complaint investigations, as well as make regular reports to elected officials, NOPD and the public, would "create the impetus and the focus for correcting problems," "empower citizens with the information necessary to effect change," and would in this way "increase the ability of citizens and the NOPD to identify, address, and correct problems, thereby improving the department and building citizen confidence and support."  *Report of the Police-Civilian Review Task Force* at 5.  As noted in the Task Force report, this type of "quality control monitoring," has been used in other communities and has had beneficial results.  *Id.* at 6.

Nearly a decade after the Task Force's recommendation, in August 2009, New Orleans created the Office of the Independent Police Monitor ("IPM") as an independent, civilian police oversight agency.  According to the IPM, its mission is to:  improve cooperation and trust between the community and NOPD through objective review of police misconduct investigations; provide outreach to the New Orleans community; and make thoughtful policy recommendations to the NOPD and the City Council.  The IPM lists as its specific responsibilities:  ensuring that all concerns regarding police misconduct are classified and investigated at the appropriate level and that those investigations are fairly, timely and thoroughly handled, and making this information available to the public; carefully considering aggregate data from complaints, investigations, community concerns and public policy in crafting recommendations aimed toward improving the quality services of the NOPD; reaching out to inform the community about the complaint process and IPM activities; and listening and responding to broader community concerns.  The IPM recently reached an agreement with NOPD to help ensure it has access to the information it needs to fulfill these responsibilities.  Last year, the IPM volunteered to use its own funds to develop a new early warning system for NOPD, and is currently working with NOPD to implement this new system.  We have met with the IPM's Police Monitor several times and have been impressed with her dedication to building genuine reform and a constructive relationship with NOPD and the community.

In addition, with assistance from DOJ's Community Relations Services, community leaders in New Orleans have contributed significant time and effort to develop a community

advisory board in conjunction with NOPD and the Mayor's office.  This board would serve as a sustainable mechanism for ongoing dialogue to understand and address concerns from the community as well as opportunities for the community and police department to work together to achieve common goals.

There are myriad types of civilian oversight and each is capable of improving police-community relations, preventing unconstitutional conduct, and helping to ensure a constructive response when such misconduct does occur.  Because the type of oversight appropriate for any given community is circumstantial, deference should be given to the oversight mechanisms a community has chosen for itself.  Regardless of the type of oversight chosen, it is critical that oversight mechanisms be sufficiently resourced and empowered.  We have some concern regarding whether the IPM has sufficient resources to carry out its duties and it remains to see whether it will be given sufficient latitude in practice to be effective.  While still in a nascent change, we are encouraged by the development of the community advisory board and hopeful that this will be an important bridge in communications between NOPD and parts of the community most concerned about police misconduct.

When combined with practices that ensure appropriate transparency in police department decisions related to misconduct and tactics, and with tools to measure, assess, and respond to changing community attitudes towards policing over time, civilian oversight can help create a powerful form of community engagement that will ensure that reforms are sustained over time, even after court-ordered oversight has ended.

## XV.   <u>CONCLUSION</u>

The law governing officer conduct in many respects simply memorializes a basic code of ethics:  treat all individuals with dignity; treat people fairly regardless of their race, ethnicity, national origin, gender, sexual orientation, or religion; use only the force necessary to uphold the law and protect others and yourself; and act with integrity, honesty and diligence in enforcing the law.  The awesome authority we vest in law enforcement officers is contingent on adherence to these tenets.

Officers' dual responsibility to enforce the law even as they strictly abide by this code thus requires the responsible exercise of considerable discretion.  Too many officers at NOPD have chosen to exercise their discretion abusively or with little concern that their work effectively prevent crime.  This has been unfair both to the many officers within the New Orleans Police Department that act with diligence and selflessness each day, as well as to the people of New Orleans these officers are sworn to serve.  Until recently, City and Department leadership had largely acquiesced to wide-spread abuses by officers at all ranks.

The City of New Orleans took a critical step by choosing not to let the Police Department be defined by its past, and instead opening the operations of the Police Department for independent review and a public report.  This decision has already benefited the people of New Orleans by allowing for a fuller understanding of the systemic problems within the Department and the extent of the resulting harm.  This understanding serves as the foundation upon which to build a new Police Department that will prevent crime more effectively, serve all parts of the New Orleans' community more fairly, respect the rights of all New Orleans' residents, and better prepare and protect officers.  Past reform efforts underscore the need for long-term commitment and meaningful community engagement to fundamentally and permanently transform the Department in this way.  We look forward to working with the City, the Police Department and the broader New Orleans community to ensure that this effort is successful.

## APPENDIX

## Recommendations to the New Orleans Police Department

**Use of Force**

1.  Develop, train on, and implement an integrated and comprehensive set of use of force policies that are consistent with best practices and current law.  Policies should comprehensively address the use of force; alternatives to force; reporting force; and reviewing and investigating force.  Policies should provide clear guidance to all NOPD members who use force and observe uses of force, as well as supervisors and commanders who review and investigate force.  All force policies should guide officers on how to avoid even justifiable force where it is safe and effective to do so, through the use of de-escalation techniques and solid tactics.  This integrated set of use of force policies should include a primary use of force policy, as well as secondary policies specifically guiding the use of each type of force NOPD officers are permitted to use, including but not limited to ECDs, impact weapons, canines, and firearms.

2.  Ensure that use of force policies explain what approved weapons may be used for and provide clear guidance regarding the circumstances under which various types and levels of force may be appropriate, including the crime at issue; the subject's level of resistance; the danger to the officer and others; the context of the force, including location, the size and apparent or known physical condition of the subject, and similar circumstances; and how the officer uses the weapon.  An adequate force policy would thus, for example, state clearly that a baton is capable of inflicting lethal injuries, but may also be considered a lower level of force, depending on how it is used and the body part attacked.  Whether this measured force policy is termed circular, quadrant, staircase, matrix, graduated, situational, or a continuum, it must provide clear guidance to officers regarding appropriate behavior, to better enable them to use force properly and to provide clear standards to which they may be held accountable.

3.  Include input from high-level NOPD command representatives, as well as representatives from the Training Division, PIB, the City Attorney's Office, and community representatives in the use of force policy development process.

4.  Require officers to report all force above un-resisted handcuffing.

5.  Establish stringent penalties for officers who use or observe force and fail to report it, regardless of whether the force appears to be reasonable.

6.  Require all officers on the scene of a use of force to write a report documenting their actions and observations.  The report should include:  a detailed account of the incident from the officer's perspective; the reason for the initial police presence; and a specific description of the acts that led to the use of force; the level of resistance encountered; and the force that was used.

7.     Ensure that all force incidents are investigated by uninvolved superior officers.  The investigator should determine:  whether the subject's actions precipitated the use of force; whether the officer's use of force was proportionate to the subject's actions or resistance; whether the injuries sustained by the subject are consistent with the amount of force claimed by the officer; and whether the officers', witnesses', and subject's versions of events reasonably agree. Where they do not, the investigator should clearly describe the discrepancies and the evidence supporting different versions of events.

8.     Require investigators to collect and document all evidence—including officer and witness statements, and physical evidence, including but not limited to audio and video recordings, photographs and other documentation of injuries or the absence of injuries— to establish material facts related to the use of force.  If the supervisor cannot resolve a material discrepancy, elevate the investigation and require an immediate, on-site response by specialized force and/or misconduct investigators.

9.     Develop processes to review all uses of force, with the level and type of review tailored to the type of force used, the type of injury, if any, resulting from the use of force, and the particular circumstances of the incident.  For higher-level uses of force, including but not limited to officer-involved shootings, or where there is an in-custody death, develop and implement a process for more stringent criminal and administrative investigation and review.  Convene interdisciplinary force or roll out "teams," that include personnel specially trained in criminal and administrative force investigations, specially trained representatives of the Training Division, representatives of the City Attorney's Office, and others as appropriate, to investigate such uses of force from a criminal and/or administrative perspective.  Require these teams to determine not only whether the use of force was out of policy, but also whether it presented tactical, policy, training, or equipment concerns.  Require a senior commander, as part of this team, to immediately respond to the scene of the incident and take command of the inquiry.  This interdisciplinary group should report to a high level group of senior officers, sometimes called a use of force review "board," that should review investigatory findings and make disciplinary, policy, training, tactical, and equipment recommendations to the Superintendent as appropriate.

10.    Significantly increase mandatory recruit and in-service use of force training.  Include tactical, legal, and ethical training in all types of force NOPD officers are permitted to use, as well as training in de-escalation and other techniques to avoid the use of force where it is safe and effective to do so.

11.    Collect and maintain use of force data and analyze this data to identify trends and develop policy, training and operational recommendations.  Consider all recommendations that result from this analysis and adopt them where appropriate.  Document the decision not to adopt a recommendation and reason for the decision.  At least annually, report to the public findings from analyzing the previous year use of force data and the steps taken to correct problems and build on successes.

12.    Develop, train on, and implement a policy on the use of canines that is comprehensive, legally sound, and consistent with best practices.

13.     Significantly improve and increase mandatory training of canines and their handlers. Training content and frequency should be consistent with best practices.  No handler or canine should be deployed unless the handler and canine are current on all training requirements and the canine is fully controllable during exercises.

14.     Collect and maintain all records on canine training, deployment, apprehension, and bites. Analyze canine-related data to develop, consistent with best practices, training and operational recommendations for individual dogs, handlers, and the unit as a whole.

15.     Establish procedures for auditing canine training, deployment, and administrative documentation, to be performed by an entity outside the Canine Unit.

16.     Develop, train on, and implement a policy on the use of force by SOD, including clear guidance on what tactics are permissible for the service of each type of warrant, and when SOD or other units will be used to serve warrants and perform other police functions.  This policy should be comprehensive, legally sound and consistent with best practices.  SOD should not be deployed for routine police work.

17.     Require SOD to document its activities in detail, including preparing plans and after-action reports.  Require review of SOD activities and deployments to identify any policy, training, or tactical concerns raised by the action.

18.     Incorporate discussion of uses of force, including trends, arrest/force ratios, and outliers during weekly department-wide COMSTAT meetings.

19.     Promptly input all force data into the early warning system.  Develop and implement policy to ensure the early warning system functions as a source of real-time information that assists line supervisors and commanders in identifying officers in need of closer supervision or particular interventions.

20.     Tailor interventions based on early warning system data to the specific problem presented, and monitor and refine the intervention as necessary until the problem is resolved.  The early warning system should be used to identify use of force outliers, determining whether the aberration is meaningful and requires correction, and monitoring interventions to determine that any use of force problems have been resolved.

**Stops, Searches, and Arrests**

1.      Institute mandatory and comprehensive Fourth Amendment training, at the Academy and annually, for all officers.  The training should include lectures as well adult learning methods that incorporate role-playing scenarios, where officers then prepare written reports to gauge comprehension of law.  Classes should be taught by a competent legal instructor with significant experience litigating Fourth Amendment issues.

2.      Institute policies and procedures to collect data on and to review stops and arrests to identify problem areas and ensure high quality arrests, searches and seizures that result in prosecutable cases.

- 3 -

3.      Include Districts' conviction rates and disposition of important cases at COMSTAT meetings.  Establish a formal system to coordinate with the DA's Office for input regarding the quality of the arrests by NOPD and to make operational changes based upon this input.

4.      Establish clear and comprehensive guidelines controlling the preparation, use and preservation of FICs.  The policy should dictate when it is mandatory, rather than discretionary, for officers to prepare a FIC, and guide officers in the use of completed FIC information.

5.      Revamp FICs to make them an analytically useful tool for both crime suppression and statistical analysis.  The cards should include the suspected crime relevant to any *Terry* or probable cause stop.  The cards should have a short narrative for the officer to list the facts that establish probable cause or articulable suspicion, and should include the length of time of the stop.  They should also include a comments section for the officer to list any investigative findings.

6.      Ensure that FIC information complies with all Federal and State privacy standards.

## Discriminatory Policing on the Basis of Race, Ethnicity, and LGBT Status

1.      Develop and implement policies that specifically and comprehensively address and prohibit discriminatory policing, including bias-based profiling.  The policy should clearly outline the very limited, suspect-specific circumstances in which officers may consider race, ethnicity, gender, LGBT status, religion, or national origin in discharging their duties.

2.      Provide coordinated training – academy, field, and in-service – that sends a clear, consistent and emphatic message that bias-based profiling and other forms of discriminatory policing are prohibited.  Include instruction on data collection protocols, relevant legal and ethical standards, how to handle stops effectively, and diversity and cultural awareness.  Provide training in how stereotypes and implicit bias may infect police work, making it less safe, less effective, alienating communities and violating the rights of individuals.  Provide training to supervisors and commanders in how to detect and respond to bias-based profiling and other forms of discriminatory policing.

3.      Begin collecting and analyzing data related to race and ethnicity of subjects of law enforcement actions, including:  traffic stops; pedestrian stops; searches; arrests; and uses of force.  Consider and implement operational changes based on this analysis. At least annually, report to the public findings from analyzing the previous year stop, search, and arrest data and the steps taken to correct problems and build on successes.

4.      Capture and track complaints alleging racial and other bias-based profiling, along with characteristics of the complainants.

5.      Develop and implement policies and protocols for responding to employees, units, assignments, or other components, that indicate a pattern of biased policing.  Consider

complaints of bias-based profiling and other potential indicators of biased policing in the Department's early warning system.

## Services for Limited English Proficient Communities

1.   Establish a language assistance plan and policy that outlines such critical functions as: determining the number of LEP individuals within NOPD's jurisdiction; collecting and recording the number of LEP victims and witnesses who seek NOPD services; interrogating and interviewing LEP individuals; responding to and tracking citizen complaints filed by LEP individuals; identifying and training multilingual staff; and training all NOPD personnel on providing language assistance services to LEP individuals.

2.   Communicate the language assistance plan and policy to police personnel, the City of New Orleans Human Relations Commission, and to the community, and provide training to personnel on the policies and the requirements of Title VI.  The communication plan should include outreach to organizations representing LEP individuals.

3.   Identify and translate official documents that are subject to public dissemination into Vietnamese and Spanish, at a minimum.

4.   Prioritize recruitment of qualified bilingual personnel and provide incentives for assuming interpreter or translator duties for the Department.

## Sexual Assault Investigations

1.   Revise policies and procedures governing response to and investigation of sex crimes, including specific guidelines covering:  the respective duties of patrol, investigators, and supervisors;  initial and follow-up victim interview protocol; collaboration with victim advocates; protocols for forensic examinations of victims; suspect interviews and forensic examinations; evidence preservation and crime scene management in the sexual assault context; and services/assistance to be offered to victims.

2.   Require training for sex crimes detectives in topics including: overcoming the perceptions of false/unfounded allegations to successfully investigate non-stranger sexual assault; drug and alcohol facilitated sexual assault; victim interviewing skills; realistic dynamics of sexual assault; victim impact; report-writing; and discovery.

3.   Require training for patrol/unformed officers with a focus on the dynamics of sexual assault; report writing, victim interviewing, and initial assessment of victim and crime scene.

4.   Incorporate the recommendations of the National Protocol for Sexual Assault Medical Forensic Examinations (Adult / Adolescents), and other recognized criminal justice model policies, procedures, and training in the development and implementation of policies and procedures.

5.  Require patrol/uniformed officers to document calls for service involving sexual assaults, including their own observations and all actions taken, and any statements of victims, witnesses, and reporting persons.

6.  Implement more thorough and regular systems to audit and ensure accountability in the classification and reporting of sex crimes.  The decision to code a report as a miscellaneous complaint should be submitted to a supervisor for close secondary review.

7.  Develop an understanding of the language and best policies regarding the definitions of "unfounded," "false," and "baseless" in the context of sexual assault.  Track these different types of conclusions separately so that the agency can easily report them.

8.  Separately track and account for all felony sexual assaults, including those offenses not included in UCR counts, *e.g.*, Drug Facilitated Sexual Assault, Sexual Assaults involving persons with disabilities unable to consent, sodomy, and male victims of sexual assault. Collect data on the final disposition of investigations, including whether the DA charged the suspect, and if so, whether the case was eventually dismissed, pled, or tried, and the final outcome.

9.  In non-stranger sexual assault cases, where there is no belief that the suspect presents a danger to the victim or the community, may flee the jurisdiction of the court or destroy evidence, NOPD should consider delaying arrest so that the investigation can fully support prosecution.  Such delay, when circumstances warrant, permits detectives to build a detailed and complete investigation.  The Department should educate advocates and the public that this is a best practice for ensuring that police provide prosecutors with thorough and professional investigations.

## Domestic Violence Investigations

1.  Revise policies and procedures to include specific guidance for initial and investigative response to domestic violence, including:  911 dispatch procedures; initial entry and preliminary investigation of scenes; identifying and documenting victim injuries; referral of all victims to the NOFJC; and procedures for follow-up investigations.

2.  Implement the law enforcement "Integrated  Protocol" developed by the NOFJC, and review and update protocols regularly.  Continue collaboration with community providers to ensure that policies and protocols remain victim-centered and effective.

3.  Assign sufficient staff to the Domestic Violence Unit at the NOFJC to permit detectives to conduct appropriate follow-up investigation, including field work and coordination with the DA's Domestic Violence Prosecution Unit.

4.  Provide mandatory training to officers and detectives responding to reports of domestic violence.  Specific training on identifying the primary aggressor in mutual combat situations, interviewing witnesses and suspects, and responding to and investigating strangulation in the context of domestic violence is strongly urged.

5.      Track dispositions of domestic violence investigations.  Such tracking should not stop at the point of an arrest, but should include information on whether the DA charged the suspect, and if so, if the case was eventually dismissed, pled, or tried, and the final outcome.

## Recruitment

1.      Refocus the Recruitment Unit on the primary goal of recruitment of high quality applicants who share the Department's values and can help it achieve its mission.

2.      Remove the background investigation function from the Recruitment Unit.  Place the Unit under the direct supervision of a Deputy Superintendent or similar level of management to ensure accountability.

3.      Task the Recruitment Unit with developing a plan for recruitment that will identify the skills and abilities NOPD needs, including, for example, the ability to think strategically, complex cognitive problem solving skills, interpersonal communication skills, capacity to use technology, emotional maturity, and the ability to collaborate with a diverse cross-section of the community.

4.      Develop clear and understandable goals for the Recruitment Unit that require maintaining detailed records and reporting of its activities.  Establish scheduled reviews of the Recruitment Unit and its personnel to ensure productivity.

5.      Staff the Recruitment Unit with full-time recruiters, as well as part-time recruiters who can be temporarily reassigned from elsewhere in the Department.  Establish job-related qualifications for members of the Recruitment Unit, and make Department-wide announcements for openings in the Unit to ensure qualified Unit members.

6.      Provide Recruitment Unit members with specific training for recruiting a qualified and diverse work force, including training on employment and discrimination law.

7.      Establish significant and sustained relationships with various institutions and community organizations that can serve as the source of qualified and diverse applicants.

8.      In conjunction with the Civil Service Commission, develop a recruitment process and testing procedure that addresses barriers for out of town applicants.  This process should permit initial testing, i.e. civil service exam, agility test, and psychological tests, to take place at the recruitment site.

9.      Explore and implement measures to better attract and reward individuals with fluency in languages other than English.

## Training

1.      Establish an executive training education task force to advise the Superintendent and identify global training priorities and broad training goals.  Include both law enforcement officials and community representatives as members.

2.      Consider establishing a public safety training consortium to provide expertise in creating training strategy, course topics, curriculum development, classroom/facility use, and instructor-development.

3.      Ensure that training priorities and goals reflect and incorporate NOPD's commitment to transforming the Department and incorporating community/problem-oriented policing into all aspects of policing.

4.      Make the Training Division the central coordination point for all NOPD training, including but not limited to recruit, in-service, use of force (firearms), roll call, leadership, special mission unit, and elective training.  The Training Division should also be responsible for tracking, maintaining, and reporting detailed, real-time training records and statistics.

5.      Develop an electronic database to create and maintain records for each recruit and each sworn and unsworn member of the Department, including a standard electronic training record and electronic copies of certificates and other materials.

6.      Create a full-time Department-Wide Training Liaison position within the Training Division, to coordinate training activities with designated liaisons in every police district and organizational unit.

7.      Establish a formal training curriculum development process that incorporates command staff input, recent research, subject matter expertise, and City Attorney review.  Require a full-time, specially-trained Curriculum Developer to formalize all curriculum development for the Department.  Develop written curricula for every training topic.

8.      Increase the number of hours allotted for training in priority subject matter areas, including use of force; the exclusionary rule; and weapons recertification.

9.      Establish eligibility criteria for all staff assigned to the Training Division, and conduct regular (at least annual) reviews of Training Division staff and adjunct instructors to ensure that they meet the delineated criteria.

11.     Provide tailored annual training to Training Division staff and adjunct instructors, including training on effective teaching, adult-learning techniques, and curriculum development.

12.     Consider designating a large enclosed climate-controlled area for physical training activities, such as defense tactics, ground fighting techniques, and baton requalification, as well as CPR recertification.  Provide ready access to a safe, modern, firing range to ensure sworn officers receive appropriate firearms training.

13.     Maintain recruit class sizes of no more than 25-30 candidates per class.  Hire candidates on a rolling basis and place them in non-sworn support roles until the desired class size is attained.

14.     Require the Training Division to develop a Field Training Program Manual that describes the policies and procedures for the field training program.

15.     Establish eligibility criteria for Field Training Officers and Field Training Sergeants, and conduct regular (at least annual) reviews of FTOs and Field Training Sergeants to ensure that they meet the delineated criteria.  Give the Training Division authority to remove any FTO or sergeant from the program.

16.     Provide a tailored annual field training officer/sergeant curriculum.

17.     Create a mechanism to actively elicit feedback from recruits regarding the quality of their field training, including the extent to which their field training was consistent with what they learned in the Academy.

18.     Establish a mandatory annual in-service training program of at least 40 hours.  Identify critical in-service training topic areas based on analysis of officer safety issues, input from members at all levels of the Department, input from members of the community, community complaints, use-of-force statistics, internal affairs statistics, court decisions, and research reflecting the latest law enforcement trends.

19.     Create tailored training tracks for command staff (captains and above); lieutenants and sergeants; detectives; narcotics and gang investigators; special mission units (SWAT, Task Force, Drug Enforcement, etc); and FTOs.  Create a customized 40-hour training program for new promotees to all ranks, and develop upper-level managers and executives by supporting participation in executive development programs.

20.     Strategically plan a daily roll call schedule consisting of brief training sessions conducted by the roll call sergeant at the beginning of each tour of duty.

## Supervision

1.     Develop and implement policies for supervision that set out clear requirements for supervisors and are consistent with best practices regarding span of control and unity of command.

2.     Develop and implement supervisory training of no fewer than 40 hours that each supervisor must complete before becoming a supervisor.  This mandatory training should include:  training in how to effectively direct and guide officers; legal standards and requirements; building community partnerships as a supervisor; reviewing officer uses of force; conducting investigations of complaints of misconduct; how to use supervisory tools such as an early warning system, audio and video recording, and AVL.

3.     Develop and implement an annual in-service training program for supervisors of no fewer than 40 hours and provides all necessary updates and refreshers, as well as training in new skills.

4.     Ensure adequate allocation of field supervisors so that field supervisors work the same days and schedules as their subordinates and can directly supervise them by responding

to the scene, reviewing their reports, investigating their uses of force, responding to complaints of misconduct; and providing counseling, redirection, and support as appropriate.

5.     Consider whether some clerical duties currently assigned to supervisors should instead be assigned to civilian or non-supervisory staff.

6.     Ensure that the early warning system can be used as a supervisory tool.  Provide the policy, training, and administrative support to ensure that the early warning system is maintained and the information included in it is accurate and timely, and that supervisors know how to use it and are required to do so.

7.     Ensure that COMSTAT includes regular consideration and analysis of integrity-related data and the quality of arrests and train supervisors on how to use this information to provide more effective supervision and direction to their officers.

8.     Implement and maintain appropriate technology to assist officer supervision and accountability, including video and audio recorders and similar devices.

9.     Hold supervisors accountable for the quality and completeness of their supervision, including their review of officers' reports and uses of force.  Supervisory performance should be assessed in part on the productivity of their subordinates as well as their response to complaints received concerning their subordinates.

## Paid Details

1.     Immediately remake the Paid Detail system. In its place, create a single office that arranges, coordinates and monitors all officers' outside law enforcement employment.

2.     Underscore that the ability to work Details is a privilege.

3.     Increase officer accountability and oversight of the Detail system.

4.     Prohibit officers from soliciting Detail opportunities.

5.     Establish a system with appropriately stringent criteria that will fairly assign officers to work Details.

6.     Set Detail pay uniformly according to rank and include a reasonable fee that goes to the City to cover the expenses of the outside employment office, workers compensation, fuel, use of equipment, and any other actual or potential costs to the City.

## Performance Evaluations and Promotions

1.     With the City and its Civil Service Commission, determine the usefulness of applying the current City-wide performance evaluation system to the Police Department, and revise the current system or develop and implement a new one.

2.      Develop and implement an NOPD-specific, comprehensive system of evaluating employee performance.  This system should recognize that ethical and effective policing are intertwined and assess both, and should assess employees' productivity not only by stops, citations, and arrests, but also by employees' success at preventing crime, building strong, prosecutable cases, and fostering productive community relationships.  Performance evaluations should be integrated into ongoing supervision and should be documented.

3.      Ensure that all supervisors are trained in and held accountable for completing timely and ongoing performance evaluations of every subordinate.  Where an employee reports to more than one supervisor, or has had more than one supervisor during the rating period, all supervisors should provide written input regarding the employee's performance while under their supervision.

4.      In conjunction with the City and Civil Service Commission, make NOPD's promotions process more fair, transparent, and flexible, allowing for promotions of NOPD's most effective and ethical officers.

5.      Develop and implement promotional criteria and assessment tools to ensure that unqualified individuals are not promoted.  Ensure that NOPD promotional selection criteria communicate NOPD's values and mission, and result in the promotion of officers who most closely adhere to these values and are capable of carrying out NOPD's mission.  Require assessment of officers' community policing and problem solving efforts and abilities, as well as officers' professionalism, ethics, and integrity, as part of the promotions selection process.  Officers with a disciplinary history that does not comport with the behavior NOPD wants to model for other officers and the community should be disqualified from promotion.

6.      Advertise promotion opportunities widely.  Give promotion exams for every position at least every 18 months, and recommend for promotion only the number of candidates for which there appear to be likely vacancies during the period before the next promotional exam.

7.      Train all members and employees on performance evaluation and promotions policies that incorporate these recommendations.

## Misconduct Complaint Intake, Investigation, and Adjudication

1.      Revise and update all policies related to the intake, investigation, and adjudication of misconduct complaints, including policies guiding complaint intake and investigation by officers, field supervisors, and PIB staff.  Create protocols and directives for use by field and PIB investigators to improve investigative quality, thoroughness and consistency.

2.      Revise policy so that complaint classification is allegation-driven rather than outcome-driven, and so that all allegations of misconduct against NOPD officers are investigated and given a formal disposition of sustained, not sustained, exonerated, or unfounded.  The level of investigation should be tailored to the requirements of the case.

3.      Revise policy to ensure that allegations of misconduct related to arrests and discriminatory policing are investigated and specifically tracked.

4.      Provide significant and ongoing training to PIB investigators and managers, as well as to field investigators and their supervisors, including ICOs, in receiving, investigating, and reviewing misconduct investigations.  Train all officers in how to properly handle complaint intake, including strategies for turning complaints into positive police-civilian interactions, and the consequences for failing to take complaints.

5.      Clarify officer and investigator responsibilities related to misconduct complaint intake and investigation and hold all investigators and officers responsible for adhering to these directives.

6.      Staff PIB with sufficient trained staff to complete thorough and timely investigations within the timeframes mandated by law.  Create a PIB selection process that ensures that only officers with excellent investigative skills and who can fairly hold officers accountable become PIB investigators.

7.      Restructure the ICO position to allow ICOs to act more effectively as a liaison between the districts and PIB and as genuine accountability liaisons.  Hold supervisors and commanders responsible for preventing, detecting, and responding to misconduct.

8.      Ensure that allegations of misconduct made in civil and criminal lawsuits are identified and promptly investigated by the Department.  Establish a system to identify and investigate cases that are dropped for lack of probable cause, or instances where officers may have violated the law or policy, as identified by the DA's Office, the Courts, the PD's Office, or federal agents or attorneys working with NOPD.

9.      Implement systems to monitor and ensure that all allegations in a complaint are captured and investigated and that investigative reports accurately reflect the content of subject and witness interviews.  Ensure that PIB and other NOPD managers thoroughly review misconduct investigations, signing off only on those in which all material evidence has been gathered, and in which all findings supported by a preponderance of that evidence.

10.     Work with the State to modify the state law requiring that administrative misconduct investigations be completed within 60 days to allow for certain exceptions, such as where the alleged misconduct involves numerous officers or is particularly complex, or where evidence is newly discovered well into the investigation.

11.     Consider having higher level commanders, rather than investigators, make investigative findings.

12.     Update the Department's penalty schedule and enact policies to ensure its proper use (*e.g.* requiring that all deviations outside the prescribed range are documented in writing, and that exceptions to the stated range do not become the rule).  Revise the disciplinary hearing structure to ensure consistency and integrity.

13. Improve training for PIB investigators and commanders on New Orleans' civil service system requirements related to the imposition of discipline.

14. Document and explain the rationale for all disciplinary decisions. To ensure transparency in the system and ensure that decisions can withstand scrutiny, implement a requirement that all disciplinary decisions be within the range set out in the penalty schedule unless there is a justified and documented rationale for going outside the range.

15. The Civil Service Commission should post all its decisions in full, online, and in a timely manner.

16. Document the reasons for every decision to reverse an investigative finding as well as the reasons for accepting or changing any disciplinary recommendation.

17. The City Attorney's Office, which should play a larger advisory role at every stage of the investigative process, should in particular provide close guidance at the disciplinary stage to ensure that NOPD's disciplinary decisions are as fair and legally defensible as possible.

18. Implement a system to allow for the investigation of misconduct and imposition of administrative discipline prior to completion of criminal or civil suits against the officer. Enhance policies, protocols, and training to ensure bifurcation of criminal and administrative investigations. Develop protocol for referring allegations of criminal misconduct to an outside agency where appropriate.

19. Provide written guidance and training to ensure that investigators identify, seek advice, and refer where appropriate, allegations of criminal conduct.

20. The DA's Office should continue and expand its efforts to work with NOPD to ensure that criminal investigations are fair and thorough, and that officers who commit crimes are held accountable.

## Community Policing

1. Articulate, internally as well as externally, that the Department is adopting Community Policing as a philosophy, not as a series of projects or programs. Ensure that the community policing philosophy is reflected in the Department' mission statement and set of cores values.

2. Build the Community Policing philosophy into all aspects of the Department's operations, including policies and operating procedures, performance evaluations, incentives, recruitment, training, and promotional criteria.

3. Review and reassess staffing allocation and personnel deployment to ensure that they support community policing and problem-solving goals.

4. Implement a mandatory and robust training on community policing and problem-oriented policing methods, including training on contemporary approaches for all officers, to

include supervisors, managers and executives.  This training should focus on practical skills and ideally include a practicum out in the community.

5.    Require in-service training on skills that enhance the officer's ability to engage successfully in community policing, to include leadership, ethics, interpersonal skills, community engagement, crime prevention, conflict resolution, verbal de-escalation of conflict, and cultural awareness training.  Train officers on how to establish formal partnerships and actively engage community organizations, including building trust with special population groups such as immigrant communities and LGBT communities.

6.    As part of the effort to rebuild credibility in the community, encourage officer outreach to a broad cross-section of community stakeholders to establish extensive problem-solving partnerships and develop cooperative strategies that build mutual respect and trusting relationships.  Create a comprehensive community policing plan with community input that collaboratively identifies and implements strategies to address crime and safety problems.  Consider programs such as citizen academies in languages other than English.

7.    Develop measurements to assess the  effectiveness of the three tenets of community policing—partnerships, problem-solving and organizational transformation.

8.    Review and evaluate alternative COMSTAT models, with a focus on using COMSTAT to hold command staff and supervisors accountable for implementing community-policing strategies.  Develop skills, knowledge and abilities for the analyst function to enhance mapping techniques, such as predatory mapping and predictive policing to support COMSTAT and community policing efforts.

9.    Provide data and information to the public in a transparent and public-friendly format to the greatest extent allowable by law.  Revise the website to be user-friendly and provide more transparent data on the website from the community perspective, and in multiple language formats.

10.    Consider working with members of racial, ethnic, and language minorities, immigrant communities, and the LGBT communities to develop a mechanism that would allow for regular communication and cooperation between the Department, the City, and community leaders, such as through the development of a community advisory panel.

**<u>Officer Assistance and Support</u>**

1.    Design and implement a comprehensive range of mental health services for NOPD professionals through a centralized and adequately-staffed office.  The range of mental health services should include:  readily accessible confidential counseling services with both direct and indirect referrals; critical incident debriefings and crisis counseling; and stress management training.

2.    Provide the infrastructure for a peer counseling program (possibly in conjunction with neighboring jurisdictions), and incorporate mental health services into an overall department-wide health and wellness program.  To this end, consider establishing a fitness center where such wellness programs and trainings could be offered, and

mandating an annual physical exam for officers where wellness issues can be addressed and discussed on an individual basis with medical professionals.

3.   Use mental health professionals to enhance training of NOPD officers on avoiding excessive force. Topics that mental health professionals can address in such training should include: cultural sensitivity and diversity; intervention by fellow officers to stop the use of excessive force; the interaction of human perception and threat assessment; decision making under highly charged conditions; psychological methods of situation control; patrol de-escalation and defusing techniques that not only provide a tactical response, but also respond to the fear stimulated by confrontations; anger management programs that use self-assessment and self-management techniques for providing individual feedback to officers on how variable levels of legitimate anger influence judgment; and training in verbal control and communication, including conflict resolution. Provide academy and in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families.

4.   Ensure that mental health services to NOPD officers and their families are incorporated into any crisis response and emergency preparedness planning and actual response.

## Interrogations

1.   Revise interrogation policies to include discussion of legal standards and safeguards, as well as express prohibitions on certain interrogation methods.

2.   Revise interrogation policies to provide specific guidance on documentation of the interrogation process and discovery obligations of DA's Office.

3.   Revise and update interview and interrogation training for recruits.

4.   Formalize training for newly assigned detectives on interrogation procedures and methods. Include legal standards, ethics, and causes for investigative failures and false confessions in all interview and interrogations training.

5.   Require video recording of all phases of interviews and interrogations.

6.   Require that detectives maintain their notes taken during interviews and interrogations and provide copies of the notes in the case file to the DA's Office.

7.   Revise selection standards for detectives in Districts and specialized units, requiring an appropriate tenure on the job, writing samples, supervisor recommendations, and an interview for qualification.

8.   Enlarge the applicant pool for detectives by posting all detective openings throughout the Department.

9.   Provide regular training to all detectives on changes to the law regarding interrogations and confessions. Consider providing this training in partnership with the DA's Office and/or USAO.

10.   Designate interview rooms for all Districts and specialized units.  Equip all interview rooms with audio and video recording technology.

**<u>Community Oversight</u>**

1.   Work with the City and the City Council to ensure that the Office of the Independent Police Monitor possesses the authority and staffing necessary to fulfill its mission, and to further build upon this mission to ensure that the IPM is a truly independent, effective, and sustainable mechanism for police accountability.

2.   Work with a variety of community groups and individuals to develop additional mechanisms to ensure representative, active, and constructive community engagement in NOPD crime prevention and accountability efforts.

3.   Develop and implement mechanisms to ensure that NOPD data and decision making is as transparent as possible, including meaningful analysis and reporting of accountability and integrity related data and decisions.

4.   Develop and implement mechanisms, such as recurring community surveys, to assess recent experiences and current attitudes about NOPD among all communities throughout the City, and changes in these experiences and attitudes over time.