

# Special Report of the Consent Decree Monitor
# For the New Orleans Police Department Consent Decree
# on NOPD Background Investigation Practices

# January 18, 2017

**Office of the Consent Decree Monitor**
**New Orleans, Louisiana**
Sheppard Mullin Richter & Hampton, LLP
Appointed By Order Of The U.S. District Court For The Eastern District Of Louisiana

**EXHIBIT "C"**

Special Report
18 January 2017
Page 2



**Table of Contents**

Table of Contents ...................................................................................................................2

Glossary of Acronyms ...........................................................................................................3

I.     Introduction to Special Report ......................................................................................5

II.    Review Methodology ....................................................................................................6

III.   Summary Findings.........................................................................................................8

IV.   NOPD Background Investigation Process ...................................................................10

V.    Background Investigation Process Shortcomings .........................................................11

VI.   Recommended Action Items ........................................................................................14

VII.  Conclusion ...................................................................................................................20

VIII. Appendix:  List of NOPD Disqualifiers ....................................................................21

IX.   Appendix:  NOPD Corrective Action Plan..................................................................26

Special Report
18 January 2017
Page 3



## Glossary of Acronyms

| | |
|---|---|
| "ASU" | Administrative Services Unit |
| "AUSA" | Assistant United States Attorney |
| "AVL" | Automatic Vehicle Locator |
| "BI" | Background Investigation |
| "BWC" | Body Worn Cameras |
| "CIT" | Crisis Intervention Team |
| "CCMS" | Criminal Case Management System |
| "CD" | Consent Decree |
| "CIT" | Crisis Intervention Team |
| "CODIS" | Combined DNA Index System |
| "ComStat" | Computer Statistics |
| "COCO" | Community Coordinating [sergeants] |
| "CPI" | California Psychological Inventory |
| "CSC" | Civil Service Commission |
| "CUC" | Citizens United for Change |
| "CVSA" | Computer Voice Stress Analysis |
| "DA" | District Attorney |
| "DI-1" | Disciplinary Investigation Form |
| "DOJ" | Department of Justice |
| "DV" | Domestic Violence |
| "DVU" | Domestic Violence Unit |
| "ECW" | Electronic Control Weapon |
| "EPIC" | Ethical Policing is Courageous (NOPD peer intervention program) |
| "EWS" | Early Warning System |
| "FBI" | Federal Bureau of Investigation |
| "FIT" | Force Investigation Team |
| "FOB" | Field Operations Bureau |
| "FTO" | Field Training Officer |
| "IACP" | International Association of Chiefs of Police |
| "ICO" | Integrity Control Officers |
| "IPM" | Independent Police Monitor |
| "KSA" | Knowledge, Skill and Ability |
| "LEP" | Limited English Proficiency |
| "LGBT" | Lesbian, Gay, Bi-sexual, and Transgender |
| "MMPT" | Minnesota Multiphasic Personality Inventory |
| "MOU" | Memorandum of Understanding |



| | |
|---|---|
| "MSB" | NOPD Management Services Bureau |
| "NNDDA" | National Narcotics Detection Dog Association |
| "NOFJC" | New Orleans Family Justice Center |
| "NOPD" | New Orleans Police Department |
| "NPCA" | National Police Canine Association |
| "OCDM" | Office of Consent Decree Monitor |
| "OIG" | Office of Inspector General |
| "OPSE" | Office of Public Secondary Employment |
| "PIB" | Public Integrity Bureau |
| "POST" | Police Officer Standards and Training Counsel |
| "PsyQ" | Psychological History Questionnaire |
| "QOL" | Quality of Life [officers] |
| "RFP" | Request for Proposal |
| "SA" | Sexual Assault |
| "SART" | Sexual Assault Response Team |
| "SOD" | Special Operations Division |
| "SRC" | Survey Research Center |
| "SUNO" | Southern University of New Orleans |
| "SVS" | Special Victims Section |
| "UNO" | University of New Orleans |
| "USAO" | United States Attorney's Office for the Eastern District of New Orleans |
| "VAW" | Violence Against Women |

Special Report
18 January 2017
Page 5



## I.     Introduction to Special Report

In 2014, NOPD embarked upon a recruiting drive aimed at hiring a significant number of new sworn officers.  The Department engaged additional recruiters, increased officer pay, partnered with local businesses to enhance the quality of its recruitment program, removed what it viewed as road-blocks to hiring (*e.g.*, the college credit requirement), and expanded the frequency of applicant testing.  While the Monitoring Team shares NOPD's goal of improving its recruiting efforts and increasing its numbers, it is critical that NOPD undertake these efforts in a manner that ensures the men and women who seek to join the Department are qualified.

Ensuring NOPD hires a diverse collection of highly qualified and ethical officers is a critical component of the Consent Decree.  Although the NOPD's desire to increase its numbers is understandable, we are highly sensitive to the dangers of hiring without due consideration of the possible consequences of a hiring decision.  Most in the law enforcement community are well aware of the price the District of Columbia Police Department paid following its "hiring binge" in the late 1980s and early 1990s. *See, e.g., D.C. Police Paying For Hiring Binge*, WASHINGTON POST, (8/28/94). And DC is not alone in making that mistake.  Accordingly, the Monitoring Team views the integrity of NOPD's hiring process as an extremely high priority in the context of ensuring constitutional policing throughout the City of New Orleans.

To this end, on October 24, 2016, the Monitoring Team initiated a review of the Department's background investigation process to ensure the individuals being accepted into the Academy are "diverse[,] highly qualified, and ethical" as required by the Consent Decree.  (CD XI)  NOPD management supported the Monitoring Team's review from the outset, and cooperated fully throughout.  Indeed, as explained below, the NOPD Compliance Bureau assisted in certain elements of our Team's review.  Additionally, as issues emerged during our review, NOPD management consistently and promptly sought to understand the issues and take meaningful corrective action.

The Monitoring Team presented its detailed findings to Judge Morgan, the NOPD, and the U.S. Department of Justice Monday, December 12, 2016, and met with Judge Morgan and the NOPD Tuesday, December 13, 2016.[1]  To its credit, the NOPD came to the meeting with a well-thought-out corrective action plan in hand.  The plan was tailored to the Monitoring Team's findings and reflected a commitment to remedying the shortcomings identified by the Monitoring Team. Following feedback from the Monitoring Team and the Court, NOPD further reviewed its corrective action plan and resubmitted it to the Monitoring Team.  The final corrective action plan is incorporated into this Special Report at Section IX.[2]

---

[1]     The Consent Decree also requires NOPD to develop and implement "a system for psychological screening and assessment of all NOPD recruit candidates" that ensures that "only individuals suitable for policing are accepted into NOPD training academy."  (CD 238)  The Monitoring Team will be reviewing that issue separately.

[2]     Pursuant to Consent Decree paragraph 457, the Monitoring Team has removed all personal information from this final report.

Special Report
18 January 2017
Page 6



## II.    Review Methodology

The Monitoring Team's evaluation focused primarily on the background investigation ("BI") as a component of the recruit selection *process*.  It is not our purpose in conducting this review to opine on whether or not a given recruit is or is not qualified to become an NOPD officer.  To perform our review, we examined background investigation files for every recruit accepted into Classes 174-178,[3] reviewed those recruits' Academy records, and interviewed multiple NOPD employees, including current and former background investigators.[4]

NOPD's Hiring Criteria identify 13 causes for "automatic rejection" of an applicant and 16 causes for "possible rejection."  Causes for automatic rejection include a felony conviction, recent drug use, and refusal to submit to a polygraph, among other things.  Causes for a possible rejection include a felony arrest, dismissals from multiple employers due to disciplinary actions, and dishonorable discharges from the military, among other things.[5]

While NOPD uses the term "disqualifiers," the Monitoring Team uses the term "risk indicators."  The Monitoring Team does not take issue with those items currently included on NOPD's list of automatic and possible disqualifiers.[6]  Indeed, we used NOPD's combined list of required and possible disqualifiers as the core of our risk indicators.  While we use a different label, the basic concept is the same.  Risk indicators, or disqualifiers, refer to facts that would prompt a reasonable person to at least ask additional questions and/or conduct additional investigation about the candidate.  While we acknowledge some risk indicators (just as with some "possible disqualifiers") may be overcome in any given case by other countervailing facts and circumstances, they nonetheless suggest a potential risk that would prompt a conscientious person to seek out additional information.  Risk indicators justifying a rejection could involve multiple minor events that individually do not cause concern, but that collectively do.

---

[3]    Whether a candidate ultimately left the Department prior to graduation – on his/her own accord or the Academy's – did not impact our analysis.  The Monitoring Team reviewed the files of all candidates *accepted into the Academy* within our review timeframe, regardless of their subsequent employment status.  Accordingly, our identification of candidates with risk indicators included candidates who voluntarily had withdrawn from the Academy, candidates who had been removed from the Academy for disciplinary and/or achievement reasons, and two individuals who were arrested while in the Department's employ.  One of these identified recruits was arrested in October 2016 on charges of burglarizing a salon in Mandeville.  The other incident involving an identified recruit involved a recent Academy graduate who was cited and placed on emergency suspension for an alleged hit and run and the alleged filing of a false police report.

[4]    The Monitoring Team personally reviewed all recruit files for Classes 174, 177, and 178.  At our direction, the NOPD Compliance Bureau reviewed Classes 175 and 176.  The Compliance Bureau used the Monitoring Team's review protocol and evaluation forms for its review.

[5]    The full list of NOPD "required" and "possible" "disqualifiers" is set out in the Appendix to this report.

[6]    While we do not take issue with NOPD's list of disqualifiers, as described below, we do take issue with NOPD's seeming practice of overlooking "possible disqualifiers," failing to consider risk indicators that are not precisely on the list of disqualifiers but that nevertheless warrant additional due diligence at the least, and failing to document decisions and reasoning.

Special Report
18 January 2017
Page 7



When we identified facts that suggested potential candidate risks, we then looked to see how those risk indicators were dealt with by the NOPD.

When risk indicators are present, best practices would call for a robust review process to ensure a justifiable and consistent approach either to rejecting an applicant or overcoming these concerns. In our view, a reasonable process involves the following steps:

- *Identifying* risk indicators through a robust background investigation,

- *Evaluating* those risks through appropriately thorough due diligence,

- *Discussing* the risks with knowledgeable personnel and engaging in a meaningful dialogue as to whether the risks are mitigated by other facts and circumstances,

- *Considering* the totality of the information available for each candidate in a sensible, holistic fashion, and

- *Documenting* in a clear fashion the conclusion reached, the risk indicators identified, the mitigating factors, and the names of those who participated in the evaluation process.

The Monitoring Team looked for evidence of this approach in the files we reviewed.[7]

---

[7]     While we understand the process of conducting background investigations can be subjective, and the evaluation of new officers is not conducive to mathematical certainty, we do expect NOPD to have and to follow a process that is rationally tailored to identifying "diverse[,] highly qualified, and ethical" candidates and that weeds out candidates who are not qualified and/or are not ethical.

Special Report
18 January 2017
Page 8



## III.     Summary Findings

We find that NOPD's process for conducting background investigations of potential Academy recruits is not designed or implemented to ensure the Department makes offers only to highly qualified, ethical candidates with personality traits meeting the needs of a modern police department.  Of the 137 active Academy recruit files we reviewed over the past month, about one third (59) of the recruit files for applicants accepted into the Academy had documented risk indicators[8] without a corresponding explanation as to why or how those risk indicators were overcome.   Perhaps even more troubling, some files were marked as having no negative information even though the potential recruit clearly had multiple risk indicators.

While some of the risk indicators we identified were *relatively* minor – *e.g.*, marijuana usage more than two years ago – other documented risk indicators were more material.  The following list offers an illustration of the sort of risk indicators we identified in the files we reviewed:[9]

- Self-reported repetitive drug use that purportedly ceased immediately prior to the start of the two-year background investigation window,

- Terminations from prior employers,

- Multiple incidents involving a police report, including unpaid child support and domestic abuse,

- Deceptive use of mental illness to gain separation from an armed service,

- Prior NOPD arrests for intoxication and auto break in,

- Patterns of deception on the Computer Voice Stress Analysis ("CVSA"),[10]

- Multiple unsuccessful applications at other police agencies,

- Failing several other departments' standards/criteria,

- Unstable work history,

- Limited term driver's license,

---

[8]     As noted above, the Monitoring Team's term "risk indicators" is slightly broader than NOPD's term "disqualifier."

[9]     It is useful to compare this illustrative list of risk indicators to the list of NOPD disqualifiers included in Section VIII of this Report.

[10]    Like some other law enforcement agencies, NOPD uses a Computer Voice Stress Analysis ("CVSA") to evaluate truthfulness.  Each applicant completes a CVSA questionnaire that then is used by the background investigator to conduct the CVSA.  The CVSA is performed by a certified CVSA examiner.  NOPD reports that a second CVSA may be given if the candidate shows signs of deception.

Special Report
18 January 2017
Page 9



- Suspended driver's license,

- Expiring temporary worker authorization for non-U.S. citizens,

- Prior negative work history, including leaving early, arriving late, violating social media policy,

- Inaccurate background form, and

- Negative professional references (including at least one "do not hire").

The existence of these and other risk indicators in the recruit files, without evidence of meaningful follow-up, suggests to us NOPD *may* be accepting candidates into the Academy who should not be NOPD officers. Our discussions with and interviews of NOPD personnel give us even greater concern in this regard. More than one NOPD employee noted that if a candidate does not violate an automatic "disqualifier," he/she generally is accepted into the Academy.[11]

*As noted above, it is important to keep in mind the Monitoring Team has reached no conclusion regarding whether any given recruit is or is not qualified to be an NOPD police officer.[12]* Our review primarily focused on the existence of risk indicators in the background investigations and the presence or absence of a meaningful discussion in the file as to how those indicators were evaluated and overcome.

In our discussions with NOPD following our data analysis, NOPD described an evaluation process that it believes does consider all required <u>and</u> possible disqualifiers. Neither the steps in the evaluation process nor the results of that process are fully documented in the files available for our review. The Monitoring Team readily recognizes the risk indicators we identified in the files may have been considered, explored, and rationally overcome in some or all of the cases, but the lack of documentation does not allow us to reach that conclusion here.

---

[11]    NOPD rightly points out it rejects a significant number of applicants. As an initial matter, NOPD reports that only 114 of 4,449 applicants were hired in 2016. NOPD further reports that in 2016 only 162 candidates were accepted into the Academy out of 333 background investigations. NOPD asserts many of these candidates were rejected based on "possible" disqualifiers. According to NOPD, its data show that 20 of 100 candidates rejected in the first six months of 2016 were rejected "solely" because of "possible disqualifiers." For purposes of this initial analysis, the Monitoring Team did not examine the files of rejected candidates.

[12]    The recruit officer and rookie officer recently arrested by NOPD described in footnote 3 above present two obvious exceptions to this general statement.

Special Report
18 January 2017
Page 10



## IV.     NOPD Background Investigation Process

NOPD describes its background investigation process as involving multiple steps directed primarily at weeding out those candidates who possess a "disqualifier."  NOPD describes its process this way:  Following the panel interview, applicants are referred to NOPD's Applicant Investigation Section to schedule a background interview.  The Section is staffed by a Lieutenant, a Sergeant, five officers, and four contract background investigators.  An applicant's background investigation consists of several steps.   The process begins with an initial interview with an investigator.  NOPD reports the interview generally lasts between three and six hours.

Once the initial interview is complete, assuming the interview did not reveal any "automatic disqualifiers," the investigator begins a series of verifications, database checks, and interviews. While NOPD provides some guidelines to the investigators on how to conduct the investigations, investigators are given latitude to conduct additional diligence (*e.g.*, interviews, records checks, reference checks, etc.) as necessary.  Upon finishing the investigation, the investigator reviews the documentation gathered, looks for "disqualifiers," and prepares a hiring recommendation, which is included in the final background investigation report.

The Background Investigation report, including the supporting documentation, is reviewed by the background investigator's supervisors for completeness and accuracy.  A Sergeant, Lieutenant, and Deputy Chief of Staff all review and sign off on the report and the recommendation.  Each individual has the opportunity to send the report back to the investigator for further analysis.  Once all signatures have been obtained, the recruit is approved to continue the application process and the final report is forwarded to Civil Service for use by the psychologist who evaluates all recruits.

As described below, the Monitoring Team finds inherent flaws in the process itself as well as in how the process is implemented by NOPD.

Special Report
18 January 2017
Page 11



## V.    Background Investigation Process Shortcomings[13]

Our review of the files, coupled with our discussions with multiple NOPD employees, suggests to us NOPD's background investigations process for evaluating potential recruits for entry into the Academy is inadequate.   Specifically, our review identified the following process and implementation shortcomings:

- ● **Insufficient training**.   NOPD provides its background investigators with insufficient training and insufficient opportunities to share best practices among the background investigation team.   This gap causes inconsistencies among investigators, incomplete investigations, and hinders innovative practices from being shared among the investigations team.

- ● **Overly Narrow Reviews**.   NOPD's background investigations process, as implemented, is overly focused on "automatic disqualifiers" at the expense of other facts that collectively may raise equally relevant risks.   It appears "potential disqualifiers" are downplayed or overlooked, and candidates too often are not considered holistically.   While NOPD represents it does look at a broad range of potential risk factors, NOPD concedes its documentation regarding the scope of its reviews was less than adequate.

- ● **Incomplete background investigations**.   While NOPD's background investigators, for the most part, are committed, hard-working, and conscientious, the Monitoring Team identified numerous files in which potential risk indicators (either "possible disqualifiers" or other facts that, collectively, suggest a need for further due diligence) were not adequately pursued.

- ● **Unreasonable Time Pressures**.   The Monitoring Team noted significant real or perceived pressure on background investigators to cut corners, overlook potential risk indicators, and/or hurry investigations.   These pressures – often over the objections of the background investigators themselves – have caused some background investigations to be concluded without adequate due diligence.[14]

---

[13]    The Monitoring Team previously questioned the quality of the Department's recruit selection process. Specifically, we questioned "whether the Department's current goal to hire more officers (a goal we do not criticize) may be clouding the Department's view of the quality of some of its current selection practices; unwittingly fostering a willingness to accept a hiring process that is "good enough" rather than one that is tailored to achieving the ends of the Consent Decree and giving the citizens of New Orleans the best police officers possible."  For a discussion of the issues that led to our prior concern, see the Monitoring Team's Special Report dated Aug. 12, 2015 at www.consentdecreemonitor.com.

[14]    Multiple sources reported to us background investigators are given an absolute 60-day deadline to complete their investigations regardless of the complexity of the investigation.  According to NOPD, 60 days is a goal, but not a requirement.  NOPD reports that over one third of its background investigations resulting in an acceptable candidate took over 60 days to be completed in 2016.  While NOPD may be correct, the perception among at least some background investigators was that it was a requirement.



- *Ineffective and/or inefficient assignment process*. The background investigation team assigns case files on a straightforward rotating basis. While this fairly distributes cases in terms of quantity, it sometimes does not fairly distribute cases in terms of complexity. This is because some cases are much more complex and time-consuming than others. Consequently, a single investigator could end up with several complex matters on his/her desk at any given time, which could prompt him/her to rush through the process in order to achieve the goals imposed by NOPD management. The Monitoring Team recognizes NOPD has made some assignment accommodations based on complexity in the past. Nonetheless, our review identified room for further improvement in this area.

- *Inadequate attention to the CVSA*. Like other departments, NOPD conducts a voice stress analysis on all recruit candidates called the CVSA. While a CVSA certainly is not foolproof, it does provide relevant data that must be considered as part of a complete background investigation. Our review, however, showed CVSA results noted by the investigators often were disregarded by others in the review/approval process.

- *Lack of documentation*. In order to ensure a fair, efficient, and effective investigation process, NOPD must document (i) the steps it takes to investigate a candidate, (ii) who was involved in the investigation, (iii) their findings, and (iv) how those findings are considered/evaluated by decision-makers. Many files we reviewed, however, lacked adequate documentation as to why and how risk indicators were overcome, downplayed, or overlooked. Further, our review revealed files involving a negative background investigator recommendation but a subsequent positive hiring decision further up the review chain. Adequate documentation takes on even greater importance where the final decision contravenes a lower level recommendation.

- *Failure to follow-up on risk indicators*. The background investigation files reveal numerous instances where risk indicators were identified by the background investigators, but were not further pursued. One file marked by the final approver as containing "no derogatory info," for example, was for a candidate who failed to disclose traffic violations on his/her application, and who was fired from two previous employers for potentially problematic reasons. Numerous other files similarly revealed risk indicators that were not pursued.

- *Failure to adhere to NOPD's own announced "disqualifiers."* NOPD provided the Monitoring Team with a list of "required disqualifiers" and "possible disqualifiers." Our review revealed numerous instances where possible disqualifiers were downplayed or overlooked; and a few instances where automatic disqualifiers similarly were overlooked. Indeed, in many cases we reviewed it appears possible disqualifiers were not considered at all, or, at least, such consideration was not documented.

Special Report
18 January 2017
Page 13



The foregoing shortcomings were discovered during our review of the actual background investigation files. Our interviews of NOPD's background investigators and others in that section further confirmed the accuracy of our findings.

Additionally, our interviews with personnel beyond the background investigations section suggests that others are seeing first-hand the preliminary consequences of these process and implementation shortcomings. The personnel with whom we spoke have perceived an erosion in the quality of recruits over the past several Academy classes. While they are quick to point out they continue to see a number of excellent candidates, they also are quick to point out they are seeing a greater number of candidates who raise concerns.[15]

Among the reasons suggested for this perceived trend is a shared belief that the Department has lowered its standards in an effort to fill Academy classes, and that the background investigation process is flawed.[16] The comments of the many employees we interviewed highlight the accuracy and significance of the conclusions our team drew from our review of the case files. These conclusions notwithstanding, however, we would be remiss if we did not note that the background investigators do a good job analyzing the recruit files in most cases, especially considering their caseloads and time pressures.[17] But even where a complete, quality background investigation is performed, the process breaks down if the findings of the investigators are not fully considered. As noted above, in many cases, risk indictors – and sometimes significant risk indicators – identified by the investigators were either downplayed or overlooked by others in the review chain.

---

[15]   The Monitoring Team recognizes the possibility that at least some of this perception is driven by the often-espoused-but-perhaps-unfair view that members of younger generations are inherently not as competent, committed, and/or disciplined as the generations who came before.

[16]   Others pointed to additional elements of the recruit evaluation process as contributing to the problem.

[17]   The background investigators we interviewed were mostly hard working, conscientious, committed NOPD employees. They were candid with us and fully cooperated in our review. Even so, the Monitoring Team did identify some cases in which we believe the investigators should have conducted additional due diligence.

Special Report
18 January 2017
Page 14



## VI.     Recommended Action Items

Based upon our review of the background investigation case files and our discussions with NOPD personnel in various roles and of various ranks, the Monitoring Team identified a number of recommendations we believe NOPD should implement immediately.   The Team shared its recommendations with NOPD December 12, 2016, and met with the Department December 13, 2016 to discuss the recommendations and NOPD's response.  As noted above, the NOPD came to the meeting with a well-thought-out corrective action plan.   The plan was tailored to the Monitoring Team's findings and reflected a commitment to remedying the shortcomings identified by the Monitoring Team.   While the full NOPD corrective action plan is incorporated into this Special Report as Attachment IX, relevant excerpts from the plan have been incorporated following each Monitoring Team recommendation below (*in italics*).

- *Recommendation*:  Ensure background investigators are given adequate time and resources to complete their investigations fully, including time to pursue additional due diligence where risk indicators are identified (whether or not the indicators rise to the level of "automatic disqualifiers").   Some employees we interviewed felt they were being pushed to rush their investigations and put quantity over quality simply to get recruits into a given Academy class.   The case-loads assigned to background investigators and the time pressures placed upon them are leading to incomplete investigations.

  - *NOPD Response: NOPD has committed to provide additional time to investigators to conduct investigations by decreasing caseloads through the hiring of four additional civilian investigators in 2017 requested by NOPD.  The Civil Service Commission already has approved the hiring of the four investigators.*

- *Recommendation*:  Issue written guidance to all NOPD managers involved in the recruit selection and hiring process reminding them that quality is more important than quantity and that background investigators must not be pressured to avoid making a negative recommendation where they uncover evidence that a candidate engaged in behavior that constitutes cause for automatic rejection or were unable to resolve causes for possible rejection.

  - *NOPD Response.  NOPD will hire a dedicated Recruitment Director[18] to oversee all aspects of the recruitment and hiring processes.   The current recruitment-related duties of the Deputy Chief of Staff will be transitioned to the new Recruitment Director.   The Recruitment Director, with the cooperation of other NOPD entities,  will implement "detailed investigation checklists, based on the revised operating guidelines, to ensure thorough investigations address all relevant questions and concerns."  The NOPD Compliance Bureau will collaborate with the*

---

[18]     Monitoring Team Note:  The Civil Service Commission approved NOPD's request to create the Recruitment Director position in early January 2017.  NOPD has agreed to modify the title to *Recruitment and Background Administrator* to better reflect the director's responsibility over recruiting <u>and</u> recruit evaluation.



*NOPD Recruitment and Applicant Investigation Division "to create guidelines and associated checklists that will guide background investigations and prompt additional follow-up investigation as necessary when risk indicators are identified." Further, NOPD has committed to provide additional time to investigators to conduct investigations.*

- **Recommendation**: Make clear to background investigators they should not be limited only to the NOPD-identified "automatic disqualifiers" in finding a candidate unacceptable. Rather than focusing on identifying candidates who have an automatic disqualifier and accepting most of those who don't, background investigators should be identifying candidates who have the attributes needed to be a successful police officer. This means looking beyond the specifically identified "disqualifiers." The totality of the circumstances regarding a given candidate may render him/her unacceptable even without an "automatic disqualifier." For example, a candidate who has no automatic disqualifiers, but who has multiple "possible disqualifiers" or has risk indicators that should cause concern even though they are not on NOPD's enumerated list, should warrant additional due diligence by the investigation team. As one interviewee put it, "sometimes a lot of small issues should add up to a disqualification."

  - *NOPD Response: NOPD has committed to evaluate candidates "more holistically and implement additional quality control mechanisms to ensure that any issues that may arise in the hiring process are addressed promptly." Further, NOPD has committed to implement "more detailed operating guidelines and procedures for background investigations to provide greater guidance on how to conduct investigations and what to do when risk indicators are identified."*

- **Recommendation**: Modify the background investigation process to require a written explanation in the file whenever a risk indicator is overcome by other facts. The explanation should clearly identify the risk indicator, the steps taken to evaluate the risk, the names of those involved in the decision-making process, and the basis for balancing the risk against any mitigating facts. The explanation also should require a clear and explicit rationale whenever a recommendation/finding of a background investigator and/or supervisor is overruled by a higher level reviewer.

  - *NOPD Response: NOPD will modify the hiring recommendation forms utilized by each reviewer "to clearly enumerate risk indicators and require an explanation of their consideration in the hiring recommendation." NOPD also has committed that this new form "will facilitate a holistic approach to evaluating candidates when making hiring recommendations." Further, as described in greater detail below, NOPD is modifying its review and approval process to (1) add a new level of review by the Director of Recruitment for all candidates, (2) require the Deputy Chief of the NOPD's Management Services Bureau to make the final decision on consensus*



candidates, and (3) institute an Officer Review Panel to decide whether to recommend hiring "non-consensus candidates."[19]

- **Recommendation**: Consider reinstating neighborhood checks by the background investigators in appropriate circumstances and/or explore efficient and effective alternative approaches to achieve the same goal.

  o *NOPD Response: NOPD will work with the Monitoring Team to identify the most effective and efficient use of neighborhood checks.*

- **Recommendation**: Enhance background investigator training and provide investigators opportunities to share best practices with their colleagues and managers.

  o *NOPD Response: NOPD has committed to provide "additional training to background investigators to ensure they have the skills to conduct robust investigations, identify risk indicators, and appropriately investigate risk indicators."*

- **Recommendation**: Direct the leadership within the background investigations section to identify police agencies outside New Orleans employing best practices and explore ways to take advantage of those practices within the NOPD.

  o *NOPD Response: NOPD has advised the Monitoring Team this responsibility will be among those to be assumed by the new Recruitment Director. Moreover, NOPD has confirmed its Compliance Bureau already has initiated this task.*

- **Recommendation**: Explore whether new and/or additional equipment and resources could increase the efficiency and quality of the background investigations.

  o *NOPD Response: The new Recruitment Director will be responsible for identifying new/additional equipment and/or resources to increase the efficiency and quality of background investigations.*

- **Recommendation**: Reconsider the current process of rotating cases among the background investigators, which may be contributing to work inefficiencies. For example, it appears the Department's effort to distribute complex and simple cases evenly among the investigators is not as effective as it could be. NOPD also should explore potential alternative approaches with the background investigators themselves.

  o *NOPD Response: NOPD has advised the Monitoring Team that the new Recruitment Director will re-evaluate the current practice of rotating cases among*

---

[19]     The terms "consensus candidate" and "non-consensus candidate" are defined below.



*background investigators and will work with the Compliance Bureau and the Monitoring Team to identify opportunity to make the process more efficient.*

- **Recommendation**: Explore ways to let investigators know the final disposition of the candidates they investigate so they feel more engaged in the hiring process.

  o **NOPD Response**: *NOPD asserts it already makes efforts to keep its background investigators apprised of the status of the recruits they investigate. Nonetheless, NOPD has committed to having the new Recruitment Director re-evaluate the current practice of sharing disposition information with investigators to identify opportunities for further improvement.*

- **Recommendation**: Pay more attention to CVSA results. While we understand CVSA results are not infallible, they are important data points in a background investigation and should not be ignored or downplayed.

  o **NOPD Response:** *NOPD already has scheduled "Computer Voice Stress Analyzer and Southern Policing Institute background investigation trainings for its investigators and will seek out additional training as necessary."*

- **Recommendation**: Consider directing the Compliance Bureau to review each background investigation file before a final decision is made regarding an individual's entry into the Academy.

  o **NOPD Response:** *NOPD will add a new final review authority for "consensus candidates." A consensus candidate is a candidate about whom the background investigator and his/her supervisors agree on a hiring decision. The Deputy Chief of the NOPD's Management Services Bureau will make the final decision on consensus candidates. Additionally, NOPD will institute an Officer Review Panel to decide whether to hire "non-consensus candidates." A non-consensus candidate is a candidate about whom the background investigator and his/her supervisors do not agree on a hiring decision. "The Officer Review Panel will be comprised of members of the rank of lieutenant or below from every bureau, including a civilian from the Compliance Bureau. The background investigator will present the candidate's qualifications and history to the panelists who will then decide whether to hire the candidate."[20]*

  *Further, NOPD's Compliance Bureau will "audit background investigations and hiring decisions to assess the quality of the hiring process and candidates entering the Academy as recruits." NOPD has made clear the Compliance Bureau will conduct these audits in the same manner as the Monitoring Team, using the*

---

[20] The Appendix at Section IX of this Report includes NOPD's graphic depiction of how the new process will work in greater detail.



*Monitoring Team's checklists to evaluate each background investigation. Moreover, to ensure a high level of independence, the Compliance Bureau will submit the results of its audit directly to the Monitoring Team without prior review by the Superintendent or other NOPD personnel.*

- **Recommendation:** NOPD should review the appropriate registry for decertified police officers (*e.g.*, the IADLEST's National Decertification Index and/or the Louisiana Peace Officer Standards and Training Council ("POST")) before admitting any recruit to the Academy. Further, NOPD should report its own officers convicted of felonies to the appropriate decertification agency and/or to Louisiana POST.

  o *NOPD Response. NOPD has inquired about gaining access to these databases and has informed the Monitoring Team it will incorporate their use into its enhanced background investigation process.*

- **Recommendation**: Consider providing Academy personnel and FTOs more information regarding recruits. The Academy and FTOs might benefit from more information from the background investigation process. The FTOs might benefit from more information from the Academy process. Currently, while Academy personnel routinely identify certain recruits as needing more ongoing observation than others (something the Academy refers to as "CTO," for "continue to observe"), such important information is not routinely shared with the FTOs. Indeed, it seems FTOs don't know anything about their recruits until the night before they become partners. Nor is the fact that a recruit needs more observation consistently added to the recruit files. Similarly, we note Academy personnel are not informed when a recruit's background investigation identifies facts warranting extra observation.

  o *NOPD Response*: *NOPD has advised the Monitoring Team that the new Recruitment Director will work with the Compliance Bureau, the Academy, and the Monitoring Team to identify ways to enhance information sharing among the Background Investigators, Academy staff, and FTOs.*

- **Recommendation:** Review all recruit files identified by the Monitoring Team as reflecting risk indicators but not reflecting how those indicators were evaluated and overcome to ensure each individual properly was accepted into the Academy.

  o *NOPD Response: NOPD has initiated a thorough re-review of each recruit file identified by the Monitoring Team as having unresolved risk indicators. Additionally, NOPD has reviewed the PIB records, Academy records, and all use of force incidents involving these individuals. NOPD has shared its findings with*



> *the Monitoring Team, the Court, and the Department of Justice to ensure every Academy recruit is fully and properly vetted.[21]*

Finally, as we have recommended previously, we recommend that the interview panel findings, the background investigation report, and the psychological test results be considered together to paint a complete picture of each candidate before a hiring decision is made. NOPD's current recruit evaluation process involves a series of actions the results of which are considered in a vacuum. This precludes – or at least makes it more difficult to perform – a holistic review of any given candidate. At no time in the evaluation process is *all* the information regarding a candidate considered by an NOPD decision-maker. This gap is exacerbated by the fact that certain information – *e.g.*, the psychological exam – is shared with NOPD only as a pass/fail report; the details of the exam are not shared with NOPD. Consequently, findings that could have significance to NOPD when considered in connection with other facts remain unavailable.

NOPD has committed to "*evaluate candidates more holistically and implement additional quality control mechanisms to ensure that any issues that may arise in the hiring process are addressed promptly.*" The Monitoring Team plans to work closely with NOPD, the Court, and the Department of Justice to ensure such additional quality control mechanisms are implemented promptly and are effective.

---

[21]    While the Monitoring Team has been impressed with NOPD's prompt response to its findings, and has reviewed the Academy, PIB, and Use of Force records produced by the NOPD, the Monitoring Team is not yet in a position to opine on whether the Department fully has pursued all identified risk indicators. NOPD's re-review of each recruit file identified by the Monitoring Team will be the subject of a forthcoming status conference with Judge Morgan.



### VII.    Conclusion

Based upon our review of the recruit background investigation files, coupled with our interviews of NOPD personnel, we find that NOPD's recruit evaluation process and the implementation of that process are significantly flawed.  While the background investigators appear to be doing a competent job obtaining relevant information on a candidate's background when they are given the time and resources to do so, the process of evaluating that information in conjunction with the other elements of a complete applicant assessment – *e.g.*, psychological assessment and drug screening – is problematic.   Significant past behavioral risk indicators uncovered by the background investigators are downplayed or overlooked; investigators are too rigidly tied to a set list of "disqualifiers" at the expense of looking at recruit candidates holistically; supplemental due diligence is not consistently performed when the facts suggest it should be; and the files are not adequately documented to determine the basis for NOPD's selection decisions.  Neglecting to factor in the specifics of the psychological exam and drug screening further results in a failure to provide a holistic assessment of the candidate.

Against the background of the significant improvement NOPD has made in so many areas since the entry of the Consent Decree, the shortcomings identified in this report are anomalous and concerning.  While we share NOPD's desire to increase its numbers with new officers, the integrity of the selection process must not be diminished to achieve that goal.  For the long-term protection of the citizens of and visitors to New Orleans, it is critical that quality not be substituted for quantity.

The Monitoring Team recognizes the thoughtful corrective action plan prepared by the NOPD, and looks forward to working with the Court, the NOPD, and the Department of Justice to ensure NOPD's corrective actions, as well as the other recommendations of the Monitoring Team, are reviewed and implemented promptly and effectively.

## VIII.   Appendix:  List of NOPD Disqualifiers

# NEW ORLEANS POLICE DEPARTMENT
# HIRING CRITERIA
*Last Revised 12/8/2014*

## MINIMUM QUALIFICATIONS TO APPLY

### RECRUIT:
An applicant must be:
1) At least 20 years old;
2) A high school graduate or possess a state approved G.E.D. equivalent;
3) Licensed to drive, and have a good driving record and driving experience; and
4) In good physical and psychological condition to perform the essential functions of the job of Police Officer

### REINSTATEMENT:
An applicant must:
1) Be former N.O.P.D. officer who left in good standing;
2) Have current P.O.S.T. certification;
3) Have valid Louisiana driver's license; and
4) Be in good physical and psychological condition.

### LATERALS:
An applicant must:
1) Have current P.O.S.T. certification or certification from an equivalent state board **and** two (2) consecutive years of full-time patrol and/or investigative law enforcement experience beyond academy and field training;
2) Be at least 20 years old;
3) Be a high school graduate or possess a state approved G.E.D. equivalent;
4) Be licensed to drive, and have a good driving record and driving experience; and
5) Be in good physical and psychological condition to perform the essential functions of the job of Police Officer.

### NEW RESERVE:
An applicant must:
1) Be at least 20 years old;
2) Be a high school graduate or possess a state approved G.E.D.;
3) Be in good physical and psychological condition to perform the essential functions of the job of Police Officer; and
4) Have a valid Louisiana driver's license.



## DISQUALIFIERS

In accordance with the Louisiana State Statues and for general application of the New Orleans Police Department's Hiring Criteria, an adult is hereby defined as a person who has attained the age of seventeen years. A juvenile is hereby defined as a person who has not attained the age of seventeen years.

## Causes for AUTOMATIC REJECTION:

1) As an adult he/she has ever been convicted of, pled guilty to, or *nolo contendere* to any **Felony.**

2) As an adult he/she has ever been convicted of, pled guilty, or *nolo contendere* to any **Misdemeanor** involving any crimes against person or sexual offenses.

3) As an adult he/she has ever been convicted of, pled guilty, or *nolo contendere* to any offense involving violations of the **civil rights** of any person under the Constitution or laws of the United States or of any territory.

4) **POLICE RECRUIT**

   A) used marijuana within two years prior to application.
   B) used any illegal drug other than marijuana within ten years prior to application.
   C) sold, distributed, manufactured, or transported any illegal drug.
   D) used any prescription drug or legally obtainable substance in a manner for which it was not intended within two years prior to application

5) **POLICE LATERAL**
   A) used marijuana within three years prior to application.
   B) used any illegal drug other than marijuana within ten years prior to application.
   C) sold, distributed, manufactured, or transported any illegal drug.
   D) used any prescription drug or legally obtainable substance in a manner for which it was not intended within three years prior to application.

6) Presence of any illegal drug in his/her system.

7) If he/she has ever been dishonorably discharged from any military service and/or arrested for any violations of the Uniform Code of Military Justice that would constitute a **Felony** or disqualifying **Misdemeanor** in the State of Louisiana;

8) If he/she has ever been terminated or forced to resign from any law enforcement agency for disciplinary reason; resigned a position within a law enforcement agency to avoid potential or proposed adverse disciplinary action or termination; or received a disability retirement from any law enforcement agency.

9) If he/she has ever established a verifiable law enforcement employment record of the following:



**A)** Any brutality or excessive use of force complaint sustained by any law enforcement agency or adjudicated by the Justice Department as a violation of Civil Rights Laws;

**B)** Six or more circumstances of sustained disciplinary action (letters of reprimand, written disciplinary citations, or suspensions, etc.) for any violation.

10) If he/she knowingly and willingly made any false statement or been deceptive by statement or omission in the written employment application, oral interview, or in any part of the entry-level selection process.

11) If he/she refused to submit to a polygraph examination and/or voice stress examination.

12) If he/she exhibited an unacceptable driving record within five years of application, as evidenced by:

**A)** Three or more negligent collisions;
**B)** Suspension for moving violations;
**C)** Revocation or Operation after suspension/revocation of driving licenses;
**D)** DWI or DUI convictions.

13) If he/she refused to submit to a urinalysis examination.

## <u>Causes for **POSSIBLE REJECTION**</u>:

1) As an adult he/she has ever been arrested and/or convicted of, pled guilty, or *nolo contendere* to, any offense involving possession or use of a firearm.

2) As a juvenile he/she has ever been arrested and/or convicted of, pled guilty, or *nolo contendere* to, any Felony, Misdemeanor, Municipal, or Traffic Offense.

3) As an adult he/she has ever been arrested for any felony.

4) As an adult he/she has ever been arrested and/or convicted of, pled guilty, or nolo contendere to, a Misdemeanor, Municipal, or Traffic offense.

5) As an adult or juvenile, he/she has ever participated in the forgery of, illegal acquisition of, or other misappropriation of prescription drugs (pharmaceuticals), such forging a prescription (script).

6) If he/she established a verifiable law enforcement employment record and has:

**A)** Six or more circumstances of documented disciplinary action (letters of reprimand, or written disciplinary citations, etc.) for any violation;
**B)** Any pending internal department investigation(s);
**C)** Any alleged misconduct sustained through an internal investigation
**D)** Any citizen complaints, regardless of justification, disposition, or final outcome.



7) As an adult he/she has ever established a verifiable civilian employment record of:

    **A)** Dismissed from two or more employers within five years prior to application due to disciplinary action;

    **B)** Poor job performance as determined by an evaluation of below average performance rating in any area by two or more employers;

    **C)** Insubordination or an inability to follow orders;

    **D)** An unstable sporadic work history, i.e., has frequently moved from job to job and or experienced lengthy periods of unemployment;

    **E)** Unfavorable recommendations from past employers;

    **F)** Employer's reports of excessive absenteeism, tardiness, or irresponsibility;

    **G)** An inability to get along with co-workers.

8) If he/she received any military discharges less than honorable, including General under Honorable Discharge.

9) As an adult he/she has ever exhibited a history of alcoholism or alcohol problems, as evidenced by, but not limited to :

    **A)** Repeatedly excessive use or dependency, determined through chemical testing or investigation;

    **B)** Any indication of use of alcohol at work or in the workplace.

10) Exhibited a history of prescription drug abuse or prescription drug problems, as evidenced by, but not limited to:

    **A)** Repeatedly excessive use or dependency, determined through chemical testing or investigation;

    **B)** Any indication of abuse of prescription drug use at work or in the workplace.

11) As an adult he/she has, within five years of application, been arrested for DWI or DUI, and received any moving violation citations, on four or more occasions.

12) If he/she has established a history of civil law suits, as evidenced by, but not limited to:

    **A)** Defendant in any negligence, brutality, excessive force, or false arrest suit, resulting from employment in a law enforcement capacity, adjudicated in favor of the plaintiff;

    **B)** Plaintiff in any suit brought against the City of New Orleans and/or the New Orleans Police Department;

    **C)** Participation in any civil suit that could potentially prove detrimental to the City Of New Orleans and/or the New Orleans Police Department due to future liability or which adversely affects the image of the City Of New Orleans and/or the New Orleans Police Department and its members.

13) If he/she has ever failed to obey or honor any judgment entered by a court of record, including, but not limited to, failure to make alimony or support payments, failure to pay any fine imposed by any court of record, or demonstration of lack of honesty and integrity in disposing of financial obligations.

Special Report
18 January 2017
Page 25



**14)** If he/she has established a credit history, as evidenced by, but not limited to:

    **A)** Credit history indication a tendency for fiscal irresponsibility;
    **B)** Default or delinquency in the repayment of loans, including student loans;
    **C)** Any credit information demonstrating a tendency to live beyond one's means.

**15)** If he/she has exhibited a history of consorting and cohabitating with known criminals and knowingly participating in criminal activity, as evidenced by, but not limited to regular or continuous association or dealings with persons who applicants know to be, or should reasonably know to be, or who are known in the community as racketeers, sexual offenders, gamblers, suspected felons, persons with extensive arrest records, under criminal investigation or indictment, or having a reputation in the community from present involvement in felonious or criminal behavior, illegal drug activity, and other crimes.

**16)** If he/she failed during the entry-level selection process, to meet mandated deadlines, provide necessary documentation, keep all scheduled appointments, and cooperate fully with staff personnel.

**APPROVED/DISAPPROVED**

**MICHAEL S. HARRISON**
**SUPERINTENDENT OF POLICE**



## IX.    Appendix:  NOPD Corrective Action Plan

To strengthen NOPD's hiring practices, the Department will implement comprehensive reforms to increase the rigor and transparency of its investigative and decision-making processes.  The Department will evaluate candidates more holistically and implement additional quality control mechanisms to ensure that any issues that may arise in the hiring process are addressed promptly.  An initial set of proposed reforms is outlined below.  The Department will re-evaluate these reforms in time to determine appropriate modifications to the process.

*Strengthening Hiring Exams*

1. **Implement robust written and multiple choice exams** created by experts from Louisiana Tech University. Civil Service will implement the exams shortly after the Department receives approval from OCDM.

*Conducting and Documenting Thorough Investigations*

1. **Hire a dedicated Recruitment Director**[22] to oversee all aspects of the recruitment and hiring processes.  NOPD will transition these duties from the Deputy Chief of Staff to the Recruitment Director who will operate within the management Services Bureau ("MSB").  The Department recognized the need for this position this past summer and successfully secured funding to hire a director in 2017.
2. **Provide additional training to background investigators** to ensure they have the skills to conduct robust investigations, identify risk indicators, and appropriately investigate risk indicators.  In advance of OCDM's review, the Department scheduled Computer Voice Stress Analyzer and Southern Policing Institute background investigation trainings for its investigators and will seek out additional training as necessary.
3. **Implement more detailed operating guidelines and procedures for background investigations** to provide greater guidance on how to conduct investigations and what to do when risk indicators are identified.
4. **Implement detailed investigation checklists**, based on the revised operating guidelines, to ensure thorough investigations that address all relevant questions and concerns.  The Compliance Bureau is collaborating with the Recruitment and Applicant Investigation Division to create the guidelines and associated checklists that will guide background investigations and prompt additional follow-up investigation as necessary when risk indicators are identified.
5. **Provide additional time to investigators to conduct investigations** by decreasing caseloads through the hiring of four additional civilian investigators in 2017, which the Department successfully advocated for earlier this year.

---

[22]    Monitoring Team Note:  NOPD has agreed to modify this title to *Recruitment and Background Administrator* to better reflect the director's responsibility over recruiting <u>and</u> recruit evaluation.

*Transparent Decision Making*

1. **Modify hiring recommendation forms utilized by each reviewer to clearly enumerate risk indicators and require an explanation of their consideration in the hiring recommendation**.  This new form will facilitate a holistic approach to evaluating candidates when making hiring recommendations.

2. **Institute the Deputy Chief of MSB as an additional level of review for *consensus* candidates**, meaning all preliminary levels of review agree on whether or not to hire the candidate (see graphic below).  If the Deputy Chief of MSB does not agree with the other reviewers, the Officer Review Panel (the next reform in this plan) will make the final hiring recommendation.

3. **Institute an Officer Review Panel to decide whether to hire *non-consensus* candidates** (see graphic below).  The Officer Review Panel will be comprised of members of the rank of lieutenant or below from every bureau, including a civilian from the Compliance Bureau.  The background investigator will present the candidate's qualifications and history to the panelists who will then decide whether to hire the candidate.  The proposed hiring recommendation process is as follows:



Special Report
18 January 2017
Page 28



*Quality Control by the Compliance Bureau*

1. **Audit background investigations and hiring decisions** to assess the quality of the hiring process and candidates entering the Academy as recruits. The Compliance Bureau will conduct these audits in the same manner as OCDM, using OCDM's checklist to evaluate each background investigation and confidentially interviewing investigators and Officer Review Panel participants regarding the process. While under the Consent Decree, findings will be submitted directly to OCDM without prior review by the Superintendent and other NOPD personnel.